1  GLANCY PRONGAY & MURRAY LLP
   Mark I. Labaton (SBN 159555)
2  mlabaton@glancylaw.com
3  1925 Century Park East, Suite 2100
   Los Angeles, California 90067
4  Telephone:  (310) 201-9150
5  Facsimile:  (310) 201-9160

6  *Attorney for Qui Tam Plaintiff*
7  *Additional Counsel on Signature Page*

8          UNITED STATES DISTRICT COURT
9          CENTRAL DISTRICT OF CALIFORNIA

10 UNITED STATES OF AMERICA,          CASE NO.: 
   STATE OF CALIFORNIA,
11 STATE OF COLORADO,
12 STATE OF CONNECTICUT,              **COMPLAINT FOR VIOLATION OF**
                                      **FEDERAL AND STATE FALSE**
13 STATE OF DELAWARE,                 **CLAIMS ACTS**
   STATE OF FLORIDA,
14 STATE OF GEORGIA,                  **FILED UNDER SEAL PURSUANT**
15 STATE OF HAWAII,                   **TO 31 U.S.C. §3730(b)(2)**
   STATE OF ILLINOIS,
16 STATE OF INDIANA,
17 STATE OF IOWA,                     **<u>DEMAND FOR JURY TRIAL</u>**
   STATE OF LOUISIANA,
18 STATE OF MARYLAND,
19 COMMONWEALTH OF
   MASSACHUSETTS,
20 STATE OF MICHIGAN,
21 STATE OF MINNESOTA,
   STATE OF MONTANA,
22 STATE OF NEVADA,
23 STATE OF NEW JERSEY,
   STATE OF NEW MEXICO,
24 STATE OF NEW YORK,
25 STATE OF NORTH CAROLINA,
   STATE OF OKLAHOMA,
26 STATE OF RHODE ISLAND,
27 STATE OF TENNESSEE,

28



CV17-1903-SJO(JPRx)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

STATE OF TEXAS,
STATE OF VERMONT,
COMMONWEALTH OF VIRGINIA,
STATE OF WASHINGTON,
and DISTRICT OF COLUMBIA,
*ex rel.* DR. KUO CHAO,

                   Plaintiffs,

    vs.

MEDTRONIC PLC, MEDTRONIC
VASCULAR, INC., COVIDIEN LP,
COVIDIEN SALES LLC, EV3, INC.,
and MICRO THERAPEUTICS, INC.,

                   Defendants.

# **<u>TABLE OF CONTENTS</u>**

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     PARTIES ................................................................................................ 5

III.    JURISDICTION AND VENUE .............................................................. 8

IV.     BACKGROUND ..................................................................................... 8

        A.      Aneurysms And Their Medical Treatment ............................... 9

        B.      Pipelines ................................................................................... 10

V.      GOVERNMENT HEALTH CARE PROGRAMS AND APPLICABLE

        LAW ..................................................................................................... 14

        A.      FDA Regulation Of Medical Devices ..................................... 14

        B.      Reimbursement Under Federal Health Care Programs ........... 17

                1.      The Billing Process for Medical Devices ...................... 17

                2.      The Medicare Program ................................................... 19

                3.      The Medicaid Program ................................................... 19

                4.      Other Federal Health Care Programs ............................. 20

        C.      The Anti-Kickback Statute ...................................................... 20

                1.      In General....................................................................... 20

                2.      Safe Harbors................................................................... 22

                3.      Compliance With The Anti-Kickback Statute Is Required

                        Under Government Health Care Programs ..................... 23

VI.     GENERAL ALLEGATIONS ................................................................. 26

        A.      Dr. Chao Learned Of Defendants' Illegal Conduct Through His

                Work As a Doctor, From The Defendants' Sales Staff and

                Through His Work For the FDA ............................................... 26

        B.      Pipelines Are a Key Driver of The Defendants' Profits ......... 29

i

1       C.      The Defendants' Robust Sales Operations and Lackadaisical

2                Compliance Efforts...........................................................30

3               1.     The Defendants' Highly Compensated Sales Staff .....................30

4               2.     The Defendants' Lax Compliance ................................31

5               3.     The Defendants' Sales Department Oversees the Proctor

6                       Program .........................................................32

7  VII.   THE DEFENDANTS' ILLEGAL KICKBACK SCHEME..............................33

8       A.      The Proctor Program: A Vehicle To Financially Reward

9                Physicians For Using Pipelines...........................................34

10             1.     Basic Structure of the Proctor Program .........................................34

11              2.     The Defendants Ignore Self-Imposed Payment

12                     Restrictions and Pay Proctors for Work Never Performed...........38

13              3.     Proctors' Hospitals Are The Defendants' Best Customers ..........40

14       B.      The Defendants' Data Collection Program Offered Additional

15                Financial Rewards To Doctors For Using Pipelines...............................42

16       C.      The Defendants' Kickback Scheme Threatens To Bias An

17                Ongoing Clinical Study .........................................................44

18              1.     Imaging Core Labs.........................................................45

19              2.     Dr. Woodward's Cascade and Oculus Companies.......................46

20              3.     Defendants' PREMIER Study .........................................47

21  VIII.  THE DEFENDANTS' OFF-LABEL MARKETING ...................................48

22       A.      The Defendants' Marketing Strategy For Pipelines Is Driven By

23                Lucrative Off-Label Markets ...................................................48

24       B.      The Defendants Know That A Large Proportion Of Pipeline

25                Sales Are Off-Label.........................................................50

26       C.      The Defendants' Marketing Practices Deliberately Promote

27                Off-Label Uses Of Pipelines ...................................................52

28

1.   The Defendants' Illegal Kickback Scheme Promotes Off-Label Use ...................................................................... 53

2.   The Defendants Paid For And Encouraged Publication Of A Study Promoting Off-Label Use ................................. 57

3.   The Defendants' Employees And Agents Promote Off-Label Use During In-Person Meetings ......................... 61

4.   The Defendants' Training Manuals Promote Off-Label Usage.................................................................... 62

5.   The Defendants Manufacture And Sell Pipelines In Sizes Designed For Off-Label Use........................................ 64

6.   Additional Off-Label Promotion Of Pipelines In Conjunction With The Defendants' Axium Coils .................. 64

D.   Certain Off-Label Uses Promoted by the Defendants Pose Serious Health Risks To Pipeline Patients ............................... 67

IX.   DEFENDANTS CAUSED THE SUBMISSION OF FALSE CLAIMS TO FEDERAL AND STATE HEALTH CARE PROGRAMS .............................. 70

A.   Value Of False Claims Submitted To Medicare And Medicaid............. 72

B.   Examples Of False Claims Submitted To Medicare ............................... 73

C.   Evidence Of False Claims Submitted To State Health Care Programs................................................................... 79

Count I................................................................................. 81

Count II ............................................................................... 82

Count III .............................................................................. 83

Count IV .............................................................................. 84

Count V ............................................................................... 85

Count VI.............................................................................. 85

Count VII ............................................................................ 86

iii

Count VIII ................................................................................. 87

Count IX .................................................................................. 88

Count X ................................................................................... 89

Count XI .................................................................................. 89

Count XII ................................................................................. 90

Count XIII ................................................................................ 91

Count XIV ................................................................................ 92

Count XV ................................................................................. 93

Count XVI ................................................................................ 93

Count XVII ............................................................................... 94

Count XVIII .............................................................................. 95

Count XIX ................................................................................ 96

Count XX ................................................................................. 97

Count XXI ................................................................................ 97

Count XXII ............................................................................... 98

Count XXIII .............................................................................. 99

Count XXIV ............................................................................ 100

Count XXV ............................................................................. 101

Count XXVI ............................................................................ 101

Count XXVII ........................................................................... 102

Count XXVIII .......................................................................... 103

Count XXIX ............................................................................ 104

Count XXX ............................................................................. 105

PRAYER FOR RELIEF .......................................................... 105

JURY DEMAND ..................................................................... 110

iv

Plaintiff/Relator, Dr. Kuo Chao, submits this Complaint on behalf of the United States of America, the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, Washington, and the District of Columbia (collectively "the States and the District of Columbia"). This Complaint against Defendants Medtronic PLC; Medtronic Vascular, Inc.; Covidien LP; Covidien Sales LLC; ev3, Inc.; and Micro Therapeutics, Inc. (collectively the "Defendants"), is based on personal knowledge, relevant documents, and information and belief.

## I. PRELIMINARY STATEMENT

1.      This is an action to recover damages and civil penalties on behalf of the United States of America, the States and the District of Columbia, arising from false and/or fraudulent records, statements, and claims made, used, or presented and caused to be made, used, or presented, by the Defendants, and/or their agents, employees, and co-conspirators, in violation of the federal False Claims Act ("FCA"), 31 U.S.C. §3729 *et seq*., as amended, and the governing statutes of the States and the District of Columbia.

