over 2013 to 2015 that are reported as related to "flow diversion." Dr. Woodward has hosted proctor training programs in Knoxville, Tennessee.

158.   In addition to serving as a Pipeline proctor, Dr. Woodward is a paid speaker for the Defendants. In or about 2012 Dr. Woodward spoke at Covidien's national sales meeting at the luxury resort Pelican Hill in Newport Beach, California. He also spoke at the Defendants' national training courses at Green Valley Ranch, a luxury resort-spa-casino near Las Vegas, Nevada. From 2012 through the present the Defendants have paid Dr. Woodward to promote numerous other products in addition to Pipelines, such as Onyx liquid embolic products and the Solitaire stent retriever device.

### 1.   **Imaging Core Labs**

159.   Dr. Woodward has financial interests in two companies that provide image core lab services to medical device companies, including the Defendants.

160.   An imaging core lab is a laboratory that provides centralized quality control and assessment of medical images. Imaging core labs are frequently used by medical device manufacturers to aid in evaluating results of clinical studies, which may include images received from numerous testing sites. The imaging core lab serves the useful function of providing expert and consistent image interpretation.

161.   An imaging core lab also is supposed to provide independence. Whereas image interpretation performed by a testing site can reflect bias (whether conscious or not) from a desire to see a result, the neutrality of an independent, third-party imaging laboratory to interpret trial results provides significantly more accurate and reliable data. Academic studies have demonstrated that bias in interpreting clinical study results can be extreme, particularly regarding company-sponsored studies. Such bias results in significant over-reporting of a product's efficacy, and significant under-reporting of a product's safety risks.

45

162.   For these reasons the overwhelming majority of clinical trial data submitted to the FDA by medical companies seeking approval of their products is interpreted by core labs. The FDA performs audits of core labs to ensure that they will produce reliable data. The FDA has issued draft guidance to assist clinical trial sponsors in the use of imaging core labs to analyze clinical trial data in support of the sponsors' FDA approval applications.

163.   Although the FDA has guidelines to limit financial conflicts of interest for investigators working on clinical studies, these rules can be read narrowly to exclude financial conflicts of interest between a study sponsor and its core lab adjudicator. The FDA does not monitor or act to limit such conflicts, which are in a regulatory blind spot.

## 2.   Dr. Woodward's Cascade and Oculus Companies

164.   Dr. Woodward founded Cascade Medical, LLC ("Cascade"), a Tennessee limited liability company. Cascade was organized in June 2010, and became inactive in August 2014. Cascade had two members, one of whom was Dr. Woodward, and provided imaging core lab services to medical device companies. Cascade's address was 2450 EJ Chapman Drive, Suite 208, Knoxville, Tennessee.

165.   From March 31, 2014 through October 30, 2014 Cascade received $101,790 in payments from Defendant Covidien LP reported as relating to "flow diversion," *i.e.*, Pipelines. These payments related to Cascade's work on two of the Defendants' studies, PUFS (Pipeline for Uncoilable or Failed Aneurysms) and ASPIRE (Aneurysm Study of Pipeline in an Observational Registry).

166.   Dr. Woodward also founded Oculus Imaging, LLC ("Oculus"), a Tennessee limited liability company. Oculus was organized in August 2014. Oculus has two members (almost certainly including Dr. Woodward), and provides imaging core lab services to medical device companies. Oculus' address is 2450 EJ Chapman

Drive, Suite 104, Knoxville, Tennessee. Dr. Woodward is the president of Oculus, and his wife, Jennifer Woodward, is the vice-president.

167.   From October 30, 2014 through December 23, 2015 Oculus received $280,122 from Defendants Covidien LP and Medtronic (through its Medtronic Neurovascular division) reported as relating to "flow diversion." These payments related to Oculus' work on several of the Defendants' studies, including PUFS, PREMIER (Prospective Study on Embolization of Intracranial Aneurysms with Pipeline Embolization Device), and PFLEX (Pipeline Flex Embolization Device with Shield Technology). In addition, Oculus has received tens of thousands of dollars from Medtronic for work on studies involving other Medtronic products (including Medtronic's BARREL and APOLLO studies).

### 3.   Defendants' PREMIER Study

168.   The PREMIER study began in July 2014, and is estimated to be completed in November 2019. The study is being performed at two clinical sites: Baptist Medical Center in Jacksonville, Florida, and Tampa General Hospital in Tampa, Florida. The study's estimated enrollment is 141 patients. To be included in the study, patients must have an intracranial aneurysm located in the anterior or posterior circulation, and the aneurysm must have a wide neck.

169.   The PREMIER study targets a much wider group of aneurysms than are approved for Pipeline use under the FDA's current indication, which requires an aneurysm to be (i) located in the C2-C6 segment of the internal carotid artery, (ii) wide necked, and (iii) 10 mm in diameter or greater. The reason for the broader focus is that the Defendants intend to use the results of the PREMIER study to ask the FDA for an expanded indication for Pipelines.

170.   Oculus' work for the Defendants with the PREMIER study continues through the present. The Defendants have hired Oculus as the study's independent core lab adjudicator. In this role, Oculus is supposed to serve as an unbiased

47

interpreter of the images produced by the study's clinical sites, to determine the effectiveness of Pipelines in treating the aneurysms observed in the study.

171.   The Defendants' payment of substantial kickbacks to Dr. Woodward, including payments under the proctor program, casts serious doubt on whether Oculus acts as an independent adjudicator. Equally large payments made to Dr. Woodward's companies, Oculus and Cascade, are also kickbacks intended to promote the sale of Pipelines by obtaining favorable results in the PREMIER study, and therefore a favorable determination from the FDA.

172.   By making large kickback payments directly to proctors, the Defendants influenced how these doctors practiced medicine. The large kickback payments to an ostensibly independent core lab adjudicator the Defendants are kickbacks designed to influence clinical trial outcomes and the FDA approval process.

## VIII. THE DEFENDANTS' OFF-LABEL MARKETING

### A.   The Defendants' Marketing Strategy For Pipelines Is Driven By Lucrative Off-Label Markets

173.   The Defendants aggressively promote the off-label usage of Pipelines to enhance revenues, largely because the market for approved on-label uses of Pipelines is limited. Chestnut (the original developer of the PED, acquired by Defendant ev3 in June 2009) submitted a Sponsor Executive Summary to the FDA on February 1, 2011 in support of its PMA application for the PED (the "Chestnut Report") (excerpts reproduced in Exhibit 3). The Chestnut Report estimated that in the United States each year there are only 2,000 aneurysms that (i) have diameter equal to or greater than 10 mm, and (ii) are in the internal carotid artery. Of these estimated 2,000 cases per year, some of the aneurysms do not have wide necks. Others may be in areas of the internal carotid artery outside of Pipelines' approved C2-C6 range. Therefore, the maximum possible on-label market for Pipelines in the U.S. is somewhat less than 2,000 sales per year, as estimated by the Defendants.

174.   The market for off-label uses of Pipelines is considerably larger. The numbers of aneurysms that (i) have diameter less than 10 mm, (ii) have necks smaller than 4 mm wide, or (iii) are not located in the C2-C6 range of the internal carotid artery, are much greater than the small number of aneurysms that meet all required conditions. Ninety-three percent of intracranial aneurysms have diameter from 0 to 10 mm, and based on the Chestnut Report 82% of aneurysms located in the head are in arteries other than the internal carotid artery.

175.   As the Defendants know, the market for off-label uses of Pipelines is more than ten times larger than the market for on-label uses. In response to these market realities, the Defendants employed a variety of practices, including the extensive use of kickbacks, to aggressively and unlawfully promote off-label uses of Pipelines. The Defendants' efforts were highly successful and helped them achieve Pipeline sales revenue reaching approximately $80 million in 2015.

176.   Dr. Chao thinks approximately 60% of the Defendants' Pipeline sales are for off-label uses. His knowledge is based in part on data reported in a letter from Defendant Medtronic to the FDA, showing that for complaints tracked in Medtronic's Product Experience Reporting System, only 37% related to aneurysms documented as meeting the size and location requirements for Pipelines' approved use. Dr. Chao's understanding regarding the substantial extent of off-label sales is further supported by his conversations with the Defendants' employees and proctors such as Dr. Moran (who confirmed that he treats almost all his aneurysm patients with Pipelines), and Jason Roberts and Justin Vance (who confirmed that most uses of Pipelines are off-label). Based on $80 million of Pipeline revenue and approximately 60% off-label use, in 2015 alone Defendants received approximately $48 million in revenue from off-label Pipeline sales.

177.   Because of the Defendants' illegal practices, federal government health insurance programs and their state counterparts have paid false claims for a significant

49

1  portion of the Defendants' off-label Pipeline sales – claims that they would not have

2  paid but for the practices described herein. The Defendants' practices have caused

3  damages to the United States Treasury and the harmed states in the tens or hundreds

4  of millions of dollars.

**B.    The Defendants Know That A Large Proportion Of Pipeline Sales Are Off-Label**

178.    The Defendants knew, acted in deliberate ignorance or acted in reckless disregard of the fact that their illegal marketing practices result in extensive off-label use of Pipelines. In addition to their intentional, deliberately ignorant or reckless promotion of off-label use, the Defendants had at least five red flag sources of information indicating a high percentage of off-label use.