2.      Beginning in or before 2011, and continuing to the present, the Defendants have illegally promoted two medical devices – the Pipeline Embolization Device (the "PED") and the Pipeline Flex Embolization Device (the "PFED," and together with the PED the "Pipelines"). The Defendants' illegal promotion took two main forms. First, the Defendants promoted the use of Pipelines through an illegal kickback scheme in which they have paid millions of dollars to participating doctors. Second, although the FDA only approved the sale of Pipelines for limited uses (specifically for use in certain segments of the internal carotid artery to treat aneurysms of certain sizes), the Defendants have mounted a national campaign to

1

1 promote Pipelines for uses far beyond the FDA-approved indications. As alleged
2 below, the Defendants' "off-label" marketing of Pipelines promoted their use (i) in
3 unapproved arteries or unapproved segments of the internal carotid artery, (ii) to treat
4 aneurysms of unapproved sizes, and (iii) in unapproved combinations with the
5 Defendants' other aneurysm treatment products. Such uses are riskier and far more
6 dangerous to patients than the FDA-approved uses for the Pipelines.

7      3.     The Defendants' kickback scheme and off-label marketing have been
8 very profitable. The Defendants charge between $13,700 and $14,995 for a single
9 PED, and between $14,220 and $15,480 for a single PFED. In 2015, the Defendants
10 sold 3,363 PFEDs in the U.S., resulting in sales of approximately $47.8 million. In the
11 fiscal quarter ended April 29, 2015 the Defendants' Pipeline sales were $18.2 million
12 ($73.1 million on an annualized basis), and in the fiscal quarter ended April 29, 2016
13 the Defendants' Pipeline sales were $24.7 million ($98.9 million on an annualized
14 basis).

15      4.     The Defendants' financial success is due mainly to Pipeline sales tainted
16 by their payment of kickbacks to prescribing physicians. The Defendants have made
17 payments to hundreds of doctors, each of roughly $1,000 to $1,500 in connection with
18 an ostensible data collection program that was open to any physician who has
19 prescribed a Pipeline. In addition, The Defendants made much larger payments to
20 approximately sixty key doctors who are the most effective at generating Pipeline
21 sales, under the Defendants' so-called "proctor" program. Because of their ability to
22 generate substantial revenue, the Defendants effectively offered these proctor
23 physicians up to one-third of the revenue from their use of Pipelines (through sham
24 consulting and services arrangements), or roughly $4,000 to $5,000 per Pipeline. A
25 significant portion of all Pipeline sales have been tainted by the Defendants' kickback
26 scheme.

27
28

5.     The Defendants' financial success is also the result of prohibited off-label marketing. As a direct result of the Defendants' improper practices, approximately 60% of all U.S. sales of Pipelines are off-label. Therefore, in 2015 alone there were approximately $48 million in off-label Pipeline sales (based approximately $80 million of total 2015 sales). Total off-label sales of Pipelines since they were first marketed in the U.S. in 2011 likely amount to hundreds of millions of dollars. Certain of the off-label uses promoted by the Defendants pose heightened health risks to patients. The Defendants are aware of such risks, and have actively concealed them from the FDA.

6.     A substantial portion of the Pipeline sales tainted by kickbacks and off-label marketing have been reimbursed by federal and state health insurance programs, including Medicaid and Medicare. Defendants have caused these programs to pay false or fraudulent claims, including but without limitation the claims identified in this Complaint, for reimbursement of kickback-induced and off-label uses of Pipelines that would not have been paid but for Defendants' illegal practices.

7.     The FCA was enacted during the Civil War, and was substantially amended in 1986. Congress amended the FCA then to enhance the federal government's ability to recover losses sustained from fraud against the United States after finding that fraud in federal programs was pervasive and that the FCA, which Congress characterized as the primary tool for combating fraud, needed modernization. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the United States to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the United States' behalf and in partnership with the United States. Subsequently, many states enacted their own false claims acts.

8.     The FCA provides that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the U.S. Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim (recently increased to $21,563 for each violation occurring after November 2, 2015), plus three times the amount of the damages sustained by the Government. The FCA defines "knowingly" to include acts committed with "actual knowledge," as well as acts committed "in deliberate ignorance" or in "reckless disregard" of their truth or falsity. Liability attaches when a defendant seeks, or causes others to seek, payment that is unwarranted from the Government.

9.     The FCA allows any person having information about a false or fraudulent claim against the United States to bring an action for himself and the federal government, and to share in any recovery.

10.     All of the Defendants have violated the federal FCA. As set forth below, the Defendants' acts also constitute violations of the California False Claims Act, Cal. Gov't Code §12650 *et seq.*; the Colorado Medicaid False Claims Act, Colo. Rev. Stat. §25.5-4-303.5 *et seq.*; the Connecticut False Claims Act, Conn. Gen. Stat. §4-274 *et seq.*; the Delaware False Claims and Reporting Act, Del. Code tit. 6, §1201 *et seq.*; the District of Columbia False Claims Act, D.C. Code §2-381.01 *et seq.*; the Florida False Claims Act, Fla. Stat. §68.081 *et seq.*; the Georgia State False Medicaid Claims Act, Ga. Code §49-4-168 *et seq.*; the Hawaii False Claims Act, Haw. Rev. Stat. §661-21 *et seq.*; the Illinois False Claims Act, 740 Ill. Comp. Stat. 175 / 1 *et seq.*; the Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code §5-11-5.7 *et seq.*; the Iowa False Claims Act, Iowa Code §685.1 *et seq.*; the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. §46:437.1 *et seq.*; the Maryland False Health Claims Act, Md. Code Ann. Health-Gen. Prov. §2-601 *et seq.*; the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, §5 *et seq.*; the Michigan Medicaid False Claim Act, Mich. Comp. Laws §400.601 *et seq.*; the Minnesota False

4

Claims Act, Minn. Stat. §15C.01 *et seq.*; the Montana False Claims Act, Mont. Code Ann. §17-8-401 *et seq.*; the Nevada False Claims Act, Nev. Rev. Stat. §357.010 *et seq.*; the New Jersey False Claims Act, N.J. Rev. Stat. §2A:32C-1 *et seq.*; the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §27-14-1 *et seq.*; the New York False Claims Act, N.Y. State Fin. Law §187 *et seq.*; the North Carolina False Claims Act, N.C. Gen. Stat. §1-605 *et seq.*; the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §5053 *et seq.*; the Rhode Island False Claims Act, R.I. Gen. Laws §9-1.1-1 *et seq.*; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §71-5-181 *et seq.*; the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §36.001 *et seq.*; the Vermont False Claims Act, Vt. Stat. Ann. tit. 32, §630 *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.1 *et seq.*; and the Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code §74.66.005 *et seq.*

11.     Based on these provisions and through this action, Dr. Chao seeks to recover damages and civil penalties arising from Defendants' making or causing to be made false or fraudulent records, statements, and/or claims, in connection with the Defendants' payment of kickbacks and off-label marketing of Pipelines. The Defendants acted knowingly, deliberately, and recklessly in their kickback scheme and off-label marketing, and knew or should have known that those practices would cause the submission of false claims to federal and state health insurance programs for uses of Pipelines that were not eligible for program reimbursement. Furthermore, Defendants knew, or should have known, that government health care programs would not have paid for Pipelines if these programs knew of the Defendants' kickbacks and off-label marketing.

## II. PARTIES

12.     Dr. Kuo Chao is a resident of California. He is a physician and has been in practice for more than twenty years since graduating from the University of

5

1  California, Los Angeles David Geffen School of Medicine in 1995. He is affiliated

2  with Kaiser Permanente Los Angeles Medical Center. Dr. Chao specializes in

3  interventional neuroradiology, and is experienced in the treatment of aneurysms. He

4  has been an advisor to the FDA's Division of Neurological and Physical Medicine

5  Devices, Office of Device Evaluation, for approximately the last five years. Dr. Chao

6  learned of the Defendants' practices discussed in this Complaint directly from the

7  Defendants' officers, clinical training staff, sales personnel and physician proctors,

8  while in the course of his work as a practicing physician. Dr. Chao gained further

9  insight into Defendants' practices while working as an advisor to the FDA's Office of

10  Device Evaluation, by analyzing documents submitted to the FDA by the Defendants.

11  He is the original source of all information appearing in this Complaint, and is not

12  aware of any public disclosure of such information.

13      13.    Defendant ev3, Inc. ("ev3") is a corporation organized under the laws of

14  Delaware, with its principal place of business in Plymouth, Minnesota. Defendant ev3

15  is a global health care company engaged in the development, manufacture and

16  marketing of medical devices. In June 2009, Defendant ev3 acquired Chestnut

17  Medical Technologies, Inc. ("Chestnut"), the original developer of the PED. Chestnut

18  has since merged into Defendant ev3 or one of its subsidiaries. Defendant ev3 was

19  purchased by Covidien PLC ("Covidien") in July 2010. Covidien and ev3 were

20  purchased by Defendant Medtronic PLC in January 2015.

21      14.    Defendant Micro Therapeutics, Inc. ("MTI") is a corporation organized

22  under the laws of Maryland, with its principal place of business in Irvine, California.