179.    First, the Defendants tracked the number of sales of Pipelines, and these sales vastly exceeded the Defendants' own estimates (as reflected in the Chestnut Report) of the market size for on-label use. Based on the Chestnut Report, there should be fewer than 2,000 aneurysms suitable for on-label use of Pipelines in the United States each year. Nonetheless, the Defendants' sales data shows that in 2015 the Defendants sold 3,363 PFEDs. Based on approximately $80 million of Pipeline sales in 2015 and prices averaging $14,000 per Pipeline, more than 5,700 Pipelines (including both the PFED and the PED) were sold in 2015 alone.

180.    Second, as part of its Quality Management System, Medtronic tracks users' experience with its products through its Product Experience Reporting System. This data reflects complaints relating to the PFED over 2014-2016. Defendant Medtronic's own analysis of these complaints (reproduced in Exhibit 4) shows that more than 28% relate to uses of the PFED in arteries outside of the approved C2-C6 range of the internal carotid artery (and a further 24% of complaints did not report a specific location). Medtronic's analysis also shows that aneurysms less than 10 mm in diameter accounted for 27% of complaints (and aneurysm size was not reported in a

1    further 35% of complaints). Moreover, Medtronic's data reveal that overall 37% of

2    these complaints related to cases where PFEDs were known to be used outside of their

3    approved indication, and an additional 27% related to cases where it could not be

4    determined whether use was within the FDA approved indication.

5        181.   Third, as discussed above, the Defendants formerly maintained a

6    kickback program in which they paid physicians between $1,000 and $1,500 to record

7    data regarding their use of Pipelines. The Defendants sponsored the IntrePED study

8    which is based on information from this kickback-derived database. This study

9    observed 793 patients with 906 aneurysms treated with Pipelines. Only 35% of the

10    aneurysms in the study were in the internal carotid artery and were greater than 10

11    mm in diameter (this study is reproduced in Exhibit 9).

12        182.   Fourth, the Defendants' own employees and proctors have confirmed

13    their awareness of a high degree of off-label use. Annie Joseph, a member of the

14    Defendants' sales staff, confirmed to Dr. Chao that the Defendants trained many

15    physicians to use Pipelines off-label. Dr. Moran, a proctor and Chief Medical Officer

16    for the Defendants, informs his Pipeline trainees that he treats all his aneurysm

17    patients with Pipelines, regardless of whether the use is off-label. Jason Roberts and

18    Justin Vance, also members of the Defendants' sales staff, likewise confirmed that

19    most Pipelines are used off-label. Also, in correspondence from one of the

20    Defendants' competitors to the FDA, the competitor states, "an experienced Pipeline

21    proctor relayed that only 40% of the cases he currently proctors are on label."

22        183.   Fifth, the Defendants' sales staff attend most or all operations using

23    Pipelines, in part because Pipelines generally must be delivered by the Defendants'

24    sales staff for each Pipeline operation, as discussed above, and in part apparently or

25    inadvertently to promote Pipeline usage. Through reports submitted to the Defendants

26    by their sales staff present at Pipeline operations, the Defendants know that many

27    Pipeline uses are off-label.

28

184.   Since 2011, the above information concerning the high percentage of off-label sales of Pipelines was available to, and known by, the Defendants' management, who kept close track of Pipeline sales performance.

185.   The Defendants were aware of the significance of off-label marketing. As detailed above, the Defendants have initiated two separate recalls since 2013 for Pipelines because they were shipped with labeling that had not been approved by the FDA. At all times the Defendants knew or were deliberately ignorant or reckless in not knowing that government health care programs would not pay for Pipeline sales tainted by off-label marketing.

186.   There are additional red flags indicating that Defendants were aware, or were deliberately ignorant or reckless in not knowing, that off-label marketing is illegal, and Pipeline uses that the government knows are induced by off-label marketing would not be reimbursed by government health care programs. For example, Medtronic's sales representatives are required to complete online training programs on the company's Compliance Wire system, including a training module titled "Understanding our Off-Label Use Policy." Medtronic employees who are overdue to complete this training receive frequent automated reminders via email.

187.   Moreover, Defendant Medtronic has an Office of Ethics and Compliance with more than a dozen employees, and Medtronic's ethics personnel, Kim Ford and Stephanie Cavender, work with the Neurovascular division and have job descriptions that include "Off Label Risk Mitigation."

C.     **The Defendants' Marketing Practices Deliberately Promote Off-Label Uses Of Pipelines**

188.   Beginning on or about April 6, 2011 (when the PED first gained FDA premarket approval), the Defendants' national marketing strategy for Pipelines recognized that their off-label uses could provide potentially large amounts of sales and revenues. The Defendants' off-label promotion of Pipelines targets applications

for which Pipelines are not approved. The Defendants' off-label marketing of Pipelines takes a variety of forms, including but not limited to those discussed below.

### 1.    The Defendants' Illegal Kickback Scheme Promotes Off-Label Use

189.    The Defendants' illegal kickback scheme promotes off-label use by providing payments to physicians for using Pipelines, regardless of whether the uses are on- or off-label.

190.    Based on data from the IntrePED study, most kickbacks paid under the Defendants' ostensible data collection program were paid for off-label uses. At most 35% of Pipeline uses reported in the IntrePED study were on-label. The Defendants knew that most of their data collection kickbacks were paid for off-label uses, and took no steps to restrict payments to on-label use.

191.    As for the proctor program, the Defendants also provided kickback payments for both on- and off-label uses. For instance, in correspondence from one of the Defendants' competitors to the FDA, the competitor states, "an experienced Pipeline proctor relayed that only 40% of the cases he currently proctors are on label." Similarly, two of the Defendants' proctors informed Dr. Chao that they use Pipelines for almost all aneurysms regardless of an aneurysm's location. Dr. Moran made this statement while proctoring a Pipeline operation in 2015 at Kaiser Permanente Los Angeles Medical Center. Dr. Edoardo Boccardi made this statement during a Pipeline training meeting in 2011 at the Green Valley Ranch, a luxury resort-spa-casino near Las Vegas, Nevada. Both doctors also touted Pipelines' safety for off-label uses during these encounters.

### The Defendants Conceal the Extent of Off-Label Use in the Proctor Program

192.    The Defendants knew that they should limit proctored Pipeline operations to those cases involving on-label uses, to avoid engaging in off-label promotion (or, more accurately, to conceal the Defendants' off-label promotional

53

scheme). The Defendants knew that sending a proctor, who was paid to represent the Defendants, to an operation documented as using Pipelines off-label constituted promotion of such off-label use. Still, the Defendants could not resist the temptation to promote off-label uses, and frequently sent proctors to operations making off-label use of Pipelines.

193.   The Defendants concealed such off-label uses in the proctor program. For example, on one occasion in 2014 Dr. Chao was asked to proctor an operation at Kaiser Foundation Hospital in Fontana, California. Sales employees of Defendant Medtronic, Jason Roberts and Justin Vance, specifically asked Dr. Chao to keep this operation "off the books" because it involved an off-label use of a Pipeline.

194.   The Defendants concealed off-label Pipeline use in the proctor program in other instances as well. When physicians contemplated off-label use of a Pipeline in an operation that would otherwise qualify for the proctor program, the Defendants' sales representatives encouraged the physicians to falsify records to reflect on-label use and then to request that the Defendants send a proctor. For example, physicians were encouraged to indicate that the diameters of aneurysms were large enough to qualify as on-label use, when in fact the aneurysms were too small to constitute an on-label use.

195.   Sometimes doctors refused to proctor off-label Pipeline operations because of their concerns about involvement in illegal, off-label promotion. In one instance, Dr. Peter Kim Nelson refused to proctor an off-label case in Oklahoma. Joel Harris, the Defendants' National Sales Manager for Pipelines, tried to convince Dr. Nelson to change his mind. When Dr. Nelson refused, Mr. Harris found a different proctor, and the off-label use and proctoring went ahead as planned, but without Dr. Nelson.

196.   The Defendants and their employee Joel Harris encouraged physicians to proctor off-label uses of Pipelines in other instances over the objections of other

54

1  doctors. For example, Joel Harris worked with the Defendants' regional sales
2  managers, and reported to the Defendants' Vice President of Sales, John Zehren. The
3  Defendants knew certain proctors objected to illegal, off-label promotion of Pipelines
4  through the proctor program, and it was the Defendants' practice to send other
5  proctors, who the Defendants knew would not object, to work off-label cases.

6  ***The Defendants Include Off-Label Cases in the Proctor Program***

7      197.   Despite the Defendants' attempts to conceal and minimize the off-label
8  uses of Pipelines in proctored cases, many such cases are recorded as off-label. The
9  Defendants maintain a password-protected website
10  (https://pipelineportal.covidien.com), which they call the Pipeline Portal, where
11  doctors can communicate with the Defendants about Pipeline cases (that is, about an
12  operation for which a doctor is considering using a Pipeline). Based on information
13  and belief, the information contained in this website confirm this Complaint's other
14  evidence of high rates of off-label use in the proctor program.

15      198.   Since the start of the proctor program in 2011 the Defendants have
16  maintained a three-physician panel to consider and approve proposed off-label uses of
17  Pipelines, and to determine whether the Defendants should send a proctor to assist
18  with a proposed Pipeline case. The Defendants pay the members of this panel for their
19  work evaluating proposed Pipeline cases.