23  Defendant MTI engages in the manufacture and marketing of medical devices for the

24  diagnosis and treatment of vascular disease. Defendant MTI has been a subsidiary of

25  Defendant ev3 since January 2006. Defendant MTI does business under the name ev3

26  Neurovascular. FDA records list Defendant MTI as the applicant for approvals of

27  Pipelines, and as the manufacturer of Pipelines.

28

15.   Defendant Covidien LP is a limited partnership organized under the laws of Delaware, with its principal office in Mansfield, Massachusetts. Defendant Covidien LP was a subsidiary of Covidien until January 2015, when Covidien and its subsidiaries (including Covidien LP) were purchased by Defendant Medtronic. Covidien LP made numerous kickback payments to physicians to encourage use of Pipelines (even if such use was off-label).

16.   Defendant Covidien Sales LLC is a limited liability company organized under the laws of Delaware, with its principal office in Mansfield, Massachusetts. Defendant Covidien Sales LLC was a subsidiary of Covidien until January 2015, when Covidien and its subsidiaries (including Covidien Sales LLC) were purchased by Defendant Medtronic. Covidien Sales LLC made numerous kickback payments to physicians to encourage use of Pipelines (even if such use was off-label).

17.   Defendant Medtronic PLC ("Medtronic") is a company organized under the laws of Ireland, with its principal place of business in Dublin, Ireland, and its U.S. headquarters in Minneapolis, Minnesota. Defendant Medtronic is among the world's largest medical technology companies. In fiscal year 2016 Medtronic employed more than 88,000 people worldwide; its net sales were approximately $28.8 billion; and its before-tax profits were approximately $4.3 billion. Defendants Covidien LP, Covidien Sales LLC, ev3, and MTI have been subsidiaries of Defendant Medtronic since Medtronic's acquisition of Covidien in January 2015. As a result of the acquisition of Covidien and its subsidiaries, Defendant Medtronic is responsible for all liabilities resulting from any acts or omissions of Covidien and these subsidiaries, including acts or omissions prior to the acquisition.

18.   Defendant Medtronic Vascular, Inc. is a corporation organized under the laws of Delaware, with its principal office in Santa Rosa, California. Defendant Medtronic Vascular, Inc. is a subsidiary of Defendant Medtronic. Medtronic Vascular,

7

Inc. made numerous kickback payments to physicians to encourage use of Pipelines (even when such use was off-label).

19.     The Defendants are often referred to collectively in this Complaint because they each are integrally involved in the marketing and sale of Pipelines, they have worked in concert and as a joint or common enterprise in marketing and selling Pipelines, and they have otherwise conspired in furtherance of and collectively engaged in the illegal acts described herein.

### III. JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1367, and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730. Under 31 U.S.C. §3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.

21.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. §3732(a) because that section authorizes nationwide service of process and because the Defendants have minimum contacts with the United States. Moreover, the Defendants can be found in, reside, or transact or have transacted business in this District.

22.     Venue is proper in this District pursuant to 31 U.S.C. §3732(a) because the Defendants can be found in and transact or have transacted business in this District. At all times relevant to this Complaint, the Defendants regularly conducted substantial business within this District, maintained employees and offices in this District, and made significant sales within this District. The statutory violations alleged herein occurred in this District, as well as throughout the United States as part of the Defendants' nationwide fraudulent marketing scheme.

### IV. BACKGROUND

23.     Pipelines are approved by the FDA for use in treating certain aneurysms.

A. **Aneurysms And Their Medical Treatment**

24.    An aneurysm is a blood-filled bulge in the wall of a blood vessel (such as an artery). Aneurysms result when the pressure of blood within the blood vessel causes a weak area of the vessel wall to expand and fill with blood. Below is an illustration of an aneurysm.



**Figure 1. Aneurysm illustration**

25.    Aneurysms can have varying symptoms, or no symptoms at all, depending on their location within the body, as the aneurysm exerts pressure on surrounding tissue and organs. If an aneurysm ruptures, breaking the wall of the blood vessel, internal bleeding can result. Aneurysms can result in death, particularly in the case of ruptured aneurysms.

26.    Aneurysms can be treated in a variety of ways. Drugs or behavioral changes to lower blood pressure can reduce the risks from an aneurysm. A common treatment is "clipping," an invasive surgical procedure in which a small metal clip is placed on the aneurysm's neck (where the aneurysm opens from the blood vessel), sealing off the aneurysm from the blood vessel. Clipping is best suited for treatment of aneurysms that are easily accessed through open surgery. For more difficult to access aneurysms, such as those in the head, other forms of treatment are sometimes preferred.

27.    Another common aneurysm treatment is "coiling," which can treat aneurysms that are more difficult to access. Using this technique, a surgeon inserts a hollow plastic tube into an easily accessible artery and threads the tube through the patient's body to the aneurysm. The surgeon then uses a guide wire to push a flexible coiling wire through the tube and into the aneurysm. Once inside the aneurysm this coiling wire bunches up and disrupts blood flow in the aneurysm, causing blood to clot. This clotting effectively blocks off the aneurysm from the artery thereby reducing the risk of rupture and shrinking the aneurysm over time.

28.    Although coiling can be used to treat aneurysms in parts of the body that are difficult to access through open surgery, it cannot treat all aneurysms. Coiling does not effectively treat aneurysms that are large or that have wide necks.

**B.    Pipelines**

29.    Pipelines represent an additional approach to aneurysm treatment. A Pipeline is a flexible mesh cylinder that expands to take on and reinforce the shape of the blood vessel in which it is placed.

30.    Like coils, Pipelines are also used to treat aneurysms in parts of the body that are difficult to access through open surgery. Unlike coils, Pipelines are supposed to be used to treat large aneurysms with wide necks.

31.    The technique used to place a Pipeline in a blood vessel is similar to that used in coiling. When using a Pipeline a surgeon inserts a hollow plastic tube into an easily accessible artery and threads the tube through the patient's body to the aneurysm. The surgeon then uses a guide wire to push the Pipeline through the tube, positioning the Pipeline across the neck of the aneurysm (as illustrated below).

**Figure 2. Pipeline placed across wide-necked aneurysm**

32.     Once in place, the Pipeline decreases blood flow into the aneurysm, causing blood to clot. This clotting effectively blocks off the aneurysm from the artery, thereby reducing the risk of rupture and shrinking the aneurysm over time.

33.     The Defendants refer to the use of Pipelines as "flow diversion" treatment because it diverts blood flow away from the aneurysm, toward the normal pathway of the blood vessel.

34.     The FDA approved the PED in 2011 and the PFED in 2015. The PFED is an updated, second-generation version of the PED.

35.     The FDA has approved Pipelines for "the endovascular treatment of adults (22 years of age and older) with large or giant wide-necked intracranial aneurysms in the internal carotid artery from the petrous to the superior hypophyseal segments."

36.     Endovascular treatment refers to introduction of the device from within a blood vessel (as described above), as opposed to open surgery.

37.     Intracranial aneurysms are those occurring in brain arteries.

38.     Large or giant aneurysms have a maximum diameter 10 mm wide or greater.

11

39.     Wide-necked aneurysms have a neck 4 mm wide or greater, and have a neck that is more than half the size of the aneurysm's maximum diameter.

40.     The FDA has only approved use of a Pipeline to treat an aneurysm that is both (i) large or giant, and (ii) wide-necked. Use of a Pipeline to treat an aneurysm meeting only one of these conditions is an off-label use.

41.     The internal carotid arteries are a pair of arteries on either side of the head and neck. The internal carotid arteries supply blood to the brain and eyes, and send branches to the forehead and nose. Below is an illustration showing the location of the internal carotid arteries.



**Figure 3. Location of the internal carotid artery**

42.     In clinical settings the internal carotid artery is typically classified into the following seven segments: cervical (C1), petrous (C2), lacerum (C3), cavernous (C4), clinoid (C5), ophthalmic (C6), and communicating (C7). These segments are labeled in the following illustration.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Figure 4. Segments of the internal carotid artery**

43.     Pipelines are FDA-approved for use from the petrous segment (C2) to the superior hypophyseal segment. The superior hypophyseal artery is located within the ophthalmic segment (C6).

44.     The FDA has not approved the use of Pipelines in combination with coils to treat the same aneurysm.

45.     As alleged below, notwithstanding the Defendants' knowledge that they could not lawfully promote Pipelines for non-approved uses, the Defendants adopted marketing strategies that led to numerous off-label and unapproved uses. These non-approved uses included (i) treatment of aneurysms not meeting the approved size specifications (requiring both a maximum diameter greater than or equal to 10 mm, and a neck greater than or equal to 4 mm),(ii) treatment of aneurysms located outside of the approved C2–C6 range of the internal carotid artery, and (iii) use in combination with the Defendants' coiling products.

46.     The Defendants have initiated three recalls of Pipelines. First, in August 2013 the Defendants recalled certain PEDs because they were shipped with instructions that failed to list certain contraindications (possible negative interactions

13

1   that preclude use of the PED for certain patients). Second, in April 2014 the

2   Defendants recalled certain PEDs because the laminate coating on their delivery wires

3   was susceptible to detaching while in the body, posing a serious risk of harm to

4   patients. Third, in October 2015 the Defendants recalled certain PEDs and PFEDs

5   shipped in the U.S. because they included instructions intended for distribution in

6   Europe.

7   **V. GOVERNMENT HEALTH CARE PROGRAMS AND APPLICABLE LAW**

8       A.   **FDA Regulation Of Medical Devices**

9       47.   Medical devices are generally subject to safety regulation by the Food

10  and Drug Administration ("FDA") under the Food, Drug, and Cosmetics Act

11  ("FDCA"), 21 U.S.C. §§301-399f.