20      199.   The three physicians initially involved in approving off-label use for the
21  proctor program were Dr. Adam Arthur, Dr. John Gaughen, and Dr. Tibor Becske. In
22  2013, however, Dr. Gaughen resigned from this role because he was uncomfortable
23  with the high volume of off-label uses approved for inclusion in the proctor program.
24  He was replaced in this role by Dr. Woodward, who apparently was not concerned by
25  frequent off-label use and profited from such usage, reaping more than $250,000 in
26  payments from the Defendants in 2013-2015 and an additional $380,000 to companies
27  under his control, much of which related to off-label uses of Pipelines.

28

55

200.   In 2011, at the beginning of the proctor program, the Defendants were more secretive about allowing off-label uses in the proctor program. The decisions of the physician panel regarding whether to allow and proctor off-label cases were not recorded in a widely accessible internet portal, but were made via the Defendants' corporate email systems. The Defendants euphemistically referred to proctored cases of off-label use as "compassionate use" cases, however this term is misleading because "compassionate use" has a commonly understood meaning in the medical community, in which the FDA can grant a patient access to an investigational treatment if numerous strict criteria are met. The Defendants' so-called compassionate use cases did not seek to meet such FDA criteria.

201.   Eventually, the Defendants transitioned away from their secretive email system for documenting off-label use in the proctor program, and began recording decisions regarding off-label use in the proctoring program in the Pipeline Portal, the password-protected website Defendants used to communicate with doctors contemplating use of a Pipeline.

202.   Through the Pipeline Portal, a doctor in training for Pipeline use can upload information about a proposed case, including a brief medical history and images of the aneurysm to be treated. The Defendants' three-doctor panel then reviews this information and determines whether the case is suitable for use of a Pipeline, and whether the Defendants should send a proctor.  This way the Defendants and their doctor panel frequently approved off-label uses of Pipelines and frequently send paid proctors to assist in cases of off-label use.

203.   By paying lucrative monetary kickbacks in a variety of forms for off-label use the Defendants promote off-label use of Pipelines.

56

*"Advanced" Proctor Training in Off-Label Use*

204.    Defendants' proctor program further promoted off-label use in the form of special training courses in off-label use for aspiring proctors, beginning in or around 2013.

205.    Defendant Medtronic developed these "advanced training" courses, in which an off-label Pipeline operation would be used to train an aspiring proctor. Off-label use frequently involves complications not encountered in standard, on-label uses of Pipelines that the FDA has determined are safe and effective. As such, off-label Pipeline cases are ideal for "advanced" training.

206.    To be eligible for such advanced training, Medtronic required a doctor to first perform five Pipeline operations under the supervision of a proctor.

207.    Such advanced training (i.e., training in off-label use) was overseen by highly compensated proctors at their home institutions. These training courses were held at the University of Buffalo in New York (under the supervision of Drs. Elad Levy and Adnan Siddiqui), the Mayo Clinic in Jacksonville, Florida (Dr. Ricardo Hanel), New York University (Drs. Tibor Becske and Peter Nelson), the University of Utah (Dr. Philipp Taussky), and in Knoxville, Tennessee (Dr. Britton Keith Woodward).

## 2.    The Defendants Paid For And Encouraged Publication Of A Study Promoting Off-Label Use

208.    Doctors consult studies reported in scientific and medical journals to learn about new research and evaluate what treatments can best serve patients. Thus, one way for a device manufacturer to promote sales is to encourage the publication of studies describing the safety and efficacy of its products. But a device manufacturer who promotes publication of studies regarding off-label use of its products is guilty of illegal off-label marketing.

57

209.   Not content with the illegally increased sales from their data collection kickback program, the Defendants leveraged the information from this program into even more illegal Pipeline sales. They did so by funding a study designed to promote the off-label use of Pipelines.

210.   The study, titled "International Retrospective Study of the Pipeline Embolization Device: A Multicenter Aneurysm Treatment Study," is referred to by Defendants as the IntrePED study. It was published in American Journal of Neuroradiology on October 29, 2014, and is attached as Exhibit 9.

211.   This study lists twenty-three co-authors, including Dr. Woodward. It contains a "Disclosures" section at the end, which discloses payments received by authors that could potentially give rise to conflicts of interest, as is customary for studies in medical journals. Such disclosures are provided for twenty of the twenty-three authors. Of the twenty disclosures, nineteen report receiving payments from the Defendants. Dr. Elad Levy is the sole author to make a disclosure while omitting mention of the Defendants, however, CMS Open Payments Data reveal that he like the other nineteen doctors also received numerous Pipeline related payments from the Defendants. Therefore, nearly all the study's authors were paid by the Defendants.

212.   Of the nineteen authors reporting payments from the Defendants, five report payments related to the Defendants' proctor program.[5] Yet, it is highly likely that more than five of the authors have served as proctors. Ten of the authors appear in the list of likely proctors contained in Exhibit 1, based on CMS Open Payments Data.[6]

_____

[5] Those reporting proctor payments are Doctors Demetrius Lopes, Edoardo Boccardi, Defendant Britton K. Woodward, Shervin Dashti, and Alain Bonafe.

[6] Those authors listed in Exhibit 1 are Doctors Adnan Siddiqui, Defendant Britton K. Woodward, Cameron McDougall, David Fiorella, Demetrius Lopes, Elad Levy, Josser Delgado Almandoz, Pascal Jabbour, Ricardo Hanel, and Raymond Turner.

213.   Payments received from the Defendants listed in the study's disclosure section include: grants, consulting fees, honoraria, board memberships, payments for lectures, travel to meetings, fees for data monitoring, and opaquely described "personal fees." In addition, the study's disclosure section reveals that the Defendants provided authors "funding for enrollment in clinical trial," and "payment for enrolled patients." The study further notes that the data registry on which it is based "was funded and supported by Covidien."

214.   The study analyzes data from 793 patients treated with Pipelines for 906 aneurysms. This data was obtained through the Defendants' data collection kickback program, at an approximate cost of up to $1 million paid by Defendants to treating doctors (793 patients times approximately $1,250 per patient from the data registry kickback program). The Defendants' cost for these kickbacks is small relative to the approximately $12.7 million in related Pipeline sales to these patients' and their largely governmental insurers (906 Pipelines multiplied by approximate $14,000 cost, on the lower end of the current $13,700 to $15,480 range that the Defendants charge for a single Pipeline).

215.   The Defendants generated a data set through the payment of kickbacks, and paid their proctors even larger kickbacks to author a study analyzing this data. The study would not have been undertaken or published without the Defendants' direct financial support.

216.   Although other devices that are comparable to Pipelines existed at the time the study was published, the study exclusively uses data relating to the use of Pipelines, and competing products from manufacturers other than the Defendants are not mentioned.

217.   The study aggressively promotes the use of Pipelines, and specifically promotes off-label use of Pipelines. It analyzes its data in four sub-groups, based on size and location of the aneurysms: (i) aneurysms in the internal carotid artery with

1    diameter greater than or equal to 10 mm, (ii) aneurysms in the internal carotid artery

2    with diameter less than 10 mm, (iii) aneurysms located in other parts of the anterior

3    circulation, and (iv) aneurysms located in the posterior circulation.

4       218.   Of these sub-groups, the first category of aneurysms often – though not

5    always – are treated through an on-label use, but this is not true for all internal carotid

6    artery aneurysms because not all aneurysms in the internal carotid artery are within

7    the approved C2-C6 range for Pipelines, and not all such aneurysms have wide necks.

8    The second group requires off-label treatment because it only includes aneurysms

9    with diameter less than 10 mm. The third group also requires off-label treatment

10    because other parts of the anterior circulation (e.g. the anterior cerebral artery, the

11    middle cerebral artery) are not within the internal carotid artery. The fourth group

12    requires off-label treatment as well because the posterior circulation (e.g. the posterior

13    communicating artery, the posterior cerebral artery) is not within the internal carotid

14    artery.

15       219.   In total, only 34.7% of the aneurysms treated with Pipelines in the study

16    were in the first group, meaning that at least 65.3% of uses reported in the study

17    require off-label treatment.

18       220.   The stated purpose of the study was "to determine neurologic

19    complication rates following Pipeline Embolization Device placement for intracranial

20    aneurysm treatment in a real-world setting." That is, to determine how often serious

21    harm results to patients from the use of Pipelines.

22       221.   The study's main conclusion is "Aneurysm treatment with the Pipeline

23    Embolization Device is associated with the lowest complication rates when used to

24    treat small ICA [internal carotid artery] aneurysms." That is, Pipelines are safest when

25    used to treat small aneurysms, which is an off-label use not approved by the FDA.

26       222.   The study also suggests follow-up studies be performed, with a special

27    focus on off-label applications, "Ultimately, further comparative studies, especially in

28

the case of small ICA aneurysms, are needed to determine which subsets of intracranial aneurysms would benefit most from PED placement compared with endosaccular coiling."

223.   As reflected in the Defendants' worksheet (reproduced in Exhibit 5) which grants sales personnel credit toward their promotional activity quota for "Pipeline IntrePED Data review," the Defendants view the IntrePED study as part of their sales operations.