12      48.   Congress enacted the Medical Device Amendments of 1976, 21 U.S.C.

13  §360c *et seq.* ("MDA"), to supplement the FDCA and to "provide for the safety and

14  effectiveness of medical devices intended for human use." Pub. L. No. 94-295, 90

15  Stat. 539 (1976) (preamble). The MDA conferred greater authority on the FDA to

16  regulate medical devices and to prevent devices lacking evidence of safety and

17  effectiveness from being marketed in the United States.

18      49.   The Center for Devices and Radiological Health ("CDRH") is the FDA

19  regulatory office which has the responsibility to protect the health and safety of

20  American consumers by ensuring that medical devices designed for use in the human

21  body are safe and effective for their intended uses and are accurately labeled.

22      50.   A medical device is "an instrument, apparatus, implement, machine,

23  contrivance, implant, in vitro reagent, or other similar or related article, including any

24  component, part, or accessory, which is . . . (2) intended for use in the diagnosis of

25  disease or other conditions, or in the cure, mitigation, treatment, or prevention of

26  disease, in man or other animals. . . ." 21 U.S.C. §321(h).

27

28

14

51.   Pursuant to its authority under the MDA, the FDA established three risk-based classifications for medical devices. Classes I, II, and III represent low, moderate, and high-risk categories based on the intended use of the device.

52.   Class I devices, such as bandages, are considered relatively safe and thus are the least regulated. Such devices are subject to basic controls, e.g., good manufacturing processes, which the FDA finds "sufficient to provide reasonable assurance of the safety and effectiveness of the device." 21 U.S.C. §360c(a)(1)(A).

53.   Class II devices, such as thermometers and powered wheelchairs, pose a moderate risk to patients and thus require special controls to provide reasonable assurance of safety and effectiveness. 21 U.S.C. §360c(a)(1)(B).

54.   Class III devices are those for which general and/or specific controls are not sufficient to provide reasonable assurance of safe and effective use. Such devices generally include life-supporting and life-sustaining devices which present a high risk of injury or illness to the patient, such as pacemakers and heart valves. 21 U.S.C. §360c(a)(1)(C). Pipelines are Class III devices.

55.   Prior to promoting or marketing a Class III device, the FDA requires companies to complete the "premarket approval process." Premarket approval ("PMA") is the most stringent level of device regulation required by FDA. The PMA process requires a manufacturer to furnish detailed information about the device's clinical testing, design, manufacturing, packaging, and labeling sufficient to reasonably assure the FDA that the device is safe and effective. 21 C.F.R. §814 *et seq.* The PMA process is designed "[t]o ensure the disapproval of PMA's for devices that have not been shown to be safe and effective or that do not otherwise meet the statutory criteria for approval." 21 C.F.R. §814.2. At the conclusion of the PMA process, the FDA issues to the PMA applicant an "approvable letter" or "not approvable letter" for the medical device. 21 C.F.R. §814.44(e), (f).

15

56.     The FDA does not approve a medical device for treatment of sickness generally. Instead, a device is approved for treatment of a specific condition, for which the device has been tested in patients. The specific approved use for the device is called the "indication." Notwithstanding the receipt of an approvable letter, a device manufacturer is not permitted to promote or market a device off-label. 21 U.S.C. §331(a), (b).

57.     "Off-label" refers to the use of an approved medical device for any purpose, or in any manner, other than what is described in the device's labeling. For example, off-label use includes using a Pipeline to treat a small aneurysm when the Pipeline's label only indicates approval for use in treating larger aneurysms.

58.     While the FDA is responsible for ensuring that a medical device is safe and effective for the specific approved indication, it does not regulate the practice of medicine. Once a device is approved for a use, the FDA does not prohibit doctors from using the device in ways that are different than those approved by the FDA. The idea is that the doctor can be trusted to exercise independent judgment (free from any conflicts of interest related to the commercial success of a medical device) to determine the medically appropriate use of a device that has been proven to have safe uses.

59.     Although doctors can use approved devices in off-label ways, the law prohibits device manufacturers from marketing or promoting a device for a use that the FDA has not approved. Specifically, a manufacturer cannot introduce a device into interstate commerce with an intent that it be used for an off-label purpose, and a manufacturer illegally "misbrands" a device if the device's labeling (which includes all marketing and promotional materials relating to the device) describes intended uses for the device that have not been approved by the FDA. 21 U.S.C. §§331, 352. Device manufacturers are not permitted to promote their devices off-label because in doing so

16

they could favor their own economic interests over patients' interest and taint the medical judgment of doctors.

60.     The off-label regulatory laws protect patients and consumers by ensuring that companies do not promote devices for uses other than those found to be safe and effective by an independent, scientific governmental body, i.e., the FDA.

**B.     Reimbursement Under Federal Health Care Programs**

61.     Whether a device is FDA-approved for a use will largely determine whether a purchase of the device will be reimbursed under Medicaid, Medicare, and other federal and state health care programs.

62.     Where a company promotes a device for off-label use or with kickbacks, related sales of the device are not eligible for reimbursement by Medicaid, Medicare, or other federal and state health care programs.

63.     Therefore, during the period of the Defendants' kickback scheme and off-label promotional campaign, any related claims for reimbursement for Pipelines from Medicaid, Medicare, or other federal or state health care programs constituted false claims. The act of seeking reimbursement for such ineligible uses of Pipelines itself constitutes a false claim. In addition, the Defendants, together with hospitals and physicians involved in the off-label and kickback-induced use of Pipelines, expressly certified compliance with applicable laws on numerous provider agreements and claim forms submitted to Medicare, Medicaid, and other federal and state health care programs. Such provider agreements and claim forms constitute false records in support of false claims.

**1.     The Billing Process for Medical Devices**

64.     The decision of whether to perform an operation using a medical device is made by a doctor in consultation with a patient. In general, once an operation using a medical device has scheduled, the hospital where the operation will be performed purchases the device from its manufacturer. Following an operation the doctor bills

17

government health care programs for the doctor's provision of services, and the hospital bills these programs for costs including reimbursement for the medical device.

65.     Under Medicare, hospitals submit claims for services delivered to Medicare beneficiaries on Form CMS-1450 (for interim reimbursements with respect to individual beneficiaries) and Form CMS-2552, also known as a Hospital Cost Report (the hospital's final claim for payment from Medicare for the period covered by the report). Doctors obtain payment from Medicare for their services by submitting Form CMS-1500.

66.     Although doctors determine which medical devices will be purchased, they have little or no reason to consider a device's cost, because the device will be purchased by a hospital. Furthermore, the hospital has little reason to prevent excessive device costs, where these costs will be reimbursed by government health care programs.

67.     Because doctors effectively make purchasing decisions, device manufacturers are motivated to persuade them to use their products. Because physicians often might not be sensitive to the costs of devices they use (and hospitals also lack incentives to act as a check on these costs), device manufacturers can find it advantageous to increase sales by sharing a device's sale proceeds with the treating doctors in the form of kickback payments.

68.     Similarly, because of physicians' control over purchasing decisions, device manufacturers may attempt to increase sales by directing off-label marketing at physicians.

69.     Where a device manufacturer attempts to persuade physicians to use its products through kickbacks or off-label marketing, the resulting sales of the device are not eligible for reimbursement under government health care programs.

18

### 2.   The Medicare Program

70.     Medicare is a public assistance program providing for payment of medical expenses for patients with certain disabilities and those aged 65 years old and older. The Medicare program subsidizes certain purchases of medical devices.

71.     Medicare is funded and administered by the federal government. Federal statutes and regulations restrict the medical devices and their uses that the federal government will pay for through Medicare. Under Medicare, "no payment may be made" for a device that is not "reasonable and necessary" for the treatment of illness. 42 U.S.C. § 1395y(a)(1)(A). Similarly, "Medicare payment is not made for medical and hospital services that are related to the use of a device that is not covered because CMS determines the device is not 'reasonable' and necessary'." 42 C.F.R. § 405.207(a). The use of devices tainted by kickbacks or off-label marketing in violation of the FDCA is not "reasonable and necessary."

72.     During the time relevant to this Complaint, the off-label uses of Pipelines promoted by the Defendants were not eligible for reimbursement under Medicare, and neither were Pipeline uses tainted by the Defendants' kickback scheme.

### 3.   The Medicaid Program

73.     Medicaid is a public assistance program providing for payment of medical expenses for low-income patients. The Medicaid program subsidizes certain purchases of medical devices.

74.     Funding for Medicaid is shared by the federal government and state governments. Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines. Federal statutes and regulations restrict the medical devices and their uses that the federal government will pay for through its funding of state Medicaid programs, in a manner like the restriction of payments under Medicare.

19

75.     During the period relevant to this Complaint, the off-label uses of Pipelines promoted by the Defendants were not eligible for reimbursement under Medicaid, and neither were Pipeline uses tainted by the Defendants' kickback scheme.

### 4.     Other Federal Health Care Programs

76.     Besides Medicaid and Medicare, the federal government reimburses a portion of the cost of medical devices under several other federal health care programs, including but not limited to TRICARE, CHAMPVA and the Federal Employees Health Benefit Program.