224.   Based on information and belief, the Defendants paid for this study to promote off-label Pipeline use, and in fact used the study to promote off-label Pipeline use following its publication.

### 3. The Defendants' Employees And Agents Promote Off-Label Use During In-Person Meetings

225.   The Defendants' employees and proctors encourage off-label use of Pipelines during in-person meetings. On one occasion in 2014 Dr. Chao was encouraged to proctor an off-label Pipeline operation at Kaiser Foundation Hospital in Fontana, California. Sales employees of Defendant Medtronic, Jason Roberts and Justin Vance, specifically asked Dr. Chao to keep this operation "off the books" because it involved an off-label use.

226.   Similarly, the Defendants' National Sales Manager for Pipelines, Joel Harris (together with the Defendants' regional sales managers), encouraged physicians to proctor off-label uses of Pipelines on numerous occasions. In one instance, Dr. Peter Kim Nelson refused to proctor an off-label case in Oklahoma despite Mr. Harris' encouragement. Nonetheless, that off-label operation was proctored anyway because Mr. Harris successfully encouraged a different physician to proctor the case.

227.   During a Pipeline training meeting attended by Dr. Chao in 2011 at the Green Valley Ranch luxury resort-spa-casino near Las Vegas, Nevada, speakers working on behalf of the Defendants promoted off-label use of Pipelines. For

61

1   example, at this meeting Dr. Edoardo Boccardi stated that he treats every aneurysm

2   with Pipelines and that Pipelines are safe for off-label treatment.

3          228.   Dr. Moran, another proctor who also serves as the Defendants' Chief

4   Medical Officer, informed Dr. Chao that he uses Pipelines for almost all aneurysms

5   regardless of the aneurysm's location, and Dr. Moran recommended Pipelines as easy

6   to use even to treat aneurysms in arteries and artery segments far beyond Pipelines'

7   FDA-approved range. Dr. Moran made these statements while proctoring a PFED

8   operation in 2015 at Kaiser Permanente Los Angeles Medical Center.

9          229.   The Defendants' sales staff are present at most or all operations using

10  Pipelines, because as described above Pipelines are typically delivered by the

11  Defendants' sales staff for each Pipeline operation. Each such occasion presents

12  opportunities for in-person off-label promotion by the Defendants.

13         230.   The Defendants' other employees and representatives similarly

14  encourage off-label use of Pipelines during in-person meetings with other physicians,

15  and sometimes conceal the extent of Pipelines' off-label use.

16         **4.    The Defendants' Training Manuals Promote Off-Label**
17              **Usage**

18         231.   The Defendants promote off-label uses for Pipelines through training

19  manuals that encourage use of Pipelines in artery segments outside of their approved

20  C2-C6 range in the internal carotid artery. The Defendants' sales personnel give these

21  manuals to doctors.

22         232.   The PFED In-Service Guide provided by Defendants sales' personnel to

23  doctors contains a page titled "Tips & Techniques: Small Vessel Deployment"

24  (excerpts reproduced in Exhibit 8). This slide depicts the use of the PFED in a

25  transparent tube with 1.5 mm diameter, demonstrating that the PFED could be used in

26  such a narrow blood vessel. The tube is very prominently labeled as having a 1.5 mm

27  diameter, indeed this appears in large red text that is repeated seven times. Yet, 1.5

28

62

mm is far smaller than the range of diameters of the internal carotid artery. The average diameter of an adult's internal carotid artery is greater than 4 mm, with a standard deviation of less than 1mm. This means that for an adult to have an internal carotid artery with a diameter of 1.5 mm would be so rare as to practically never occur. Therefore, the Defendants' promotion of Pipelines for use in such narrow blood vessels is promotion for an off-label use.

233.   The PFED Interactive In-Service Guide provided by Defendants sales' personnel to doctors contains a page titled "Pipeline Flex Embolization Device Technology" (excerpts reproduced in Exhibit 6). This page identifies four different zones of a patient's body that a PFED may traverse (beginning from near the groin) in order to reach an aneurysm in the head, and touts the technology behind the PFED's delivery system that enables it to successfully pass through these different parts of the body. This page indicates that the PFED can reach as far into the head as the "M1 bifurcation." M1 is a reference to the first segment of the middle cerebral artery. The middle cerebral artery is not part of the internal carotid artery. Any use of the PFED in the middle cerebral artery would be an off-label use.

234.   The PFED Training Manual that Defendants sales' personnel give to proctors contains a page titled "Distal Deployment Technique: Push Delivery Wire" (excerpts reproduced in Exhibit 7). This page contains an image of a PFED being deployed to treat a posterior communicating aneurysm. Such aneurysms occur in the posterior communicating segment, which is beyond Pipelines' FDA-approved range. Therefore, this is a depiction of an off-label use. Notably, the image on this manual page is taken from an operation performed by proctors including Dr. Moran.

235.   The Defendants promote the off-label use of Pipelines through the depictions and descriptions of off-label uses contained in these manuals, and in related training provided to doctors including during proctor training.

**5.    The Defendants Manufacture And Sell Pipelines In Sizes Designed For Off-Label Use**

236.    The Defendants manufacture different size Pipelines based on (i) the length of the aneurysm neck to be blocked, which determines the required length of the Pipeline's mesh cylinder, and (ii) the diameter of the blood vessel at the site of the aneurysm, which determines the required diameter of the Pipeline's mesh cylinder.

237.    The Defendants instruct doctors to use a Pipeline with a labeled diameter approximating the largest diameter of the target blood vessel where the aneurysm is located. Logically, the diameter of the Pipeline should roughly match the diameter of the blood vessel, because the Pipeline will reinforce, and essentially become a part of, the blood vessel wall.

238.    The Defendants manufacture PFEDs with labeled diameters as small as 2.5 mm. Yet, the C2-C6 segments of the internal carotid artery, for which Pipelines are approved, are very rarely as narrow as 2.5 mm. As discussed above, the average diameter of an adult's internal carotid artery is greater than 4 mm, with a standard deviation of less than 1 mm.  Therefore, the Defendants manufacture and sell versions of Pipelines that they know will be used overwhelmingly in off-label applications. Data available to the Defendants through various sources including their data collection kickback program would clearly demonstrate that the Defendants' smaller diameter devices are overwhelmingly used in off-label applications.

**6.    Additional Off-Label Promotion Of Pipelines In Conjunction With The Defendants' Axium Coils**

239.    Aside from the foregoing types of off-label promotion for use of Pipelines in unapproved artery segments or to treat small aneurysms, the Defendants undertook another form of illegal, off-label promotion. The Defendants promoted the simultaneous use of Pipelines and the Defendants' other aneurysm treatment products, although the FDA has not approved the simultaneous use of Pipelines and these other

64

products. Specifically, the Defendants promoted the use of Pipelines in conjunction with the Defendants' Axium Coils.

240.    Axium Coils are flexible coiling wires designed to be placed inside of an aneurysm, where they bunch up and disrupt blood flow in the aneurysm, causing blood to clot. This clotting effectively blocks off the aneurysm from the artery thereby reducing the risk of rupture and shrinking the aneurysm over time.

241.    Coiling is a commonly used treatment for aneurysms that predates the use of Pipelines and similar products, but coils have certain drawbacks, including difficulty in treating large or wide necked aneurysms (which Pipelines are designed to treat).

242.    When the Defendants obtained FDA approval for certain uses of Pipelines they were required to demonstrate through clinical trials that those uses were safe and effective. The Defendants did not supply any data to the FDA showing that the use of Pipelines combined with coils is safe and effective, and the FDA approved indication for Pipelines does not include the simultaneous use of a Pipeline and coils to treat the same aneurysm. Any such use of a Pipeline is off-label.

243.    Pipelines are meant to be effective without the use of coils, and the price of a Pipeline is in significant part based on the price of treating an aneurysm solely with coils. Any number of coils may be used to treat a single aneurysm, depending on the volume of the aneurysm. One study found a range of three to 41 coils used per aneurysm, with an average of 11.7 coils. The Defendants sell different versions of their Axium Coils at costs between approximately $1,500 and $2,500 per coil. Thus, the use of multiple coils can be expected to be costly, with a price roughly equivalent to the use of one Pipeline.

244.    The Defendants realized that their Pipeline sales could reduce their Axium Coil sales, and that they stood to profit by promoting the combined use of

65

Pipelines and Axium Coils, even though this constitutes off-label use. So, that is what they did.

245.   Through the proctor program the Defendants encouraged the use of Axium Coils by providing more proctoring assignments (i.e. and, hence, paying more kickbacks) to doctors who used Axium Coils alongside Pipelines. This has resulted in a preference among certain proctor physicians for Axium Coils over similar, competing coil products.  For example, a presentation by Defendant Medtronic's Pacific Northwest region sales team titled "FY 17 ES Growth Plan," excerpts of which are reproduced in Exhibit 10, lists as an action item "Utilize ES friendly proctors for Pipeline cases," naming Doctors Ryan Priest and Jeremy Fields. The references to "ES" are to Medtronic's "endosaccular" products, namely coils. This same presentation lists another action item to establish a regional roundtable program, "to cover pipe but review coils to create exposure and word of mouth."