77.     TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces. CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected disability. The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees and retirees. Coverage of off-label device use under these programs is similar to coverage under the Medicare and Medicaid programs. *See, e.g.*, TRICARE Policy Manual 6010.60-M, Chapter 8, Section 5.1 (April 1, 2015); CHAMPVA Policy Manual, Chapter 2, Section 17.8 (May 16, 2011).

78.     During the period relevant to this Complaint, the off-label uses of Pipelines promoted by the Defendants did not qualify for reimbursement under any of the federal health care programs, and neither did Pipeline uses tainted by the Defendants' kickback scheme.

### C.     The Anti-Kickback Statute

#### 1.     In General

79.     The federal health care Anti-Kickback statute, 42 U.S.C. §1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services furnished to patients that are medically

unnecessary, of poor quality, or harmful to a vulnerable patient population. To protect the integrity of federal health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the kickback gives rise to overutilization or poor quality of care.

80.     The Anti-Kickback statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a federally-funded health care program. 42 U.S.C. §1320a-7b(b). Under this statute, companies may not offer or pay (and doctors may not accept) any remuneration, in cash or kind, directly or indirectly, to induce doctors or others to order or recommend medical devices that may be paid for by Medicaid, Medicare, or other federal health care programs.

81.     A claim for payment from a government health care program that includes items or services resulting from a violation of the Anti-Kickback statute constitutes a false or fraudulent claim for purposes of the FCA. 42 U.S.C. §1320a-7b(g).

82.     The law not only prohibits outright bribes and rebate schemes, but also prohibits any payment by a company to a doctor which has as one of its purposes inducement of the physician to increase sales of the company's medical devices. Such payments are viewed as tainting the doctor's judgment.

83.     Examples of activities prohibited by the Anti-Kickback statute include payments for sham consulting services, illusory training sessions, sham research and educational grants, sham speaking fees, lavish entertainment, travel and lodging expenses, expensive meals and wine, and other gifts and discounts. These activities are especially suspect if the medical device supplier selects the physician based on its belief that the physician is likely to prescribe the company's products rather than based on the doctor's professional qualifications or services rendered to the company.

21

The statute is designed to deter healthcare providers from using such personal benefits and enticements as a means of tainting the medical judgment of physicians.

84.     Concern about improper marketing practices like those alleged in this Complaint prompted the Inspector General of the Department of Health and Human Services to issue a Special Fraud Alert concerning marketing practices that violated the Anti-Kickback statute. Special Fraud Alert: Prescription Drug Marketing Schemes, 59 Fed. Reg. 65,376 (Dec. 19, 1994). Among the improper practices cited by the Inspector General are companies' payments to doctors where, as here, the doctor had offered no services of benefit to the company but the payment was, or appeared to have been, based on the volume of business the doctor could generate for the company.

### 2.     Safe Harbors

85.     The Anti-Kickback statue provides certain "safe harbors" to exclude certain conduct from its ambit so long as the parties involved have strictly complied with all the conditions of the safe harbor. Parties to an arrangement, however, cannot obtain safe harbor protection by entering a sham contract that appears on paper to meet all of the safe harbor requirements, but does not reflect the actual arrangement between the parties.

86.     There is a safe harbor for personal service arrangements which requires, among other things, that:

> The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

42 C.F.R. § 1001.952(d)(5). This safe harbor also requires that:

22

The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

42 C.F.R. § 1001.952(d)(7).

87.     The Defendants do not meet these safe harbor requirements because they offer incentives to doctors based on the volume or value of business the doctor generates or that they expect the doctor to generate. The Defendants do not pay physicians consistent with fair market value in arms' length transactions, nor do they engage physicians for commercially reasonable business purposes. Rather, the Defendants engage physicians based on their own sales targets.

### 3.     Compliance With The Anti-Kickback Statute Is Required Under Government Health Care Programs

88.     Compliance with the Anti-Kickback statute is a precondition to participation as a health care provider under the Medicaid, Medicare, and other federal health care programs.

89.     With Medicaid, for example, each physician that participates in the program must sign a provider agreement with his or her state. Although there are variations in the agreements among the states, the agreement typically requires the prospective Medicaid provider to agree that he or she will comply with all Medicaid requirements, which include the anti-kickback provisions of the law. In numerous states, the Medicaid claim form itself contains a certification by the provider that the provider has complied with all aspects of the Medicaid program, including compliance with federal laws.

90.     With Medicare, hospitals and doctors sign Provider Agreements with the Center for Medicare and Medicaid Services ("CMS") to establish their eligibility to seek reimbursement from Medicare. As part of that agreement, without which the

23

hospitals and physicians may not seek reimbursement from federal health care programs, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [this provider]. The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

Medicare Enrollment Application Form CMS-855A; Form CMS-855I.

91.     When a hospital or physician submits a claim for payment under Medicare, it does so subject to and under the terms of its certification to the United States that the services for which payment is sought were delivered in accordance with federal law, to include without limitation the Anti-Kickback statue.

92.     Every Hospital Cost Report also contains a Certification which must be signed by the chief administrator of the provider or a responsible designee of the administrator.

93.     The Form CMS-2552 Hospital Cost Report certification page includes the following statement:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

24

The cost-report signatory is also required to certify that:

> To the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

94.     By signing Form CMS-2552, a hospital administrator is required to and does certify that its cost report (i) is truthful, i.e., that the cost information contained in the report is true and accurate; (ii) is correct, i.e., that it is entitled to reimbursement for the reported costs in accordance with applicable instructions; (iii) is complete, i.e., that the cost report is based upon all information known to the provider; and (iv) does not include any services that resulted from an illegal kickback, or from any other violation of health care laws and regulations.

95.     Physicians and hospitals that participate in a federal health care program generally must certify (via provider agreements and claim forms) that they have complied with applicable federal rules and regulations, including the Anti-Kickback statute.

96.     Because of the systematic payment of kickbacks to physicians made with the intent and effect of inducing them to use Pipelines, the Defendants caused physicians and hospitals to submit claims in violation of conditions of payment and claims with false certifications to the United States. Claims tainted by the Defendants' kickback scheme are false claims.

# VI. GENERAL ALLEGATIONS

**A.** **Dr. Chao Learned Of Defendants' Illegal Conduct Through His Work As a Doctor, From The Defendants' Sales Staff and Through His Work For the FDA**

97. Dr. Chao learned of the Defendants' practices from the Defendants' officers, clinical training staff, sales personnel and proctors while working as a physician. He gained further insight into Defendants' practices while working as an advisor to the FDA's Office of Device Evaluation, and by analyzing documents submitted to the FDA by the Defendants.

98. Dr. Chao's interactions with the Defendants' officers, clinical training staff, sales personnel and proctors include, among others:

(a) A Pipeline training meeting attended by Dr. Chao in 2011 at the Green Valley Ranch luxury resort-spa-casino near Las Vegas, Nevada, also attended by Doctors Edoardo Boccardi and Tibor Becske, two of the Defendants' speakers and proctors.

(b) A Pipeline operation attended by Dr. Chao in 2015 at Kaiser Permanente Los Angeles Medical Center, also attended by Dr. Christopher Moran, one of the Defendants' proctors and a Chief Medical Officer of the Defendants.

(c) Discussions between Dr. Chao and Annie Joseph, a member of the Defendants' sales staff whose duties included managing aspects of the proctor program from 2011 to 2014.

(d) Discussions with Jason Roberts, the Southern California regional manager of the Defendants' sales operations, including a discussion about arranging a Pipeline operation at Kaiser Foundation Hospital in Fontana, California in 2014.

26

(e)     Discussions with Justin Vance, a member of the Defendants' sales staff who worked under the supervision of Jason Roberts, including a discussion about arranging a Pipeline operation at Kaiser Foundation Hospital in Fontana, California in 2014.

99.    Dr. Chao's review of relevant documents while working at the FDA included the following, among others:

(a)     Medtronic's response to the FDA's information request letter regarding the PFED, dated February 2, 2016.

(b)     Medtronic's response to the FDA's request for information regarding aneurysm occlusion rates, dated November 9, 2016.

(c)     Pipeline training manuals created and distributed by the Defendants since 2015.

100.    Prior to filing this Complaint, Dr. Chao had not seen any public disclosure of the allegations raised herein and has no basis to believe there has been any. Dr. Chao also is the original source of this Complaint's allegations about Defendants' false claims that come from his personal knowledge and interactions and his own research and analysis.

101.    During his interactions with the Defendants' employees and agents, and during his work for the FDA, Dr. Chao learned of the following practices:

(a)     The Defendants offered physicians improper financial inducements to use Pipelines, regardless of whether their use was on- or off-label. For example, through the Defendants' proctor program, physicians who created sales of Pipelines and promoted use of Pipelines to other medical professionals received cash payments of up to thousands of dollars per day and in some cases totaling over a hundred thousand dollars per year.

(b)     As another form of improper financial inducement, the Defendants used an ostensible data collection program to financially reward physicians for using Pipelines regardless of whether their use was on- or off-label.