246.   In 2011, Dr. Chao attended a Pipeline training meeting at the Green Valley Ranch luxury resort-spa-casino near Las Vegas, Nevada. At a dinner planned as part of the training meeting, Dr. Chao spoke to the Defendants' proctor, Dr. Tibor Becske. At this dinner Dr. Bescke recommended to Dr. Chao the use of Pipelines together with coils in order to treat certain types of aneurysms (specifically, intradural aneurysms). These aneurysms were believed to present an increased risk of delayed rupture after an initially successful Pipeline operation. The Defendants were aware of such concerns about this type of aneurysm, and promoted the combined use of Pipelines and Axium Coils to treat such aneurysms, even though this is an off-label use.

247.   The Defendants' Pipeline kickback programs and off-label marketing have succeeded in increasing the Defendants' sales of Axium Coils as well as Pipeline sales. Prior to the Defendants' marketing of Pipelines and implementation of corresponding kickback programs, the Defendants' Axium Coils had an

approximately 6% share of the market for aneurysm treatment coils in 2011. Following the introduction of Pipelines and related kickback programs, the Defendants' coil market share more than doubled to 15% by 2015.

248.   This off-label cross promotion of Pipelines and Axium coils was especially effective in increasing Axium coil use by current or aspiring Pipeline proctors. For example, before Defendants began cross promoting Pipelines and Axium coils, Dr. Alexander Coon exclusively used Target brand coils sold by Defendants' competitor, Stryker. However, following Defendants' off-label marketing push Dr. Coon switched to using Axium for half of his coils.

249.   The Defendants' off-label promotion of the combined use of Pipelines and Axium Coils is further confirmed by the Defendants' worksheet (reproduced in Exhibit 5) which grants the Defendants' Pipeline sales personnel credit toward their promotional activity quota for the item "Coil Case in Target Account."

D.   **Certain Off-Label Uses Promoted by the Defendants Pose Serious Health Risks To Pipeline Patients**

250.   Two of the off-label uses promoted by the Defendants present an elevated, and poorly understood, risk of serious health problems to Pipeline patients. First, simultaneous use of Pipelines in conjunction with the Defendants' coils. Second, use of Pipelines in and near small-diameter arteries beyond the FDA-approved range of C2-C6 in the internal carotid artery.

251.   The heightened risks associated with these off-label Pipeline uses are poorly understood because the Defendants have not performed adequate safety testing. As determined by the FDA, the safety of Pipelines has only been sufficiently tested in the C2-C6 range of the internal carotid artery, and has only been sufficiently tested for the standalone use of Pipelines (without coils or other ancillary devices).

252.   The Defendants' off-label promotion of Pipelines for simultaneous use with coils poses a heightened risk to patients. This heightened risk results from the

67

combination of (i) blood thinners that are used when placing a Pipeline in a patient's artery, (ii) the increased likelihood of rupturing an aneurysm by filling it with coils, and (iii) the effect of a Pipeline to impede access to the ruptured aneurysm. If an aneurysm ruptures while a patient is on blood thinners this presents a heightened risk of death or severe injury due to internal bleeding, which is even harder to remedy when a Pipeline blocks a doctor's access to the aneurysm.

253.   Such a rupture occurred in a 2014 operation performed at Kaiser Permanente Los Angeles Medical Center by Dr. Lei Feng. Before that operation, the patient was on blood thinners. Dr. Feng placed a Pipeline and placed coils in the aneurysm. A coil protruded through the aneurysm wall, rupturing the aneurysm. After the patient's aneurysm ruptured, Dr. Feng was forced to occlude the artery in order to save the patient's life, which caused a massive stroke and severe harm to the patient.

254.   Besides these complications from off-label Pipeline use in conjunction with coils, Defendants actively promote the use of Pipelines in and near small-diameter arteries located further into the head than the on-label internal carotid artery. Aneurysms in these arteries are likely treated with the Defendants' small-diameter Pipelines (such as the 2.5 mm diameter Pipelines, which are specifically designed for such off-label use).

255.   The Defendants promote Pipelines for use in and near small-diameter arteries despite experience demonstrating that such use presents heightened risks to patients. Pipelines' delivery system is not designed to operate in small-diameter arteries, which are often characterized by complicated twists and turns (referred to in medical parlance as tortuous anatomy). When used in small-diameter arteries and tortuous anatomy, Pipelines' delivery system is significantly more likely to break or become stuck, posing heightened risks of serious medical problems to patients.

256.   The Defendants' sales manager Jason Roberts informed Dr. Chao that the Defendants experienced problems with the PED, where parts of the PED's delivery

68

system (specifically, its distal wire and capture coil) would become entangled in small-diameter arteries. This entanglement made removing the PED's delivery system difficult. Attempts at removal in these cases resulted in tearing of the artery, internal bleeding, and even death. In particular, the Defendants' experience demonstrated that such complications occurred in the anterior choroidal artery and in perforating branches of cerebral arteries.

257.   In one operation performed by Dr. Cameron McDougall at Barrow's Neurological Institute in Phoenix, Arizona, a part of the PED's delivery system (the distal tip) became entangled in a perforating artery. Dr. McDougall then had to break off the entangled part of the delivery system (by twisting the delivery wire in place within the artery) to retrieve the remainder of the delivery system. This broken segment of the delivery system remained in the patient, which may cause significant medical complications in the future. A similar disaster occurred in an operation performed by Dr. Li-Mei Lin, in which a PED delivery system became entangled in a perforating artery. In trying to remove the device, she punctured the artery and the patient died from massive hemorrhaging.

258.   Jason Roberts told Dr. Chao that a different, but related, set of problems occurred with the PED's successor, the PFED. The Defendants experienced problems with the microcatheters used in Pipelines' delivery systems when trying to navigate tortuous anatomy. Initially the Defendants used the Marksman microcatheter, which they eventually replaced with the Phenom microcatheter, though the same type of problems continued. In tortuous anatomy, the microcatheter becomes kinked and instead of maintaining its circular shape, it partially collapses or takes on an oval shape, thereby pinching the other components of the delivery system and immobilizing the PFED within the microcatheter, such that the PFED cannot be deployed in the patient as intended. Dr. Chao experienced such problems when he used the PFED, and reported these problems to the FDA.

69

259.   In or around June 2015, Dr. Chao performed an operation in which two Pipeline delivery systems broke inside of a patient and had to be removed. Following that operation Jason Roberts called other Medtronic employees, and in that call the employees discussed similar problems identified in approximately twenty to thirty other operations.

260.   The Defendants sought to conceal problems with use of Pipelines in small-diameter arteries. For example, Jason Roberts informed Dr. Chao that Medtronic Senior Vice President of Regulatory Affairs David Breiter instructed Roberts not to discuss such problems with Dr. Chao because of Dr. Chao's work for the FDA. The Defendants continue to experience problems with use of Pipelines in small-diameter and tortuous arteries, and have delayed or avoided reporting these problems to the FDA (in part due to the Defendants' desire to obtain an expanded indication for Pipelines in connection with the PREMIER study).

261.   By concealing serious complications arising from off-label use from the FDA and simultaneously promoting these off-label uses, the Defendants put the safety of Pipeline patients at risk.

## IX. DEFENDANTS CAUSED THE SUBMISSION OF FALSE CLAIMS TO FEDERAL AND STATE HEALTH CARE PROGRAMS

262.   Defendants knowingly caused to be submitted thousands of false claims to federal and state agencies as a result of the Defendants' payment of illegal kickbacks and off-label marketing campaign.

263.   A defendant is liable under the FCA and corresponding state laws where the following elements are present: (i) a claim that defendants caused to be made to the government, or a record related to a claim, (ii) which claim or record is false, (iii) which claim or record defendants knew was false, and (iv) which claim or record is material. Knowingly under the FCA means with actual knowledge, acting in deliberate ignorance or acting in reckless disregard of the truth.

70

264. Here, any claim for payment from a government health care program that includes Pipelines or related services resulting from the Defendants' payment of kickbacks constitutes a false claim for purposes of the FCA. *See* 42 U.S.C. §1320a-7b(g).

265. Any certification of compliance with the Anti-Kickback statute made on a Provider Agreement (Form CMS-855) or Hospital Cost Report (Form CMS-2552) for Medicare, and any similar certification made to Medicaid or other government health care programs, constituted a false record if made by a physician or institution in connection with a use of Pipelines tainted by kickback payments from the Defendants.

266. Based on the Defendants' off-label marketing, any off-label claims for reimbursement for Pipelines and related services from Medicaid, Medicare or other federal or state health care programs constitute false claims. Such claims are false because compliance with federal law regarding medical device labeling is a precondition of obtaining reimbursement under these programs. Similarly, for physicians and hospitals targeted by the Defendants' off-label marketing, any provider agreements and claim forms on which the physicians and hospitals certified compliance with health care laws and program rules were false records.

267. Defendants knew, or were deliberately ignorant or reckless in not knowing, the falsity of these claims and records. As large, legally sophisticated medical device companies the Defendants are experienced with applicable laws regarding medical device labeling and the Anti-Kickback statute. Medtronic maintains an Office of Ethics and Compliance that employs at least two people whose duties include "Off Label Risk Mitigation." Medtronic's sales staff are required to complete off-label compliance training. In addition, Defendants have initiated two separate recalls since 2013 for Pipelines because they were shipped with labeling that had not been approved by the FDA. Further demonstrating the Defendants' knowledge of

71

falsity, the Defendants' employees repeatedly asked physicians to keep off-label Pipeline operations "off the books."