(c)     The Defendants' payments to physicians under the proctor program and the data collection kickback program were disproportionate to the value of the services performed by the physicians, and represented payment for work never actually performed. The Defendants' primary purpose for such payments was to increase Pipeline sales.

(d)     The Defendants have hired companies controlled by a proctor to provide ostensibly independent laboratory services for a clinical trial that seeks an expanded indication for Pipelines from the FDA, and the large payments from the Defendants to this proctor and his companies threaten to bias the study's outcome and the FDA's decision making process.

(e)     Although the Defendants knew they were prohibited from promoting Pipelines for off-label uses, the Defendants were aware that a large percentage of Pipeline sales came from off-label uses, and the Defendants actively sought to encourage such off-label sales.

(f)     The Defendants paid for and otherwise encouraged publication of a study promoting off-label use, the IntrePED study of data generated by the Defendants' data collection kickback scheme.

(g)     The Defendants' employees and proctor physicians promoted off-label Pipeline use during in-person meetings with other physicians, including during meetings with Dr. Chao.

(h)     The Defendants' knew that encouraging off-label use of Pipelines through the proctor program constituted illegal off-label marketing, so the Defendants actively sought to conceal the off-label nature of proctored Pipeline cases, including by falsifying records.

28

(i)     The Defendants' training manuals and marketing materials contain information about off-label uses of Pipelines and actively promote such uses, and these materials are given to doctors by the Defendants' sales representatives.

(j)     The Defendants manufacture and sell Pipelines in various sizes, including sizes so small that the Defendants know they would overwhelmingly be used in off-label applications, in small-diameter arteries where Pipeline use presents elevated health risks to patients.

(k)     The Defendants promote the simultaneous use of Pipelines and their Axium Coils to treat the same aneurysm, which is an off-label use, and which presents elevated health risks to patients.

**B.     Pipelines Are a Key Driver of The Defendants' Profits**

102.   Pipelines are a valuable business line that is important to the Defendants' growth. For example, Defendant ev3's Form 10-Q for the quarter ended April 4, 2010 reveals that ev3 purchased Chestnut (the original developer of the PED) for $79.4 million up front, and a contingent payment of up to $75 million payable upon the FDA's premarket approval of the PED. This additional $75 million was paid in full during 2011.

103.   Covidien's Form 10-K for the year ended September 28, 2012 calls the PED a "key product" within Covidien's Medical Devices business segment. An exhibit to a Covidien current report on Form 8-K dated July 11, 2014 notes an increase of $179 million (or 13%) in net sales for Covidien's Vascular Therapies division in fiscal year 2012, which was "primarily driven by increased sales of Neurovascular products, namely stents and flow diversion products." The reference to flow diversion products means Pipelines.

104.   In the fiscal quarter ended April 29, 2015 the Defendants' Pipeline sales were $18.2 million ($73.1 million on an annualized basis), and in the fiscal quarter

ended April 29, 2016 the Defendants' Pipeline sales were $24.7 million ($98.9 million on an annualized basis). This represents a 35% year on year increase in sales. These are the most recent sales figures available to Dr. Chao.

**C.    The Defendants' Robust Sales Operations and Lackadaisical Compliance Efforts**

105.   The Defendants have highly developed sales operations, in which sales staff are offered generous incentive compensation. The Defendants' have placed their compliance functions at a lower priority. The Defendants' sales staff even oversee ostensibly "clinical" or "educational" aspects of the business, such as the proctor kickback program.

**1.    The Defendants' Highly Compensated Sales Staff**

106.   The Neurovascular division of Defendant Medtronic, which sells Pipelines among other products, employs roughly 150 sales personnel. John Zehren serves as Vice President of Sales for North America. Reporting to Zehren are Chris Weaver, who manages Eastern U.S. sales, and Doug Jones, who manages Western U.S. sales. Reporting to Weaver and Jones are approximately ten regional managers, a Pipeline clinical team, and a stroke products unit. Each regional manager oversees roughly ten sales employees, known as territory managers.

107.   Dr. Chao primarily dealt with Medtronic's Southern California sales team. Medtronic's Southern California region includes Los Angeles, San Diego, and Orange County. The regional manager for Southern California is Jason Roberts. Roberts oversees seven sales staff, including Justin Vance and Annie Joseph, who are discussed herein. Dr. Chao also dealt with Medtronic's Pipeline clinical team which is led by Joel Harris, who manages six staff members.[1]

---

[1] Such "clinical" staff include Medtronic employees Jane Anderson, Robert Stoeckmann, Joey Egidio, Rene Gomez, Stephanie Simmers, and Skip McCann.

30

108.   Medtronic's sales staff are highly compensated, with most of their compensation being incentive-based. Medtronic sets sales goals for its staff, and if those goals are met the staff can expect to earn their "target" compensation, or more. For Medtronic's fiscal year ended April 29, 2016 target compensation for territory managers was $295,000, and more than forty territory managers achieved their targets. For that year, target compensation for regional managers was $325,000. Salary makes up approximately one-third of target compensation, with the bulk of target compensation consisting of incentive pay for achieving aggressive sales goals.

109.   Employees who exceeded target sales were rewarded handsomely. For example, in Medtronic's fiscal year ended April 29, 2016 Jason Roberts earned $685,000.

110.   Medtronic's incentive compensation for its sales employees took several different forms to encourage sales staff to meet monthly, quarterly, and annual targets. In addition, incentive compensation was based on and designed to encourage sales of products that Medtronic deemed important and sought to promote. For example, sales personnel could obtain bonuses for selling certain amounts of "CORE" products, including Pipelines.

111.   Medtronic's generous compensation and focus on incentive pay predictably led sales personnel, by design, to aggressively pursue sales by both legal and illegal means. In this environment, legal compliance was at best an afterthought, and at worst an impediment to increasing sales.

## 2.   The Defendants' Lax Compliance

112.   Medtronic has an Office of Ethics and Compliance with more than a dozen employees. Two of Medtronic's ethics personnel, Kim Ford and Stephanie Cavender, work with the Neurovascular division and have job descriptions that include "Off Label Risk Mitigation." The work of this small group has minimal, if any, impact on Medtronic's day-to-day operations. It has failed to eliminate, or even

effectively reduce, Medtronic's wide-ranging and expensive efforts to illegally promote Pipelines.

113.   Medtronic sales personnel are required to complete online training relating to off-label promotion. If they do not complete such training by the required deadline, they receive email notifications that their training is overdue, but there apparently are no more serious consequences to failing to complete this training. For example, at the end of Medtronic's 2016 fiscal year Jason Roberts was overdue to complete such off-label training. Nonetheless, he received more than $180,000 in incentive pay relating to Medtronic's fourth quarter of 2016.

114.   Medtronic's compliance failures are not limited to the payment of kickbacks and off-label marketing, rather a lack of concern for compliance appears to be a pervasive feature of Medtronic's sales operation. Multiple times, Medtronic sales personnel were reprimanded by hospitals for failing to follow hospital policies while attending Pipeline operations. In one instance, Sunrise Hospital and Medical Center in Las Vegas suspended access privileges for three months for Medtronic territory manager David King stemming from his repeated failures to obtain necessary permissions to attend operations. On the same day this suspension was announced, Medtronic sales managers, apparently unconcerned with these serious violations of hospital policies, decided to have a new employee shadow King for training.

### 3.   The Defendants' Sales Department Oversees the Proctor Program

115.   Although the proctor program is ostensibly educational in nature, this program is primarily managed by the Defendants' sales personnel, not by the Defendants' clinical education specialists.

116.   Joel Harris, the Defendants' National Sales Manager for Pipelines, managed many components of the proctor program. Although the proctor program was nominally managed by Fred Gunderman, the Defendants' Director of Physician

32

1  and Clinical Education, the Defendants' "clinical specialists" were in fact sales

2  personnel who reported to Joel Harris.

3      117.   All sales representatives in Medtronic's Neurovascular division receive

4  weekly emails notifying them of Pipeline proctoring events for the upcoming week.

5  These emails list the date, the trainee physician, physician proctor, hospital, and sales

6  representative, that are associated with each event. These emails also admonish sales

7  representatives to turn in timely reports regarding Pipeline proctoring events for which

8  they are responsible.

9      118.   A document created by the Defendants for use by their clinical sales

10  personnel to track Pipeline promotional activities (reproduced in Exhibit 5) shows that

11  such "clinical" staff and the proctor program were viewed by the Defendants as part of

12  their sales operation. This document, titled "2017 Pipeline Clinical Specialist Strategic

13  Account Activities – [Plan of Action] Worksheet," lists various promotional tasks and

14  the corresponding amount of "case coverage credit" that the Defendants' employees

15  would receive for each task. Among the activities for which sales personnel receive

16  credit toward their sales activity quotas is "Schedule a Proctor to visit for Grand

17  Rounds." The Defendants' sales personnel are instructed to submit these worksheets

18  to various employees of the Defendants, including local and regional sales managers,

19  as well as "Pipe Mgr/Sales Ops." This oversight of proctors' activities by the

20  Defendants' sales operations personnel demonstrates that the Defendants viewed the

21  proctor program as a part of their sales efforts.