268.   The Defendants' knowledge of their violation of the Anti-Kickback statute is demonstrated in part by their attempts to conceal kickbacks and to disguise kickbacks as legitimate compensation for services provided by physicians under the proctor program and data collection program.

269.   Defendants' false claims and records are material because they have a natural tendency to influence the decisions of the government about whether to reimburse off-label and kickback-induced uses of Pipelines, and whether to accept physicians' and hospitals' certifications of compliance with applicable laws including the Anti-Kickback statute. If the government payors learned of the Defendants' off-label marketing scheme and kickback payments, they would or should not not have relied on these false records or accepted these false claims, and would not have paid millions of dollars for off-label and kickback-induced uses of Pipelines.

A.   **Value Of False Claims Submitted To Medicare And Medicaid**

270.   The Defendants' Pipeline sales have been paid for approximately 25% by Medicaid, approximately 25% by Medicare, and approximately 50% either privately or by other federal and state health care programs.

271.   During the Defendants' off-label promotional campaign, any off-label claims for reimbursement for Pipelines from Medicaid, Medicare or other federal or state health care programs would have constituted false claims. As discussed above, approximately 60% of the Defendants' Pipeline sales are for off-label uses.

272.   Based on approximately $80 million of Pipeline sales in 2015, there were approximately $48 million of off-label Pipeline sales in that year. Of this amount, Medicaid paid approximately $12 million and Medicare also paid approximately $12 million. The total number and cost of off-label Pipeline sales from 2011 through the present that have been reimbursed by Medicare and Medicaid is likely much greater

1  than these figures. Each such off-label reimbursement constituted a false claim due to

2  the Defendants' off-label marketing program.

3       273.  The Defendants' kickback scheme has caused the submission of

4  additional false claims. Data reported in the Defendants' IntrePED study provides an

5  example of such claims. Every claim to a government health care program related to a

6  Pipeline use reflected in the Defendants' IntrePED study is a false claim. These claims

7  are likely all tainted by data collection kickbacks, and many are also tainted by

8  kickbacks made under the proctor program. The substantial majority of the 906

9  Pipelines reported in the "study" were used off-label, many of which were also tainted

10  by kickbacks.

11       274.  Each year Medicare and Medicaid pay millions of dollars' worth of false

12  claims relating to thousands of Pipelines that are off-label, tainted by kickbacks, or

13  both.

14  **B.  <u>Examples Of False Claims Submitted To Medicare</u>**

15       275.  Doctors involved in the Defendants' proctor program have submitted

16  numerous claims to Medicare for performing medical procedures that use Pipelines.

17  All such claims are false claims, because they are tainted by kickbacks paid to the

18  proctors by the Defendants. In addition, about 60% of such claims are false claims on

19  the independent ground that they relate to off-label uses of Pipelines promoted by the

20  Defendants' off-label marketing.

21       276.  While it is not feasible to describe all such false claims in detail in this

22  Complaint, and the details of many such claims are not entirely in Dr. Chao's

23  possession, representative examples of the claims illustrate the Defendants' pattern of

24  causing physicians and hospitals to make false claims and false records.

25       277.  For example, Dr. Moran is a participant in the proctor program. While

26  proctoring a Pipeline operation in 2015 at Kaiser Permanente Los Angeles Medical

27  Center, Dr. Moran told Dr. Chao that he uses Pipelines for almost all aneurysms

28

73

regardless of the aneurysm's location, and that he uses Pipelines for almost all his aneurysm patients.

278.   Records from the Center for Medicare and Medicaid Services show that Dr. Moran performed and supervised numerous operations using Pipelines during 2012-2014.

279.   CMS maintains a database reflecting medical procedures provided to Medicare beneficiaries. This database lists information regarding types of procedures performed, number of procedures performed, and the physician performing the procedure. The CMS database assigns numerical codes to different procedures using the Healthcare Common Procedure Coding System ("HCPCS"), which itself is based on a code set called Current Procedural Terminology ("CPT").

280.   The code 61624 is the CPT and HCPCS code used for performance of a procedure that seeks to occlude, or block off, an aneurysm, such as a procedure using a Pipeline. The code 75894 is the CPT and HCPCS code used for radiological supervision and interpretation of such a procedure (i.e. the use of imaging technology to monitor the placement of a Pipeline in a patient).

281.   The Defendants publish a Pipeline Embolization Device Coding and Reimbursement Guide, which lists various medical billing codes commonly associated with use of Pipelines. This guide is intended as a reference for physicians and hospital staff tasked with obtaining reimbursement for use of Pipelines. The guide lists different CPT codes applicable to use of Pipelines. The most prominently featured code in the guide is 61624 relating to "Transcatheter permanent occlusion or embolization" Another code listed by the guide is 75894-26 relating to "Transcatheter therapy, embolization, any method, radiological supervision and interpretation" (the "-26" modifier code denotes services performed by a physician, as opposed to a different technician).

74

282.   The CMS database indicates that during 2012-2014 Dr. Moran performed 68 services billed to Medicare under the HCPCS code 61624, for "Occlusion of abnormal artery" and 75 services billed to Medicare under the HCPCS code 75894, for "Radiological supervision and interpretation." The annual figures are broken out in the table below.

| Code | Procedure | 2012 | 2013 | 2014 | Total |
|---|---|---|---|---|---|
| 61624 | Occlusion of abnormal artery | 18 | 34 | 16 | 68 |
| 75894 | Radiological supervision and interpretation | 22 | 34 | 19 | 75 |

**Table 1. Medicare procedures billed by Dr. Moran during 2012-2014**

283.   It is common for a single operation to be billed under multiple codes. Most or all the 68 "occlusion" cases reflected above probably relate to the same patients and operations as the 75 "supervision" cases.

284.   Based on these 75 operations billed to Medicare by a participant in the Defendants' proctor program, and based on the proctor's statement to Dr. Chao that he uses Pipelines in almost all his aneurysm cases, Dr. Moran performed or assisted in roughly 70 operations billed to Medicare during 2012-2014 that used Pipelines.

285.   Through his participation in the proctor program Dr. Moran was exposed to, and participated in, the Defendants' off-label marketing. Based on his statement to Dr. Chao that he uses Pipelines in all aneurysms regardless of their location in the body, a significant number of these 70 operations used Pipelines in an off-label manner in arteries outside of Pipelines' approved range of C2-C6 within the internal carotid artery.

286.   Each of these roughly 70 Pipeline operations was tainted by kickbacks, due to Dr. Moran's receipt of hundreds of thousands of dollars from the Defendants. As discussed above, using the proctor program and data collection program, the Defendants made payments to participating physicians. Data on these payments is available from the CMS Open Payments database, which collects information on

1  payments from medical device companies to physicians, along with data about the

2  products that these payments relate to.

3       287.   The Open Payments data show that during 2013-2015 Dr. Moran

4  received 340 payments relating to "pipeline" or "flow diversion" devices, totaling

5  over $200,000 from Defendants Covidien LP, Covidien Sales LLC, Medtronic

6  Vascular, Inc., and Medtronic (through its Medtronic Neurovascular division). Most

7  of these payments relate to Dr. Moran's participation in the proctor program. The

8  following table summarizes the payments to Dr. Moran by the Defendants.

| Payor | 2013 | 2014 | 2015 | Total |
|-------|------|------|------|-------|
| Covidien LP | 969.68 | 30,892.71 | 0 | 31,862.39 |
| Covidien Sales LLC | 107,064.57 | 21,134.44 | 0 | 128,199.01 |
| Medtronic Neurovascular | 0 | 0 | 45,050.75 | 45,050.75 |
| Medtronic Vascular, Inc. | 0 | 0 | 598.13 | 598.13 |
| **Total** | 108,034.25 | 52,027.15 | 45,648.88 | 205,710.28 |

**Table 2. Defendants' Pipeline payments to Dr. Moran**

288.   Exhibit 2 contains a more detailed table showing each of the 340

payments received by Dr. Moran from the Defendants during this period that are listed

as relating to "flow diversion" or "pipelines." The payments occur frequently, and

many are in the thousands of dollars.

289.   As shown in Exhibit 2, these 340 documented payments fall under the

following categories: (i) food and beverage (total $5,817), (ii) compensation for

services (total $117,329), (iii) travel and lodging (total $60,222), (iv) royalty or

license payments (total $1,200), and (v) consulting fees (total $21,140).

290.   Dr. Moran traveled frequently in trips paid for by the Defendants,

including to popular vacation and resort destinations. Dr. Moran's travel for the

Defendants took him throughout the United States to popular vacation destinations

such as Miami and San Francisco, and to exotic international destinations such as

76

1  Buenos Aires, Argentina; Nice, France; and Madrid, Spain.[7] At each of these

2  international destinations the Defendants provided travel and lodging. A primary

3  purpose for such travel was to provide a substantial personal benefit to Dr. Moran in

4  exchange for his use and promotion of Pipelines.

5    291.    The above two tables confirm the relationship between Pipeline related

6  procedures performed by a physician and payments by the Defendants to that

7  physician. The Medicare billing data in Table 1 show that Dr. Moran performed

8  roughly twice the number of Pipeline procedures in 2013 as in 2014. The payments

9  data in Table 2 show that the Defendants paid Dr. Moran roughly twice as much in

10  2013 as in 2014.