22          **VII. THE DEFENDANTS' ILLEGAL KICKBACK SCHEME**

23      119.   The Defendants' illegal kickback scheme took two main forms. First, the

24  Defendants operate the proctor program under which they pay certain key physicians

25  hundreds of thousands of dollars annually to increase Pipeline sales. Second, the

26  Defendants operated a purported data collection program, the true purpose of which

27  was to offer any physician who used a Pipeline between $1,000 and $1,500.

28

33

120.   The Defendants knew that they were operating an illegal kickback scheme, and they knew that if this scheme was disclosed to government health care programs, those programs would refuse to pay for Pipelines tainted by kickback payments. Accordingly, the Defendants conceal their kickback scheme as payment to physicians for services, in a successful effort to deceive government health care programs and receive substantial revenue from kickback-tainted, on-label and off-label procedures.

**A.   The Proctor Program: A Vehicle To Financially Reward Physicians For Using Pipelines**

121.   The Defendants offer physicians improper financial inducements to use Pipelines through the Defendants' proctor program. In this program physicians who create sales of Pipelines and promote use of Pipelines to other medical professionals receive cash payments of thousands of dollars per day and in some cases over a hundred thousand dollars per year. These payments are disguised as compensation for services performed by the proctor physicians (such as overseeing Pipeline operations, or performing Pipeline-related research), but are solely based on the proctors' ability to generate Pipeline sales.

**1.   Basic Structure of the Proctor Program**

122.   The Defendants' proctor program began in 2011 when the PED was first marketed in the United States. There are approximately fifty-five doctors in the proctor program.

123.   Exhibit 1 contains a list of likely proctors based on CMS Open Payments Data. Each of these fifty-eight doctors received more than $10,000 worth of payments related to "pipelines" or "flow diversion" from the Defendants during 2013-2015. These fifty-eight doctors received a total of $5.2 million of such Pipeline-related payments from the Defendants over this period. Of these doctors, twenty-two received

more than $100,000 of such Pipeline-related payments from the Defendants in 2013-2015.

124.   Dr. Chao learned during his work as a practicing physician that many of the doctors listed in Exhibit 1 are proctors for the Defendants, including Dr. Philipp Taussky, Dr. John Gaughen, Dr. Alexander Coon, Dr. Britton Keith Woodward and Dr. Christopher Moran.

125.   As an example of payments made to a proctor, Exhibit 2 contains a detailed list of Pipeline-related payments made by the Defendants during 2013-2015 to one proctor, Dr. Moran. These 340 separate payments total more than $200,000. The payments occur frequently, and many are for thousands of dollars.

126.   In addition to substantial cash payments, the Defendants compensated proctors by paying for expensive mini-vacations. For example, the Defendants paid for multiple physicians to attend a Pipeline "training meeting" in 2011 at the Green Valley Ranch, a luxury resort-spa-casino near Las Vegas, Nevada. Likewise, as set forth in Exhibit 2, Dr. Moran appears to have traveled frequently for the Defendants to posh vacation destinations throughout the United States such as Miami and San Francisco, and to posh international destinations such as Buenos Aires, Argentina; Nice, France; and Madrid, Spain.[2] At each of these international destinations the Defendants provided free travel and lodging for Dr. Moran. There was no reason to have "training" sessions at posh luxury resorts other than to use the "training" as a

_____

[2] CMS' data set lists the city, state, and country of travel associated with a particular payment. For the Defendants' payments to Dr. Moran listing Buenos Aires as the city, the state listed is California and the country listed is the U.S., however this appears to be an error as there is no city of Buenos Aires in California. Presumably this was a data entry error and the payment relates to travel in Buenos Aires, Argentina. Similarly, payments relating to the city Madrid also list locations of California and the United States, though there is no locale known as Madrid in California.

pretext to provide free mini-vacations to reward those doctors that helped Defendants generate tens of millions of dollars in Pipeline sales.

127.   Because of the cash payments, travel, and other kickbacks received by proctors from the Defendants, physicians had strong incentives to become proctors. For a doctor to become a proctor, the Defendants required the doctor to perform at least ten operations in which at least one Pipeline was used to treat a patient's aneurysm. On average 1.6 Pipelines are used per patient. Therefore, in the process of becoming a proctor a doctor would cause the purchase of approximately sixteen Pipelines. At an approximate cost per Pipeline of $14,000, this would result in about $224,000 worth of sales for the Defendants.

128.   Once a doctor meets the Defendants' ten-operation requirement to become a proctor, that doctor becomes eligible to receive lucrative cash payments from the Defendants based on the doctor's work promoting Pipelines. For example, for each operation using one or more Pipelines overseen by a proctor, the proctor received approximately $4,000 to $5,000 from the Defendants (under sham consulting and services arrangements), or roughly one-third of the Defendants' revenue from the sale of each Pipeline. This financial arrangement encouraged doctors to perform operations using Pipelines so that they could become proctors and later receive payments for supervising other doctors using Pipelines, and for undertaking other activities to encourage Pipeline sales. Thus, Defendants induced or effectively bribed these doctors through this very generous kickback system, and thereby tainted the doctors' judgment.

129.   Besides payments for overseeing operations using Pipelines, the Defendants made payments to proctors based on other tasks undertaken to promote Pipelines. Under the Defendants' policies, proctors received payments for promotional activities at approximately $400 to $500 per hour worked, or roughly $3,200 to

$4,000 for an eight-hour day. This hourly rate varied based on the experience of the proctor, with key physicians being paid up to $500 per hour.

130.   In this way, the proctor program operated much like a pyramid scheme. To become eligible for payments as a proctor, physicians had to first generate substantial revenue for the Defendants. Once a doctor generated enough Pipeline sales, he could share in the scheme's profits, in part through encouraging other doctors to use Pipelines.

131.   The Defendants used such illegal kickbacks to maximize proctors' compensation, and proctors as would be expected took advantage of Defendants' largesse. For example, not wanting to lose the opportunity to make as much money as possible through this lucrative proctoring arrangement, Dr. Moran regularly called the Defendants' sales employee, Annie Joseph, seeking proctoring assignments, and he would become angry if told that no assignments were available. In response, the Defendants increased Dr. Moran's proctoring assignments such that between 2013 and 2015, he received more than $200,000 of Pipeline related payments, which was mostly due to his participation in the proctor program.

132.   Similarly, to benefit Dr. Alexander Coon, a proctor who generated substantial Pipeline sales for the Defendants (and received more than $280,000 in Pipeline related payments from them between 2013 and 2015), Defendants paid for Dr. Coon to travel from his place of work in Maryland to fly cross country and proctor Pipeline operations at the University of California, Irvine health system. This made no practical or economic sense, and caused needless cost, but Defendants agreed to such arrangements, and even encouraged them, to accommodate Dr. Coon's desire to receive more proctoring compensation. This was not necessary, cost-effective or otherwise practical, because there already was a qualified doctor certified in the use of Pipelines available at the University of California, Irvine health system—Dr. Shuichi Suzuki. Therefore, Dr. Coon's expensive cross-country travel made no sense except as

37

a means of incentivizing Dr. Coon by maximizing the amount of money he could receive from such procedures.

133.   This accommodation, or benefit to a high-value doctor, was extended to other doctors too if they could produce substantial revenue from Pipelines. For example, on approximately ten separate occasions the Defendants paid for Dr. Moran (based in St. Louis) to proctor operations at the University of Oklahoma, although doctors based at this institution were already certified in Pipeline use. Again, there was no practical reason for this arrangement, other than to provide more kickbacks to Dr. Moran for generating substantial Pipeline sales, often for off-label and unsafe or inefficacious uses.

### 2.   The Defendants Ignore Self-Imposed Payment Restrictions and Pay Proctors for Work Never Performed

134.   Over and above the excessive and unnecessary payments for work performed in the proctor program, the Defendants routinely paid doctor proctors kickbacks for work they never even performed. The Defendants knew this, but nonetheless paid such kickbacks because the proctor program was not intended to compensate proctors for work performed. Rather, the proctor program was intended to provide a series of financial incentives to encourage doctors to use as many Pipelines as possible, generating revenue to Defendants which was substantially paid for by government payors.

135.   For instance, the Defendants frequently paid proctors for a full, eight-hour day of work, regardless of how little time the proctor worked. A doctor who proctored one operation at his or her home hospital would perform approximately two hours of work, but the Defendants would pay such a physician for eight hours. From at least 2013 on, most proctors worked on only one Pipeline operation in a day, so this

1  type of excess payment (as part of the Defendants' already rich kickback scheme) was
2  widespread.

3     136.   As another example of money for nothing under the proctor program, the
4  Defendants frequently compensated proctors for travel that was never undertaken. The
5  Defendants' stated policy was to pay half of their proctor payment rate (about $200 to
6  $250 per hour) for a proctor's travel time going to or from Pipeline proctoring duties,
7  and total travel payments for a day were limited to approximately $1,400 under this
8  policy. But instead of paying the proctors based on time spent in transit, the
9  Defendants routinely paid the maximum $1,400.