11    292.    Further confirming that these payments relate to Dr. Moran's use of

12  Pipelines, the payments to Dr. Moran from Covidien entities ceased and payments

13  from Medtronic entities began at the beginning of 2015, precisely when Medtronic

14  acquired Covidien and the Pipelines business.

15    293.    Dr. Moran received off-label marketing and kickbacks from the

16  Defendants, and performed numerous operations using Pipelines, including off-label

17  uses. Medicare (and almost certainly other federal and state health care programs)

18  paid substantial amounts for Dr. Moran's Pipeline-related services, and for the

19  Pipelines used in these operations, all of which were tainted by the Defendants'

20  kickbacks and off-label marketing.

21    294.    Medicare's payment for Dr. Moran's Pipeline related services can be

22  easily verified and documented by the false records Defendants caused to be

23  submitted to Medicare. First, each of the approximately 70 Pipeline operations billed

24  by Dr. Moran to Medicare under HCPCS codes 61624 and 75894 during 2012-2014 is

25  almost certainly recorded in a Form CMS-1500 submitted to Medicare. In addition to

26

27    [7]*See supra* note 2 regarding international travel data.

28

1 identifying Dr. Moran as the physician and the relevant Pipeline related HCPCS
2 codes, these forms include information about the patient, the date of the procedure, the
3 hospital, and the patient's insurance coverage. These Forms CMS-1500 are rendered
4 false by Dr. Moran's receipt of kickback payments, by the Defendants' payment of
5 kickback payments, and by the Defendants' off-label marketing (for those operations
6 performed by Dr. Moran involving off-label use of a Pipeline).

7       295.   Each of these approximately 70 Pipeline operations is almost certainly
8 also reflected in interim hospital reimbursement forms (Form CMS-1450) and
9 Hospital Cost Reports (Form CMS-2552). While Dr. Moran may have performed
10 Pipeline operations at different hospitals, it appears that he performed many such
11 procedures at his home institution of Barnes-Jewish Hospital in St. Louis, Missouri.

12      296.   Medtronic's sales data show that Barnes-Jewish Hospital is among the
13 largest purchasers of Pipelines, accounting for $163,900 of Pipeline sales in the fiscal
14 quarter ended April 29, 2015, and $242,600 of Pipeline sales in the fiscal quarter
15 ended April 29, 2016 (see Exhibit 12).

16      297.   Because of the Defendants' kickback scheme and off-label marketing,
17 any interim hospital reimbursement forms and Hospital Cost Reports submitted by
18 Barnes-Jewish Hospital that reflect Pipeline procedures performed by Dr. Moran are
19 false claims. Such Hospital Cost Reports contain express falsehoods, because they
20 require the signatory to certify that the services represented in the report comply with
21 health care laws and regulations, including the Anti-Kickback statute.

22      298.   Any Medicare Provider Agreements (Form CMS-855I) in effect for Dr.
23 Moran during the 2012-2014 period when these approximately 70 Pipeline operations
24 were billed to Medicare also constitute false records that give rise to false claims. Like
25 the Hospital Cost Report, the Provider Agreement requires its signatory to certify
26 compliance with Medicare laws, including the Anti-Kickback statute. Because of Dr.

27
28

78

Moran's participation in the Defendants' kickback scheme and off-label marketing, these Provider Agreements represent false claims.

299.   Dr. Moran is one of many doctors who: (i) received kickbacks from the Defendants, (ii) were exposed to Defendants' aggressive off-label marketing, and (iii) used Pipelines (whether on- or off-label) in their medical practice. CMS data indicates that during 2013-2015 alone the Defendants made 8,484 payments related to "flow diversion" or "pipelines," to hundreds of different doctors (including Dr. Moran), totaling more than $5.7 million. Exhibit 1 contains a list of likely proctors with the total dollar amounts paid to them by the Defendants during 2013-2015. The Pipeline related claim forms and provider agreements submitted by these proctor physicians and their hospitals are additional false records that the Defendants caused to be submitted to Medicare, and the claims submitted by these physicians and hospitals are additional false claims that Defendants caused to be made to Medicare.

C.     **Evidence Of False Claims Submitted To State Health Care Programs**

300.   Medicaid is a partnership between state and federal government, and Medicaid claims are reimbursed jointly by the states and the United States. As such, when false claims relating to off-label use of Pipelines are submitted to Medicaid, these claims constitute false claims for purposes of the relevant state health care programs.

301.   Payments under the proctor program from the Defendants to physicians residing in different states establish that the Defendants' kickback scheme and off-label marketing were active in each of the states discussed in this Complaint. Therefore, it is highly likely that the health care programs run by these states paid false claims for Pipelines as a direct result of the Defendants' fraudulent conduct.

302.   As discussed above, the Defendants made kickback payments to physicians participating in the proctor program and the data collection program. Data on some of these payments is available from the CMS Open Payments database.

303.   The following table shows the amounts of payments made from the Defendants to doctors in each relevant state during 2013-2015, reported as relating to Defendants' "flow diversion" and "pipeline" products. States not discussed in this complaint are omitted from the table.

| State | Total Payments | State | Total Payments |
|---|---|---|---|
| California | 184,369.01 | Minnesota | 259,602.11 |
| Colorado | 109,899.58 | Montana | 460.09 |
| Connecticut | 2,901.17 | Nevada | 7,324.90 |
| Delaware | 190.39 | New Jersey | 45,866.51 |
| District of Columbia | 35,839.65 | New Mexico | 886.74 |
| Florida | 785,761.24 | New York | 992,112.97 |
| Georgia | 6,339.69 | North Carolina | 150,361.41 |
| Hawaii | 384.75 | Oklahoma | 8,168.97 |
| Illinois | 49,080.04 | Rhode Island | 93.92 |
| Indiana | 490.65 | Tennessee | 324,949.00 |
| Iowa | 5,376.67 | Texas | 182,466.29 |
| Louisiana | 15,744.07 | Vermont | 703.69 |
| Maryland | 289,969.02 | Virginia | 212,532.33 |
| Massachusetts | 34,527.99 | Washington | 53,979.63 |
| Michigan | 21,535.82 | | |

**Table 3. Defendants' payments to doctors by state 2013-2015**

304.   In addition to the evidence of the Defendants' multi-state kickback scheme presented in Table 3, likely participants in the Defendants' proctor program reside in most of these states as demonstrated in Exhibit 1. Also, likely proctors are affiliated with hospitals in most of these states, and such hospitals are known to purchase large amounts of Pipelines (as shown in Exhibit 12).

305.   As discussed above, Medicaid paid approximately $12 million for off-label uses of Pipelines in 2015 and an unknown additional amount, also believed to be in the millions of dollars, for on-label Pipeline uses that were tainted by the Defendants' kickbacks. Therefore, each year state Medicaid programs contribute millions of dollars to pay for off-label and kickback-induced uses of Pipelines.

306.   Based on these figures, and the nationwide scope of the Defendants' proctor program, (i) physicians in each of these states received off-label marketing and/or kickbacks from the Defendants, (ii) these physicians used Pipelines as intended by the Defendants (including in many off-label applications), and (iii) these physicians and their hospitals made related false claims to their respective state governments.

## Count I

## **Federal False Claims Act**

## **31 U.S.C. §3729(a)(1)(A) and (a)(1)(B)**

307.   Dr. Chao re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 306.

308.   This is a claim for treble damages and penalties for each false claim and each false statement under the False Claims Act, 31 U.S.C. §3729, *et seq.*, as amended.

309.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

310.   Because of the acts described above, the Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Government to approve and pay such false and fraudulent claims.

311.   Each sale of Pipelines that resulted from the Defendants' illegal marketing practices and/or illegal kickbacks represents a false or fraudulent record or statement. Each claim form, provider agreement, cost report, or other such form submitted to the Government from Pipeline sales resulting from the Defendants' illegal marketing and kickbacks is also a false or fraudulent record or statement. Each claim for reimbursement for such off-label or kickback-induced sales

81

1  submitted to a federal health insurance program represents a false or fraudulent
2  claim for payment.

3      312.  Dr. Chao cannot now identify each and every false claim for payment
4  that was caused by the Defendants' conduct. The false claims were presented by
5  hundreds or thousands of separate entities, across the United States, and over several
6  years. Dr. Chao has no control over or dealings with such entities and has no access
7  to the records in their possession.

8      313.  The Government, unaware of the falsity of the records, statements and
9  claims made or caused to be made by the Defendants, paid and continues to pay the
10 claims that would not be paid but for the Defendants' illegal off-label marketing
11 practices and illegal kickbacks.

12     314.  Because of Defendants' acts, the United States has been damaged, and
13 continues to be damaged, in substantial amount to be determined at trial. Federal
14 health insurance programs have paid thousands of claims amounting to tens or
15 hundreds of millions of dollars, for off-label sales for indications that were not
16 approved by the FDA and/or for sales that were illegally induced by the Defendants'
17 kickbacks.

18                                     **Count II**
19                   **California False Claims Act**
20         **Cal. Gov't Code §12561(a)(1) and (a)(2)**

21     315.  Dr. Chao re-alleges and incorporates by reference the allegations
22 contained in paragraphs 1 through 306.