10    137.   If a proctor traveled for one hour, and worked for two hours, under the
11  Defendants' ostensible policies they should have paid the proctor $1,000 ($200 for
12  travel and $800 for work). Nonetheless, in fact, the Defendants would usually pay the
13  proctor $4,600 ($1,400 for travel and $3,200 for work). The Defendants' practice of
14  making such unjustified payments reveals the true nature of these payments as a form
15  of revenue sharing which proctors received for using Pipelines, rather than being
16  reasonable compensation for supervising other doctors who used Pipelines or for other
17  Pipeline related work.

18    138.   That proctors were routinely paid the $4,600 per day maximum for work
19  and travel is confirmed by the CMS Open Payments database, which collects
20  information on payments from medical device companies to physicians, along with
21  data about the products to which these payments relate. The Open Payments data
22  show that during 2013-2015, out of 8,484 payments from the Defendants to
23  physicians related to "flow diversion" or "pipelines," 266 of these payments were in
24  the exact amount of $4,600, and this is by far the most common dollar amount for
25  payments from the Defendants to physicians (other than numerous payments reported
26  as $10, apparently made for incidental expenses incurred while working or travelling).
27  For example, in 2013-2015, Dr. Britton Keith Woodward alone received at least
28

39

twenty separate payments from the Defendants in the precise amount of $4,600, amounting to $92,000, a substantial portion of which likely relates to "work" never performed.

139.    At the beginning of the proctor program in 2011, the Defendants' payments to proctors were made in lower, more reasonable amounts. At that time the Defendants paid proctors approximately $1,000 for overseeing a Pipeline operation. Yet, by 2015 the Defendants had increased such payments to approximately $4,000 to $5,000 per Pipeline operation, with no increase in the amount of work performed by proctors, and no possible justification for this 400% increase in proctor payments, other than a desire to increase Pipeline sales by tainting doctors' judgment with ever-larger kickbacks.

140.    The Defendants recognized that the large cash payments under the proctor program risked revealing the true nature of this kickback scheme. Accordingly, to maintain the illusion that proctors were paid only reasonable compensation for services rendered and to conceal their actual conduct, the Defendants included a provision in their consulting agreements with proctors that theoretically imposed a $60,000 per year maximum on compensation paid to a given proctor. Despite this stated cap, the Defendants regularly permitted proctors to exceed this maximum by executing amendments to the consulting agreements. These amendments made the cap theoretical rather than real, and therefore meaningless; it was little more than a fig-leaf to disguise Defendants' behavior. For example, the Defendants paid Dr. Moran more than $100,000 in 2013 for his Pipeline-related work. The Defendants likewise paid Dr. Woodward more than $130,000 in 2015 for his Pipeline-related work.

### 3.    Proctors' Hospitals Are The Defendants' Best Customers

141.    As demonstrated in Exhibit 12, hospitals that are affiliated with Pipeline proctors are among the Defendants' largest sources of Pipeline sales revenues. For

Medtronic's fiscal quarter ended April 29, 2015, at least six of the top 10 hospitals by Pipeline purchases are home to one or more likely proctors.[3] Furthermore, a similarly large portion of all hospitals that purchased any Pipelines during this fiscal quarter were affiliated with at least one proctor. Hospitals affiliated with known proctors such as Dr. Woodward (Fort Sanders Regional Medical Center) and Dr. Moran (Barnes-Jewish Hospital) also purchased substantial amounts of Pipelines during this quarter.

142.   In addition, Medtronic's data regarding its top 20 customers for its 2016 and 2015 fiscal years (reproduced in Exhibit 11) confirms that proctors' home institutions are consistently among the top Pipeline purchasers. Again, at least six of the top ten hospitals listed are affiliated with likely proctors.[4]

143.   This close link between proctors, their home institutions, and the Defendants' sales revenue is further evidence that the proctor program operates as part of the Defendants' sales operation.

144.   The proctor program purports to assist medical professionals in learning about Pipelines' proper use. Yet, it primarily operates as an improper financial incentive to encourage physicians to use Pipelines. Defendants even use the proctor program to make some payments to doctors that are unrelated to work performed. These payments, such as paying a proctor for eight hours of work when only two were performed, are thinly disguised kickbacks. Other payments, such as payments to proctors relating to services performed, but which are nonetheless excessive and are primarily intended to promote Pipeline sales, are more heavily disguised kickbacks, but are kickbacks as well. Such payments are based on the amount of business

---

[3] NYU Langone Medical Center, Westchester County Medical Center, Jefferson Hospital for Neuroscience, Rush University Medical Center, Medical University Hospital Authority, St. Josephs Hospital and Medical Center.

[4] NYU Langone Medical Center, Jefferson Hospital for Neuroscience, Westchester County Medical Center, Johns Hopkins Hospital, Baptist Medical Center, Beth Israel Deaconess Medical Center.

41

proctors generate and/or that the Defendants expect the proctors to generate. Such large payments are not warranted by the work performed by the proctors.

**B.** **The Defendants' Data Collection Program Offered Additional Financial Rewards To Doctors For Using Pipelines**

145.   Besides the proctor program, the Defendants formerly maintained another kickback program under which they paid doctors between $1,000 and $1,500 to record data regarding their use of Pipelines. These payments were disguised as compensation for services performed by the physicians, but, like payments under the proctor program, were primarily meant to encourage the use of Pipelines.

146.   The Defendants required physicians to record only a small amount of data to be eligible for these payments, such as the size and location of the aneurysm, and the outcome of the operation. Recording the data did not take a significant amount of a physician's time. The large payments made to physicians were disproportionate to the minimal services provided.

147.   Data collected through the Defendants' kickback program was used in the International Retrospective Study of Pipeline Embolization Device (IntrePED) study (reproduced in Exhibit 9). This study was funded by the Defendants. Many of the study's authors, such as Dr. Woodward, participated in the proctor program and were paid large amounts of money by the Defendants.

148.   The IntrePED study reported data from the period July 2008 – February 2013. The PED first obtained FDA premarket approval in April 2011, so before that time Pipeline sales were few, and limited to unusual circumstances. It is not known how many Pipelines were sold during the period of the IntrePED study, but based on the limited available sales data it appears that the 906 Pipelines reported in the study constituted a significant percentage of all Pipelines sold during the July 2008 – February 2013 period.

149.   This high participation rate demonstrates that the Defendants' data collection kickback program was highly effective, as physicians jumped at the chance to obtain such easy money. Furthermore, the high participation rate demonstrates that a significant proportion of all Pipeline sales are tainted by kickbacks from the Defendants.

150.   Ostensibly the Defendants' data registry was a way for the Defendants to obtain information to track Pipelines' performance. In fact, this program operated primarily as a marketing tool and a vehicle to give more money to doctors using Pipelines.

151.   Furthermore, the Defendants likely had no need to collect this data from doctors because the Defendants' sales personnel are present at nearly all operations using Pipelines, and these sales personnel make detailed reports to the Defendants about the uses of Pipelines in such operations.

152.   Because of the high cost of Pipelines, and because the Defendants offer only a limited number of Pipelines to hospitals on consignment, hospitals generally do not maintain inventories of Pipelines. Rather, when an operation calls for a Pipeline, it usually must be obtained from the Defendants, which requires the Defendants' sales personnel to travel to the hospital and provide the required Pipelines. As such, all or most data obtained from physicians through the Defendants' data collection program was already in the Defendants' possession, which further demonstrates that the true purpose of the data collection program is to financially reward physicians for using Pipelines.

153.   The data collection kickback program complemented the proctor kickback program. Whereas kickbacks under the proctor program are limited to the most active Pipeline users, the data registry kickbacks were available to all physicians, even if they only used a single Pipeline. For each use of a $14,000 Pipeline, the

43

Defendants would pay between $1,000 and $1,500 for "data collection," compared with about $4,000 for "proctoring."

### C.  The Defendants' Kickback Scheme Threatens To Bias An Ongoing Clinical Study

154.  In addition to the Defendants' kickback payments made directly to physicians, the Defendants have provided lucrative compensation to at least two companies owned and operated by a Pipeline proctor, Dr. Woodward. Making matters worse, one of Dr. Woodward's companies has been retained to fill the role of an unbiased, independent adjudicator to assess the results of an ongoing study being performed by the Defendants. The Defendants aim to use the results of this study to convince the FDA to expand the indication for Pipelines. This is disturbing, improper and unethical for several reasons including because Dr. Woodward's judgment may be tainted by his receipt of substantial kickbacks under the proctor program.

155.  Between 2013 and 2015 Dr. Woodward himself received more than $250,000 from Defendants broken down as follows: $40,353,47 in 2013; $83,588.62 in 2014; and $133,641.23 in 2015. During the same time, Dr. Woodward's companies received more than $380,000 from Defendants for the ostensible purposes of performing core image lab services related to Pipeline studies. Through the Defendants' substantial kickback payments made to Dr. Woodward (directly as a proctor and indirectly through his companies), the results of this study can be compromised, which would ultimately endanger patients if the study is relied on by the FDA.

156.  Dr. Britton Keith Woodward works in Knoxville, Tennessee, where he is affiliated with Fort Sanders Regional Medical Center, the Neurovascular Research Center of East Tennessee, and Vista Radiology, P.C.

157.  Dr. Woodward is one of the Defendants' highest compensated Pipeline proctors. The Defendants made over $250,000 of direct payments to Dr. Woodward

44