23     316.  This is a claim for treble damages and penalties under the California
24 False Claims Act.

25     317.  Because of the acts described above, the Defendants knowingly
26 presented or caused to be presented, false or fraudulent claims to the California State
27 Government for payment or approval.

28

318.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

319.   The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal off-label marketing practices and illegal kickbacks.

320.   Because of the Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

**Count III**

**Colorado Medicaid False Claims Act**

**Colo. Rev. Stat. §25.5-4-305(1)(a) and (1)(b)**

321.   Dr. Chao re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 306.

322.   This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

323.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval.

324.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Colorado State Government to approve and pay such false and fraudulent claims.

325.   The Colorado State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented

83

1  by the Defendants, paid and continues to pay the claims that would not be paid but

2  for the Defendants' illegal off-label marketing practices and illegal kickbacks.

3       326.   Because of the Defendants' acts, the State of Colorado has been

4  damaged, and continues to be damaged, in substantial amount to be determined at

5  trial.

6                                    **Count IV**

7                         **Connecticut False Claims Act**

8                    **Conn. Gen. Stat. §4-275(a)(1) and (a)(2)**

9       327.   Dr. Chao re-alleges and incorporates by reference the allegations

10  contained in paragraphs 1 through 306.

11      328.   This is a claim for treble damages and penalties under the Connecticut

12  False Claims Act.

13      329.   Because of the acts described above, the Defendants knowingly

14  presented or caused to be presented, false or fraudulent claims to the Connecticut

15  State Government for payment or approval.

16      330.   Because of the acts described above, the Defendants knowingly made,

17  used or caused to be made or used false records and statements, and omitted material

18  facts, to induce the Connecticut State Government to approve and pay such false and

19  fraudulent claims.

20      331.   The Connecticut State Government, unaware of the falsity of the

21  records, statements and claims made, used, presented or caused to be made, used or

22  presented by the Defendants, paid and continues to pay the claims that would not be

23  paid but for the Defendants' illegal off-label marketing practices and illegal

24  kickbacks.

25      332.   Because of the Defendants' acts, the State of Connecticut has been

26  damaged, and continues to be damaged, in substantial amount to be determined at

27  trial.

28

                                        84

**Count V**

**Delaware False Claims and Reporting Act**

**Del. Code tit. 6, §1201(a)(1) and (a)(2)**

333.   Dr. Chao re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 306.

334.   This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act.

335.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

336.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

337.   The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal off-label marketing practices and illegal kickbacks.

338.   Because of the Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

**Count VI**

**District of Columbia False Claims Act**

**D.C. Code §2-381.02(a)(1) and (a)(2)**

339.   Dr. Chao re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 306.

85

340.   This is a claim for treble damages and penalties under the District of Columbia False Claims Act.

341.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

342.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the District of Columbia Government to approve and pay such false and fraudulent claims.

343.   The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal off-label marketing practices and illegal kickbacks.

344.   Because of the Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## Count VII

### Florida False Claims Act

### Fla. Stat. §68.082(2)(a) and (2)(b)

345.   Dr. Chao re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 306.

346.   This is a claim for treble damages and penalties under the Florida False Claims Act.

347.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

86

348.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

349.   The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal off-label marketing practices and illegal kickbacks.

350.   Because of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## Count VIII

### Georgia State False Medicaid Claims Act

### Ga. Code §49-4-168.1(a)(1) and (a)(2)

351.   Dr. Chao re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 306.

352.   This is a claim for treble damages and penalties under the Georgia State False Medicaid Claims Act.

353.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

354.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

355.   The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented

87

by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal off-label marketing practices and illegal kickbacks.

356.   Because of the Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

**Count IX**

**Hawaii False Claims Act**

**Haw. Rev. Stat. §661-21(a)(1) and (a)(2)**

357.   Dr. Chao re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 306.

358.   This is a claim for treble damages and penalties under the Hawaii False Claims Act.

359.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

360.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

361.   The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal off-label marketing practices and illegal kickbacks.

362.   Because of the Defendants' acts, the State of Hawaii has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

88

## Count X

### Illinois False Claims Act

### 740 Ill. Comp. Stat. 175 / 3(a)(1)(A) and (a)(1)(B)

363.   Dr. Chao re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 306.

364.   This is a claim for treble damages and penalties under the Illinois False Claims Act.

365.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

366.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

367.   The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal off-label marketing practices and illegal kickbacks.

368.   Because of the Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## Count XI

### Indiana Medicaid False Claims and Whistleblower Protection Act

### Ind. Code §5-11-5.7-2(a)(1) and (a)(2)

369.   Dr. Chao re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 306.

89

370.   This is a claim for treble damages and penalties under the Indiana Medicaid False Claims and Whistleblower Protection Act.

371.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

372.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

373.   The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal off-label marketing practices and illegal kickbacks.

374.   Because of the Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## Count XII

## Iowa False Claims Act

## Iowa Code §685.2(1)(a) and (1)(b)

375.   Dr. Chao re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 306.306

376.   This is a claim for treble damages and penalties under the Iowa False Claims Act.

377.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Iowa State Government for payment or approval.

90

378. Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Iowa State Government to approve and pay such false and fraudulent claims.

379. The Iowa State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal off-label marketing practices and illegal kickbacks.

380. Because of the Defendants' acts, the State of Iowa has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

**Count XIII**

**Louisiana Medical Assistance Programs Integrity Law**

**La. Rev. Stat. §46:438.3(A) and (B)**

381. Dr. Chao re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 306.

382. This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

383. Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

384. Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Louisiana State Government to approve and pay such false and fraudulent claims.

385. The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented

91

1  by the Defendants, paid and continues to pay the claims that would not be paid but
2  for the Defendants' illegal off-label marketing practices and illegal kickbacks.

3      386.   Because of the Defendants' acts, the State of Louisiana has been
4  damaged, and continues to be damaged, in substantial amount to be determined at
5  trial.

6                                   **Count XIV**
7                        **<u>Maryland False Health Claims Act</u>**
8                  **<u>Md. Code Ann. Health-Gen. Prov. §2-602(a)(1) and (a)(2)</u>**

9      387.   Dr. Chao re-alleges and incorporates by reference the allegations
10 contained in paragraphs 1 through 306.

11     388.   This is a claim for treble damages and penalties under the Maryland
12 False Health Claims Act.

13     389.   Because of the acts described above, the Defendants knowingly
14 presented or caused to be presented, false or fraudulent claims to the Maryland State
15 Government for payment or approval.

16     390.   Because of the acts described above, the Defendants knowingly made,
17 used or caused to be made or used false records and statements, and omitted material
18 facts, to induce the Maryland State Government to approve and pay such false and
19 fraudulent claims.

20     391.   The Maryland State Government, unaware of the falsity of the records,
21 statements and claims made, used, presented or caused to be made, used or presented
22 by the Defendants, paid and continues to pay the claims that would not be paid but
23 for the Defendants' illegal off-label marketing practices and illegal kickbacks.

24     392.   Because of the Defendants' acts, the State of Maryland has been
25 damaged, and continues to be damaged, in substantial amount to be determined at
26 trial.

27
28

**Count XV**

**Massachusetts False Claims Act**

**Mass. Gen. Laws ch. 12, §5B(a)(1) and (a)(2)**

393.   Dr. Chao re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 306.

394.   This is a claim for treble damages and penalties under the Massachusetts False Claims Act.

395.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts State Government for payment or approval.

396.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Massachusetts State Government to approve and pay such false and fraudulent claims.

397.   The Massachusetts State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal off-label marketing practices and illegal kickbacks.

398.   Because of the Defendants' acts, the State of Massachusetts has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

**Count XVI**

**Michigan Medicaid False Claim Act**

**Mich. Comp. Laws §400.607(1)**

399.   Dr. Chao re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 306.

93

1   400.   This is a claim for treble damages and penalties under the Michigan
2   Medicaid False Claim Act.

3   401.   Because of the acts described above, the Defendants knowingly
4   presented or caused to be presented, false or fraudulent claims to the Michigan State
5   Government for payment or approval.

6   402.   Because of the acts described above, the Defendants knowingly made,
7   used or caused to be made or used false records and statements, and omitted material
8   facts, to induce the Michigan State Government to approve and pay such false and
9   fraudulent claims.

10   403.   The Michigan State Government, unaware of the falsity of the records,
11   statements and claims made, used, presented or caused to be made, used or presented
12   by the Defendants, paid and continues to pay the claims that would not be paid but
13   for the Defendants' illegal off-label marketing practices and illegal kickbacks.

14   404.   By reason of the Defendants' acts, the State of Michigan has been
15   damaged, and continues to be damaged, in substantial amount to be determined at
16   trial.

17                              **Count XVII**
18                        **Minnesota False Claims Act**
19                  **Minn. Stat. §15C.02(a)(1) and (a)(2)**

20   405.   Dr. Chao re-alleges and incorporates by reference the allegations
21   contained in paragraphs 1 through 306.

22   406.   This is a claim for treble damages and penalties under the Minnesota
23   False Claims Act.

24   407.   Because of the acts described above, the Defendants knowingly
25   presented or caused to be presented, false or fraudulent claims to the Minnesota
26   State Government for payment or approval.

27
28
                              94