GLANCY PRONGAY & MURRAY LLP
Mark I. Labaton (SBN 159555)
mlabaton@glancylaw.com
Garth A. Spencer (SBN 335424)
gspencer@glancylaw.com
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:   (310) 201-9150
Facsimile:    (310) 201-9160

*Attorneys for Qui Tam Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>STATE OF CALIFORNIA,<br>STATE OF COLORADO,<br>STATE OF CONNECTICUT,<br>STATE OF DELAWARE,<br>STATE OF FLORIDA,<br>STATE OF GEORGIA,<br>STATE OF HAWAII,<br>STATE OF ILLINOIS,<br>STATE OF INDIANA,<br>STATE OF IOWA,<br>STATE OF LOUISIANA,<br>COMMONWEALTH OF<br>MASSACHUSETTS,<br>STATE OF MICHIGAN,<br>STATE OF MINNESOTA,<br>STATE OF MONTANA,<br>STATE OF NEVADA,<br>STATE OF NEW JERSEY,<br>STATE OF NEW MEXICO,<br>STATE OF NEW YORK,<br>STATE OF NORTH CAROLINA,<br>STATE OF OKLAHOMA,<br>STATE OF RHODE ISLAND,<br>STATE OF TENNESSEE, | CASE NO.: 2:17-cv-01903-MCS-SS<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE CLAIMS ACTS**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

STATE OF TEXAS,
STATE OF VERMONT,
COMMONWEALTH OF VIRGINIA,
STATE OF WASHINGTON,
and DISTRICT OF COLUMBIA,
*ex rel.* DR. KUO CHAO,

                  Plaintiffs,

    vs.

MEDTRONIC PLC, MEDTRONIC
VASCULAR, INC., MEDTRONIC
USA, INC., COVIDIEN LP, and
COVIDIEN SALES LLC,

                  Defendants.

Plaintiff/Relator, Dr. Kuo Chao, submits this Complaint on behalf of the United States of America, the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, Washington, and the District of Columbia (collectively "the States and the District of Columbia"). This Complaint against Defendants Medtronic PLC; Medtronic Vascular, Inc.; Medtronic USA, Inc.; Covidien LP; and Covidien Sales LLC (collectively the "Defendants").

**INTRODUCTION**

1.     This is an action to recover damages and civil penalties on behalf of the United States of America, the States and the District of Columbia, arising from false and/or fraudulent records, statements, and claims made, used, or presented and caused to be made, used, or presented, by the Defendants, and/or their agents, employees, and co-conspirators, in violation of the federal False Claims Act ("FCA"), 31 U.S.C. §3729 *et seq.*, as amended, and the governing statutes of the States and the District of Columbia.

2.     Beginning in or before 2011, and continuing to at least 2019, the Defendants illegally promoted two medical devices – the Pipeline Embolization Device (the "PED") and the Pipeline Flex Embolization Device (the "PFED," and together with the PED the "Pipelines").

3.     The Defendants promoted such illegal usage of Pipelines by paying doctors throughout the United States prohibited kickbacks to induce their usage these medical devices.

4.     A federal healthcare Anti-Kickback statute ("AKS") strictly prohibits such kickbacks. And the FCA imposes liability jointly and severally on both the heath care provider giving the kickback and anyone soliciting such a kickback.

5.      Pursuant to the FCA, liability for claims generated from kickbacks is automatic, and penalties and damages imposed by the FCA and state law for medical claims generated from such kickbacks are severe. The reason for is that kickbacks are presumed to taint the judgment of medical professionals. As a result, medical claims submitted to federal and state entities that are based on kickbacks are strictly presumed to be false claims for which both the provider and the recipient of such kickbacks are jointly and severally held strictly liable.

6.      Here, as set forth in detail below, Defendants gave doctors throughout the United States egregious and plentiful kickbacks in many forms. Defendants paid these kickbacks to induce doctors to use their Pipeline (and other) products. Defendants liberally doled out such kickbacks to doctors throughout the United States – often through Defendants' sales department – to promote sales of Defendants' Pipeline medical products.

7.      The Defendants generally charged more than $12,500 for a single Pipeline, and in some cases more than $15,000. During the time covered by this action, Defendants sold thousands of Pipelines annually resulting in total sales of hundreds of millions of dollars.

8.      According to SEC filings, the Defendants' financial success was due substantially to Pipeline sales tainted by kickbacks to prescribing physicians.

9.      A substantial portion of the Pipeline sales tainted by kickbacks have been reimbursed by federal and state health insurance programs, including Medicaid and Medicare. Defendants have caused these programs to pay millions of dollars of false or fraudulent claims, including but without limitation claims identified in this Complaint.

10.     Dr. Chao was never an employee of Defendants' companies, much less one in the claims department, and therefore does not have access to the claims Defendants submitted, the billing statements, requests for payment, or other such

documents but based on what he has learned from Defendant company employees, and what he pleads here, has strong factual reasons to believe that such kickbacks generated the submission at minimum of tens of millions of dollars in false claims to federal and state government entities.

11.     The FCA was enacted during the Civil War and was substantially amended in 1986. Congress amended the FCA then to enhance the federal government's ability to recover losses sustained from fraud against the United States after finding that fraud in federal programs was pervasive and that the FCA, which Congress characterized as the primary tool for combating fraud, needed modernization. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the United States to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the United States' behalf and in partnership with the United States. Subsequently, many states enacted their own false claims acts.

12.     The FCA provides that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the United States for payment or approval is liable for a civil penalty of up to $21,563 for each such false claim plus three times the amount of the damages sustained. The FCA defines "knowledge" to include "actual knowledge," "deliberate ignorance" or "reckless disregard" of the truth or falsity. Liability attaches when a defendant seeks, or causes others to seek, payment that is unwarranted.

13.     The FCA allows any person having information about a false or fraudulent claim against the United States to bring an action for himself and the federal government, and to share in any recovery.

14.     The United States intervenes in only a fraction of the filed FCA cases, and by law its decisions relating to intervention have no bearing, according to the

Department of Justice and settled caselaw, on the merits of any particular action. In recent years, the United States has increasingly exercised its statutory authority to move to dismiss cases that it believed following an investigation to lack sufficient merit. It has not done so here.

15.     The Defendants have violated the federal FCA. As set forth below, the Defendants' acts also constitute violations of the California False Claims Act, Cal. Gov't Code §12650 *et seq.*; the Colorado Medicaid False Claims Act, Colo. Rev. Stat. §25.5-4-303.5 *et seq.*; the Connecticut False Claims Act, Conn. Gen. Stat. §4-274 *et seq.*; the Delaware False Claims and Reporting Act, Del. Code tit. 6, §1201 *et seq.*; the District of Columbia False Claims Act, D.C. Code §2-381.01 *et seq.*; the Florida False Claims Act, Fla. Stat. §68.081 *et seq.*; the Georgia State False Medicaid Claims Act, Ga. Code §49-4-168 *et seq.*; the Hawaii False Claims Act, Haw. Rev. Stat. §661-21 *et seq.*; the Illinois False Claims Act, 740 Ill. Comp. Stat. 175 / 1 *et seq.*; the Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code §5-11-5.7 *et seq.*; the Iowa False Claims Act, Iowa Code §685.1 *et seq.*; the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. §46:437.1 *et seq.*; the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, §5 *et seq.*; the Michigan Medicaid False Claim Act, Mich. Comp. Laws §400.601 *et seq.*; the Minnesota False Claims Act, Minn. Stat. §15C.01 *et seq.*; the Montana False Claims Act, Mont. Code Ann. §17-8-401 *et seq.*; the Nevada False Claims Act, Nev. Rev. Stat. §357.010 *et seq.*; the New Jersey False Claims Act, N.J. Rev. Stat. §2A:32C-1 *et seq.*; the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §27-14-1 *et seq.*; the New York False Claims Act, N.Y. State Fin. Law §187 *et seq.*; the North Carolina False Claims Act, N.C. Gen. Stat. §1-605 *et seq.*; the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §5053 *et seq.*; the Rhode Island False Claims Act, R.I. Gen. Laws §9-1.1-1 *et seq.*; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §71-5-181 *et seq.*; the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §36.001

*et seq.*; the Vermont False Claims Act, Vt. Stat. Ann. tit. 32, §630 *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.1 *et seq.*; and the Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code §74.66.005 *et seq.*

16.     Dr. Chao seeks to recover damages and civil penalties arising from Defendants' making or causing to be made false or fraudulent records, statements, and/or claims, in connection with the Defendants' payment of kickbacks relating to Pipelines. The Defendants acted knowingly, deliberately, and recklessly in submitting false claims to federal and state health insurance programs for uses of Pipelines that were not eligible for program reimbursement. Furthermore, Defendants knew, or should have known, that government health care programs would not have paid for Pipelines if these programs knew of the Defendants' kickbacks.

## PARTIES

17.     Dr. Kuo Chao is a resident of California. He has been practicing medicine since graduating from the University of California, Los Angeles David Geffen School of Medicine in 1995. Dr. Chao specializes in interventional neuroradiology and is experienced in the treatment of aneurysms. He is affiliated with Kaiser Permanente Los Angeles Medical Center.

18.     Dr. Chao learned of the Defendants' kickbacks from the Defendants' officers, clinical training staff, sales personnel, and physician proctors, which kickbacks were paid to various doctors, in the course of his work as a practicing physician and work-related relationship with Defendants' employees. He is the original source of information in this Complaint and is not aware of any public disclosure of such information. As discussed below, Defendants' kickbacks came in various forms. Pursuant to the FCA and relevant caselaw, both the providing and receiving of such kickbacks constitute false claims.

19.     Defendant Covidien LP is a limited partnership organized under the laws of Delaware, with its principal office in Mansfield, Massachusetts. Defendant Covidien LP was a subsidiary of Covidien PLC ("Covidien") until January 2015, when Covidien and its subsidiaries (including Covidien LP) were purchased by Defendant Medtronic. Covidien LP made numerous kickback payments to physicians to encourage use of Pipelines.

20.     Defendant Covidien Sales LLC is a limited liability company organized under the laws of Delaware, with its principal office in Mansfield, Massachusetts. Defendant Covidien Sales LLC was a subsidiary of Covidien until January 2015, when Covidien and its subsidiaries (including Covidien Sales LLC) were purchased by Defendant Medtronic. Covidien Sales LLC made numerous kickback payments to physicians to encourage use of Pipelines.

21.     Defendant Medtronic PLC ("Medtronic") is a company organized under the laws of Ireland, with its principal place of business in Dublin, Ireland, and its U.S. headquarters in Minneapolis, Minnesota. Defendant Medtronic is among the world's largest medical technology companies. In fiscal year 2016 Medtronic employed more than 88,000 people worldwide; its net sales were approximately $28.8 billion; and its before-tax profits were approximately $4.3 billion. Defendants Covidien LP and Covidien Sales LLC have been subsidiaries of Defendant Medtronic since Medtronic's acquisition of Covidien in January 2015. As a result of the acquisition of Covidien and its subsidiaries, Defendant Medtronic is responsible for liabilities resulting from any acts or omissions of Covidien and these subsidiaries, including acts or omissions prior to the acquisition.

22.     Defendant Medtronic Vascular, Inc. is a corporation organized under the laws of Delaware, with its principal office in Santa Rosa, California. Defendant Medtronic Vascular, Inc. is a subsidiary of Defendant Medtronic. Medtronic Vascular, Inc. made numerous kickback payments to physicians to encourage use of Pipelines.

23.     Defendant Medtronic USA, Inc. is a corporation organized under the laws of Minnesota, with its principal office in Minneapolis, Minnesota. Defendant Medtronic USA, Inc. is a subsidiary of Defendant Medtronic. Medtronic USA, Inc. made numerous kickback payments to physicians to encourage the use of Pipelines.

24.     The Defendants are often referred to collectively in this Complaint because they each are integrally involved in the marketing and sale of Pipelines, and because they have worked largely in concert and as a joint or common enterprise in marketing and selling Pipelines, and they have otherwise conspired in furtherance of and collectively engaged in the illegal acts described herein.

**JURISDICTION AND VENUE**

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1367, and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730. Under 31 U.S.C. §3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.

26.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. §3732(a) because that section authorizes nationwide service of process and because the Defendants have minimum contacts with the United States. Moreover, the Defendants can be found in, reside, or transact or have transacted business in this District.

27.     Venue is proper in this District pursuant to 31 U.S.C. §3732(a) because the Defendants can be found in and transact or have transacted business in this District. At all times relevant to this Complaint, the Defendants regularly conducted substantial business within this District, maintained employees and offices in this District, and made significant sales within this District. The statutory violations alleged herein occurred in this District, as well as throughout the United States as part of the Defendants' nationwide fraudulent marketing scheme.

## BACKGROUND

28.     Pipelines are approved by the Food and Drug Administration ("FDA") for use in treating certain aneurysms.

### Aneurysms And Their Medical Treatment

29.     An aneurysm is a blood-filled bulge in the wall of a blood vessel (such as an artery). Aneurysms result when the pressure of blood within the blood vessel causes a weak area of the vessel wall to expand and fill with blood. Below is an illustration of an aneurysm.



**Figure 1. Aneurysm illustration**

30.     Aneurysms can have varying symptoms, or no symptoms at all, depending on their location within the body, as the aneurysm exerts pressure on surrounding tissue and organs. If an aneurysm ruptures, breaking the wall of the blood vessel, internal bleeding can result. Aneurysms can result in death, particularly in the case of ruptured aneurysms. Although aneurysms can result in death, particularly in the case of ruptured aneurysms, most aneurysms are asymptomatic and have low rates of rupture and therefore do not need to be treated given the higher risk from complications associated with various treatments.

31.     Aneurysms can be treated in a variety of ways. Drugs or behavioral changes to lower blood pressure can reduce the risks from an aneurysm. A common treatment is "clipping," an invasive surgical procedure in which a small metal clip is

8

placed on the aneurysm's neck (where the aneurysm opens from the blood vessel),
sealing off the aneurysm from the blood vessel. Clipping is best suited for treatment of
aneurysms that are easily accessed through open surgery. For more difficult to access
aneurysms, such as those in the head, other forms of treatment are sometimes
preferred.

32.     Another common aneurysm treatment is "coiling," which can treat
aneurysms that are more difficult to access. Using this technique, a surgeon inserts a
hollow plastic tube into an easily accessible artery and threads the tube through the
patient's body to the aneurysm. The surgeon then uses a guide wire to push a flexible
coiling wire through the tube and into the aneurysm. Once inside the aneurysm this
coiling wire bunches up and disrupts blood flow in the aneurysm, causing blood to
clot. This clotting effectively blocks off the aneurysm from the artery thereby
reducing the risk of rupture and shrinking the aneurysm over time.

**Pipelines**

33.     Pipelines represent an additional approach to aneurysm treatment. A
Pipeline is a flexible mesh cylinder that expands to take on and reinforce the shape of
the blood vessel in which it is placed.

34.     Like coils, Pipelines are also used to treat aneurysms in parts of the body
that are difficult to access through open surgery.

35.     When using a Pipeline, a surgeon inserts a hollow plastic tube into an
easily accessible artery and threads the tube through the patient's body to the
aneurysm. The surgeon then uses a guide wire to push the Pipeline through the tube,
positioning the Pipeline across the neck of the aneurysm (as illustrated below).



**Figure 2. Pipeline placed across wide-necked aneurysm**

36.    Once in place, the Pipeline decreases blood flow into the aneurysm, causing blood to clot. This clotting effectively blocks off the aneurysm from the artery, thereby reducing the risk of rupture and shrinking the aneurysm over time.

37.    The Defendants refer to the use of Pipelines as "flow diversion" treatment because it diverts blood flow away from the aneurysm, toward the normal pathway of the blood vessel.

38.    The FDA approved the PED in 2011 and the PFED in 2015. The PFED is an updated, second-generation version of the PED.

39.    In February 2019 Medtronic announced that it had received FDA approval for an expanded indication for the PFED based on clinical data from its Prospective Study on Embolization of Intracranial aneurysms with the Pipeline Device ("PREMIER") trial.

40.    Pipelines were originally developed by Chestnut Medical Technologies, Inc., which was acquired by ev3, Inc. Covidien acquired ev3, Inc. in July 2010.

**RELEVANT HEALTH CARE PROGRAMS AND APPLICABLE LAW**

41.    Where a company promotes a device with kickbacks, related sales of the device are not eligible for reimbursement by Medicaid, Medicare, or other federal and state health care programs. Therefore, during the period of the Defendants' kickback

scheme, any related claims for reimbursement for Pipelines from Medicaid, Medicare, or other federal or state health care programs constituted false claims. Seeking reimbursement for such ineligible uses of Pipelines constitutes a false claim.

42. The Defendants, together with hospitals and physicians involved in the kickback-induced use of Pipelines, expressly certified compliance with applicable laws on numerous provider agreements and claim forms submitted to Medicare, Medicaid, and other federal and state health care programs. Such provider agreements and claim forms constitute false records in support of false claims.

43. The decision of whether to perform an operation using a medical device is made by a doctor in consultation with a patient. Once an operation using a medical device has scheduled, the hospital where the operation will be performed purchases the device from its manufacturer. Following an operation, the doctor bills government health care programs for the doctor's provision of services, and the hospital bills these programs for costs including reimbursement for the medical device.

44. Under Medicare, hospitals submit claims for services delivered to Medicare beneficiaries on Form CMS-1450 (for interim reimbursements with respect to individual beneficiaries) and Form CMS-2552, also known as a Hospital Cost Report (the hospital's final claim for payment from Medicare for the period covered by the report). Doctors obtain payment from Medicare for their services by submitting Form CMS-1500.

45. Although doctors determine which medical devices will be purchased, they have little or no reason to consider a device's cost, because the device will be purchased by a hospital. The hospital has little reason to prevent excessive device costs, where these costs will be reimbursed by government health care programs.

46. Because doctors effectively make purchasing decisions, device manufacturers are motivated to persuade them to use their products. Because physicians often might not be sensitive to the costs of devices they use (and hospitals

11

also lack incentives to act as a check on these costs), device manufacturers can find it advantageous to increase sales by sharing a device's sale proceeds with the treating doctors in the form of kickback payments.

47.     Where a device manufacturer attempts to persuade physicians to use its products through kickbacks, the resulting sales of the device are not eligible for reimbursement under government health care programs.

48.     Medicare is a public assistance program providing for payment of medical expenses for patients with certain disabilities and those 65 years old and older. The Medicare program subsidizes certain purchases of medical devices.

49.     Medicare is funded and administered by the federal government. Federal statutes and regulations restrict the medical devices and their uses that the federal government will pay for through Medicare. Under Medicare, "no payment may be made" for a device that is not "reasonable and necessary" for the treatment of illness. 42 U.S.C. § 1395y(a)(1)(A). Similarly, "Medicare payment is not made for medical and hospital services that are related to the use of a device that is not covered because CMS determines the device is not 'reasonable' and necessary'." 42 C.F.R. § 405.207(a). The use of devices tainted by kickbacks is not "reasonable and necessary."

50.     The kickback-tainted uses of Pipelines promoted by the Defendants were not eligible for reimbursement under Medicare.

51.     Medicaid is a public assistance program providing for payment of medical expenses for low-income patients. The Medicaid program subsidizes certain purchases of medical devices.

52.     Funding for Medicaid is shared by the federal government and state governments. Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines. Federal statutes and regulations restrict the medical devices and their uses that the federal government will pay for through its

funding of state Medicaid programs, in a manner like the restriction of payments under Medicare.

53.     The kickback-tainted uses of Pipelines promoted by the Defendants were not eligible for reimbursement under Medicaid.

54.     Besides Medicaid and Medicare, the federal government reimburses a portion of the cost of medical devices under several other federal health care programs, including but not limited to TRICARE, CHAMPVA and the Federal Employees Health Benefit Program.

55.     TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces. CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected disability. The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees and retirees.

56.     The kickback-tainted uses of Pipelines promoted by the Defendants did not qualify for reimbursement under any of the federal health care programs.

**The Anti-Kickback Statute**

57.     Pursuant to the FCA and relevant caselaw, kickbacks taint medical judgment and claims made based on kickbacks are false for which both the giver and recipient of such kickbacks are held strictly liable.

58.     The AKS, 42 U.S.C. §1320a-7b(b), arose from Congressional concern that payoffs to those who can influence health care decisions will result in goods and services furnished to patients that are medically unnecessary, of poor quality, or harmful to a vulnerable patient population. To protect the integrity of federal health care programs from these difficult to detect harms, Congress enacted a prohibition

against the payment of kickbacks in any form, regardless of whether the kickback gives rise to overutilization or poor quality of care.

59.     The AKS prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally funded health care program. 42 U.S.C. §1320a-7b(b). Pursuant to this statute, companies may not offer or pay (and doctors may not accept) any remuneration, in cash or kind, directly or indirectly, to induce doctors or others to order or recommend medical devices that may be paid for by Medicaid, Medicare, or other federal health care programs.

60.     A claim for payment from a government health care program that includes items or services resulting from a violation of the AKS constitutes a false or fraudulent claim for purposes of the FCA. 42 U.S.C. §1320a-7b(g).

61.     The law not only prohibits outright bribes and rebate schemes, but also prohibits any payment by a company to a doctor which has as one of its purposes the inducement of the physician to increase sales of the company's medical devices. Such payments are viewed as tainting the doctor's judgment.

62.     Kickbacks are viewed as particularly egregious when a medical device supplier selects the physician, as here, based on its belief that the physician is likely to prescribe the company's products. The medical anti-kickback statute is designed to deter healthcare providers from using such personal benefits and enticements as a means of tainting the medical judgment of physicians.

63.     Concern about improper marketing practices like those alleged in this Complaint prompted the Inspector General of the Department of Health and Human Services to issue a Special Fraud Alert concerning marketing practices that violated the AKS. Special Fraud Alert: Prescription Drug Marketing Schemes, 59 Fed. Reg.

65,376 (Dec. 19, 1994). Among the improper practices cited by the Inspector General are companies' payments to doctors where payments are made to generate business.

64.     The AKS provides a severely limited "safe harbor" for personal service arrangements which requires, among other things, that:

> The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

42 C.F.R. § 1001.952(d)(5). This safe harbor also requires that:

> The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

42 C.F.R. § 1001.952(d)(7).

65.     This safe harbor is an affirmative defense for which the Defendant, not the Relator, bears a heavy burden of establishing that its actions are covered by this limited and narrow safe harbor.

66.     The Defendants do not meet these strict Safe Harbor requirements because, among other reasons: a) they offered incentives to doctors based on the volume or value of business the doctor generates or that they expect the doctor to generate; b) the benefits were dispensed largely at the discretion of Defendants' sales' personnel for such reasons; c) the Defendants did not pay physicians consistent with fair market value in arms' length transactions; and d) the Defendants did not engage physicians for commercially reasonable business purposes.

67.     Compliance with the AKS is a condition to participation as a health care provider under the Medicaid, Medicare, and other federal health care programs.

68.     With Medicaid, for example, each physician that participates in the program must sign a provider agreement with his or her state. Although there are variations in the agreements among the states, the agreement typically requires the prospective Medicaid provider to agree that he or she will comply with all Medicaid requirements, which include the anti-kickback provisions of the law. In numerous states, the Medicaid claim form itself contains a certification by the provider that the provider has complied with all aspects of the Medicaid program, including compliance with federal laws.

69.     With Medicare, hospitals and doctors sign Provider Agreements with the Center for Medicare and Medicaid Services ("CMS") to establish their eligibility to seek reimbursement from Medicare. As part of that agreement, without which the hospitals and physicians may not seek reimbursement from federal health care programs, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [this provider]. The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

Medicare Enrollment Application Form CMS-855A; Form CMS-855I.

70.     When a hospital or physician submits a claim for payment under Medicare, it does so subject to and under the terms of its certification to the United States that the services for which payment is sought were delivered in accordance with federal law, to include without limitation the AKS.

71.     Every Hospital Cost Report also contains a Certification which must be signed by the chief administrator of the provider or a responsible designee of the administrator.

16

72.     The Form CMS-2552 Hospital Cost Report certification page includes the following statement:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

The cost-report signatory is also required to certify that:

> To the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

73.     By signing Form CMS-2552, a hospital administrator is required to and does certify that its cost report (i) is truthful, i.e., that the cost information contained in the report is true and accurate; (ii) is correct, i.e., that it is entitled to reimbursement for the reported costs in accordance with applicable instructions; (iii) is complete, i.e., that the cost report is based upon all information known to the provider; and (iv) does not include any services that resulted from an illegal kickback, or from any other violation of health care laws and regulations.

74.     Physicians and hospitals that participate in a federal health care program generally must certify (via provider agreements and claim forms) that they have complied with applicable federal rules and regulations, including the AKS.

75.     Because of the systematic payment of kickbacks to physicians made with the intent and effect of inducing them to use Pipelines, the Defendants caused physicians and hospitals to submit claims in violation of conditions of payment and

claims with false certifications to the United States. All claims tainted by the Defendants' kickbacks are false claims.

## GENERAL ALLEGATIONS

76.     While working as a doctor, Dr. Chao learned of the Defendants' kickback practices from the Defendants' proctoring course, personnel, clinical training staff, salespersons, Defendants' proctors, and others employed by and associated with Defendants. Dr. Chao learned further relevant facts through his independent research and analysis regarding Defendants' kickback payments.

77.     Dr. Chao has had conversations with Defendants' employees, particularly sales employees, and with doctors who used Pipeline products, and has attended Pipeline training sessions at various locations and with doctors throughout the county who used Pipeline products.

78.     Prior to the filing of his action, Dr. Chao had not seen any public disclosure of the allegations upon which he bases this action and has no basis to believe there has been any.

79.     Dr. Chao also is the original source of this Complaint's allegations about Defendants' false claims that come from his personal knowledge and interactions and from his own research and analysis.

80.     As indicated in Defendants' SEC filings, Pipelines are a valuable business line and a driver of corporate profits that have been important to the Defendants' growth.

81.     The Defendants maintained a bloated and well-compensated sales operation. And Defendants paid sales staff through generous, largely incentive-based compensation awarded to aggressively expand Pipeline usage.  Simultaneously, Defendants treated compliance with kickback regulations as a low priority.

82.     Consistent with Defendants' aggressive sales push, the Defendants' sales
staff largely oversaw "clinical" or "educational" aspects of the business including the
proctor program and had a disproportionate say in the awarding of perquisites to
doctors whom they perceived as their premier Pipeline customers.

83.     During much of the period covered by this action, the Neurovascular
division of Defendant Medtronic, which sold Pipelines, employed approximately 150
sales personnel during the relevant period. John Zehren served as Vice President of
Sales for North America. Chris Weaver, who managed Eastern U.S. sales, and Doug
Jones, who managed Western U.S. sales reported to Zehren. Reporting to Weaver and
Jones were approximately ten regional managers, a Pipeline clinical team, and a stroke
products unit. Each regional manager oversaw approximately ten sales employees,
known as territory managers.

84.     Dr. Chao dealt primarily, though not exclusively, with Medtronic's
Southern California sales team. Medtronic's Southern California region includes Los
Angeles, San Diego, and Orange County. For much of the period covered by this
action, the regional manager for Southern California was Jason Roberts. Roberts
oversaw seven sales staff, including Justin Vance and Annie Joseph. Dr. Chao also
dealt with Medtronic's Pipeline clinical team led by Joel Harris, who managed six
clinical staff members.

85.     Medtronic's sales staff were highly compensated, with most of their
compensation being incentive-based. Medtronic sets sales goals for its staff, and if
those goals are met the staff can expect to earn their "target" compensation, or more.
Medtronic's pushed its sales employees hard to meet rigorous monthly, quarterly, and
annual targets. And incentive compensation was based on and designed to encourage
sales of products that Medtronic deemed important including Pipelines.  For example,
for Medtronic's fiscal year ended April 29, 2016 target compensation for territory
managers was $295,000, and more than forty territory managers achieved their targets.

19

For that year, target compensation for regional managers was $325,000. Salary comprises approximately one-third of target compensation, with the bulk of target compensation consisting of incentive pay for achieving aggressive sales goals. Employees who exceeded target sales were paid handsomely. For example, in Medtronic's fiscal year ended April 29, 2016 one regional manager earned $685,000.

86.     Defendants' generous compensation and focus on incentive pay predictably led sales personnel to aggressively pursue sales and to abet the unlawful conduct referred to herein.

87.     As part of the Defendants' aggressive marketing, all sales representatives in Medtronic's Neurovascular division received weekly emails notifying them of Pipeline proctoring promotional events for the upcoming week. These emails listed the date, the trainee physician, physician proctor, hospital, and sales representative, associated with each event. These emails also admonish sales representatives to turn in timely reports regarding their attendance and participation in Pipeline promotional proctoring events, which included medical training events relating to Pipeline usage whenever possible. The idea was to aggressively market the Pipeline device to doctors.

88.     A document created by the Defendants for use by their clinical sales personnel to track Pipeline promotional activities (reproduced in Exhibit 5) shows that Defendants' "clinical" staff and the proctor program events were viewed by the Defendants as a prime opportunity to market Defendants' Pipeline product. This document, titled "2017 Pipeline Clinical Specialist Strategic Account Activities – [Plan of Action] Worksheet," lists various promotional tasks and the corresponding amount of "case coverage credit" that the Defendants' employees would receive for participating in such marketing events.  Among the activities for which Defendants' personnel receive credit toward their sales activity quotas is "Schedule a Proctor to visit for Grand Rounds." The Defendants' personnel are instructed to submit these

worksheets to various employees of the Defendants, including local and regional sales managers, as well as "Pipe Mgr/Sales Ops." This oversight of proctors-related activities by the Defendants' sales operations personnel reveals that the Defendants viewed the proctor program as integral to their sales efforts.

89.    Significantly, although the Defendants' proctor program was officially billed as an educational program, it was in fact primarily managed by the Defendants' sales personnel, not by the Defendants' clinical education specialists. For example, although Fred Gunderman, the Defendants' Director of Physician and Clinical Education, was "nominally" in charge of this program, Joel Harris, the Defendants' National Sales Manager for Pipelines, and sales personnel reporting to Mr. Harris, in fact, managed most components of the proctor program.

90.    Sales personnel involved in the kickback scheme alleged herein took steps to conceal the kickback scheme. For example, Defendants' chief sales executive John Zehren kept two phones, and would text doctors from his personal, non-company issued phone when he wanted to avoid discovery of the text messages. Zehren's work phone number was 312-590-XXXX, and his personal phone number was 949-838-XXXX. (Part of Mr. Zehren's phone numbers have been redacted to protect his privacy.)

91.    Additionally, to conceal overly aggressive and illicit sales conduct Zehren instructed Defendants' employees including Pipelines West Coast sales director Bob Bushok, Pipelines National Sales Manager Joel Harris, and Pipelines East Coast sales director Dan Hughes to use personal phones to communicate for company business. Some of Defendants' personnel further used phone applications designed to encrypt or otherwise conceal text messages to further conceal their work-related sales communications, using apps such as Viber, WhatsApp and Dust. Defendants' East Coast sales director Dan Hughes used WhatsApp and Dust to communicate with his sales team members.

92.     Concerned that their sales practices violated applicable law, following the filing of this action, Defendants have recently terminated the employment of most of the sales staff who were at the heart of the Defendants' kickback scheme as alleged herein. Defendants terminated sales employees Bob Bushok, Dan Hughes, Joel Harris, and John Zehren, and restructured their sales department. Based on information and belief, these terminations resulted from the terminated employees' involvement in Defendants' illegal kickback scheme.

**THE DEFENDANTS' ILLEGAL KICKBACKS**

93.     Through numerous means discussed in detail below, the Defendants knowingly gave kickbacks to doctors to promote usage of their Pipeline devices. These kickbacks resulted in the submission of tens of millions of dollars in false claims.

94.     During his interactions with the Defendants' employees and agents, Dr. Chao learned of such expensive kickbacks that Defendants gave to doctors to promote usage of Pipelines, which Pipelines were then often paid for by federal and state healthcare agencies. Such kickbacks came in a variety of forms specified below.

**Defendants' Misuse of The Proctoring Program to Promote Pipeline Sales**

95.     Pursuant to the FCA, a company that sells products paid for the by taxpayer can legally market its products.  But it cannot provide kickbacks to induce such sales. Deciding whether a given payment constitutes legitimate marketing or amounts to a kickback often is a fact issue that requires line drawing. To increase or maintain sales, some providers have misused legitimate medical, marketing, or other problems to provide kickbacks in specific instances.  As alleged below, that is what Defendants have done here.

96.     In 2011, the FDA approved the commercial use of Pipelines. Then, the FDA only permitted Defendants to use Pipelines solely in extraordinarily limited circumstances because Pipeline failed in its application with the FDA to be approved

to be used except in very limited circumstances. The FDA limited such usage to certain huge aneurysms located in certain blood vessels in the head. Specifically, the FDA approved Pipelines for "the endovascular treatment of adults (22 years of age and older) with large or giant wide-necked intracranial aneurysms in the internal carotid artery from the petrous to the superior hypophyseal segments."

97.     Endovascular treatment refers to introduction of the device from within a blood vessel, as opposed to open surgery. Intracranial aneurysms are those occurring in brain arteries. Large or giant aneurysms have a diameter greater than 10 mm wide.

98.     Wide-necked aneurysms have a neck 4 mm wide or greater and have a neck that is more than half the size of the aneurysm's maximum diameter.

99.     The internal carotid arteries are a pair of arteries on either side of the head and neck. The internal carotid arteries supply blood to the brain and eyes and send branches to the forehead and nose. Below is an illustration showing the location of the internal carotid arteries.



**Figure 3. Location of the internal carotid artery**

100.     In clinical settings the internal carotid artery is typically classified into the following seven segments: cervical (C1), petrous (C2), lacerum (C3), cavernous

(C4), clinoid (C5), ophthalmic (C6), and communicating (C7). These segments are
labeled in the following illustration.



**Figure 4. Segments of the internal carotid artery**

101.    Pipelines' initial FDA-approved use was from the petrous segment (C2)
to the superior hypophyseal segment. The superior hypophyseal artery is located
within the ophthalmic segment (C6).

102.    Chestnut Medical Technologies, Inc. (the original developer of the PED,
acquired by ev3, Inc. in June 2009) submitted a Sponsor Executive Summary to the
FDA on February 1, 2011 in support of its PMA application for the PED (the
"Chestnut Report"). The Chestnut Report estimated that in the United States each year
only 2,079 aneurysms occur that (i) have diameter equal to or greater than 10 mm, and
(ii) are in the internal carotid artery. Of these estimated 2,079 cases per year, some of
the aneurysms do not have wide necks. Others could be in areas of the internal carotid
artery outside of Pipelines' approved C2-C6 range.

103.    Therefore, each year at most only 2,079 Americans developed the types
of aneurysms that initially qualified in 2011 for the approved-FDA usage.  Later, the
FDA expanded its categories of uses, but by then defendants faced potentially stiff

marketplace competition from companies developing comparable medical devices.

104.   The numbers of aneurysms that (i) have diameter less than 10 mm, (ii) have necks smaller than 4 mm wide, or (iii) are not located in the C2-C6 range of the internal carotid artery, greatly exceeds the minuscule number of aneurysms that meet all FDA-required conditions in 2011 for FDA-approved commercial usages of the Pipelines.

105.   Ninety-three percent of intracranial aneurysms have diameter from 0 to 10 mm and based on the Chestnut Report 82% of aneurysms located in the head are in arteries other than the internal carotid artery. Therefore, more than 10 times as many aneurysms that do not fall within Pipelines' originally FDA-approved indication occur in the United States each year compared to aneurysms within that indication.

106.   Still, when the FDA approved usage of Pipelines for commercial purposes in 2011, there were relatively few doctors in the United States who had sufficient experience with Pipelines to independently perform Pipeline procedures in a safe and effective manner compared with European doctors, who had been using Pipeline devices since 2009. But the medical and practical need for such proctoring rapidly decreased over time. Nonetheless, while the medical and practical need for the proctoring program substantially decreased since its inception, instead of reducing their utilization of the program, Defendants ramped up such usage and increasingly put spending decisions in the hands of Defendants' marketing department. Defendants did so for one reason: to generate and increase Pipeline sales.

107.   Through their Proctoring Program, the Defendants rapidly expanded the number of Pipeline-trained doctors such that in short order the Proctoring Program either was no longer necessary or could have been seriously phased down. Nonetheless, the Defendants did just the opposite; they cranked up the program. They did this to increase their Pipeline sales despite the small number of Pipeline-eligible aneurysms occurring in the United States each year, and due to increased competition

in the marketplace. In this way, Defendants misused an otherwise legitimate program in specific instances as a vehicle to provide kickbacks to promote and induce sales of Defendants' Pipeline products.

108.   When Defendants first introduced the Pipeline, it was a novel device. As such, it required training for doctors to use safely and effectively. Defendants and their affiliates started a program for doctors experienced in using Pipelines to train other doctors to use the device. Such training meant that experienced doctors would supervise, or proctor, less experienced doctors in their initial usage of the Pipelines. Relator does not question that such training served a purpose at the outset. But he also alleges that such training became increasingly unnecessary over time and used to promote the off-label usage of Pipeline devices. And over time, Defendants increasingly paid for proctoring or paid excessive proctoring expenses as kickbacks to increase Pipeline sales for both on and off-label usages.

109.   In addition, over time Defendants drastically increased the amounts of Proctoring payments for no good reason other than to provide kickbacks to doctors. This included the Defendants' drastic four or five-fold increases in proctoring payments over time for the same proctoring work. For example, in 2011, Defendants typically paid proctors approximately on average $1,000 for overseeing a Pipeline operation.

110.   Yet, by 2015, Defendants inexplicably increased such payments for overseeing the same procedures four or five times to approximately on average $4,000 to $5,000 per Pipeline operation. There is no good reason for this, and such four- and five-fold boosts in payments can only be seen one way – as kickbacks.  The amount of work was the same. Inflation cannot account for such massive increases. Defendants' boosting of proctoring payments represents to a significant degree Defendants' increased use of kickbacks to promote Pipeline sales.

111. Defendants also misused their Proctoring Program in other ways to increase Pipeline sales for usages not approved by the FDA.

112. After the FDA approved Pipelines for commercial usage in 2011, Defendants asked the FDA to expand permissible commercial uses for Pipelines. But the FDA did not grant that request until years later. Nonetheless, immediately after the FDA approved the Pipeline for very limited uses in 2011 and long before the FDA expanded the instances for which it approved such Pipeline usage, Defendants sought through their proctoring program efforts to increase Pipeline off-label (non-FDA approved) commercial sales through the proctoring program.

113. Defendants misused their proctoring and marketing programs to expand and encourage such usage. For example, in sales pitches to Dr. Chao and other doctors, Defendants' sales agents touted the benefits that the proctoring program provided for both on, and off-label (unapproved), uses of Pipeline devices. In addition, at proctoring training sessions, Defendants' sales agents promoted the off-label uses to doctors and even provided training material for off-label (unapproved) uses to both proctors and doctors being proctored. Sales agents further told doctors that the benefits of proctoring extended to both on and off-label usage of Pipeline products.

114. Illustrative of Defendants' overly broad usage of the proctoring program to encourage off-label sales of Pipelines is correspondence Dr. Chao uncovered from one of the Defendants' competitors to the FDA. There, the competitor complains that "an experienced Pipeline proctor relayed that only 40% of the cases he currently proctors are on label." This is confirmed  by the data from the IntrePED trial which reflect 65.4% of procedures were for off-label procedures. Pushed by aggressive marketing and by high-usage proctors, the percentage of off-label procedures increased dramatically over time.

115.   The percentage of off-label cases increased over time as most of the potential on label cases were treated.  In fact, Dr. Ricardo Hanel stated at a Society of Neurointerventional Surgery event in 2019 that "we've treated 10 mm cavernous aneurysm to extinction."  Cavernous aneurysms are the predominant type of aneurysms within the FDA's originally approved indication for Pipelines.

116.   Similarly, two of the Defendants' proctors informed Dr. Chao that they use Pipelines for almost all aneurysms they treated regardless of an aneurysm's location. Dr. Moran made this statement while proctoring a Pipeline operation in 2015 at Kaiser Permanente Los Angeles Medical Center. Dr. Edoardo Boccardi made this statement during a Pipeline training meeting in 2011 at the Green Valley Ranch, a luxury resort-spa-casino near Las Vegas, Nevada. Both doctors also touted Pipelines' safety for such uses during these encounters.

117.   Because Defendants wanted to use the proctoring program to encourage broader use of Pipelines beyond their original indication, Defendants chose doctors for training in the proctor program and for proctoring assignments based in part on the doctors' willingness to help with Defendants' goal of encouraging broader use of Pipelines beyond their original indication.

118.   Dr. Chao knows of such non-indicated Pipeline usage through the Proctoring Program from personal experience. For example, in 2014 the Defendants asked him to proctor a procedure at the Kaiser Foundation Hospital in Fontana, and Defendants' sales employees Jason Roberts and Justin Vance told Dr. Chao to keep this that operation "off the books" because it involved a Pipeline usage outside of the FDA's approved indications.

119.   Sometimes doctors, however, refused to proctor Pipeline operations outside of approved indications. Once, for example, Dr. Peter Kim Nelson refused to proctor such a case in Oklahoma. Joel Harris, the Defendants' National Sales Manager for Pipelines, pushed Dr. Nelson to change his mind. When Dr. Nelson held his

1   ground, Mr. Harris found a different proctor, and the proctoring went ahead as
2   planned, without Dr. Nelson.

3       120.   Since the start of the proctor program in 2011 the Defendants and their
4   affiliates have maintained a three-physician panel to consider and approve proposed
5   uses of Pipelines, and to determine whether the Defendants and their affiliates should
6   send a proctor to assist with such a proposed Pipeline case. The Defendants pay the
7   members of this panel for their work evaluating proposed Pipeline cases.

8       121.   The three physicians initially involved in approving use for the proctor
9   program were Dr. Adam Arthur, Dr. John Gaughen, and Dr. Tibor Becske. In 2013,
10  however, Dr. Gaughen resigned from this role because he was uncomfortable with the
11  high volume of non-indicated uses approved for inclusion in the proctor program. Dr.
12  Woodward (who reaped more than $250,000 in payments from the Defendants in
13  2013-2015 and an additional $380,000 to companies under his control) replaced him.

14      122.   In 2011, the physician panel used the Defendants' email system to
15  document their decisions as to whether to allow and proctor non-indicated Pipeline
16  procedures.  But in time, the Defendants stopped using this email system to document
17  off-label (non-FDA approved) usages of Pipelines and proctoring assignments and
18  instead tracked such procedures and assignments through a password-protected
19  website (https://pipelineportal.covidien.com), which they call the Pipeline Portal. The
20  Defendants euphemistically referred to proctored cases outside of Pipelines'
21  indication as "compassionate use," "emergency use," and "special use" cases. The
22  Defendants made this change to conceal use of the Proctoring Program to expand
23  usage, including off-label (non-FDA approved) usage of their Pipeline products.

24      123.   Through the Pipeline Portal, a doctor in training for Pipeline use can
25  upload information about a proposed case, including a brief medical history and
26  images of the aneurysm to be treated. The Defendants' three-doctor panel reviews this
27  information and determines whether the case is suitable for use of a Pipeline, and
28

whether the Defendants should send a proctor.  In this way the Defendants and their doctor panel frequently approved non-indicated uses of Pipelines and often sent paid proctors to assist in such cases.

124.   Defendants' Pipeline Proctor Program also provided special "advanced training" courses in non-indicated use, beginning in or around 2013. Such uses of Pipelines frequently involve complications not encountered in standard, indicated uses of Pipelines. As such, non-indicated Pipeline cases are ideal for "advanced" proctor training; in fact, almost all the cases presented at advanced proctor training were off-label. To be eligible for advanced training, Defendants required a doctor to first perform five Pipeline operations under the supervision of a proctor.

125.   Such advanced training was overseen by highly compensated proctors at their home institutions. These training courses were held at the University of Buffalo in New York (under the supervision of Drs. Elad Levy and Adnan Siddiqui), the Mayo Clinic in Jacksonville, Florida (Dr. Ricardo Hanel), New York University (Drs. Tibor Becske and Peter Nelson), the University of Utah (Dr. Philipp Taussky), and in Knoxville, Tennessee (Dr. Britton Keith Woodward).

126.   Although the Defendants' Proctoring Program apparently served legitimate purposes in some circumstances – especially early on – Defendants also misused this program and on specific occasions misused the program to give doctors kickbacks. In addition to the promotional practices and marketing practices that cross the line as discussed above, another means by which Defendants consistently misused this program was to give and disguise the kickbacks as compensation for services performed by proctor physicians such as overseeing Pipeline procedures or performing Pipeline-related research or for travel related to such procedures. In particular cases, Defendants often intentionally overpaid proctors for their work and for their travel expenses and for work that was medically not necessary.

127.   Because of the cash payments, travel, and other kickbacks received by proctors from the Defendants, doctors had strong incentives to become proctors. Becoming a proctor was a means to obtain a variety of such perquisites. The arrangements Defendants devised were profitable both for doctors and for Defendants and tainted the doctors' medical judgments.

128.   By design, these arrangements went far beyond mere marketing practices. To start with, to become a proctor the Defendants required a doctor to perform a minimum of ten Pipeline procedures. Making doctors proctors was profitable for Defendants because on average each procedure required 1.6 Pipelines that each cost approximately $14,000. So, certifying a single proctor resulted in approximately $224,000 worth in Defendant sales.

129.   Once a doctor satisfies the Defendants' ten-procedure requirement to become a proctor, that doctor can then become eligible to receive lucrative cash payments from Defendants of approximately $4,000 to $5,000 per procedure, roughly one-third of the Defendants' revenue from the sale of each Pipeline. According to Dr. Chao's conversations with Defendants' sales employees the system was designed to reward doctors for using Pipelines.

130.   The Defendants started their Proctoring Program in with approximately fifty-five doctors. Exhibit 1 contains a list of fifty-eight doctors who received a total of $5.2 million relating to "pipelines" or "flow diversion" from the Defendants during 2013-2015. Twenty-two of these doctors received more than $100,000 each of such Pipeline-related payments. Many of the doctors listed in Exhibit 1 are proctors for the Defendants, including Dr. Philipp Taussky (who received $219,310 during 2013-2015); Dr. John Gaughen (who received $332,167); Dr. Alexander Coon (who received $280,866), and Dr. Britton Keith Woodward (who received $257,583).

131.   According to the CMS Open Payments Data Defendants made large cash payments to numerous doctors from at least 2013 through at least 2019 (the period

currently covered by the publicly available Open Payments Data). Between 2013-2019 Defendants paid a total of $12.4 million to doctors recorded as relating to "pipelines" or "flow diversion." The total of such payments exceeded $1 million in each year in this period. Individual doctors received large amounts of these payments. During this time, Defendants paid thirty-four doctors each more than $100,000 and paid Dr. Christopher Moran alone more than $500,000.

132.   Exhibit 2 is a detailed list of Pipeline-related payments made by the Defendants during 2013-2015 to Dr. Moran. These 340 separate payments total more than $200,000. As set forth in Exhibit 2, Dr. Moran traveled frequently at Defendants' expense to posh vacation destinations throughout the United States such as Miami and San Francisco, and to posh international destinations such as Buenos Aires, Argentina; Nice, France; and Madrid, Spain.[1] At each of these international destinations the Defendants provided free travel and lodging for Dr. Moran. The Defendants also paid for multiple physicians to attend a Pipeline "training meeting" in 2011 at the Green Valley Ranch, a luxury resort-spa-casino near Las Vegas, Nevada. There was no reason to have "training" sessions at posh national, much less international, luxury resorts other than as a pretext to provide one of many forms of kickbacks.

### *Defendants Intentionally Overpaid Proctors for Work Never Performed*

133.   Defendants' IntrePED study (*see* Ex. 9) reported a mean Pipeline procedure time of 101 minutes and 30 seconds. Defendants' ASPIRe study (*see* Ex. 13) reported a mean Pipeline procedure time of 112.9 minutes. Yet, Defendants

---

[1] CMS' data set lists the city, state, and country of travel associated with a particular payment. For the Defendants' payments to Dr. Moran listing Buenos Aires as the city, the state listed is California and the country listed is the U.S., however this appears to be an error as there is no city of Buenos Aires in California. Presumably this was a data entry error and the payment for travel in Buenos Aires, Argentina. Similarly, payments relating to the city Madrid also list locations of California and the United States, though there is no locale known as Madrid in California.

routinely paid proctors for a full eight hour day per procedure, or more than four times the reported average procedure duration. The Defendants often gave doctors kickbacks by habitually and systematically overpaying doctors $3,200 for a full, eight-hour day of work regardless of how little time the proctor worked. In fact, most proctoring procedures took place at the hospital where the proctor worked and required less than two hours of work, less than a fourth of the inflated rate that the Defendants paid the proctors.  In addition, Defendants would routinely pay proctoring doctors a $1,400 kickback as a "travel" stipend even when the doctor worked at his or her home hospital and did not travel. Such "travel" payments violated Defendants' written policies but nonetheless were promoted or solicited as kickbacks and knowingly paid by Defendants to proctors.

134.   Defendants, however, knowingly routinely overpaid their proctors – particularly proctors whose employers purchased large amounts of Pipelines – for a full day of work even when the doctors worked substantially less than a full day.  In addition, Defendants routinely paid for travel time when the doctor incurred no travel expenses. These excessive payments were kickbacks.

135.   This is confirmed by the CMS Open Payments database. This database contains information relating to payments from medical device companies to physicians, along with data about the products to which these payments relate. Most payments listed as being paid from Defendants and relating to Pipelines do not relate to proctoring. But of those that do appear to be compensation for proctoring, in close to thirty percent of such instances Defendants paid doctors their maximum amount for a full eight-hour day along with travel time of $4,600, and in close to twenty percent of such instances Defendants paid their maximum amount for a full eight-hour day without travel of $3,200.

136.   Consistent with this trend, in 2013-2015, Dr. Britton Keith Woodward alone received at least twenty separate payments from the Defendants in the precise

amount of $4,600, amounting to $92,000. Dr. Alexander Coon also received at least twenty separate payments from the Defendants over 2013-2015 in the precise amount of $4,600, amounting to $92,000.

137.   Thus, while proctors during this time worked on average of less than two hours and frequently did not travel, Defendants intentionally grossly overpaid their proctors routinely as a pattern and practice of kickbacks designed to generate product sales. Clearly, a substantial percentage of Pipeline proctoring related payments reflected in the Open Payments Data were paid at Defendants' maximum rates; Defendants could not have routinely overpaid such proctoring fees by accident and this was not an industry practice, either. The co-founder of one of Defendants' competitors and a senior executive of another competitor told Dr. Chao that their companies had trouble competing with Defendants to hire doctors as consultants because unlike Defendants their companies paid doctors solely for the time their proctors worked. And the co-founder also said his company unlike that of the Defendants paid their proctors solely on a "wheels up, wheels down" basis for travel time.

### *Defendants Rewarded Favored Doctors with Medically Unnecessary Proctoring Assignments*

138.   The Defendants used such kickbacks to maximize favored proctors' compensation. For example, Dr. Moran regularly called the Defendants' sales department to solicit proctoring assignments, and the sales department obliged such that between 2013 and 2019 Defendants paid him more than $500,000 for such assignments. Similarly, at the request of Dr. Alexander Coon, Defendants repeatedly flew him across the country for proctoring assignments. These included multiple trips from Maryland to California even though there were many qualified proctors at the time in California. Specifically, according to the CMS Open Payments database,

during 2013-2019 Defendants made payments to Dr. Coon related to "Flow Diversion" in connection with travel to Irvine, California on January 29, 2014; February 10, 2014; February 10-11, 2015; April 25, 2015, April 28, 2015; May 15, 2015; May 19, 2015; August 10, 2015; August 12, 2015; and July 13, 2016.

139. Defendants also flew Dr. Moran to Nice and Madrid to proctor even though many European doctors were qualified as proctors and had even more experience using the Pipeline devices than Dr. Moran did. And according to Dr. Chao's conversations with Defendants' sales employee Annie Joseph, Defendants paid Dr. Moran to proctor for doctors who did not need proctoring, including proctoring assignments in Europe even though there were many experienced proctors available in Europe. Dr. Moran received such assignments because of his demands and to placate and keep him happy and using Pipeline devices.

### *Defendants' Kickbacks Under the Proctoring Program Do Not Qualify for the AKS Personal Services Safe Harbor*

140. The AKS is an affirmative defense that the Defendants by law bear the burden of establishing. It is a fact issue not amenable to being decided on a Motion to Dismiss. Nonetheless, false claims that Defendants caused to be submitted in conjunction with their Proctoring Program would not qualify for the narrow AKS safe harbor protection under any circumstances.

141. The Defendants recognized that the large cash payments under their Proctor Program risked exposing them to FCA kickback claims. Accordingly, to maintain the illusion that proctors were paid only reasonable compensation for services rendered, and to conceal their actual conduct, and to limit their exposure for the certain proctor related claims to the extent possible, Defendants included a provision in their consulting agreements with proctors that theoretically imposed a $60,000 per year maximum on compensation paid to a given proctor. Yet, despite this

35

stated cap, the Defendants regularly permitted proctors to exceed this maximum by executing amendments to the consulting agreements. These amendments made the cap theoretical rather than real, and therefore meaningless; it was little more than a fig-leaf to disguise Defendants' behavior. For example, the Defendants paid Dr. Moran more than $100,000 in 2013 for his Pipeline-related work. The Defendants likewise paid Dr. Woodward more than $130,000 in 2015 for his Pipeline-related work.

142.   As discussed above, the AKS provides a severely limited "safe harbor" for personal service arrangements which requires, among other things, that:

> The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

42 C.F.R. § 1001.952(d)(5). This safe harbor also requires that:

> The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

42 C.F.R. § 1001.952(d)(7).

143.   The Defendants do not meet these strict Safe Harbor requirements in connection with their payments for Pipeline proctoring services, for several reasons, each of which is sufficient by itself to preclude safe harbor protection.

144.   First, the aggregate compensation paid to proctors over the terms of their agreements with Defendants was not set in advance, because although it was ostensibly subject to an annual cap Defendants paid doctors more than these caps and amended the agreements to increase the caps.

145.   Second, the aggregate compensation paid to proctors over the terms of their agreements with Defendants was not consistent with fair market value in arms-

length transactions, because although the agreements ostensibly limited payment to hours of work performed and travel undertaken, Defendants paid proctors for hours of work never performed and or travel never undertaken. Paying substantial amounts for work or travel never performed is not consistent with fair market value in arms-length transactions. Furthermore, these doctors eagerly sought these proctoring assignments even getting angry when they felt they did not get enough assignments as the proctoring hourly compensation was far higher than their salaried positions.

146.   Third, the aggregate compensation paid to proctors over the terms of their agreements with Defendants was determined in a manner that considered the volume or value of referrals or business between the doctors and the Defendants for which payment was made in whole or in part under Medicare, Medicaid and other Federal health care programs. Defendants selected doctors to become Pipeline proctors based on criteria including the value of business those doctors and/or their home institutions generated for Defendants.

147.   Fourth, Defendants contracted with Pipeline proctor doctors for services that exceeded those which were reasonably necessary to accomplish the commercially reasonable business purpose of the Pipeline proctoring services. For example, as discussed above, Defendants contracted for excessive and commercially unreasonable services by having Dr. Coon proctor in Irvine, California, and by having Dr. Moran proctor in Europe.

**Defendants' Misuse of Data Collection Registries to Provide Kickbacks to Doctors**

148.   The Defendants' data collection program provided additional kickbacks to doctors using Pipelines. Through this "program," the Defendants paid doctors between $1,000 and $1,500 for small amounts of patient data. Very little of this data had any market value at all. In fact, as explained below due to deliberate flaws in the studies based on these data registries, approximately eighty percent of this data had

absolutely no market value at all because it was unnecessary for the studies' ostensible purposes.

149.   These payments were disguised as compensation for useful services rendered by the physicians, but like payments under the proctor program constituted kickbacks to encourage Pipeline usage.

150.   The Defendants required physicians to record only a small amount of data to be eligible for these payments, such as the size and location of the aneurysm, and the outcome of the operation. Recording the data did not take a significant amount of a physician's time. The large payments made to physicians were disproportionate to the minimal services provided and had little practical value.

151.   Ostensibly, the Defendants' data registry was a way for the Defendants to obtain information to track Pipelines' performance. In fact, this program operated primarily as a marketing tool and a vehicle to give more money to doctors using Pipelines. The Defendants likely had little need for much of this data from doctors because the Defendants' sales personnel attended nearly all procedures using Pipelines, and these sales personnel made detailed reports to the Defendants about the uses of Pipelines in such procedures. Thus, virtually all data obtained from physicians through the Defendants' data collection program was already in the Defendants' possession.

152.   Whereas the more substantial kickbacks the Defendants gave to incentivize the doctors using the most Pipelines amount individually to hundreds of thousands of dollars, those given to doctors using the registry were smaller but were handed out to doctors who used a few or even a single pipeline. For each use of a single $14,000 Pipeline, the Defendants would pay a kickback of between $1,000 and $1,500 for "data collection."

153.  Most problematic, though, much of the data had absolutely no market value based on deliberate, built-in, Defendant-constructed design flaws in the studies using the registries' data.

154.  The Defendants' data collection kickbacks related to two so-called studies conducted by the Defendants – the IntrePED (Exhibit 9) and ASPIRe (Exhibit 13) studies, both of which employed data registries.  Collectively, Defendants paid doctors for the data for close to 1,000 patients in conjunction with these two studies.  (And the doctors who benefitted most (as the purported authors of Defendants' published studies based on this data) were the doctors who often used Pipeline devices such as Dr. Woodward, Dr. Orlando Diaz, and Dr. Josser Delgado Almandoz).

155.  Providing information for use in the IntrePED study required little work of the participating doctors.

156.  IntrePED was a retrospective study, meaning that the treatment of patients had already been completed, and the data from these treatments had already been recorded in the patients' medical files. Indeed, 38% of the patients reported on in the study had been previously reported in existing medical literature. And the study stated that "[t]he study sponsor [*i.e.*, Covidien] was responsible for site management, data management, statistical analysis, and safety re- porting." The IntrePed study required "no systematic imaging of patients . . . because sites were required to follow their standard procedures." Nor did it require a follow-up protocol. To participate, a doctor, or that doctor's assistant, merely needed to submit pre-existing patient data.

157.  Likewise, the ASPIRe study required little work from participating doctors.  For it, the published study states that "vascular imaging was evaluated at an independent core laboratory for assessment of aneurysm occlusion and parent artery stenosis." And furthermore, that the "observational registry was funded and supported by Covidien, with scientific oversight of the study steering committee members."

158.   Furthermore, as discussed further below, the objectivity and scientific value of the ASPIRe study was further compromised by the fact that Defendants hired conflicted companies owned by Pipeline proctor Dr. Britton Keith Woodward to provide the imaging core lab services for it. As Ms. Pugh told Dr. Chao at a Society of NeuroInterventional Surgery conference in 2017 at the Broadmoor luxury resort in Colorado Springs, Colorado, the true purpose of these studies was to encourage doctors to use more Pipelines.

159.   One of the most revealing and egregious design flaws in these two registries is that they were set up without any power study to determine how many patients were needed to make the studies and their information statistically useful or relevant. This was done intentionally by Defendants to justify payments to doctors for all patient data even though if the studies had been properly designed, Defendants would have known that approximately eighty percent of the data they paid doctors to obtain had zero market value because it was unnecessary.

160.   Based on his background, Dr. Chao is fully knowledgeable about what is necessary to make a study statistically and otherwise useful. This background includes Dr. Chao's decades-long work at the FDA relating significantly to validating more than 200 scientific studies – all of which unlike Defendants' studies contained the necessary power studies. Dr. Chao's academic background also includes biology and economics majors from Yale University, where Dr. Chao graduated summa cum laude, an MBA from New York University focused on finance and a public health degree from Columbia University. During this time, he took eight statistics classes, and is therefore highly familiar if not an expert in what constitutes a valid study based on statistical data. Based on his experience and expertise, Defendants' studies were largely useless, and Defendants paid for far more data than they could possibly have made good use of.

161.   Before a medical device company undertakes a clinical trial, it must perform what is known as a power study. It does this to evaluate the number of patients it will need to obtain a statistically significant result in the trial. Otherwise, the trial is worthless if too few patients enroll to demonstrate statistical significance, and places patients in unnecessary danger if too many patients enroll.

162.   Here, concerned about the efficacy of Defendants' trials, Dr. Chao asked Defendants' employee Vitas Sipelis whether Medtronic ever performed a power study for the IntrePED or ASPIRe studies. Sipelis told Dr. Chao that they did not.

163.   That Defendants enrolled nearly 1,000 patients (and 1,113 aneurysms) in these two studies without performing a power study to determine if that was an appropriate number of patients is further evidence that these were not legitimate studies, but instead operated to provide cover to give kickbacks to doctors who used Pipelines.

164.   Another reason to use a power study is that in most cases medical device companies want to limit the number of subjects in a study because of the high cost of performing a study.  For many legitimate studies of experimental devices, companies pay participating hospitals $10,000-$15,000 per subject, and the companies do not receive compensation for the devices.  But because IntrePED and ASPIRe were post-market studies, meaning that Pipeline was already FDA approved, Defendants and their affiliates received approximately $15,000 in sales revenue per Pipeline deployed and only had to pay $1,000 per subject or per aneurysm. As many cases required multiple Pipelines (most commonly from one to three per patient), Defendants were obtaining a substantial profit from each case enrolled in the IntrePED and ASPIRe studies despite their payments to participating doctors.

165.   Had Defendants done power studies, they would have learned that at least eighty percent of the data they paid doctors for had no market value whatsoever. Moreover, this conclusion that the IntrePED and ASPIRe studies operated to provide

cover to give kickbacks to doctors who used Pipelines is further reinforced by the fact
that Defendants and their affiliates began these two substantially overlapping studies
at almost the exact same time.

166.   Regarding the excessive data for each study, for comparison purposes,
other studies of products potentially competing with or comparable to Pipeline
enrolled approximately 100-200 patients each not the close to 1,000 patients (or 1,113
aneurysms) whose largely unnecessary data Defendants paid doctors to obtain.
Defendants and their affiliates' own Pipeline study, Pipeline for Uncoilable or Failed
Aneurysms (PUFS), begun in October 2008, enrolled only 108 patients. Defendants'
competitor Stryker began its Safety and Effectiveness of an Intracranial Aneurysm
Embolization System for Treating Large or Giant Wide Neck Aneurysms (SCENT)
study in October 2012, which enrolled only 213 patients. Defendants' competitor
Microvention-Terumo, Inc. began its Pivotal Study of the FRED Stent System in the
Treatment of Intracranial Aneurysms (FRED) study in July 2013 and enrolled only
145 patients. Microvention also performed the Safety and Efficacy Analysis of
FRED® Embolic Device in Aneurysm Treatment (SAFE) study beginning in July
2014 and enrolled only 100 patients. Defendants' own Pipeline Flex With SHield
Technology Embolization - An International MulticEnter ObservationaL Post Market
StuDy (SHIELD) study, begun in March 2016, enrolled only 205 patients. And
Defendants' Prospective Study on Embolization of Intracranial Aneurysms With
Pipeline™ Embolization Device (PREMIER) study, begun in July 2014, enrolled only
197 patients.

167.   Measured against these other studies of Pipelines or comparable
products, IntrePED's 793 patients (and 906 aneurysms) is a clearly excessive outlier,
and more so when combined with the 191 patients of the largely redundant ASPIRe
study. IntrePED could have demonstrated statistical significance with a small fraction
of the patients enrolled.

168.   The PUFS study provides an informative comparison. PUFS began in 2008, prior to Pipelines' FDA approval. Therefore, in PUFS Defendants and their affiliates did not receive any payment for each Pipeline used, and in fact had to pay $10,000-$15,000 per subject.   As such, Defendants and their affiliates performed a power analysis to demonstrate that only 108 patients were needed to meet the study's goals to prove efficacy and safety at statistically significant levels. Thus, even if these studies had any marginal purpose aside from their use in paying doctors, most of the data accumulated as Defendants knew had no market value.

169.   Additional limitations of the IntrePed and ASPIRe studies further illustrate their limited value. Beyond the foregoing allegations regarding the unnecessarily large patient enrollment in IntrePED and ASPIRe, additional facts demonstrate the limited value of these two studies.

170.   The IntrePED study began in March 2012 and ASPIRe in May 2012. The IntrePED study enrolled 793 patients with 906 aneurysms. ASPIRe enrolled 191 patients with 207 aneurysms.  Thus, in addition to being based on far too much data, these two studies also were largely redundant because both related to similar subject matter and had overlapping authors, and the same lead author Dr. David F. Kallmes.

171.   Information pertaining to about 38% of the patients enrolled in IntrePED had already been published in prior studies, calling into question the value of re-publishing this data in the IntrePED study. Defendants essentially paid doctors to resubmit the same data provided in other publications for many of the cases. Furthermore, unlike other studies which study both effectiveness and safety, IntrePED only studied safety. And IntrePED did not seek to test a hypothesis as many studies do, but merely collected and published data.

172.  ASPIRe was published in a journal called Interventional Neurology which accepts almost all articles submitted for publication and is not highly regarded within the profession. And the ASPIRe publication in Interventional Neurology

43

indicated no disclosures for conflict of interest ("The authors declare that there are no conflicts of interest to disclose") when all the authors had received payments from Defendants for submitting patient data. This is a glaring omission by the studies' authors.

173.   The Defendants also misused the IntrePed Registry to overcome doctors' safety concerns and broaden Pipeline uses beyond those approved by the FDA. After Pipeline was FDA approved in April 2011, doctors who were Pipelines' first users experienced relatively high stroke complications when using Pipelines.  Some doctors such as Dr. David Fiorella, the principal investigator for the COCOA (Complete Occlusion of Coilable Aneurysms) study of Pipelines begun by Chestnut Medical Technologies in October 2008, voiced concern over Pipeline safety because of high bleed rates. Therefore, when Pipeline was eventually approved by the FDA in 2011, it obtained only a very limited indication, which had the potential to severely limit use and sales of Pipeline. Defendants utilized registry studies in part to encourage doctors to overcome their safety concerns and to expand the use of Pipelines from its narrow, approved indication.

174.   The Defendants misuse of their registries to pay kickbacks to induce Pipeline usage and promote sales appears to be part of a pattern of conduct. In or about December 2018, Covidien agreed to pay $13 million to resolve civil liability for allegedly paying kickbacks to induce the use of its Solitaire mechanical thrombectomy device.  The Solitaire device is intended to restore blood flow and retrieve a blood clot in certain stroke patients.

175.   According to the Department of Justice press release relating to the settlement:

> The United States alleged that Covidien caused false claims to be submitted to Medicare and Medicaid by paying kickbacks to hospitals and institutions to induce them to use Covidien's Solitaire device.  Specifically, the United States alleged that after receiving FDA clearance for the

44

Solitaire device, Covidien launched a registry to pay hospitals and institutions to collect data about user experiences with the device. For about two years beginning in August 2014, Covidien paid a fee to hospitals and institutions that participated in a registry each time they used a new Solitaire device and reported certain clinical data about their practices for treating stroke patients to Covidien. Covidien solicited certain hospitals and institutions for the registry in order to convert their business from the competitor's product and/or persuade them to continue using Covidien products, and knowingly and willfully used the registry as a means of increasing device sales.

176. According to a statement published by Medtronic at the time, the conduct at issue related to the Systematic Evaluation of Patients Treated With Stroke Devices for Acute Ischemic Stroke (STRATIS) study. That study began in August 2014 and enrolled 984 patients.

177. Like IntrePED and ASPIRe, the STRATIS study was an observational registry dedicated to one of Defendants' products, and medical providers were offered payments to participate.

178. The Defendants payments of kickbacks through their IntrePED and ASPIRe registries does not qualify for AKS Safe Harbor Protection. As discussed above, the Anti-Kickback statue provides a severely limited "safe harbor" for personal service arrangements which requires, among other things, that:

The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

42 C.F.R. § 1001.952(d)(5). This safe harbor also requires that:

The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

42 C.F.R. § 1001.952(d)(7).

179.   The Defendants do not meet these strict Safe Harbor requirements in connection with their payments for doctors' participation in the IntrePED or ASPIRe registries, for at least two reasons, either of which is sufficient by itself to preclude safe harbor protection.

180.   First, the aggregate compensation paid to proctors was not consistent with fair market value in arms-length transactions, because, as described above, providing data for these studies required minimal work from the participating doctors. This is particularly true in the case of IntrePED, which was a retrospective study in which doctors provided information that had already been recorded from previous patient encounters. Paying $1,000-$1,500 per patient enrolled under these circumstances is not consistent with fair market value in arms-length transactions.

181.   Second, Defendants contracted with doctors for services that exceeded those which were reasonably necessary to accomplish the commercially reasonable business purpose of the IntrePED and ASPIRe studies. As discussed above, Defendants contracted for excessive and commercially unreasonable services by enrolling far more patients than was necessary in order to achieve statistically significant study results.

**Defendants' Awarding of Kickbacks to Favored Doctors as a Side or Incidental Benefit to its Business-Driven Purchase of Lazarus Effect**

182.   In or about September 2015 Defendant Medtronic acquired Lazarus Effect ("Lazarus") for $100 million in an all-cash transaction. Although there appear to have been some independent business purposes for this purchase, incidental to it, the Defendants provided kickbacks to select doctors.

183.   Then, Lazarus was developing a medical device called the Lazarus Cover device, "designed to wrap stent retriever devices with a novel nitinol mesh cover that folds over the retreiver [sic] during clot retrieval and 'candy wraps' the stent with the clot contained." In simplified terms, the purpose of the device was to reduce the

likelihood that blood clots would be released into a patient's bloodstream during the process of removing a stent previously placed in a patient's blood vessel.

184.    The Lazarus Cover device obtained CE approval in Europe in November 2014. At the time of Medtronic's September 2015 acquisition of Lazarus, the Lazarus Cover had not been FDA approved. The medical device regulatory approval process is much different in Europe than in the United States.  In Europe, devices don't need clinical data for CE approval.  CE approval generally only requires lab testing and not use in humans.  Therefore, device companies often first get CE approval, and then later try to get FDA approval. In fact, Lazarus was taken off the market in Europe in or about 2018.

185.    Medtronic announced its agreement to acquire Lazarus in a September 28, 2015 press release.

186.    The CMS Open Payments database identifies 28 doctors as receiving substantial "Royalty or License" payments from Medtronic Neurovascular on September 24, 2015, totaling more than $28 million.

187.    At the time of its acquisition, Lazarus had approximately 28 physician investors, many of whom received shares in the company in exchange for their involvement, work, or consulting with Lazarus and not because they had invested money into Lazarus, and many of whom came to own their interests in Lazarus shortly before its acquisition by Medtronic. Among the doctors who received payments in connection with Defendant Medtronic's acquisition of Lazarus were Dr. J. Mocco, Dr. Adnan Siddiqui, Dr. David Levy, and Dr. Aquilla Turk.

188.    There is no practical reason for a company such as Lazarus to have 28 physician advisors. Moreover, these physician advisors were involved in the fields of interventional neuroradiology, neurosurgery, interventional cardiology, neurology and radiology.

189.   Lazarus' product was a neurological device so it is unclear why interventional cardiologists would be involved with the company. Moreover, approximately one-quarter of the physician advisors involved had no expertise in the medical fields most relevant to Lazarus' product.

190.   Nonetheless, all of these "physician advisors" were in positions to be able to cause or recommend the use of Medtronic products, either in their own practices or at their affiliated institutions, and several of these doctors promoted the Lazarus device to the broader medical community through publications. For example, Dr. Siddiqui and Dr. Mocco performed and published a study purporting to demonstrate the superiority of using the Lazarus cover device over stroke treatment with stent retrievers without the Lazarus cover.  The study, published in 2015, was titled "Stent retriever thrombectomy with the Cover accessory device versus proximal protection with a balloon guide catheter: in vitro stroke model comparison" and was published in the Journal of NeuroInterventional Surgery ("JNIS"). There, Drs. Siddiqui and Mocco both disclosed that they were consultants for Lazarus, and Dr. Siddiqui but not Dr. Mocco disclosed "financial interests" in Lazarus.

191.   Upon Medtronic's purchase of Lazarus, Dr. Mocco received more than $2 million and Dr. Siddiqui received almost $600,000.

192.   In their article published in JNIS, Dr. Mocco and Dr. Siddiqui, using lab models, described their methodology as follows: "after introducing fresh clot into the middle cerebral artery, we compared rates of target vessel recanalization and embolization in new territories (areas in which clot had not been introduced) achieved with the Solitaire Flow Restoration (FR) stent retriever (Covidien, Irvine, California) in conjunction with the use of a conventional guide catheter (control group), a balloon guide catheter (BGC group), and the Cover device (Cover group)."

193.   The two doctors claimed to demonstrate that "[s]uccessful recanalization . . . was achieved in 50% of control cases, 45% of BGC cases, and 91% of Cover

device cases," *i.e.*, that the Lazarus device has a 91% rate of good clot retrieval versus 45%-50% when using the Solitaire stent retriever without the Lazarus Cover, or double the success rate. But, in fact, human studies near the same time with the Solitaire stent retriever observed over 88% good recanalization.  Furthermore, removing blood clot from lab models is much easier than from real humans because of the complexity of human anatomy and real clots.

194.   Any company performing its due diligence on Lazarus as a potential acquisition would have realized that the Mocco and Siddiqui study was unreliable, because its reported 45%-50% successful recanalization using the Solitaire stent retriever without the Lazarus Cover in a lab setting was absurdly low given that human studies observed 88% good recanalization for the Solitaire without the Lazarus Cover.

195.   Any company performing its due diligence on Lazarus as a potential acquisition would also have realized that the Cover was likely far less effective than portrayed in the Mocco and Siddiqui study, in part due to the authors' financial conflicts of interest.

196.   The conflicted Mocco and Siddiqui study was not the only reason to doubt the effectiveness of the Lazarus Cover device. According to Defendants' executive Stacy Pugh, doctors in Europe had serious problems with the Lazarus device and particularly were not able to cover stent retrievers well using the device. Since the Lazarus device received CE approval in Europe in November 2014, Medtronic should have known of these problems for almost a year by the time of the September 2015 Lazarus acquisition.

197.   At the outset of Medtronic's negotiations to purchase Lazarus, Medtronic planned to pay an upfront fee of $15 million for the company, an additional $15 million milestone payment if Lazarus earned $10 million in annual revenue, and an

49

additional $20 million milestone payment if Lazarus earned $25 million in annual revenue.

198.   Based on the agreement as conceived, if – and only if – Lazarus met both milestones Medtronic would pay $50 million. But Medtronic then abruptly changed its approach and agreed to purchase Lazarus for twice that amount, $100 million, with the payment upfront for cash and with no contingencies or milestones based on FDA approval, revenues, or any other metrics (which contingencies or milestones were often included in acquisitions of medical device startup companies).

199.   Brett Wall, who at the time was President of Medtronic's neurovascular division made the arrangements for this purchase. Based on what Medtronic personnel told Dr. Chao, Mr. Wall had authority to make acquisitions of up to $100 million without obtaining approval from Medtronic's board.

200.   According to Dr. Chao's conversations with Medtronic personnel, Medtronic budgeted $100 million for the acquisition, which it had to spend. This budgeting consideration arose partially in connection with Medtronic's acquisition of Covidien and later corporate restructuring and was partially driven by tax reasons.

201.   On September 28, 2015, several months after the Covidien acquisition was completed, Medtronic announced that "it has completed an internal restructuring of the ownership of certain legacy Covidien businesses that reduces the cash and investments held by Medtronic's U.S.-controlled non-U.S. subsidiaries . . . As a result of the Restructuring, approximately $9.8 billion (or approximately $9.3 billion net of tax) of cash, cash equivalents and investments in marketable debt and equity securities previously held by U.S.-controlled non-U.S. subsidiaries is available for general corporate purposes."

202.   Medtronic's earlier acquisition of Covidien and the ensuing corporate restructuring involved a tax inversion, whereby Medtronic's headquarters for tax

purposes was moved from Minneapolis, Minnesota to Dublin, Ireland, to obtain lower corporate tax rates.

203.   As such, Medtronic had been planning to acquire Lazarus, but also had a budget surplus that it felt it had to be spent. To make use of these funds, Medtronic therefore raised its purchase price for Lazarus to $100 million upfront, in order to achieve the secondary goal of inducing Lazarus' physician advisors to cause or recommend the use of Medtronic products including Pipelines.

204.   Judging by the subsequent use of Medtronic products by Lazarus physician advisors and their institutions, Medtronic's attempt to induce doctors to use its products through the generous acquisition price for Lazarus was successful.

205.   According to an internal Medtronic presentation titled "FY17Q1 Sales Region meeting," Medtronic neurovascular (the Medtronic business unit that acquired Lazarus) was the fastest growing business within Medtronic during its 2016 fiscal year, growing revenue at 34% or $81.6 million.

206.   Dr. Yves Gobin, who received almost $13 million in the Lazarus acquisition, is the senior neuro-interventional radiologist at Cornell New York Hospital which is part of the New York Presbyterian system. Dr Athos Patsalides trained and later worked at Cornell New York Hospital, and also received over $300k from Medtronic's Lazarus acquisition.  Medtronic neurovascular sales to New York Presbyterian increased 338% (or $3.3 million) in the 2016 fiscal year.  Medtronic neurovascular Pipeline sales to New York Presbyterian increased 224% (or $1.4 million) in the 2016 fiscal year, and Axium coil sales increased 1902% (or $392,000).

207.   The increases in Medtronic neurovascular sales to New York Presbyterian are likely attributable to Cornell New York Hospital. Columbia Presbyterian Medical Center is the other major hospital in the New York Presbyterian system. According to Dr Meyers, most of the aneurysms treated at Columbia Presbyterian Medical Center are still clipped instead of using coils or Pipelines.

Therefore, Columbia Presbyterian Medical Cen likely maintained stable purchase volume from Medtronic neurovascular in the 2016 fiscal year.

208.   Other medical centers affiliated with the physician advisors who received large payments from Medtronic in the Lazarus acquisition also had notable increases in Medtronic neurovascular product usage in Medtronic's 2016 fiscal year.

209.   The University of Tennessee (affiliated with Dr. Adam Arthur, who received over $70,000 in the Lazarus acquisition) had Medtronic neurovascular "Core – NP" sales increase 241% (or $589,000) in the 2016 fiscal year.

210.   Mount Sinai (affiliated with Drs. J Mocco, Alejandro Berenstein, Johanna Fifi, and Joshua Bederson, who respectively received $2.2 million, $1.6 million, $98,000, and $571,000 in the Lazarus acquisition) had Medtronic neurovascular "Core – NP" sales increase 81% (or $419,000) in the 2016 fiscal year.

211.   Methodist Hospital (affiliated with Drs. John Gurian and Walter Zink, who respectively received $357,000 and $140,000 in the Lazarus acquisition) had Medtronic neurovascular total sales increase 83% (or $1.5 million), and "Core – NP" sales increase 87% (or $813,000) in the 2016 fiscal year.

212.   Northwestern (affiliated with Dr. Harish Shownkeen, who received over $280,000 in the Lazarus acquisition) had Medtronic neurovascular Pipeline sales increase 133% (or $505,000) in the 2016 fiscal year.

213.   Kaleida Health-Buffalo General (affiliated with Dr. Adnan Siddiqui, who received over $593,000 in the Lazarus acquisition) had Medtronic neurovascular Pipeline sales increase 35% (or $226,000), and stroke products sales increase 107% (or $305,000) in the 2016 fiscal year.

214.   Long Beach Memorial (affiliated with Dr. Satoshi Tateshima, who received over $44,000 in the Lazarus acquisition) had Medtronic neurovascular stroke products sales increase 65% (or $308,000) in the 2016 fiscal year.

215.   This partial list of substantial sales increases to the home institutions of Lazarus physician advisors shows that such institutions collectively increased Medtronic purchases by millions of dollars in Medtronic's fiscal year 2016, following the September 2015 Lazarus acquisition.

216.   The "Core" devices referred to above were wires, catheters, and Medtronic's Onyx product. There were no significant changes in these "core" devices in 2015 and 2016. Therefore, the sales growth observed for these devices at University of Tennessee and Mount Sinai suggests a significant shift in these institutions' device usage to Medtronic and away from competitors' products.  Similarly coils such as Defendants' Axium product are essentially interchangeable commodities without significant variation among competing manufacturers, and therefore the dramatic 1902% ($392,000) increase in Medtronic's fiscal year 2016 coil sales to New York Cornell suggests a pronounced shift from Cornell using competitors' coils to Medtronic's.

217.   The Lazarus Cover device never even obtained FDA approval. And in 2018, only three years after acquiring Lazarus, Medtronic shelved its previously stated plans to develop Lazarus' products or technology.

218.   Ms. Pugh and other Medtronic employees attributed the failure of Lazarus to the fact that most doctors came to use longer stent retrievers (such as 40 mm length stent retrievers), for which the Lazarus Cover device was less effective. But that explanation is not persuasive because if the Lazarus device did in fact double the effectiveness of clot retrieval (as promoted by the 2015 Mocco and Siddiqui study), doctors would have continued to use shorter 30 mm stent retriever devices to obtain the enormous benefits of the Lazarus Cover.

**Other Benefits That Defendants Gave to Doctors**

219.   Defendants also distributed kickbacks to doctors to induce Pipeline usage through fellowships, grants, and other means.

53

220.   Defendants claimed that their decisions to award such perquisites were made by an independent NeuroVascular Medical Board. But this board's decisions were primarily influenced by Defendants' sales personnel particularly Mr. Zehren and Ms. Pugh.

221.   As an example of Defendants' doling out of research roles as a form of kickback payment, Defendants gave Dr. Ricardo Hanel the role of principal investigator in Defendants' Prospective Study on Embolization of Intracranial Aneurysms with Pipeline Embolization Device (PREMIER) study as a reward for using Defendants' products. As another example, Defendants gave companies controlled by Dr. Britton Keith Woodward the role of core lab for the PREMIER study as a reward for Dr. Woodward's use of Defendants' products.

222.   Similarly, Defendant sales' personnel were largely responsible for the funding of other perquisites to doctors and hospitals identified as likely to use their products, including $700,000 for a seven-year fellowship funded by Defendants and awarded to Dr. Reza Jahan and UCLA Health.

223.   Defendants also funded neurointerventional fellowships for University of Colorado, the Barrow Neurological Institute in Phoenix, the Harborview Medical Center in Seattle, and to institutions affiliated with proctors Dr. Christopher Moran (Washington University in St. Louis) and Dr. Demetrius Lopes (in Chicago).

224.   If a fellowship host institution that was funded by Defendants decreased its usage of Defendants' Pipelines, the Defendants would decrease or decline to renew their funding for such fellowships. In addition to providing funding for fellowships, Defendants also provided funds to doctors or institutions through grants.

225.   In short, Defendants used grants to encourage use of Pipelines and other of Defendants' products, and Defendants would decrease the amount of a grant if an applicant used fewer of Defendants' products.

226.    In addition, as demonstrated in Exhibit 12, hospitals affiliated with Pipeline proctors were among the Defendants' best customers.[2] Furthermore, a comparably large portion of all hospitals that purchased any Pipelines were affiliated with at least one proctor. Hospitals affiliated with proctors such as Dr. Woodward (Fort Sanders Regional Medical Center) and Dr. Moran (Barnes-Jewish Hospital) also purchased substantial amounts of Pipelines. Medtronic's data regarding its top 20 customers for its 2016 and 2015 fiscal years (reproduced in Exhibit 11) confirms that proctors' home institutions were consistently among the top Pipeline purchasers.

227.    Besides Defendants' kickback payments made directly to physicians, the Defendants provided lucrative compensation to at least two companies owned and operated by a Pipeline proctor, Dr. Woodward, one of which was retained to fill the role of an ostensibly unbiased, independent adjudicator to assess the results of a study performed by the Defendants.

228.    Aside from the hundreds of thousands of dollars in kickbacks Defendants paid to his companies, between 2013 and 2015, defendants directly paid Dr. Woodward more than $250,000 from Defendants broken down as follows: $40,353,47 in 2013; $83,588.62 in 2014; and $133,641.23 in 2015.

229.    During this three-year period alone, Dr. Woodward's companies also received more than $380,000 from Defendants for the ostensible purpose of performing core image lab services related to Pipeline studies. Through the Defendants' substantial kickback payments made to Dr. Woodward (directly as a proctor and indirectly through his companies) and putting him and Defendants in an ethically conflicted position, the results of this study could have been compromised and endangered patients.

---

[2] NYU Langone Medical Center, Westchester County Medical Center, Jefferson Hospital for Neuroscience, Rush University Medical Center, Medical University Hospital Authority, St. Joseph's Hospital and Medical Center.

230.   Dr. Britton Keith Woodward works in Knoxville, Tennessee, where he is affiliated with Fort Sanders Regional Medical Center, the Neurovascular Research Center of East Tennessee, and Vista Radiology, P.C.

231.   Besides serving as a Pipeline proctor, Dr. Woodward has been a paid speaker for the Defendants. In or about 2012 Dr. Woodward spoke at Covidien's national sales meeting at the luxury resort Pelican Hill in Newport Beach, California. He also spoke at the Defendants' national training courses at Green Valley Ranch, a luxury resort-spa-casino near Las Vegas, Nevada. Moreover, Dr. Woodward has financial interests in two companies that have provided image core lab services to medical device companies, including the Defendants.

232.   An imaging core lab is a laboratory that provides centralized quality control and assessment of medical images. Imaging core labs are frequently used by medical device manufacturers to aid in evaluating results of clinical studies, which may include images received from numerous testing sites. The imaging core lab serves the useful function of providing expert and consistent image interpretation.

233.   An imaging core lab also is supposed to provide independent analysis, which Woodward's companies did not provide here. Academic studies have demonstrated that bias in interpreting clinical study results can be extreme, particularly regarding company-sponsored studies. Such bias results in significant over-reporting of a product's efficacy, and significant under-reporting of a product's safety risks.

234.   Dr. Woodward founded Cascade Medical, LLC ("Cascade"), a Tennessee limited liability company. Organized in June 2010, Cascade became inactive in August 2014. Cascade had two members, one of whom was Dr. Woodward, and provided imaging core lab services to medical device companies. From March 31, 2014 through October 30, 2014, Cascade received $101,790 in payments from Defendant Covidien LP reported as relating to "flow diversion," *i.e.*, Pipelines. These

payments related to Cascade's work on two of the Defendants' studies, PUFS (Pipeline for Uncoilable or Failed Aneurysms) and ASPIRe (Aneurysm Study of Pipeline in an Observational Registry).

235.   In August 2014, Dr. Woodward founded Oculus Imaging, LLC ("Oculus"), a Tennessee limited liability company, whose two members apparently were Woodward and his wife. In 2014 and 2015, Defendants Covidien LP and Medtronic (through its Medtronic Neurovascular division) paid Oculus close to $300,000 for several studies of Defendants' devices.

236.   One study, the PREMIER study, was conducted at two clinical sites: Baptist Medical Center in Jacksonville, Florida, and Tampa General Hospital in Tampa, Florida. The study's enrollment was 197 patients. To be included in the study, patients must have had an intracranial aneurysm located in the anterior or posterior circulation, and the aneurysm must have a wide neck.

237.   The PREMIER study targeted a much wider group of aneurysms than were approved for Pipeline use under the FDA's prior indication, which required an aneurysm to be (i) located in the C2-C6 segment of the internal carotid artery, (ii) wide necked, and (iii) 10 mm in diameter or greater. The aim of the broader focus was to support Defendants' request to the FDA to approve this device for an expanded indication for Pipelines, which the FDA granted in February 2019.

238.   The Defendants hired Oculus as the study's "independent" core lab adjudicator. In this role, Oculus was supposed to serve as an unbiased interpreter of the images produced by the study's clinical sites, to determine the effectiveness of Pipelines in treating the aneurysms observed in the study.

239.   The Defendants' payment of substantial kickbacks to Dr. Woodward, including payments under the proctor program, casts serious doubt on whether Oculus acted as an independent adjudicator.

240.   Substantial monetary payments to Dr. Woodward stemming from his cozy relationship with Defendants likely resulted in millions of dollars in FCA claims (due to Dr. Woodward's high volume of Pipeline use over many years).

**DEFENDANTS CAUSED THE SUBMISSION OF FALSE CLAIMS TO FEDERAL AND STATE HEALTH CARE PROGRAMS**

241.   Defendants knowingly caused to be submitted thousands of false claims to federal and state agencies because of the Defendants' payment of illegal kickbacks.

242.   A defendant is liable under the FCA and corresponding state laws where the following elements are present: (i) a claim that defendants caused to be made to the government, or a record related to a claim, (ii) which claim or record is false, (iii) which claim or record defendants knew was false, and (iv) which claim or record is material. Knowingly under the FCA means with actual knowledge, acting in deliberate ignorance or acting in reckless disregard of the truth. Here, any claim for payment from a government health care program that includes Pipelines or related services resulting from the Defendants' payment of kickbacks constitutes a false claim for purposes of the FCA. *See* 42 U.S.C. §1320a-7b(g).

243.   Any certification of compliance with the Anti-Kickback statute made on a Provider Agreement (Form CMS-855) or Hospital Cost Report (Form CMS-2552) for Medicare, and any similar certification made to Medicaid or other government health care programs, constituted a false record if made by a physician or institution in connection with a use of Pipelines tainted by kickback payments from the Defendants.

244.   Defendants knew, or were deliberately ignorant or reckless in not knowing, the falsity of these claims and records. As large, legally sophisticated medical device companies the Defendants are experienced with applicable laws regarding the AKS.

58

245.   The Defendants' knowledge of their violation of the AKS is demonstrated in part by their attempts to conceal kickbacks and to disguise kickbacks as legitimate compensation for services provided by doctors.

246.   Defendants' false claims and records are material because they have a natural tendency to influence the decisions of the United States whether to reimburse kickback-induced uses of Pipelines, and whether to accept physicians' and hospitals' certifications of compliance with applicable laws including the AKS.

**Value of False Claims Submitted to Medicare And Medicaid**

247.   The Defendants' Pipeline sales have been paid for approximately 25% by Medicaid, approximately 25% by Medicare, and approximately 50% either privately or by other federal and state health care programs.

248.   The Defendants' kickback practices have caused the submission of false claims.

249.   Each year covered by this action, Medicare and Medicaid paid at least hundreds of thousands of dollars of false claims relating to at least hundreds of Pipelines that are tainted by kickbacks. In addition, Defendants caused the submission of false statements in support of such claims and doctors affiliated with Defendants submitted false claims and statements in support of false claims as well.

250.   While it is not feasible to describe all such false claims in detail in this Complaint, and the details of many such claims are not entirely in Dr. Chao's possession, clear cut indicia that Defendants submitted such claims and representative examples of the claims illustrate the Defendants' pattern of causing physicians and hospitals to make false claims and to submit false records, both of which are subject to FCA liability.

251.   For example, Dr. Moran is a participant in the proctor program. While proctoring a Pipeline operation in 2015 at Kaiser Permanente Los Angeles Medical Center, Dr. Moran told Dr. Chao that he uses Pipelines for almost all aneurysms

regardless of the aneurysm's location, and that he uses Pipelines for almost all his aneurysm patients.

252. Records from the Center for Medicare and Medicaid Services show that Dr. Moran performed and supervised numerous operations using Pipelines during 2012-2014.

253. CMS maintains a database reflecting medical procedures provided to Medicare beneficiaries. This database lists information regarding types of procedures performed, number of procedures performed, and the physician performing the procedure. The CMS database assigns numerical codes to different procedures using the Healthcare Common Procedure Coding System ("HCPCS"), which itself is based on a code set called Current Procedural Terminology ("CPT").

254. The code 61624 is the CPT and HCPCS code used for performance of a procedure that seeks to occlude, or block off, an aneurysm, such as a procedure using a Pipeline. The code 75894 is the CPT and HCPCS code used for radiological supervision and interpretation of such a procedure (i.e. the use of imaging technology to monitor the placement of a Pipeline in a patient).

255. The Defendants publish a Pipeline Embolization Device Coding and Reimbursement Guide, which lists various medical billing codes commonly associated with use of Pipelines. This guide is intended as a reference for physicians and hospital staff tasked with obtaining reimbursement for use of Pipelines. The guide lists different CPT codes applicable to use of Pipelines. The most prominently featured code in the guide is 61624 relating to "Transcatheter permanent occlusion or embolization" Another code listed by the guide is 75894-26 relating to "Transcatheter therapy, embolization, any method, radiological supervision and interpretation" (the "-26" modifier code denotes services performed by a physician, as opposed to a different technician).

256.   The CMS database indicates that during 2012-2014 Dr. Moran performed 68 services billed to Medicare under the HCPCS code 61624, for "Occlusion of abnormal artery" and 75 services billed to Medicare under the HCPCS code 75894, for "Radiological supervision and interpretation." The annual figures are broken out in the table below.

| Code | Procedure | 2012 | 2013 | 2014 | Total |
|---|---|---|---|---|---|
| 61624 | Occlusion of abnormal artery | 18 | 34 | 16 | 68 |
| 75894 | Radiological supervision and interpretation | 22 | 34 | 19 | 75 |

**Table 1. Medicare procedures billed by Dr. Moran during 2012-2014**

257.   It is common for a single operation to be billed under multiple codes. Most or all the 68 "occlusion" cases reflected above probably relate to the same patients and operations as the 75 "supervision" cases.

258.   Based on these 75 operations billed to Medicare by a participant in the Defendants' proctor program, and based on the proctor's statement to Dr. Chao that he uses Pipelines in almost all his aneurysm cases, Dr. Moran performed or assisted in roughly 70 operations billed to Medicare during 2012-2014 that used Pipelines.

259.   Each of these roughly 70 Pipeline operations was tainted by kickbacks, due to Dr. Moran's receipt of hundreds of thousands of dollars from the Defendants. As discussed above, using the proctor program and data collection program, the Defendants made payments to participating physicians. Data on these payments is available from the CMS Open Payments database, which collects information on payments from medical device companies to physicians, along with data about the products that these payments relate to.

260.   The Open Payments data show that during 2013-2015 Dr. Moran received 340 payments relating to "pipeline" or "flow diversion" devices, totaling over $200,000 from Defendants Covidien LP, Covidien Sales LLC, Medtronic Vascular, Inc., and Medtronic (through its Medtronic Neurovascular division). Most

of these payments relate to Dr. Moran's participation in the proctor program. The

following table summarizes the payments to Dr. Moran by the Defendants.

| Payor | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|
| Covidien LP | 969.68 | 30,892.71 | 0 | 31,862.39 |
| Covidien Sales LLC | 107,064.57 | 21,134.44 | 0 | 128,199.01 |
| Medtronic Neurovascular | 0 | 0 | 45,050.75 | 45,050.75 |
| Medtronic Vascular, Inc. | 0 | 0 | 598.13 | 598.13 |
| Total | 108,034.25 | 52,027.15 | 45,648.88 | 205,710.28 |

**Table 2. Defendants' Pipeline payments to Dr. Moran**

261.   Exhibit 2 contains a more detailed table showing each of the 340

payments received by Dr. Moran from the Defendants during this period that are listed

as relating to "flow diversion" or "pipelines." The payments occur frequently, and

many are in the thousands of dollars.

262.   As shown in Exhibit 2, these 340 documented payments fall under the

following categories: (i) food and beverage (total $5,817), (ii) compensation for

services (total $117,329), (iii) travel and lodging (total $60,222), (iv) royalty or

license payments (total $1,200), and (v) consulting fees (total $21,140).

263.   Dr. Moran traveled frequently in trips paid for by the Defendants,

including to popular vacation and resort destinations. Dr. Moran's travel for the

Defendants took him throughout the United States to popular vacation destinations

such as Miami and San Francisco, and to exotic international destinations such as

Buenos Aires, Argentina; Nice, France; and Madrid, Spain.[3] At each of these

international destinations the Defendants provided travel and lodging. A primary

purpose for such travel was to provide a substantial personal benefit to Dr. Moran in

exchange for his use and promotion of Pipelines.

---

[3]*See supra* note 1 regarding international travel data.

264.    The above two tables confirm the relationship between Pipeline related procedures performed by a physician and payments by the Defendants to that physician. The Medicare billing data in Table 1 show that Dr. Moran performed roughly twice the number of Pipeline procedures in 2013 as in 2014. The payments data in Table 2 show that the Defendants paid Dr. Moran roughly twice as much in 2013 as in 2014.

265.    Further confirming that these payments relate to Dr. Moran's use of Pipelines, the payments to Dr. Moran from Covidien entities ceased and payments from Medtronic entities began at the beginning of 2015, precisely when Medtronic acquired Covidien and the Pipelines business.

266.    Dr. Moran began receiving payments from Defendant Medtronic USA, Inc. in 2016 and continued to receive such payments through at least 2019. Dr. Moran received $129,289.25 in payments from Medtronic USA, Inc. listed as relating to "Pipeline" or "Flow Diversion" in 2016 alone.

267.    Dr. Moran received kickbacks from the Defendants, and performed numerous operations using Pipelines. Medicare (and almost certainly other federal and state health care programs) paid substantial amounts for Dr. Moran's Pipeline-related services, and for the Pipelines used in these operations, all of which were tainted by the Defendants' kickbacks.

268.    Medicare's payment for Dr. Moran's Pipeline related services can be easily verified and documented by the false records Defendants caused to be submitted to Medicare. First, each of the approximately 70 Pipeline operations billed by Dr. Moran to Medicare under HCPCS codes 61624 and 75894 during 2012-2014 is almost certainly recorded in a Form CMS-1500 submitted to Medicare. In addition to identifying Dr. Moran as the physician and the relevant Pipeline related HCPCS codes, these forms include information about the patient, the date of the procedure, the hospital, and the patient's insurance coverage. These Forms CMS-1500 are rendered

false by Dr. Moran's receipt of kickback payments, and by the Defendants' payment
of kickback payments.

269. Each of these approximately 70 Pipeline operations is would be reflected
in interim hospital reimbursement forms (Form CMS-1450) and Hospital Cost
Reports (Form CMS-2552). While Dr. Moran may have performed Pipeline
operations at different hospitals, it appears that he performed many such procedures at
his home institution of Barnes-Jewish Hospital in St. Louis, Missouri.

270. Medtronic's sales data show that Barnes-Jewish Hospital is among the
largest purchasers of Pipelines, accounting for $163,900 of Pipeline sales in the fiscal
quarter ended April 29, 2015, and $242,600 of Pipeline sales in the fiscal quarter
ended April 29, 2016 (see Exhibit 12).

271. Because of the Defendants' kickback scheme, any interim hospital
reimbursement forms and Hospital Cost Reports submitted by Barnes-Jewish Hospital
that reflect Pipeline procedures performed by Dr. Moran are false claims. Such
Hospital Cost Reports contain express falsehoods, because they require the signatory
to certify that the services represented in the report comply with health care laws and
regulations, including the Anti-Kickback statute.

272. Any Medicare Provider Agreements (Form CMS-855I) in effect for Dr.
Moran during the 2012-2014 period when these approximately 70 Pipeline operations
were billed to Medicare also constitute false records that give rise to false claims. Like
the Hospital Cost Report, the Provider Agreement requires its signatory to certify
compliance with Medicare laws, including the Anti-Kickback statute. Because of Dr.
Moran's participation in the Defendants' kickback scheme, these Provider
Agreements represent false claims.

273. Dr. Moran is one of many doctors who received kickbacks from the
Defendants and used Pipelines in their medical practice. CMS data indicates that
during 2013-2015 alone the Defendants made 8,484 payments related to "flow

diversion" or "pipelines," to hundreds of different doctors (including Dr. Moran), totaling more than $5.7 million. Exhibit 1 contains a list of likely proctors with the total dollar amounts paid to them by the Defendants during 2013-2015. The Pipeline related claim forms and provider agreements submitted by these proctor physicians and their hospitals are additional false records that the Defendants caused to be submitted to Medicare, and the claims submitted by these physicians and hospitals are additional false claims that Defendants caused to be made to Medicare.

274.    Similarly to Dr. Moran, publicly available Medicare data shows that other doctors who participated in Defendants' Pipeline proctor program received large payments from the Defendants relating to Pipelines, and very likely billed Pipeline related procedures to Medicare.

275.    For example, the following table shows payments from the Defendants to Dr. Woodward over 2013-2017 relating to "Pipelines" or "Flow Diversion":

| Payor | 2013 | 2014 | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|---|---|
| Covidien LP | $0 | $48 | $0 | $0 | $0 | $48 |
| Covidien Sales LLC | $40,353 | $83,541 | $0 | $0 | $0 | $123,895 |
| Medtronic Neurovascular | $0 | $0 | $133,641 | $0 | $0 | $133,641 |
| Medtronic USA, Inc. | $0 | $0 | $0 | $27,753 | $3,706 | $31,459 |
| **Total** | $40,353 | $83,589 | $133,641 | $27,753 | $3,706 | $289,042 |

276.    And the following table shows procedures performed by Dr. Woodward and billed to Medicare during 2013-2017 that likely involved the use of Pipelines based on their HCPCS procedure codes:

| Code / Procedure | 2013 | 2014 | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|---|---|
| 61624 Occlusion of abnormal artery | 0 | 0 | 13 | 14 | 14 | 41 |
| 75894 Radiological supervision and interpretation | 0 | 0 | 13 | 14 | 16 | 43 |

277.    As another example, the following table shows payments from the Defendants to Dr. Coon over 2013-2017 relating to "Pipelines" or "Flow Diversion":

| Payor | 2013 | 2014 | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|---|---|
| Covidien LP | $268 | $1,180 | $0 | $0 | $0 | $1,449 |
| Covidien Sales LLC | $62,868 | $122,229 | $0 | $0 | $0 | $185,097 |
| Medtronic Neurovascular | $0 | $0 | $94,321 | $0 | $0 | $94,321 |
| Medtronic USA, Inc. | $0 | $0 | $0 | $54,755 | $16,976 | $71,731 |
| Medtronic Vascular, Inc. | $0 | $0 | $0 | $0 | $66 | $66 |
| Total | $63,136 | $123,409 | $94,321 | $54,755 | $17,041 | $352,663 |

278.   And the following table shows procedures performed by Dr. Coon and billed to Medicare during 2013-2017 that likely involved the use of Pipelines based on their HCPCS procedure codes:

| Code / Procedure | 2013 | 2014 | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|---|---|
| 61624 Occlusion of abnormal artery | 53 | 37 | 40 | 41 | 36 | 207 |
| 75894 Radiological supervision and interpretation | 0 | 37 | 40 | 40 | 36 | 153 |

279.   Dr. Moran, Dr. Woodward, and Dr. Coon are merely examples of doctors who (i) received large Pipeline related payments from the Defendants, (ii) very likely billed Pipeline related procedures to Medicare, and (iii) participated in Defendants' proctor program. Many other doctors, some of which are discussed in this Complaint, also fit this same pattern.

**A.   Evidence Of False Claims Submitted To State Health Care Programs**

280.   Medicaid is a partnership between state and federal government, and Medicaid claims are reimbursed jointly by the states and the United States. As such, when false claims relating to Pipelines are submitted to Medicaid, these claims constitute false claims for purposes of the relevant state health care programs.

281.   Payments under the proctor program from the Defendants to physicians residing in different states establish that the Defendants' kickback scheme was active in each of the states discussed in this Complaint. Therefore, it is highly likely that the

health care programs run by these states paid false claims for Pipelines as a direct result of the Defendants' fraudulent conduct.

282.   As discussed above, the Defendants made kickback payments to physicians participating in the proctor program and the data collection program. Data on some of these payments is available from the CMS Open Payments database.

283.   The following table shows the amounts of payments made from the Defendants to doctors in each relevant state during 2013-2015, reported as relating to Defendants' "flow diversion" and "pipeline" products. States not discussed in this complaint are omitted from the table.

| State | Total Payments | State | Total Payments |
|---|---|---|---|
| California | 184,369.01 | Minnesota | 259,602.11 |
| Colorado | 109,899.58 | Montana | 460.09 |
| Connecticut | 2,901.17 | Nevada | 7,324.90 |
| Delaware | 190.39 | New Jersey | 45,866.51 |
| District of Columbia | 35,839.65 | New Mexico | 886.74 |
| Florida | 785,761.24 | New York | 992,112.97 |
| Georgia | 6,339.69 | North Carolina | 150,361.41 |
| Hawaii | 384.75 | Oklahoma | 8,168.97 |
| Illinois | 49,080.04 | Rhode Island | 93.92 |
| Indiana | 490.65 | Tennessee | 324,949.00 |
| Iowa | 5,376.67 | Texas | 182,466.29 |
| Louisiana | 15,744.07 | Vermont | 703.69 |
| Massachusetts | 34,527.99 | Virginia | 212,532.33 |
| Michigan | 21,535.82 | Washington | 53,979.63 |

**Table 3. Defendants' payments to doctors by state 2013-2015**

284.   In addition to the evidence of the Defendants' multi-state kickback scheme presented in Table 3, likely participants in the Defendants' proctor program have resided in most of these states as demonstrated in Exhibit 1. Also, likely proctors are affiliated with hospitals in most of these states, and such hospitals are known to purchase large amounts of Pipelines (as shown in Exhibit 12).

67

285.   As discussed above, Medicaid paid an unknown but large amount, believed to be at least in the hundreds of thousands of dollars, for Pipeline uses that were tainted by the Defendants' kickbacks.

286.   Based on these figures, and the nationwide scope of the Defendants' proctor program, (i) physicians in each of these states received kickbacks from the Defendants, (ii) these physicians used Pipelines as intended by the Defendants, and (iii) these physicians and their hospitals made related false claims to their respective state governments.

**Count I**

**Federal False Claims Act**

**31 U.S.C. §3729(a)(1)(A) and (a)(1)(B)**

287.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

288.   This is a claim for treble damages and penalties for each false claim and each false statement under the False Claims Act, 31 U.S.C. §3729, *et seq.*, as amended.

289.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

290.   Because of the acts described above, the Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Government to approve and pay such false and fraudulent claims.

291.   Each sale of Pipelines that resulted from the Defendants' illegal kickbacks represents a false or fraudulent record or statement. Each claim form, provider agreement, cost report, or other such form submitted to the Government from Pipeline sales resulting from the Defendants' illegal kickbacks is also a false or

68

fraudulent record or statement. Each claim for reimbursement for such kickback-induced sales submitted to a federal health insurance program represents a false or fraudulent claim for payment.

292.   Dr. Chao cannot now identify each and every false claim for payment that was caused by the Defendants' conduct. The false claims were presented by hundreds or thousands of separate entities, across the United States, and over several years. Dr. Chao has no control over or dealings with such entities and has no access to the records in their possession.

293.   The Government, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

294.   Because of Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial. Federal health insurance programs have paid at least hundreds of claims amounting to at least hundreds of thousands of dollars, for sales that were illegally induced by the Defendants' kickbacks.

**Count II**

**California False Claims Act**

**Cal. Gov't Code §12561(a)(1) and (a)(2)**

295.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

296.   This is a claim for treble damages and penalties under the California False Claims Act.

297.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

69

298.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

299.   The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

300.   Because of the Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

**Count III**

**Colorado Medicaid False Claims Act**

**Colo. Rev. Stat. §25.5-4-305(1)(a) and (1)(b)**

301.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

302.   This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

303.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval.

304.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Colorado State Government to approve and pay such false and fraudulent claims.

305.   The Colorado State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented

70

by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

306.   Because of the Defendants' acts, the State of Colorado has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

**Count IV**

**Connecticut False Claims Act**

**Conn. Gen. Stat. §4-275(a)(1) and (a)(2)**

307.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

308.   This is a claim for treble damages and penalties under the Connecticut False Claims Act.

309.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Connecticut State Government for payment or approval.

310.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Connecticut State Government to approve and pay such false and fraudulent claims.

311.   The Connecticut State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

312.   Because of the Defendants' acts, the State of Connecticut has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## Count V

## Delaware False Claims and Reporting Act

## Del. Code tit. 6, §1201(a)(1) and (a)(2)

313.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

314.   This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act.

315.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

316.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

317.   The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

318.   Because of the Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## Count VI

## District of Columbia False Claims Act

## D.C. Code §2-381.02(a)(1) and (a)(2)

319.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

72

320.   This is a claim for treble damages and penalties under the District of Columbia False Claims Act.

321.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

322.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the District of Columbia Government to approve and pay such false and fraudulent claims.

323.   The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

324.   Because of the Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

### Count VII

### Florida False Claims Act

### Fla. Stat. §68.082(2)(a) and (2)(b)

325.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

326.   This is a claim for treble damages and penalties under the Florida False Claims Act.

327.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

73

328.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

329.   The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

330.   Because of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

**Count VIII**

**<u>Georgia State False Medicaid Claims Act</u>**

**<u>Ga. Code §49-4-168.1(a)(1) and (a)(2)</u>**

331.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

332.   This is a claim for treble damages and penalties under the Georgia State False Medicaid Claims Act.

333.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

334.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

335.   The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented

by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

336. Because of the Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

**Count IX**

**Hawaii False Claims Act**

**Haw. Rev. Stat. §661-21(a)(1) and (a)(2)**

337. Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

338. This is a claim for treble damages and penalties under the Hawaii False Claims Act.

339. Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

340. Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

341. The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

342. Because of the Defendants' acts, the State of Hawaii has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## Count X

### Illinois False Claims Act

### 740 Ill. Comp. Stat. 175 / 3(a)(1)(A) and (a)(1)(B)

343.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

344.   This is a claim for treble damages and penalties under the Illinois False Claims Act.

345.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

346.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

347.   The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

348.   Because of the Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## Count XI

### Indiana Medicaid False Claims and Whistleblower Protection Act

### Ind. Code §5-11-5.7-2(a)(1) and (a)(2)

349.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

76

350.   This is a claim for treble damages and penalties under the Indiana Medicaid False Claims and Whistleblower Protection Act.

351.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

352.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

353.   The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

354.   Because of the Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## Count XII
### Iowa False Claims Act
### Iowa Code §685.2(1)(a) and (1)(b)

355.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

356.   This is a claim for treble damages and penalties under the Iowa False Claims Act.

357.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Iowa State Government for payment or approval.

358.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Iowa State Government to approve and pay such false and fraudulent claims.

359.   The Iowa State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

360.   Because of the Defendants' acts, the State of Iowa has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## Count XIII

### Louisiana Medical Assistance Programs Integrity Law

### La. Rev. Stat. §46:438.3(A) and (B)

361.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

362.   This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

363.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

364.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Louisiana State Government to approve and pay such false and fraudulent claims.

365.   The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented

by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

366.   Because of the Defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

**Count XIV**

**Massachusetts False Claims Act**

**Mass. Gen. Laws ch. 12, §5B(a)(1) and (a)(2)**

367.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

368.   This is a claim for treble damages and penalties under the Massachusetts False Claims Act.

369.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts State Government for payment or approval.

370.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Massachusetts State Government to approve and pay such false and fraudulent claims.

371.   The Massachusetts State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

372.   Because of the Defendants' acts, the State of Massachusetts has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## Count XV

### Michigan Medicaid False Claim Act

### Mich. Comp. Laws §400.607(1)

373.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

374.   This is a claim for treble damages and penalties under the Michigan Medicaid False Claim Act.

375.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Michigan State Government for payment or approval.

376.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Michigan State Government to approve and pay such false and fraudulent claims.

377.   The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

378.   By reason of the Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## Count XVI

### Minnesota False Claims Act

### Minn. Stat. §15C.02(a)(1) and (a)(2)

379.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

380.   This is a claim for treble damages and penalties under the Minnesota False Claims Act.

381.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Minnesota State Government for payment or approval.

382.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Minnesota State Government to approve and pay such false and fraudulent claims.

383.   The Minnesota State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

384.   Because of the Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## Count XVII

### Montana False Claims Act

### Mont. Code Ann. §17-8-403(1)(a) and (1)(b)

385.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

386.   This is a claim for treble damages and penalties under the Montana False Claims Act.

387.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval.

388.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Montana State Government to approve and pay such false and fraudulent claims.

389.   The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

390.   Because of the Defendants' acts, the State of Montana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## Count XIII

## Nevada False Claims Act

## Nev. Rev. Stat. §357.040(1)(a) and (1)(b)

391.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

392.   This is a claim for treble damages and penalties under the Nevada False Claims Act.

393.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

394.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

395.   The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented

by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

396. Because of the Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

**Count XIX**

**New Jersey False Claims Act**

**N.J. Rev. Stat. §2A:32C-3(a) and (b)**

397. Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

398. This is a claim for treble damages and penalties under the New Jersey False Claims Act.

399. Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

400. Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the New Jersey State Government to approve and pay such false and fraudulent claims.

401. The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

402. Because of the Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## Count XX

### New Mexico Medicaid False Claims Act

### N.M. Stat. Ann. §27-14-4(A) and (C)

403.    Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

404.    This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

405.    Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

406.    Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

407.    The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

408.    Because of the Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## Count XXI

### New York False Claims Act

### N.Y. State Fin. Law §189(1)(a) and (1)(b)

409.    Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

410.   This is a claim for treble damages and penalties under the New York False Claims Act.

411.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

412.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the New York State Government to approve and pay such false and fraudulent claims.

413.   The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

414.   Because of the Defendants' acts, the State of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

**Count XXII**

**North Carolina False Claims Act**

**N.C. Gen. Stat. §1-607(a)(1) and (a)(2)**

415.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

416.   This is a claim for treble damages and penalties under the North Carolina False Claims Act.

417.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

85

418.   By virtue of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the North Carolina State Government to approve and pay such false and fraudulent claims.

419.   The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

420.   Because of the Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

**Count XXIII**

**Oklahoma Medicaid False Claims Act**

**Okla. Stat. tit. 63, §5053.1(B)(1) and (B)(2)**

421.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

422.   This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

423.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

424.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay such false and fraudulent claims.

425.   The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented

by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

426.   Because of the Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

**Count XXIV**

**Rhode Island False Claims Act**

**R.I. Gen. Laws §9-1.1-3(a)(1) and (a)(2)**

427.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

428.   This is a claim for treble damages and penalties under the Rhode Island False Claims Act.

429.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

430.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Rhode Island State Government to approve and pay such false and fraudulent claims.

431.   The Rhode Island State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

432.   Because of the Defendants' acts, the State of Rhode Island has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

1

2

3

4

5

**Count XXV**

**Tennessee Medicaid False Claims Act**

**Tenn. Code Ann. §71-5-182(a)(1)(A) and (a)(1)(B)**

433.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

6

7

434.   This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Act.

8

9

10

435.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

11

12

13

14

436.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

15

16

17

18

437.   The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

19

20

21

438.   Because of the Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

22

23

24

**Count XXVI**

**Texas Medicaid Fraud Prevention Act**

**Tex. Hum. Res. Code Ann. §36.002(1)**

25

26

439.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

27

28

88

440.   This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act.

441.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

442.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Texas State Government to approve and pay such false and fraudulent claims.

443.   The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

444.   Because of the Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## Count XXVII

## Vermont False Claims Act

## Vt. Stat. Ann. tit. 32, §631(a)(1) and (a)(2)

445.   Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

446.   This is a claim for treble damages and penalties under the Vermont False Claims Act.

447.   Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Vermont State Government for payment or approval.

448.   Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material

facts, to induce the Vermont State Government to approve and pay such false and
fraudulent claims.

449.   The Vermont State Government, unaware of the falsity of the records,
statements and claims made, used, presented or caused to be made, used or presented
by the Defendants, paid and continues to pay the claims that would not be paid but
for the Defendants' illegal kickbacks.

450.   Because of the Defendants' acts, the State of Vermont has been
damaged, and continues to be damaged, in substantial amount to be determined at
trial.

**Count XXIII**

**Virginia Fraud Against Taxpayers Act**

**Va. Code Ann. §8.01-216.3(A)(1) and (A)(2)**

451.   Dr. Chao re-alleges and incorporates by reference the allegations
contained in the paragraphs above.

452.   This is a claim for treble damages and penalties under the Virginia
Fraud Against Taxpayers Act.

453.   Because of the acts described above, the Defendants knowingly
presented or caused to be presented, false or fraudulent claims to the Virginia State
Government for payment or approval.

454.   Because of the acts described above, the Defendants knowingly made,
used or caused to be made or used false records and statements, and omitted material
facts, to induce the Virginia State Government to approve and pay such false and
fraudulent claims.

455.   The Virginia State Government, unaware of the falsity of the records,
statements and claims made, used, presented or caused to be made, used or presented
by the Defendants, paid and continues to pay the claims that would not be paid but
for the Defendants' illegal kickbacks.

456.    Because of the Defendants' acts, the State of Virginia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## Count XXIX

### Washington State Medicaid Fraud False Claims Act

### Wash. Rev. Code §74.66.020(1)(a) and (1)(b)

457.    Dr. Chao re-alleges and incorporates by reference the allegations contained in the paragraphs above.

458.    This is a claim for treble damages and penalties under the Washington State Medicaid Fraud False Claims Act.

459.    Because of the acts described above, the Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Washington State Government for payment or approval.

460.    Because of the acts described above, the Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the Washington State Government to approve and pay such false and fraudulent claims.

461.    The Washington State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendants, paid and continues to pay the claims that would not be paid but for the Defendants' illegal kickbacks.

462.    Because of the Defendants' acts, the State of Washington has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Chao prays for judgment against the Defendants as follows:

(a)      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions plus a civil penalty for each violation of 31 U.S.C. §3729 (as periodically increased by statutory inflation adjustments), plus pre and post-judgment interest at a rate of 10 percent per year;

(b)      that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of California has sustained because of the Defendants' actions plus a civil penalty for each violation of Cal. Gov't Code §12561(a) plus interest;

(c)      that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Colorado has sustained because of the Defendants' actions, plus a civil penalty for each violation of Colo. Rev. Stat. §25.5-4-305(1), plus interest;

(d)      that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Connecticut has sustained because of the Defendants' actions plus a civil penalty for each violation of Conn. Gen. Stat. §4-275(a) plus interest;

(e)      that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Delaware has sustained because of the Defendants' actions, plus a civil penalty for each violation of Del. Code tit. 6, §1201(a), plus interest;

(f)      that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the District of Columbia has sustained because of the Defendants' actions, plus a civil penalty for each violation of D.C. Code §2-381.02(a), plus interest;

(g)      that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Florida has

sustained because of the Defendants' actions, plus a civil penalty for each violation of Fla. Stat. §68.082(2), plus interest;

(h)     that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Georgia has sustained because of the Defendants' actions, plus a civil penalty for each violation of Ga. Code §49-4-168.1(a), plus interest;

(i)     that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Hawaii has sustained because of the Defendants' actions, plus a civil penalty for each violation of Haw. Rev. Stat. §661-21(a), plus interest;

(j)     that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of the Defendants' actions, plus a civil penalty for each violation of 740 Ill. Comp. Stat. 175 / 3(a)(1), plus interest;

(k)     that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Indiana has sustained because of the Defendants' actions, plus a civil penalty for each violation of Ind. Code §5-11-5.7-2(a), plus interest;

(l)     that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Iowa has sustained because of the Defendants' actions, plus a civil penalty for each violation of Iowa Code §685.2(1), plus interest;

(m)     that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Louisiana has sustained because of the Defendants' actions, plus a civil penalty for each violation of La. Rev. Stat. §46:438.3, plus interest;

(n)    that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Massachusetts has sustained because of the Defendants' actions, plus a civil penalty for each violation of Mass. Gen. Laws ch. 12, §5B(a), plus interest;

(o)    that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Michigan has sustained because of the Defendants' actions, plus a civil penalty for each violation of Mich. Comp. Laws §400.612, plus interest;

(p)    that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Minnesota has sustained because of the Defendants' actions, plus a civil penalty for each violation of Minn. Stat. §15C.02(a), plus interest;

(q)    that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Montana has sustained because of the Defendants' actions, plus a civil penalty for each violation of Mont. Code Ann. §17-8-403(1), plus interest;

(r)    that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Nevada has sustained because of the Defendants' actions, plus a civil penalty for each violation of Nev. Rev. Stat. §357.040(1), plus interest;

(s)    that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of New Jersey has sustained because of the Defendants' actions, plus a civil penalty for each violation of N.J. Rev. Stat. §2A:32C-3, plus interest;

(t)    that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of New Mexico

has sustained because of the Defendants' actions, plus a civil penalty for each violation of N.M. Stat. Ann. §27-14-4, plus interest;

(u)    that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of New York has sustained because of the Defendants' actions, plus a civil penalty for each violation of N.Y. State Fin. Law §189(1), plus interest;

(v)    that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of North Carolina has sustained because of the Defendants' actions, plus a civil penalty for each violation of N.C. Gen. Stat. §1-607(a), plus interest;

(w)    that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Oklahoma has sustained because of the Defendants' actions, plus a civil penalty for each violation of Okla. Stat. tit. 63, §5053.1(B), plus interest;

(x)    that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Rhode Island has sustained because of the Defendants' actions, plus a civil penalty for each violation of R.I. Gen. Laws §9-1.1-3(a), plus interest;

(y)    that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Tennessee has sustained because of the Defendants' actions, plus a civil penalty for each violation of Tenn. Code Ann. §71-5-182(a)(1), plus interest;

(z)    that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Texas has sustained because of the Defendants' actions, plus a civil penalty for each violation of Tex. Hum. Res. Code Ann. §36.002, plus interest;

(aa)   that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Vermont has sustained because of the Defendants' actions, plus a civil penalty for each violation of Vt. Stat. Ann. tit. 32, §631(a), plus interest;

(bb)   that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Virginia has sustained because of the Defendants' actions, plus a civil penalty for each violation of Va. Code Ann. §8.01-216.3(A), plus interest;

(cc)   that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Washington has sustained because of the Defendants' actions, plus a civil penalty for each violation of Wash. Rev. Code §74.66.020(1), plus interest;

(dd)   that Dr. Chao be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act, and the equivalent provisions of the state statutes set forth above;

(ee)   that Dr. Chao be awarded all costs of this action and interest thereon, including attorneys' fees and expenses; and

(ff)   that Dr. Chao recover such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Dr. Chao hereby demands a trial by jury.

96

1   Dated: April 26, 2021                     Respectfully submitted,

2

3                                             By:   /s/ Mark I. Labaton
4                                             GLANCY PRONGAY & MURRAY LLP
                                              Mark I. Labaton (SBN 159555)
5                                             mlabaton@glancylaw.com
                                              Garth A. Spencer (SBN 335424)
6                                             gspencer@glancylaw.com
                                              1925 Century Park East, Suite 2100
7                                             Los Angeles, California 90067
                                              Telephone:   (310) 201-9150
8                                             Facsimile:   (310) 201-9160
9

10

11                                            *Attorneys for Qui Tam Plaintiff*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>Exhibit List</u>**

Exhibit 1 -    Likely Participants in the Defendants' Proctor Program During 2013-2015

Exhibit 2 -    Payments from the Defendants to Dr. Moran Relating to "Pipelines" or "Flow
               Diversion"

Exhibit 3 -    [omitted]

Exhibit 4 -    [omitted]

Exhibit 5 -    2017 Pipeline Clinical Specialist Strategic Account Activities – POA Worksheet

Exhibit 6 -    [omitted]

Exhibit 7 -    [omitted]

Exhibit 8 -    [omitted]

Exhibit 9 -    International Retrospective Study of the Pipeline Embolization Device: A
               Multicenter Aneurysm Treatment Study Published October 29, 2014

Exhibit 10 -   [omitted]

Exhibit 11 -   Medtronic FY 2017 Q1 Sales Region Meeting (excerpts)

Exhibit 12 -   Medtronic Pipeline Customer Hospitals with Quarterly Sales and Associated
               Proctors

Exhibit 13 -   Aneurysm Study of Pipeline in an Observational Registry (ASPIRe) Published
               May 26, 2016

# Exhibit 1

Likely Participants in the Defendant's Proctor Program During 2013-2015

| First | Last | City | State | Payments |
|-------|------|------|-------|----------|
| Peter | Nelson | New York | NY | 355,691.34 |
| John | Gaughen | Charlottesville | VA | 332,167.15 |
| Alexander | Coon | Baltimore | MD | 280,866.47 |
| Britton | Woodward | Knoxville | TN | 257,583.32 |
| Stanley | Barnwell | Portland | OR | 249,080.15 |
| Philipp | Taussky | Salt Lake City | UT | 219,310.52 |
| Christopher | Moran | Saint Louis | MO | 205,710.28 |
| Maksim | Shapiro | New York | NY | 200,909.47 |
| Josser | Delgado Almandoz | Minneapolis | MN | 191,651.98 |
| Mohammad | Chaudry | Charleston | SC | 191,296.35 |
| Guilherme | Dabus | Miami | FL | 191,093.26 |
| Peter | Sunenshine | Tampa | FL | 185,829.85 |
| Tibor | Becske | New York | NY | 174,968.23 |
| Curtis | Given | Lexington | KY | 162,083.39 |
| Ricardo | Hanel | Jacksonville | FL | 148,247.12 |
| Kevin | Cockroft | Hershey | PA | 122,756.84 |
| Raymond | Turner | Charleston | SC | 122,739.27 |
| Adnan | Siddiqui | Buffalo | NY | 121,506.89 |
| Christian | Ramsey | Lexington | KY | 115,020.13 |
| Daniel | Huddle | Englewood | CO | 106,593.85 |
| Luis | Gonzalez | Philadelphia | PA | 101,572.96 |
| Orlando | Diaz | Houston | TX | 100,845.60 |
| Italo | Linfante | Miami | FL | 92,860.60 |
| Eren | Erdem | Little Rock | AR | 77,724.76 |
| David | Niemann | Madison | WI | 77,595.25 |
| Avery | Evans | Charlottesville | VA | 62,090.80 |
| David | Fiorella | Stony Brook | NY | 57,280.49 |
| Sten | Solander | Chapel Hill | NC | 44,542.18 |
| Rashid | Janjua | Winston Salem | NC | 43,607.20 |
| Basavaraj | Ghodke | Seattle | WA | 43,227.29 |
| Arash | Khalessi-Hosseini | San Diego | CA | 42,141.62 |
| Adam | Arthur | Memphis | TN | 40,003.93 |
| Yasha | Kadkhodayan | Saint Louis | MO | 39,121.26 |
| Ciro | Randazzo | Atlantic City | NJ | 36,218.67 |
| Elad | Levy | Buffalo | NY | 32,492.89 |
| Gary | Duckwiler | Los Angeles | CA | 32,193.08 |
| Michel | Mawad | Houston | TX | 30,504.40 |
| William | Bank | Washington | DC | 22,929.58 |
| Demetrius | Lopes | Chicago | IL | 22,386.23 |
| Joe | Bernard | Charlotte | NC | 21,575.95 |
| Alan | Reeves | Kansas City | KS | 19,502.01 |
| Michael | Stiefel | Valhalla | NY | 19,397.65 |
| Peter | Kan | Houston | TX | 19,288.92 |
| Ali | Malek | West Palm Beach | FL | 18,502.61 |

Likely Participants in the Defendants' Proctor Program During 2013-2015

| First | Last | City | State | Payments |
|-------|------|------|-------|----------|
| Jeremy | Fields | Clackamas | OR | 18,455.20 |
| Vijaykumar | Patel | Knoxville | TN | 17,147.26 |
| Khalil | Zahra | Oradell | NJ | 16,788.84 |
| Cameron | McDougall | Phoenix | AZ | 16,277.72 |
| Amon | Liu | Redwood City | CA | 16,063.28 |
| Mohammad Ali | Aziz-Sultan | Boston | MA | 14,997.10 |
| Pascal | Jabbour | Philadelphia | PA | 14,776.32 |
| Ajit | Puri | Boston | MA | 13,614.52 |
| Arun | Amar | Belleville | NJ | 12,717.60 |
| Christopher | Koebbe | San Antonio | TX | 11,838.36 |
| Andrew | Stemer | Washington | DC | 11,661.01 |
| Spiros | Blackburn | Gainesville | FL | 11,192.83 |
| Tom | Yao | Louisville | KY | 11,030.66 |
| John | Reavey-Cantwell | Richmond | VA | 10,521.62 |
| | | | **Total** | 5,229,794.11 |

This list of likely participants in the Defendants' proctor program is derived from CMS Open Payments Data available at https://openpaymentsdata.cms.gov

The city and state listed here for each physician is the most recent city and state of residence for that physician that is listed in the Open Payments data through the end of 2015.

The amount of payments listed here for each physician is the total of the Defendants' payments to the physician during the 2013-2015 period covered by the Open Payments data, for which the payments list an associated covered product of "flow diversion" or "pipeline."

# Exhibit 2

Payments from the Defendants to Dr. Moran Relating to "Pipelines" or "Flow Diversion"

| Date | Amount | Payor | Type | Travel City | Travel State |
|------|--------|-------|------|-------------|--------------|
| 8/27/13 | 41.05 | Covidien LLP | Food and Beverage | | |
| 8/28/13 | 985.69 | Covidien Sales LLP | Compensation for services | | |
| 8/28/13 | 810.69 | Covidien Sales LLC | Compensation for services | | |
| 8/30/13 | 810.69 | Covidien Sales LLC | Compensation for services | | |
| 8/30/13 | 510.69 | Covidien Sales LLC | Compensation for services | | |
| 8/30/13 | 510.69 | Covidien Sales LLC | Compensation for services | | |
| 9/11/13 | 100.00 | Covidien Sales LLC | Compensation for services | | |
| 9/12/13 | 255.40 | Covidien Sales LLC | Compensation for services | | |
| 9/12/13 | 10.00 | Covidien Sales LLC | Compensation for services | | |
| 9/12/13 | 10.00 | Covidien Sales LLC | Compensation for services | | |
| 9/12/13 | 3.00 | Covidien Sales LLC | Compensation for services | | |
| 9/17/13 | 377.28 | Covidien Sales LLC | Compensation for services | | |
| 9/18/13 | 155.94 | Covidien Sales LLC | Compensation for services | | |
| 9/18/13 | 3.00 | Covidien Sales LLC | Compensation for services | | |
| 9/18/13 | 0.80 | Covidien LLP | Food and Beverage | | |
| 9/18/13 | 31.19 | Covidien LLP | Food and Beverage | | |
| 9/18/13 | 10.00 | Covidien Sales LLC | Compensation for services | | |
| 9/18/13 | 10.00 | Covidien Sales LLC | Compensation for services | | |
| 9/18/13 | 10.00 | Covidien Sales LLC | Compensation for services | | |
| 9/19/13 | 231.65 | Covidien Sales LLC | Compensation for services | | |
| 9/19/13 | 200.75 | Covidien Sales LLC | Compensation for services | | |
| 9/19/13 | 168.69 | Covidien Sales LLC | Compensation for services | | |
| 9/20/13 | 327.29 | Covidien Sales LLC | Compensation for services | | |
| 9/20/13 | 292.48 | Covidien Sales LLC | Compensation for services | | |
| 9/20/13 | 10.00 | Covidien Sales LLC | Compensation for services | | |
| 9/20/13 | 1.00 | Covidien Sales LLC | Compensation for services | | |
| 9/21/13 | 194.56 | Covidien Sales LLC | Compensation for services | | |
| 9/23/13 | 156.69 | Covidien Sales LLC | Compensation for services | | |
| 9/23/13 | 10.81 | Covidien LP | Food and Beverage | | |
| 9/24/13 | 127.07 | Covidien Sales LLC | Compensation for services | | |
| 9/24/13 | 116.44 | Covidien Sales LLC | Compensation for services | | |
| 9/25/13 | 65.48 | Covidien LP | Food and Beverage | | |
| 9/26/13 | 141.12 | Covidien Sales LLC | Compensation for services | | |

Payments from the Defendants to Dr. Moran Relating to "Pipelines" or "Flow Diversion"

| Date | Amount | Payor | Type | Travel City | Travel State |
|---|---|---|---|---|---|
| 9/26/13 | 20.76 | Covidien LP | Food and Beverage | | |
| 9/27/13 | 349.77 | Covidien Sales LLC | Compensation for services | | |
| 9/27/13 | 133.55 | Covidien Sales LLC | Compensation for services | | |
| 10/2/13 | 5,100.00 | Covidien Sales LLC | Compensation for services | | |
| 10/9/13 | 7,200.00 | Covidien Sales LLC | Compensation for services | | |
| 10/11/13 | 10.00 | Covidien Sales LLC | Compensation for services | | |
| 10/11/13 | 1.00 | Covidien Sales LLC | Compensation for services | | |
| 10/16/13 | 7,200.00 | Covidien Sales LLC | Compensation for services | | |
| 10/16/13 | 3,681.37 | Covidien Sales LLC | Compensation for services | | |
| 10/16/13 | 44.06 | Covidien LP | Food and Beverage | | |
| 10/17/13 | 10.00 | Covidien Sales LLC | Compensation for services | | |
| 10/17/13 | 1.00 | Covidien Sales LLC | Compensation for services | | |
| 10/18/13 | 224.45 | Covidien Sales LLC | Compensation for services | | |
| 10/18/13 | 10.00 | Covidien Sales LLC | Compensation for services | | |
| 10/18/13 | 2.00 | Covidien Sales LLC | Compensation for services | | |
| 10/19/13 | 144.26 | Covidien Sales LLC | Compensation for services | | |
| 10/20/13 | 492.30 | Covidien Sales LLC | Compensation for services | | |
| 10/20/13 | 10.00 | Covidien Sales LLC | Compensation for services | | |
| 10/20/13 | 10.00 | Covidien Sales LLC | Compensation for services | | |
| 10/20/13 | 1.00 | Covidien Sales LLC | Compensation for services | | |
| 10/21/13 | 306.78 | Covidien Sales LLC | Compensation for services | | |
| 10/21/13 | 154.73 | Covidien Sales LLC | Travel and Lodging | Pittsburgh | PA |
| 10/21/13 | 133.94 | Covidien Sales LLC | Compensation for services | | |
| 10/21/13 | 58.68 | Covidien LP | Food and Beverage | | |
| 10/21/13 | 10.00 | Covidien Sales LLC | Compensation for services | | |
| 10/22/13 | 193.09 | Covidien Sales LLC | Compensation for services | | |
| 10/22/13 | 144.73 | Covidien Sales LLC | Compensation for services | | |
| 10/22/13 | 136.40 | Covidien Sales LLC | Compensation for services | | |
| 10/23/13 | 14,820.00 | Covidien Sales LLC | Compensation for services | | |
| 10/23/13 | 7,020.00 | Covidien Sales LLC | Compensation for services | | |
| 10/23/13 | 7,020.00 | Covidien Sales LLC | Compensation for services | | |
| 10/23/13 | 7,020.00 | Covidien Sales LLC | Compensation for services | | |
| 10/23/13 | 7,020.00 | Covidien Sales LLC | Compensation for services | | |

Payments from the Defendants to Dr. Moran Relating to "Pipelines" or "Flow Diversion"

| Date | Amount | Payor | Type | Travel City | Travel State |
|---|---|---|---|---|---|
| 10/23/13 | 7,020.00 | Covidien Sales LLC | Compensation for services | | |
| 10/23/13 | 4,420.00 | Covidien Sales LLC | Compensation for services | | |
| 10/23/13 | 589.20 | Covidien Sales LLC | Compensation for services | | |
| 10/23/13 | 84.43 | Covidien Sales LLC | Compensation for services | | |
| 10/24/13 | 710.30 | Covidien Sales LLC | Compensation for services | | |
| 10/24/13 | 10.00 | Covidien Sales LLC | Compensation for services | | |
| 10/25/13 | 341.94 | Covidien Sales LLC | Compensation for services | | |
| 10/26/13 | 298.69 | Covidien Sales LLC | Compensation for services | | |
| 10/28/13 | 229.67 | Covidien Sales LLC | Compensation for services | | |
| 10/28/13 | 210.47 | Covidien Sales LLC | Compensation for services | | |
| 10/30/13 | 4,420.00 | Covidien Sales LLC | Compensation for services | | |
| 11/6/13 | 465.94 | Covidien Sales LLC | Travel and Lodging | Columbus | OH |
| 11/11/13 | 96.57 | Covidien Sales LLC | Food and Beverage | | |
| 11/12/13 | 64.25 | Covidien Sales LLC | Food and Beverage | | |
| 11/13/13 | 8,840.00 | Covidien Sales LLC | Compensation for services | | |
| 11/13/13 | 4,420.00 | Covidien Sales LLC | Compensation for services | | |
| 11/13/13 | 4,420.00 | Covidien Sales LLC | Compensation for services | | |
| 11/13/13 | 90.52 | Covidien Sales LLC | Food and Beverage | | |
| 11/14/13 | 9.67 | Covidien Sales LLC | Food and Beverage | | |
| 11/14/13 | 9.36 | Covidien Sales LLC | Food and Beverage | | |
| 11/15/13 | 23.40 | Covidien LP | Food and Beverage | | |
| 12/4/13 | 139.92 | Covidien Sales LLC | Compensation for services | | |
| 12/10/13 | 741.10 | Covidien Sales LLC | Compensation for services | | |
| 12/10/13 | 233.10 | Covidien Sales LLC | Travel and Lodging | Buenos Aires | Argentina* |
| 12/10/13 | 134.26 | Covidien Sales LLC | Compensation for services | | |
| 12/10/13 | 129.26 | Covidien Sales LLC | Compensation for services | | |
| 12/10/13 | 117.07 | Covidien Sales LLC | Compensation for services | | |
| 12/10/13 | 10.00 | Covidien Sales LLC | Travel and Lodging | Los Angeles | CA |
| 12/10/13 | 10.00 | Covidien Sales LLC | Travel and Lodging | Los Angeles | CA |
| 12/10/13 | 2.00 | Covidien Sales LLC | Travel and Lodging | Los Angeles | CA |
| 12/10/13 | 1.00 | Covidien Sales LLC | Travel and Lodging | Los Angeles | CA |
| 12/10/13 | 1.00 | Covidien Sales LLC | Travel and Lodging | Los Angeles | CA |

Payments from the Defendants to Dr. Moran Relating to "Pipelines" or "Flow Diversion"

| Date | Amount | Payor | Type | Travel City | Travel State |
|------|--------|-------|------|-------------|--------------|
| 12/17/13 | 233.10 | Covidien Sales LLC | Travel and Lodging | Buenos Aires | Argentina* |
| 12/17/13 | 131.00 | Covidien Sales LLC | Travel and Lodging | San Diego | CA |
| 12/17/13 | 10.00 | Covidien Sales LLC | Travel and Lodging | San Diego | CA |
| 12/17/13 | 10.00 | Covidien Sales LLC | Compensation for services | | |
| 12/18/13 | 358.47 | Covidien LP | Travel and Lodging | Mansfield | MA |
| 12/18/13 | 271.37 | Covidien LP | Travel and Lodging | Mansfield | MA |
| 12/19/13 | 18.02 | Covidien LP | Food and Beverage | | |
| 12/23/13 | 18.13 | Covidien LP | Food and Beverage | | |
| 12/25/13 | 7.46 | Covidien LP | Food and Beverage | | |
| 12/30/13 | 10.00 | Covidien Sales LLC | Compensation for services | | |
| 12/31/13 | 698.00 | Covidien Sales LLC | Compensation for services | | |
| 12/31/13 | 277.47 | Covidien Sales LLC | Travel and Lodging | Houston | TX |
| 12/31/13 | 144.79 | Covidien Sales LLC | Travel and Lodging | Houston | TX |
| 12/31/13 | 10.00 | Covidien Sales LLC | Compensation for services | | |
| 1/2/14 | 1,105.00 | Covidien Sales LLC | Travel and Lodging | Oklahoma City | OK |
| 1/2/14 | 10.00 | Covidien Sales LLC | Compensation for services | | |
| 1/3/14 | 150.29 | Covidien Sales LLC | Compensation for services | | |
| 1/3/14 | 124.23 | Covidien Sales LLC | Food and Beverage | | |
| 1/6/14 | 3.77 | Covidien LP | Food and Beverage | | |
| 1/7/14 | 294.00 | Covidien Sales LLC | Travel and Lodging | San Diego | CA |
| 1/8/14 | 358.47 | Covidien LP | Travel and Lodging | Boston | MA |
| 1/8/14 | 271.37 | Covidien LP | Travel and Lodging | Boston | MA |
| 1/8/14 | 172.80 | Covidien LP | Travel and Lodging | Boston | MA |
| 1/8/14 | 172.80 | Covidien LP | Travel and Lodging | Boston | MA |
| 1/8/14 | 152.50 | Covidien Sales LLC | Travel and Lodging | San Diego | CA |
| 1/8/14 | 149.27 | Covidien LP | Travel and Lodging | Boston | MA |
| 1/10/14 | 234.19 | Covidien Sales LLC | Compensation for services | | |
| 1/10/14 | 154.73 | Covidien Sales LLC | Compensation for services | | |
| 1/10/14 | 106.78 | Covidien Sales LLC | Compensation for services | | |
| 1/29/14 | 943.00 | Covidien Sales LLC | Travel and Lodging | Irvine | CA |
| 1/29/14 | 299.35 | Covidien Sales LLC | Travel and Lodging | Irvine | CA |
| 1/29/14 | 136.11 | Covidien Sales LLC | Travel and Lodging | Irvine | CA |

Payments from the Defendants to Dr. Moran Relating to "Pipelines" or "Flow Diversion"

| Date | Amount | Payor | Type | Travel City | Travel State |
|------|--------|-------|------|-------------|--------------|
| 1/29/14 | 101.74 | Covidien Sales LLC | Travel and Lodging | Irvine | CA |
| 1/29/14 | 10.00 | Covidien Sales LLC | Travel and Lodging | Irvine | CA |
| 1/29/14 | 0.70 | Covidien Sales LLC | Travel and Lodging | Irvine | CA |
| 2/14/14 | 455.00 | Covidien Sales LLC | Travel and Lodging | Irvine | CA |
| 2/14/14 | 10.00 | Covidien Sales LLC | Travel and Lodging | Irvine | CA |
| 2/18/14 | 1,730.20 | Covidien Sales LLC | Travel and Lodging | Irvine | CA |
| 2/18/14 | 1,375.80 | Covidien Sales LLC | Travel and Lodging | Irvine | CA |
| 2/18/14 | 910.20 | Covidien Sales LLC | Travel and Lodging | Costa Mesa | CA |
| 2/18/14 | 587.88 | Covidien Sales LLC | Travel and Lodging | Los Angeles | CA |
| 2/18/14 | 10.00 | Covidien Sales LLC | Travel and Lodging | Irvine | CA |
| 2/18/14 | 10.00 | Covidien Sales LLC | Travel and Lodging | Irvine | CA |
| 3/4/14 | 1,200.00 | Covidien Sales LLC | Royalty or License | | |
| 3/4/14 | 118.82 | Covidien Sales LLC | Travel and Lodging | Costa Mesa | CA |
| 3/6/14 | 482.85 | Covidien Sales LLC | Travel and Lodging | San Diego | CA |
| 3/6/14 | 147.57 | Covidien Sales LLC | Travel and Lodging | Laguna Beach | CA |
| 3/7/14 | 143.88 | Covidien LP | Food and Beverage | | |
| 3/7/14 | 120.01 | Covidien LP | Food and Beverage | | |
| 3/7/14 | 24.17 | Covidien LP | Food and Beverage | | |
| 3/20/14 | 139.00 | Covidien Sales LLC | Travel and Lodging | Irvine | CA |
| 3/24/14 | 197.57 | Covidien LP | Food and Beverage | | |
| 3/24/14 | 14.25 | Covidien LP | Food and Beverage | | |
| 3/25/14 | 617.10 | Covidien Sales LLC | Travel and Lodging | Laguna Beach | CA |
| 3/25/14 | 198.30 | Covidien Sales LLC | Food and Beverage | | |
| 3/25/14 | 11.81 | Covidien LP | Food and Beverage | | |
| 4/7/14 | 116.01 | Covidien LP | Food and Beverage | | |
| 4/7/14 | 11.22 | Covidien LP | Food and Beverage | | |
| 4/23/14 | 60.81 | Covidien Sales LLC | Food and Beverage | | |
| 4/29/14 | 55.85 | Covidien LP | Food and Beverage | | |
| 4/29/14 | 2.81 | Covidien LP | Food and Beverage | | |
| 6/9/14 | 18.10 | Covidien LP | Food and Beverage | | |
| 6/27/14 | 170.01 | Covidien Sales LLC | Food and Beverage | | |
| 7/15/14 | 206.04 | Covidien LP | Food and Beverage | | |

Payments from the Defendants to Dr. Moran Relating to "Pipelines" or "Flow Diversion"

| Date | Amount | Payor | Type | Travel City | Travel State |
|---|---|---|---|---|---|
| 7/17/14 | 98.56 | Covidien LP | Food and Beverage | | |
| 7/17/14 | 25.17 | Covidien LP | Food and Beverage | | |
| 9/3/14 | 15.73 | Covidien LP | Food and Beverage | | |
| 9/23/14 | 125.87 | Covidien LP | Compensation for services | | |
| 9/24/14 | 9,125.00 | Covidien LP | Compensation for services | | |
| 9/24/14 | 8,000.00 | Covidien LP | Consulting Fee | | |
| 9/24/14 | 5,600.00 | Covidien LP | Compensation for services | | |
| 9/24/14 | 4,000.00 | Covidien LP | Consulting Fee | | |
| 9/24/14 | 3,500.00 | Covidien Sales LLC | Consulting Fee | | |
| 9/24/14 | 2,500.00 | Covidien Sales LLC | Compensation for services | | |
| 9/24/14 | 1,125.48 | Covidien LP | Travel and Lodging | Nice | France |
| 9/24/14 | 133.23 | Covidien LP | Food and Beverage | | |
| 9/24/14 | 88.01 | Covidien LP | Travel and Lodging | Nice | France |
| 9/24/14 | 79.90 | Covidien LP | Travel and Lodging | Irvine | CA |
| 9/24/14 | 76.16 | Covidien Sales LLC | Food and Beverage | | |
| 9/24/14 | 70.58 | Covidien LP | Travel and Lodging | Irvine | CA |
| 9/24/14 | 27.00 | Covidien LP | Travel and Lodging | Irvine | CA |
| 10/7/14 | 198.02 | Covidien Sales LLC | Food and Beverage | | |
| 10/7/14 | 176.86 | Covidien Sales LLC | Food and Beverage | | |
| 10/16/14 | 123.91 | Covidien Sales LLC | Food and Beverage | | |
| 10/27/14 | 107.57 | Covidien Sales LLC | Travel and Lodging | Dallas | TX |
| 10/27/14 | 107.57 | Covidien Sales LLC | Travel and Lodging | Dallas | TX |
| 11/3/14 | 47.04 | Covidien LP | Food and Beverage | | |
| 11/21/14 | 62.06 | Covidien LP | Compensation for services | | |
| 11/21/14 | 18.68 | Covidien LP | Compensation for services | | |
| 11/21/14 | 9.70 | Covidien LP | Food and Beverage | | |
| 11/21/14 | 6.13 | Covidien LP | Food and Beverage | | |
| 12/2/14 | 141.64 | Covidien Sales LLC | Food and Beverage | | |
| 12/2/14 | 18.43 | Covidien Sales LLC | Food and Beverage | | |
| 12/3/14 | 510.42 | Covidien Sales LLC | Travel and Lodging | Memphis | TN |
| 12/15/14 | 580.92 | Covidien Sales LLC | Travel and Lodging | Nashville | TN |
| 12/15/14 | 410.68 | Covidien Sales LLC | Travel and Lodging | Oklahoma City | OK |

Payments from the Defendants to Dr. Moran Relating to "Pipelines" or "Flow Diversion"

| Date | Amount | Payor | Type | Travel City | Travel State |
|---|---|---|---|---|---|
| 12/16/14 | 141.91 | Covidien Sales LLC | Food and Beverage | Memphis | TN |
| 12/16/14 | 10.22 | Covidien Sales LLC | Food and Beverage | | |
| 12/17/14 | 42.44 | Covidien LP | Compensation for services | | |
| 12/19/14 | 52.80 | Covidien Sales LLC | Food and Beverage | | |
| 12/22/14 | 141.93 | Covidien LP | Food and Beverage | | |
| 12/27/14 | 121.96 | Covidien Sales LLC | Food and Beverage | | |
| 12/27/14 | 98.46 | Covidien Sales LLC | Food and Beverage | | |
| 12/27/14 | 74.66 | Covidien Sales LLC | Food and Beverage | | |
| 12/28/14 | 136.09 | Covidien Sales LLC | Food and Beverage | | |
| 1/1/15 | 391.90 | Medtronic Vascular, Inc. | Travel and Lodging | Memphis | TN |
| 1/2/15 | 226.20 | Medtronic Neurovascular | Travel and Lodging | Atlanta | GA |
| 1/2/15 | 143.08 | Medtronic Neurovascular | Travel and Lodging | Kansas City | MO |
| 1/2/15 | 121.10 | Medtronic Vascular, Inc. | Travel and Lodging | Memphis | TN |
| 1/6/15 | 1,085.20 | Medtronic Neurovascular | Travel and Lodging | Kansas City | MO |
| 1/6/15 | 781.60 | Medtronic Neurovascular | Travel and Lodging | Kansas City | MO |
| 1/6/15 | 387.40 | Medtronic Neurovascular | Travel and Lodging | Atlanta | GA |
| 1/6/15 | 312.64 | Medtronic Neurovascular | Travel and Lodging | Memphis | TN |
| 1/6/15 | 251.62 | Medtronic Neurovascular | Travel and Lodging | Atlanta | GA |
| 1/6/15 | 234.32 | Medtronic Neurovascular | Travel and Lodging | Nashville | TN |
| 1/6/15 | 193.70 | Medtronic Neurovascular | Travel and Lodging | Oklahoma City | OK |
| 1/6/15 | 155.52 | Medtronic Neurovascular | Travel and Lodging | Oklahoma City | OK |
| 1/6/15 | 155.52 | Medtronic Neurovascular | Travel and Lodging | Oklahoma City | OK |
| 1/6/15 | 149.97 | Medtronic Neurovascular | Travel and Lodging | Nashville | TN |
| 1/6/15 | 15.93 | Medtronic Neurovascular | Food and Beverage | | |
| 1/7/15 | 1,101.00 | Medtronic Neurovascular | Travel and Lodging | Newport Beach | CA |
| 1/20/15 | 7,049.60 | Medtronic Neurovascular | Travel and Lodging | Madrid | Spain* |
| 1/20/15 | 799.60 | Medtronic Neurovascular | Travel and Lodging | Madrid | Spain* |
| 1/21/15 | 288.20 | Medtronic Neurovascular | Travel and Lodging | Raleigh | NC |
| 1/28/15 | 84.61 | Medtronic Neurovascular | Food and Beverage | | |
| 1/28/15 | 15.40 | Medtronic Neurovascular | Consulting Fee | | |
| 2/17/15 | 1,833.43 | Medtronic Neurovascular | Travel and Lodging | Memphis | TN |
| 2/17/15 | 1,234.00 | Medtronic Neurovascular | Travel and Lodging | Huntsville | AL |

Payments from the Defendants to Dr. Moran Relating to "Pipelines" or "Flow Diversion"

| Date | Amount | Payor | Type | Travel City | Travel State |
|---|---|---|---|---|---|
| 2/17/15 | 429.84 | Medtronic Neurovascular | Travel and Lodging | Chicago | IL |
| 2/17/15 | 415.38 | Medtronic Neurovascular | Travel and Lodging | Huntsville | AL |
| 2/17/15 | 207.67 | Medtronic Neurovascular | Travel and Lodging | Memphis | TN |
| 2/17/15 | 160.34 | Medtronic Neurovascular | Travel and Lodging | Chicago | IL |
| 2/17/15 | 160.34 | Medtronic Neurovascular | Travel and Lodging | Chicago | IL |
| 2/17/15 | 159.00 | Medtronic Neurovascular | Travel and Lodging | Huntsville | AL |
| 3/31/15 | 1,997.91 | Medtronic Neurovascular | Travel and Lodging | Miami | FL |
| 3/31/15 | 278.10 | Medtronic Neurovascular | Travel and Lodging | Sacramento | CA |
| 3/31/15 | 169.29 | Medtronic Neurovascular | Travel and Lodging | Miami | FL |
| 3/31/15 | 154.48 | Medtronic Neurovascular | Travel and Lodging | Los Angeles | CA |
| 3/31/15 | 135.12 | Medtronic Neurovascular | Travel and Lodging | Sacramento | CA |
| 4/1/15 | 434.12 | Medtronic Neurovascular | Travel and Lodging | Buffalo | NY |
| 4/1/15 | 65.00 | Medtronic Neurovascular | Travel and Lodging | Durham | NC |
| 4/2/15 | 510.77 | Medtronic Neurovascular | Travel and Lodging | Los Angeles | CA |
| 4/2/15 | 242.00 | Medtronic Neurovascular | Travel and Lodging | Miami | FL |
| 4/2/15 | 149.86 | Medtronic Neurovascular | Travel and Lodging | Memphis | TN |
| 4/2/15 | 148.40 | Medtronic Neurovascular | Travel and Lodging | Los Angeles | CA |
| 4/2/15 | 132.20 | Medtronic Neurovascular | Travel and Lodging | San Diego | CA |
| 4/23/15 | 198.90 | Medtronic Neurovascular | Travel and Lodging | Miami | FL |
| 4/24/15 | 2,023.74 | Medtronic Neurovascular | Travel and Lodging | Memphis | TN |
| 4/24/15 | 1,334.87 | Medtronic Neurovascular | Travel and Lodging | Nashville | TN |
| 4/24/15 | 770.13 | Medtronic Neurovascular | Travel and Lodging | Salt Lake City | UT |
| 4/24/15 | 314.10 | Medtronic Neurovascular | Travel and Lodging | Salt Lake City | UT |
| 4/24/15 | 169.00 | Medtronic Neurovascular | Travel and Lodging | Memphis | TN |
| 4/24/15 | 144.37 | Medtronic Neurovascular | Travel and Lodging | Nashville | TN |
| 4/24/15 | 108.61 | Medtronic Neurovascular | Travel and Lodging | Salt Lake City | UT |
| 5/19/15 | 135.85 | Medtronic Neurovascular | Food and Beverage | | |
| 5/19/15 | 122.44 | Medtronic Neurovascular | Food and Beverage | | |
| 5/19/15 | 118.00 | Medtronic Neurovascular | Travel and Lodging | Irvine | CA |
| 5/19/15 | 59.66 | Medtronic Neurovascular | Travel and Lodging | Irvine | CA |
| 5/19/15 | 58.34 | Medtronic Neurovascular | Travel and Lodging | Irvine | CA |
| 5/19/15 | 47.73 | Medtronic Neurovascular | Travel and Lodging | Irvine | CA |

Payments from the Defendants to Dr. Moran Relating to "Pipelines" or "Flow Diversion"

| Date | Amount | Payor | Type | Travel City | Travel State |
|---|---|---|---|---|---|
| 5/19/15 | 35.00 | Medtronic Neurovascular | Travel and Lodging | Irvine | CA |
| 5/19/15 | 32.81 | Medtronic Neurovascular | Travel and Lodging | Irvine | CA |
| 5/20/15 | 13.09 | Medtronic Neurovascular | Food and Beverage | | |
| 5/20/15 | 4.36 | Medtronic Neurovascular | Food and Beverage | | |
| 5/22/15 | 867.03 | Medtronic Neurovascular | Travel and Lodging | Kansas City | MO |
| 5/22/15 | 143.10 | Medtronic Neurovascular | Travel and Lodging | Kansas City | MO |
| 5/22/15 | 137.28 | Medtronic Neurovascular | Travel and Lodging | Kansas City | MO |
| 5/31/15 | 137.28 | Medtronic Neurovascular | Travel and Lodging | Kansas City | MO |
| 5/31/15 | 135.44 | Medtronic Neurovascular | Travel and Lodging | Kansas City | MO |
| 6/1/15 | 871.56 | Medtronic Neurovascular | Travel and Lodging | Tucson | AZ |
| 6/1/15 | 123.65 | Medtronic Neurovascular | Travel and Lodging | Fort Lauderdale | FL |
| 6/4/15 | 100.00 | Medtronic Neurovascular | Food and Beverage | | |
| 6/4/15 | 95.00 | Medtronic Neurovascular | Travel and Lodging | Buffalo | NY |
| 6/4/15 | 75.00 | Medtronic Neurovascular | Travel and Lodging | Buffalo | NY |
| 6/10/15 | 271.60 | Medtronic Neurovascular | Travel and Lodging | Buffalo | NY |
| 6/10/15 | 243.17 | Medtronic Neurovascular | Travel and Lodging | Irvine | CA |
| 6/10/15 | 86.00 | Medtronic Neurovascular | Travel and Lodging | Newport Beach | CA |
| 6/10/15 | 29.00 | Medtronic Neurovascular | Travel and Lodging | Irvine | CA |
| 6/25/15 | 85.13 | Medtronic Vascular, Inc. | Food and Beverage | Irvine | CA |
| 6/26/15 | 853.23 | Medtronic Neurovascular | Travel and Lodging | Kansas City | MO |
| 6/26/15 | 233.35 | Medtronic Neurovascular | Travel and Lodging | Fort Lauderdale | FL |
| 6/26/15 | 193.53 | Medtronic Neurovascular | Travel and Lodging | Kansas City | MO |
| 6/26/15 | 159.13 | Medtronic Neurovascular | Travel and Lodging | Fort Lauderdale | FL |
| 6/26/15 | 156.59 | Medtronic Neurovascular | Travel and Lodging | Fort Lauderdale | FL |
| 6/26/15 | 82.58 | Medtronic Neurovascular | Food and Beverage | | |
| 6/29/15 | 12.88 | Medtronic Neurovascular | Food and Beverage | | |
| 7/6/15 | 61.51 | Medtronic Neurovascular | Food and Beverage | | |
| 7/6/15 | 32.98 | Medtronic Neurovascular | Food and Beverage | | |
| 7/17/15 | 17.68 | Medtronic Neurovascular | Food and Beverage | | |
| 7/19/15 | 35.00 | Medtronic Neurovascular | Food and Beverage | | |
| 7/21/15 | 16.62 | Medtronic Neurovascular | Food and Beverage | | |
| 7/21/15 | 8.75 | Medtronic Neurovascular | Food and Beverage | | |

Payments from the Defendants to Dr. Moran Relating to "Pipelines" or "Flow Diversion"

| Date | Amount | Payor | Type | Travel City | Travel State |
|---|---|---|---|---|---|
| 7/23/15 | 164.62 | Medtronic Neurovascular | Food and Beverage | | |
| 7/27/15 | 190.97 | Medtronic Neurovascular | Travel and Lodging | Jacksonville | FL |
| 7/27/15 | 179.00 | Medtronic Neurovascular | Travel and Lodging | Hollywood | FL |
| 7/27/15 | 117.43 | Medtronic Neurovascular | Food and Beverage | | |
| 7/29/15 | 166.76 | Medtronic Neurovascular | Travel and Lodging | Jacksonville | FL |
| 7/29/15 | 165.28 | Medtronic Neurovascular | Travel and Lodging | Jacksonville | FL |
| 7/29/15 | 137.28 | Medtronic Neurovascular | Travel and Lodging | Kansas City | MO |
| 8/10/15 | 622.95 | Medtronic Neurovascular | Travel and Lodging | Minneapolis | MN |
| 8/10/15 | 587.92 | Medtronic Neurovascular | Travel and Lodging | Minneapolis | MN |
| 8/10/15 | 464.48 | Medtronic Neurovascular | Travel and Lodging | San Francisco | CA |
| 8/24/15 | 139.11 | Medtronic Neurovascular | Food and Beverage | San Francisco | CA |
| 8/30/15 | 929.10 | Medtronic Neurovascular | Travel and Lodging | Minneapolis | MN |
| 8/31/15 | 161.00 | Medtronic Neurovascular | Travel and Lodging | Jacksonville | FL |
| 8/31/15 | 103.83 | Medtronic Neurovascular | Travel and Lodging | Jacksonville | FL |
| 8/31/15 | 89.00 | Medtronic Neurovascular | Travel and Lodging | Jacksonville | FL |
| 9/9/15 | 683.28 | Medtronic Neurovascular | Travel and Lodging | Oklahoma City | OK |
| 9/10/15 | 179.10 | Medtronic Neurovascular | Travel and Lodging | Oklahoma City | OK |
| 9/10/15 | 131.12 | Medtronic Neurovascular | Travel and Lodging | Oklahoma City | OK |
| 9/10/15 | 114.96 | Medtronic Neurovascular | Travel and Lodging | San Francisco | CA |
| 9/10/15 | 114.28 | Medtronic Neurovascular | Travel and Lodging | Minneapolis | MN |
| 9/21/15 | 350.76 | Medtronic Neurovascular | Travel and Lodging | Irvine | CA |
| 9/27/15 | 206.00 | Medtronic Neurovascular | Travel and Lodging | Irvine | CA |
| 9/27/15 | 206.00 | Medtronic Neurovascular | Travel and Lodging | Irvine | CA |
| 9/27/15 | 112.00 | Medtronic Neurovascular | Travel and Lodging | Irvine | CA |
| 9/27/15 | 112.00 | Medtronic Neurovascular | Travel and Lodging | Irvine | CA |
| 9/29/15 | 533.20 | Medtronic Neurovascular | Travel and Lodging | Miami | FL |
| 9/29/15 | 296.20 | Medtronic Neurovascular | Travel and Lodging | Dallas | TX |
| 9/29/15 | 204.00 | Medtronic Neurovascular | Travel and Lodging | Miami | FL |
| 9/29/15 | 173.92 | Medtronic Neurovascular | Travel and Lodging | Irvine | CA |
| 10/2/15 | 453.86 | Medtronic Neurovascular | Travel and Lodging | Irvine | CA |
| 10/2/15 | 140.21 | Medtronic Neurovascular | Travel and Lodging | Fort Lauderdale | FL |
| 10/5/15 | 143.74 | Medtronic Neurovascular | Food and Beverage | | |

Payments from the Defendants to Dr. Moran Relating to "Pipelines" or "Flow Diversion"

| Date | Amount | Payor | Type | Travel City | Travel State |
|------|--------|-------|------|-------------|--------------|
| 10/7/15 | 206.31 | Medtronic Neurovascular | Travel and Lodging | Dallas | TX |
| 10/7/15 | 165.23 | Medtronic Neurovascular | Food and Beverage | | |
| 10/7/15 | 154.00 | Medtronic Neurovascular | Travel and Lodging | Dallas | TX |
| 10/7/15 | 139.00 | Medtronic Neurovascular | Travel and Lodging | Dallas | TX |
| 10/7/15 | 139.00 | Medtronic Neurovascular | Travel and Lodging | Dallas | TX |
| 10/7/15 | 134.10 | Medtronic Neurovascular | Food and Beverage | | |
| 10/8/15 | 169.84 | Medtronic Neurovascular | Travel and Lodging | Irvine | CA |
| 10/8/15 | 112.00 | Medtronic Neurovascular | Travel and Lodging | Irvine | CA |
| 10/8/15 | 112.00 | Medtronic Neurovascular | Travel and Lodging | Irvine | CA |
| 10/14/15 | 12.52 | Medtronic Neurovascular | Food and Beverage | | |
| 10/14/15 | 6.41 | Medtronic Neurovascular | Compensation for services | | |
| 10/29/15 | 417.60 | Medtronic Neurovascular | Travel and Lodging | Fort Lauderdale | FL |
| 10/29/15 | 131.43 | Medtronic Neurovascular | Travel and Lodging | Fort Lauderdale | FL |
| 10/29/15 | 119.03 | Medtronic Neurovascular | Travel and Lodging | Fort Lauderdale | FL |
| 11/7/15 | 376.46 | Medtronic Neurovascular | Travel and Lodging | Houston | TX |
| 11/10/15 | 206.10 | Medtronic Neurovascular | Travel and Lodging | Fort Lauderdale | FL |
| 12/10/15 | 325.26 | Medtronic Neurovascular | Travel and Lodging | Houston | TX |
| 12/10/15 | 325.26 | Medtronic Neurovascular | Travel and Lodging | Houston | TX |
| 12/10/15 | 70.00 | Medtronic Neurovascular | Travel and Lodging | Houston | TX |
| 12/10/15 | 37.54 | Medtronic Neurovascular | Travel and Lodging | Houston | TX |

**Total**        205,710.28

This list of payments is derived from CMS Open Payments Data available at https://openpaymentsdata.cms.gov

The payments listed here are those for which the payment data lists an associated covered product of "flow diversion" or "pipeline."

* CMS' data set lists the city, state, and country of travel associated with a particular payment. For payments to Dr. Moran listing Buenos Aires as the city, the state listed in the CMS data is California and the country listed is the U.S., however this appears to be an error as there is no city of Buenos Aires in California. Presumably this was a data entry error and the payment relates to travel in Buenos Aires, Argentina. Similarly, the CMS data for payments relating to the city Madrid also list locations of California and the U.S., though there is no Madrid, California. Therefore, this exhibit lists the Travel State for these payments as Spain and Argentina, respectively.

# Exhibits 3-4 Omitted

# Exhibit 5

# 2017 Pipeline Clinical Specialist
# Strategic Account Activities –POA Worksheet

Pipeline Clinical Specialist:_____     Date:_____

Account/City:_____     TM:_____

Physician(s):_____     Case Credit:_____

### Strategic Account Action Items (circle all that were completed):

## .5 Case Coverage Credit

- Pipeline PUFFS Data review.
- Pipeline IntrePED Data review.
- Review/Discuss Enterprise Registry
- Review/Discuss Neuroform Registry
- Review - Patency of Opth Art after FD
- Review Current Clinical Paper Id:_____
- Competitive FD Clin Paper Review id_____
- Pipeline Cost Savings Calculator vs. SAC.
- Admin mtg to review Pipe vs SAC savings

- Review of potential Pipeline Cases with clinicians.
- Pipeline Case follow-up live/Angio review

## 2 Case Coverage Credit – Approved in Adv.

- Coordinate primary Pipeline training for untrained clinicians Id:_____
- Schedule a Proctor to visit for Grand Rounds.
- Coordinate Physician lab visit to another lab.
- Coordinate & Host a Physician Training Program 1-3 phys.

## 1 Case Coverage Credit

- Identify and develop training curriculum to meet specific needs of physician(s)
- Schedule and implement a Pipeline Simulator training program_Elstrat Model.
- Advanced Pipeline training outside of

- Lab Day/Staff In-service
- Lab based Flow Model training.
- Flex Physician Certification Training
- Coil Case in Target Account.

- In-service NICU staff on Pipeline Formal.
- In-service Neurosurgery Office on Pipeline ID activities_____
- In-service Referral INR/Neuro Surg on Pipeline Id_____

- Fellow Pipeline Training Formal
- Fellow Flow Model Training
- Fellow clinical paper review

Comments:_____

_____

NextStep/ActionItem:_____

_____

***Strategic Activities will counted towards Case Coverage Quota if the Plan Of Action worksheet is attached and submitted to TM, RM, Pipe Mgr/Sales Ops for each activity. See page 2 for further definition.*

# Case Quota & Strategic Activities Summary

## Case Quota & Strategic Activities:

Pipeline 2015 strategy consists of more than just covering cases, but involves the PCS as the Regional Expert on Flow Diversion. We need your experience to meet with non-adopters (never performed a Pipeline case), slow adopters, late adopters and other hospital personnel. To compensate for these strategic activities they will count towards Case Quota under the following conditions:

- Actual Case Coverage – activities on case coverage days only count as .5 credit as additional case coverage for that day.

- .5 credit case coverage for lower effort activities and duplicate activities in other nearby accounts.

- 1 credit case coverage for activities that require advanced planning and consume more than 5 hours of activity.

- 2 credit case coverage (require Mgt approval in advance of the activity) are for activities that require extra planning, effort or time and may require additional travel to achieve.

**Strategic Activity Worksheet to be completed for each strategic account activity performed and submitted to RM, TM, Pipe Mgr, and Sales Op's.**

- **Must be submitted within 2 business days to TM, RM, and National Pipeline Manager for activity to be counted.**
- **Next Step/Action Item & explanation is required for each activity.**
- **No longer accepting jpg files – Please scan with Genius Scan to PDF File or use PDF file and input the data.**

*\*\*Strategic Activities will counted towards Case Coverage Quota if the Plan Of Action worksheet is attached and submitted to TM, RM, Pipe Mgr/Sales Ops for each activity. See page 2 for further definition.*

138
Exhibit 5

Exhibits 6-8 Omitted

# Exhibit 9

Case 2:17-cv-01903-CJC-MRW Document 2614 Filed 8174731 Page 122 of 149  Page ID
Published October 29, 2014 as 10.3174/ajnr.A4111        #:1137

ORIGINAL RESEARCH
**INTERVENTIONAL**



# International Retrospective Study of the Pipeline Embolization Device: A Multicenter Aneurysm Treatment Study

D.F. Kallmes, R. Hanel, D. Lopes, E. Boccardi, A. Bonafé, S. Cekirge, D. Fiorella, P. Jabbour, E. Levy, C. McDougall, A. Siddiqui, I. Szikora, H. Woo, F. Albuquerque, H. Bozorgchami, S.R. Dashti, J.D. Almandoz, M.E. Kelly, R. Turner IV, B.K. Woodward, W. Brinjikji, G. Lanzino, and P. Lylyk

## ABSTRACT

**BACKGROUND AND PURPOSE:** Flow diverters are increasingly used in the endovascular treatment of intracranial aneurysms. Our aim was to determine neurologic complication rates following Pipeline Embolization Device placement for intracranial aneurysm treatment in a real-world setting.

**MATERIALS AND METHODS:** We retrospectively evaluated all patients with intracranial aneurysms treated with the Pipeline Embolization Device between July 2008 and February 2013 in 17 centers worldwide. We defined 4 subgroups: internal carotid artery aneurysms of ≥10 mm, ICA aneurysms of <10 mm, other anterior circulation aneurysms, and posterior circulation aneurysms. Neurologic complications included spontaneous rupture, intracranial hemorrhage, ischemic stroke, permanent cranial neuropathy, and mortality. Comparisons were made with $t$ tests or ANOVAs for continuous variables and the Pearson $\chi^2$ or Fisher exact test for categoric variables.

**RESULTS:** In total, 793 patients with 906 aneurysms were included. The neurologic morbidity and mortality rate was 8.4% (67/793), highest in the posterior circulation group (16.4%, 9/55) and lowest in the ICA <10-mm group (4.8%, 14/294) ($P = .01$). The spontaneous rupture rate was 0.6% (5/793). The intracranial hemorrhage rate was 2.4% (19/793). Ischemic stroke rates were 4.7% (37/793), highest in patients with posterior circulation aneurysms (7.3%, 4/55) and lowest in the ICA <10-mm group (2.7%, 8/294) ($P = .16$). Neurologic mortality was 3.8% (30/793), highest in the posterior circulation group (10.9%, 6/55) and lowest in the anterior circulation ICA <10-mm group (1.4%, 4/294) ($P < .01$).

**CONCLUSIONS:** Aneurysm treatment with the Pipeline Embolization Device is associated with the lowest complication rates when used to treat small ICA aneurysms. Procedure-related morbidity and mortality are higher in the treatment of posterior circulation and giant aneurysms.

**ABBREVIATIONS:** IntrePED = International Retrospective Study of Pipeline Embolization Device; IPH = intraparenchymal hemorrhage; PED = Pipeline Embolization Device

Endoluminal flow-diverter therapy has gained widespread acceptance for the treatment of intracranial aneurysms.[1-4] High rates of complete aneurysm occlusion have been reported, even in large and giant aneurysms, with the use of endoluminal flow diverters.[1-7] The Pipeline Embolization Device (PED; Covidien, Irvine, California) received CE mark approval in 2008 for the embolization of cerebral aneurysms and received US FDA approval in 2011 (PMA P100018) for the treatment of large and giant wide-neck aneurysms in the internal carotid artery, from the petrous to the superior hypophyseal segments. While numerous previous studies have reported overall rates of adverse events similar to

Received March 27, 2014; accepted after revision June 23.

From the Department of Radiology (D.F.K., W.B., G.L.), Mayo Clinic, Rochester, Minnesota; Department of Neurosurgery (R.H.), Mayo Clinic, Jacksonville, Florida; Department of Neurological Surgery (D.L.), Rush University Medical Center, Chicago, Illinois; Department of Neuroradiology (E.B.), Niguarda Ca' Granda Hospital, Milan, Italy; Department of Neuroradiology (A.B.), Hôpital Gui de Chauliac, Montpellier, France; Department of Radiology (S.C.), Hacettepe University Hospitals, Ankara, Turkey; Department of Neurosurgery (D.F., H.W.), Stony Brook University Medical Center, Stony Brook, New York; Department of Neurosurgery (P.J.), Thomas Jefferson University, Philadelphia, Pennsylvania; Department of Neurosurgery (E.L., A.S.), University at Buffalo, State University of New York, Buffalo, New York; Department of Neurosurgery (C.M., F.A.), Barrow Neurological Associates, Phoenix, Arizona; National Institute of Neurosciences (I.S.), Budapest, Hungary; Department of Neurology (H.B.), Oregon Health and Science University, Portland, Oregon; Norton Neuroscience Institute (S.R.D.), Louisville, Kentucky; Department of Radiology (J.D.A.), Neuroscience Institute, Abbott Northwestern Hospital, Minneapolis, Minnesota; Division of Neurosurgery, Department of Surgery (M.E.K.), University of Saskatchewan, Saskatoon, Saskatchewan, Canada;

Department of Neurosciences (R.T.), Medical University of South Carolina, Charleston, South Carolina; Vista Radiology PC (B.K.W.), Knoxville, Tennessee; and Department of Neuroscience (P.L.), Equipo de Neurocirugía Endovascular Radiología Intervencionista, Buenos Aires, Argentina.

Preliminary results of this study previously presented at: Annual Meeting of the Society of NeuroInterventional Surgery, July 29–August 1, 2013; Miami, Florida.

Please address correspondence to David Kallmes, MD, Mayo Clinic, 200 First St SW, OL1-112 SMH, Rochester, MN 55905; e-mail: Kallmes.david@mayo.edu

Indicates article with supplemental on-line appendix.

http://dx.doi.org/10.3174/ajnr.A4111

Copyright 2014 by American Society of Neuroradiology.

148
Exhibit 9

those in other endovascular procedures, case reports and small case series documenting severe and "unexpected" complications have raised questions about the safety of these devices.[1,3,8,9] Severe and unexpected adverse events include spontaneous rupture of treated aneurysms and intraparenchymal intracranial hemorrhage unrelated to aneurysm rupture.[8,10-12] These reports led to policies in some regions mandating concomitant coil embolization with flow-diverter therapy to mitigate the risk of spontaneous aneurysm rupture.[13]

Most previous literature on flow-diversion therapy comprised single-center case series, either retrospective or prospective, and has substantial selection bias, which may affect the rates of severe and unexpected adverse events. These biases may be diminished through pooling of consecutive patients treated at multiple centers in a "real-world" setting, with homogeneous end points and methods of data analysis. The International Retrospective Study of Pipeline Embolization Device (IntrePED) registry was designed for this purpose and to determine rates of important neurologic safety events following PED placement for intracranial aneurysm treatment.

## MATERIALS AND METHODS
### Study Design and Participants
We retrospectively evaluated all patients with intracranial aneurysms treated with the Pipeline Embolization Device between July 2008 and February 2013 in 6 countries in 17 centers experienced in PED use. Local institutional review boards or ethics committees approved the study and use of patients' retrospective data. An institutional review board/ethics committee waiver of informed consent (and Health Insurance Portability and Accountability Act Waiver of Authorization for US sites) or a sponsor institutional review board/ethics committee–approved informed consent form was obtained from each participating site. Written informed consent was obtained from each patient, if required. This observational registry was funded and supported by Covidien, with scientific oversight of the study steering committee members. Physicians who contributed data for this study were endovascular-trained neurointerventionalists. Each site that participated was required to have at least 1 physician who had treated a minimum of 10 PED cases before the time of institutional review board/ethics committee approval for the study. Unless an investigator had been a participant in a clinical study before commercialization of the PED, this study captures the investigators' experience as new users of the device. A majority of the 26 IntrePED physicians were new users, and their early cases were included in the registry.

Data were collected from the time of the first commercial use of PED at a site until the time of institutional review board/ethics committee approval of the study protocol for that site. Investigational centers were required to provide data on all consecutive patients to eliminate selection bias, provided that the patients fulfilled the following conditions: 1) received PED treatment for an intracranial aneurysm after the date of regulatory approval in that region or country, and 2) had a clinical evaluation following treatment during the window of time before institutional review board/ethics committee approval. Because this was a retrospective study, there were no patients lost to follow-up.

Seven hundred ninety-three patients treated for 906 aneurysms were enrolled. Many patients (38%) had been previously reported in the literature.[14-29] We defined 4 primary anatomic/size subgroups: internal carotid artery aneurysms ≥10 mm ("large ICA"), ICA aneurysms of <10 mm ("small ICA"), other anterior circulation aneurysms ("other anterior"), and posterior circulation aneurysms.

### Procedures
Because this was a retrospective study, procedural details and periprocedural patient management varied across centers. All centers used a common study protocol that specified the data to be collected, study end points, events of interest, and statistical analyses. The Steering Committee defined neurologic "clinical safety events of interest" a priori, including spontaneous rupture of the target aneurysm causing subarachnoid hemorrhage or cavernous carotid fistula, intraparenchymal hemorrhage (IPH) (both ipsilateral and contralateral), ischemic stroke, parent artery stenosis, and permanent cranial neuropathy. Site investigators identified events of interest according to the study protocol through retrospective review of the patient's record. All events of interest were reviewed in detail by an Adverse Events Review Committee, comprising of 3 members of the Steering Committee, including the overall study principal investigator. The committee determined the category of event and whether the event was major or minor. A "major" adverse event was defined as an ongoing clinical deficit at 7 days following the event. "Minor" adverse events were defined as events that resolved within 7 days with no clinical sequelae. All major adverse events are included in the neurologic morbidity and mortality rates. Long-term neurologic morbidity and mortality rates included morbidity and mortality due to adverse events occurring any time in the postoperative period (<30 days and ≥30 days). Information collected during the study was standardized across centers and included baseline characteristics of patients and aneurysms, procedural information, prespecified clinical safety events of interest, and follow-up clinic visits or telephone calls. A list of data collected for each patient/aneurysm is provided in the On-line Appendix. Because this was a retrospective study, the timing of the patient follow-up evaluations was conducted per institution standard of care.

### Statistical Analysis
Statistical analyses were performed by using SAS, Version 9.1 or higher (SAS Institute, Cary, North Carolina). Summary statistics are presented for all data available by using means and SDs for continuous variables and frequency tabulations for categoric variables. Comparisons between groups for continuous variables were evaluated by using $t$ tests or ANOVAs and the Fisher exact test or Pearson $\chi^2$ for binary categoric variables. Most statistical analyses were performed across patient groups—that is, on a per-patient basis. Because some patients had >1 aneurysm treated with a PED, however, each patient's first aneurysm was used to classify patients into the 4 anatomic/size subgroups, and the largest aneurysm was used to classify patients into the 3 aneurysm size categories. Some analyses, including aneurysm characteristics and spontaneous ruptures across aneurysm-size groups, were performed across all aneurysms rather than across patients.

150
Exhibit 9

**Table 1: Aneurysm characteristics**

| Aneurysm Characteristics | Anterior ICA ≥10 mm (n = 311) | Anterior <10 mm (n = 349) | Posterior (n = 59) | Other Anterior ≥10 mm (n = 178) | Total (n = 896)ᵃ | P Value |
|---|---|---|---|---|---|---|
| Aneurysm size (mm) | | | | | | <.001 |
|   Mean ± SD | 16.8 ± 6.2 | 5.2 ± 2.2 | 14.5 ± 9.0 | 9.8 ± 7.9 | 10.7 ± 7.7 | |
|   Median, range | 15.0, 10.0–42.0 | 5.0, 1.0–9.9 | 11.8, 1.7–45.0 | 7.2, 1.0–55.0 | 9.0, 1.0–55.0 | |
| Aneurysm type | | | | | | |
|   Small | 0 | 349/349 (100%) | 19/58 (32.8%) | 105/178 (59.0%) | 473/897 (52.8%) | |
|   Large | 268/311 (86.2%) | 0 | 29/58 (50.0%) | 60/178 (33.7%) | 357/897 (39.8%) | |
|   Giant | 43/311 (13.8%) | 0 | 10/58 (17.2%) | 13/178 (7.3%) | 66/897 (7.3%) | |
| Aneurysm neck (mm) | | | | | | <.001 |
|   Mean ± SD | 8.5 ± 5.1 | 4.1 ± 2.2 | 9.3 ± 8.4 | 5.3 ± 5.1 | 6.2 ± 4.9 | |
|   Median, range | 7.6, 0.9–50.0 | 4.0, 0.8–22.0 | 8.0, 1.7–53.0 | 4.0, 1.0–50.0 | 5.0, 0.8–53.0 | |
| Aneurysm shape | | | | | | <.001 |
|   Fusiform | 49/311 (15.8%) | 17/349 (4.9%) | 17/59 (28.8%) | 29/178 (16.3%) | 112/897 (12.5%) | |
|   Saccular | 239/311 (76.9%) | 305/349 (87.4%) | 25/59 (42.4%) | 118/178 (66.3%) | 686/897 (76.5%) | |
|   Dissecting | 10/311 (3.2%) | 8/349 (2.3%) | 13/59 (22.0%) | 22/178 (12.4%) | 53/897 (5.9%) | |
|   Other | 13/311 (4.2%) | 19/349 (5.4%) | 4/59 (6.8%) | 9/178 (5.1%) | 46/897 (5.1%) | |
| Aneurysm location | | | | | | <.001 |
|   Internal carotid artery | 311/311 (100%) | 349/349 (100%) | 0 | 0 | 660/897 (73.6%) | |
|   Middle cerebral artery | 0 | 0 | 0 | 43/178 (24.2%) | 43/897 (4.8%) | |
|   Posterior cerebral artery | 0 | 0 | 15/59 (25.4%) | 0 | 15/897 (1.7%) | |
|   Basilar artery | 0 | 0 | 44/59 (74.6%) | 0 | 44/897 (4.9%) | |
|   Other | 0 | 0 | 0 | 135/178 (75.8%) | 135/897 (15.1%) | |
| Presented with ruptured aneurysm | 12/311 (3.9%) | 24/345 (7.0%) | 4/59 (6.8%) | 34/176 (19.3%) | 74/891 (8.2%) | <.001 |
| Multiple PEDs used | 143/311 (46.0%) | 97/347 (28.0%) | 19/59 (32.2%) | 47/178 (26.4%) | 306/895 (34.2%) | <.001 |

**Note:**—n indicates the number of aneurysms.
ᵃ Aneurysm size was not reported for 10 aneurysms.

### Role of the Funding Source

An academic principal investigator and an academic steering committee supervised the trial design and operations. The steering committee interpreted the results, and the principal investigator wrote the report. The study sponsor was responsible for site management, data management, statistical analysis, and safety reporting. The corresponding author was the academic principal investigator for the study and had full access to all study data and the final responsibility for the decision to submit for publication.

### RESULTS

Seven hundred ninety-three patients with 906 aneurysms (76 [8.4%] ruptured, 824 [91%] unruptured, and 6 [0.7%] unknown) were included. Three hundred eleven aneurysms (34.3%) were ICA ≥10 mm, 349 aneurysms (38.5%) were ICA <10 mm, 59 aneurysms (6.5%) were in the posterior circulation, and 178 aneurysms (19.6%) were ≥10 mm and located in anterior circulation locations other than the ICA. Combined location/size information was not available for 9 aneurysms. Posterior circulation aneurysms were generally large, with an average size of 14.5 ± 9.0 mm. Patients with non-ICA anterior circulation aneurysms presented with aneurysm rupture in 19.3% of cases (34/176), a significantly higher rate than that in the other groups (P < .001). Four hundred seventy-three aneurysms (52.8%) were small, 357 aneurysms (39.8%) were large, and 66 aneurysms (7.3%) were giant. Median follow-up was 19.3 months with 706 (89%) patients having follow-up of >12 months. Size information was not available for 10 aneurysms.

Multiple PEDs were used in 308 cases (34.2%). Patients with ICA aneurysms ≥10 mm had the highest rate of multiple PED use (46.0%, 143/311) and were significantly more likely to receive treatment with multiple PEDs compared with the other groups (P < .001). Mean procedure time was 101 minutes 30 seconds ±

50 minutes 30 seconds and was highest in the ICA aneurysms ≥10-mm group (111 minutes 24 seconds ± 56 minutes 36 seconds) (P < .01). Aneurysm data are summarized in Table 1.

The 30-day morbidity and mortality rate was 6.3% (50/793) with a 30-day neurologic morbidity rate of 5.7% (44/793) and a 30-day neurologic mortality rate of 2.6% (21/793). The long-term neurologic morbidity and mortality rate was 8.4% (67/793) with a neurologic morbidity rate of 7.4% (59/793) and a neurologic mortality rate of 3.8% (30/793). Individual morbidity and mortality rates did not add up to the total combined morbidity and mortality rate because some patients had >1 neurologic morbidity. The morbidity and mortality rates were highest in the posterior circulation group (16.4%, 9/55) and lowest in the ICA <10 mm group (4.8%, 14/294). The morbidity and mortality rates were higher in patients with giant aneurysms compared with those with large and small aneurysms (25.8% versus 8.8% versus 5.4%, P < .01). When patients with ruptured, dissecting, or fusiform aneurysms were excluded, the overall morbidity and mortality rate was 5.7%.

The spontaneous rupture rate was 0.6% (5/793), with 2 of the 5 events being cavernous carotid fistulas with clinical sequelae. Four of the 5 cases occurred within 30 days. There was no difference in the spontaneous rupture rate among the 4 groups (P = .17). Spontaneous rupture was higher in giant aneurysms (4.5%, 3/66) compared with large (0.6%, 2/357) and small aneurysms (0.0%, 0/473) (P < .001). Overall the intraparenchymal hemorrhage rate was 2.4% (19/793). There was no difference in the hemorrhage rate among the primary patient subgroups (P = .73) or among aneurysm sizes (P = .24). Fifteen (79%) of the 19 hemorrhages occurred within 30 days of the procedure.

The ischemic stroke rate was 4.7% (37/793). A majority of strokes occurred within 30 days of treatment (26/793, 3.3%). The

**Table 2: Complications by aneurysm location and size subgroups**

| Complications | Anterior ICA ≥10 mm (n = 275) | Anterior ICA <10 mm (n = 294) | Posterior (n = 55) | Other Anterior (n = 165) | Total (n = 793)[a] | 95% CI; P Value |
|---|---|---|---|---|---|---|
| Mean aneurysm size (mm) | 16.8 ± 6.2 | 5.2 ± 2.2 | 14.5 ± 9.0 | 9.8 ± 7.9 | 10.7 ± 7.7 | (10.2–11.2); <.001 |
| Spontaneous rupture | 4 (0.7%) | 0 (0.0%) | 0 (0.0%) | 1 (0.6%) | 5 (0.6%) | (0.2%–1.5%); .17 |
| Intraparenchymal hemorrhage | 6 (2.2%) | 6 (2.0%) | 1 (1.8%) | 6 (3.6%) | 19 (2.4%) | (1.3%–3.4%); .73 |
| Ischemic stroke | 15 (5.5%) | 8 (2.7%) | 4 (7.3%) | 10 (6.1%) | 37 (4.7%) | (3.2%–6.2%); .16 |
| Parent artery stenosis | 1 (0.4%) | 1 (0.4%) | 0 (0.0%) | 0 (0.0%) | 2 (0.3%) | (0%–0.7%); 1.0 |
| Cranial neuropathy | 2 (0.7%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 2 (0.3%) | (0%–0.7%); .30 |
| Neurologic morbidity | 24 (8.7%) | 14 (4.5%) | 5 (9.1%) | 16 (9.7%) | 59 (7.4%) | (5.6%–9.2%); .16 |
| Neurologic mortality | 11 (4.0%) | 4 (1.4%) | 6 (10.9%) | 9 (5.5%) | 30 (3.8%) | (2.5%–5.1%); <.01 |
| Neurologic morbidity and mortality (all patients) | 26 (9.5%) | 14 (4.8%) | 9 (16.4%) | 18 (10.9%) | 67 (8.4%) | (6.5%–10.3%); .01 |
| Neurologic morbidity and mortality (patients with unruptured aneurysms) | 24/263 (9.2%) | 11/270 (4.1%) | 7/51 (13.7%) | 11/131 (8.4%) | 53/717 (7.4%) | (5.5%–9.3%); .03 |
| Neurologic morbidity and mortality (patients with ruptured aneurysms) | 2/12 (16.7%) | 3/24 (12.5%) | 2/4 (50.0%) | 7/34 (20.6%) | 14/76 (18.4%) | (10.0%–27.1%); .35 |
| Neurologic morbidity and mortality (excluding ruptured, dissecting, or fusiform aneurysms) | 15 (7.0%) | 9 (3.6%) | 3 (12.0%) | 6 (6.8%) | 33 (5.7%) | (4.1%–7.3%); .19 |

**Note:**—n indicates the number of patients.
[a] Numbers do not sum across categories and subcategories because some patients experienced >1 event.

**Table 3: Occurrence of complications by time**

| Complications | <72 Hours | | 72 Hours–30 Days | | >30 Days | | Total (n = 793)[a] | P Value |
|---|---|---|---|---|---|---|---|---|
| | Anterior (n = 738) | Posterior (n = 55) | Anterior (n = 738) | Posterior (n = 55) | Anterior (n = 738) | Posterior (n = 55) | | |
| Spontaneous rupture | 1 (0.1%) | 0 (0%) | 3 (0.4%) | 0 (0%) | 1 (0.1%) | 0 (0%) | 5 (0.6%) | .51 |
| Intraparenchymal hemorrhage | 3 (0.4%) | 1 (1.8%) | 11 (1.5%) | 0 (0%) | 4 (0.5%) | 0 (0%) | 19 (2.4%) | .83 |
| Ischemic stroke | 17 (2.3%) | 2 (3.6%) | 7 (0.9%) | 0 (0%) | 9 (1.2%) | 2 (3.6%) | 37 (4.7%) | .58 |
| Parent artery stenosis | 0 (0%) | 0 (0%) | 1 (0.1%) | 0 (0%) | 1 (0.1%) | 0 (0%) | 2 (0.3%) | .63 |
| Cranial neuropathy | 0 (0%) | 0 (0%) | 2 (0.3%) | 0 (0%) | 0 (0%) | 0 (0%) | 2 (0.3%) | .58 |
| Neurologic morbidity | 20 (2.7%) | 3 (5.5%) | 21 (2.8%) | 0 (0%) | 13 (1.8%) | 2 (3.6%) | 59 (7.4%) | .56 |
| Neurologic mortality | 4 (0.5%) | 1 (1.8%) | 13 (1.8%) | 2 (3.6%) | 7 (0.9%) | 3 (5.5%) | 30 (3.8%) | <.01 |
| Neurologic morbidity and mortality (all patients) | 23 (3.1%) | 3 (5.5%) | 22 (3.0%) | 2 (3.6%) | 13 (1.8%) | 4 (7.3%) | 67 (8.4%) | <.01 |
| Neurologic morbidity and mortality (patients with unruptured aneurysms) | 19/664 (2.9%) | 3/51 (5.9%) | 16/664 (2.4%) | 1/51 (2.0%) | 11/664 (1.7%) | 3/51 (5.9%) | 53/717 (7.4%) | .08 |
| Neurologic morbidity and mortality (patients with ruptured aneurysms) | 4/70 (5.7%) | 0/4 (0%) | 6/70 (8.6%) | 1/4 (25.0%) | 2/70 (2.9%) | 1/4 (25.0%) | 14/76 (18.4%) | .17 |
| Neurologic morbidity and mortality (excluding ruptured, dissecting, or fusiform aneurysms) | 13/549 (2.4%) | 1/25 (4.0%) | 12/549 (2.2%) | 0/25 (0%) | 5/549 (0.9%) | 2/25 (8.0%) | 33/575 (5.7%) | .41 |

**Note:**—n indicates the number of patients.
[a] Numbers do not sum across categories and subcategories because some patients experienced >1 event.

highest stroke rates were seen in patients with posterior circulation aneurysms (7.3%, 4/55) and the "other anterior circulation" group (6.1%, 10/165). The anterior circulation ICA <10-mm group had the lowest stroke rates (2.7%, 8/294) (P = .16). When studying differences based on aneurysm size, patients with giant aneurysms had the highest stroke rates (14.5%, 9/62) compared with patients with large (5.0%, 17/339) and small aneurysms (2.8%, 11/386) (P < .01).

In-stent stenosis occurred in 0.3% (2/793) with no significant differences among groups (P = 1.0). Permanent cranial neuropathy occurred in 0.3% (2/793) of patients with no significant differences among groups (P = .30). These data are summarized in Tables 2–4.

Neurologic mortality was 3.8% (30/793) and was significantly different among the 4 primary patient subgroups (P < .01). The 30-day mortality rate was 2.5% (20/793), which represented nearly two-thirds of all mortality observed in the average 19.3 months of follow-up. Patients with posterior circulation aneurysms had the highest rate of neurologic mortality (10.9%, 6/55), and patients with anterior ICA <10-mm aneurysms had the low-est neurologic mortality (1.4%, 4/294). The mortality rate was significantly higher in patients with giant aneurysms compared with those with large and small aneurysms, respectively (9.6% versus 5.0% versus 1.8%, P < .01). The overall mortality rate in patients who presented with ruptured aneurysms was 10.5% (8/76), with no significant differences among groups (P = .11). These data are summarized in Tables 2–4.

In addition to the above-listed major events, 5 cases of intracranial hemorrhage, 15 cases of ischemic strokes, and 5 cases of parent artery stenosis were also observed as minor events in which the patient's symptoms resolved within 7 days of the event occurrence with no clinical sequelae. Three additional deaths were reported due to non-neurologic reasons.

## DISCUSSION

This large multicenter study of flow-diversion therapy demonstrated a neurologic morbidity and mortality rate of 8.4%. Most adverse events were ischemic strokes from thromboembolic complications and were substantially more common in large, anterior circulation aneurysms and posterior circulation aneurysms com-

**Table 4: Complications by aneurysm size**

| Complications | Small (n = 386) (N = 473) | | Large (n = 339) (N = 357) | | Giant (n = 62) (N = 66) | | Total (n = 793)[a,b] (N = 906) | P Value |
| | Anterior (n = 372) | Posterior (n = 14) | Anterior (n = 309) | Posterior (n = 30) | Anterior (n = 52) | Posterior (n = 10) | | |
|---|---|---|---|---|---|---|---|---|
| Mean aneurysm size (mm) | 5.1 ± 2.2 | 6.0 ± 2.6 | 14.8 ± 4.0 | 15.0 ± 4.3 | 28.8 ± 5.3 | 29.1 ± 7.2 | 10.7 ± 7.7 | <.001 |
| Spontaneous rupture | 0 (0%) | 0 (0%) | 2 (0.5%) | 0 (0%) | 3 (5.8%) | 0 (0%) | 5 (0.6%) | <.01 |
| Intraparenchymal hemorrhage | 7 (1.9%) | 0 (0%) | 8 (2.6%) | 0 (0%) | 3 (5.8%) | 1 (10.0%) | 19 (2.4%) | .24 |
| Ischemic stroke | 10 (2.7%) | 1 (7.1%) | 16 (5.2%) | 1 (3.3%) | 7 (13.5%) | 2 (20.0%) | 37 (4.7%) | <.01 |
| Parent artery stenosis | 1 (0.3%) | 0 (0%) | 1 (0.3%) | 0 (0%) | 0 (0%) | 0 (0%) | 2 (0.3%) | 1.0 |
| Cranial neuropathy | 0 (0%) | 0 (0%) | 2 (0.6%) | 0 (0%) | 0 (0%) | 0 (0%) | 2 (0.3%) | .41 |
| Neurologic morbidity | 18 (4.8%) | 1 (7.1%) | 24 (7.8%) | 1 (3.3%) | 12 (23.1%) | 3 (30.0%) | 59 (7.4%) | <.01 |
| Neurologic mortality | 6 (1.6%) | 1 (7.1%) | 15 (4.9%) | 2 (6.7%) | 3 (5.8%) | 3 (30.0%) | 30 (3.8%) | <.01 |
| Neurologic morbidity and mortality[a] (all patients) | 19 (5.1%) | 2 (14.3%) | 27 (8.7%) | 3 (10.0%) | 12 (23.1%) | 4 (40.0%) | 67 (8.4%) | <.01 |
| Neurologic morbidity and mortality (patients with unruptured aneurysms) | 11/321 (3.4%) | 1/12 (8.3%) | 23/291 (7.9%) | 3/29 (10.3%) | 12/51 (23.5%) | 3/9 (33.3%) | 53/717 (7.4%) | <.01 |
| Neurologic morbidity and mortality (patients with ruptured aneurysms) | 8/51 (15.7%) | 1/2 (50.0%) | 4/18 (22.2%) | 0/1 (0%) | 0/1 (0%) | 1/1 (100%) | 14/76 (18.4%) | .23 |
| Neurologic morbidity and mortality (excluding ruptured, dissecting, or fusiform aneurysms) | 11/294 (3.7%) | 0/7 (0%) | 12/217 (5.5%) | 2/13 (15.4%) | 7/37 (18.9%) | 1/5 (20.0%) | 33/574 (5.7%) | <.01 |

**Note:**—n indicates the number of patients; N, number of aneurysms.
[a] Six patients did not have aneurysm size reported.
[b] Numbers do not sum across categories because some patients experienced >1 event.

pared with small, anterior circulation aneurysms. Spontaneous aneurysm rupture was rare, occurring in 0.6% of patients, with 3/5 events occurring within giant aneurysms. Intraparenchymal hemorrhage, unrelated to rupture of the target aneurysm but resulting in major neurologic deficit, was noted in 2.4% of patients. These results are important because they provide clarity regarding the previously noted severe and unexpected adverse events associated with flow-diversion therapy in a real-world setting. Our data suggest strongly that spontaneous aneurysm rupture is not of clinical concern in non-giant aneurysms. Parenchymal hemorrhage remains of concern, especially because its etiology is unclear.

Our findings corroborate those of numerous previously published smaller studies and meta-analyses. Previously published studies have demonstrated morbidity and mortality rates ranging from 0%–12% and 0%–7%, respectively.[30-32] Two large meta-analyses of flow-diverter treatment demonstrated morbidity rates of 5.0%–7.3% and mortality rates of 2.8%–4.0%.[1,3] Our study, which is the largest clinical study of PED to date to our knowledge, demonstrated a 30-day morbidity rate of 5.5% (44/793) and a 30-day mortality rate of 2.5% (20/793).

Posttreatment aneurysm rupture is a serious concern of flow-diverter therapy. Concerns for postoperative aneurysm rupture with flow diverters are so serious that Balt Extrusion issued a medical device alert instructing practitioners not to use the Silk flow diverter (Balt Extrusion, Montmorency, France) without coils due to the "potential for patient death."[13] In their meta-analysis of flow-diverter treatment, which included the PED and Silk flow-diverter devices, Brinjikji et al[3] found an overall postoperative rupture rate of 4%, with an early rupture rate of 3% with a significantly higher rupture rate in large and giant aneurysms. Our study demonstrated a posttreatment rupture rate of <1%, 3/5 occurring among patients with giant aneurysms. While postoperative rupture rates are minimal in patients with small and large aneurysms, postoperative rupture remains a real and significant complication of Pipeline treatment in patients with giant aneurysms.

Spontaneous IPH is a poorly understood complication of

flow-diverter treatment. Hemorrhagic transformation of ischemic stroke, hemodynamic alteration from flow-diverter placement, dual antiplatelet therapy, potential association with intraprocedural foreign body emboli, and the significant role of P2Y12 receptor overinhibition are proposed mechanisms.[8,14,15,33] Prior studies have reported rates ranging from 0% to 10% for this complication.[8,30,34,35] In their meta-analysis, Brinjikji et al[3] found an IPH rate of 3.0%. Arrese et al[1] found a postoperative hemorrhage rate of 1.8%, not stratifying by SAH and IPH. Our study found an IPH rate of 2.4%. Similar to prior studies, our study found no difference in IPH rates by aneurysm size or location.[3]

Ischemic strokes due to thromboembolism and perforator infarctions are well-described complications of flow-diverter treatment. Ischemic stroke may result from stent wall thrombus formation and occlusion, parent artery occlusion, or distal thromboembolic events. Our study found an ischemic stroke rate of 4.7%, with higher rates in posterior circulation aneurysms compared with the ICA aneurysm <10-mm group (7.3% versus 2.7%).[1,3,9,36] Similar to Brinjikji et al,[3] we also found that the stroke rate increased with aneurysm size as patients with large and giant aneurysms had higher stroke rates than those with small aneurysms. Intraoperatively, acute thrombus formation can be mitigated by prompt injection of glycoprotein IIb/IIIa platelet inhibitors; however, it is difficult to reduce the long-term risk of thromboembolic events associated with flow-diverter treatment.[37]

Endosaccular coiling (with or without stent assistance) is an alternative to flow-diverter therapy. A systematic review of stent-assisted coiling by McLaughlin et al[38] found an intraprocedural complication rate of 4.0%, a postprocedural thromboembolic event rate of 4.3%, and a delayed in-stent stenosis rate of 5.3%. These complication rates are similar to the findings of our study on the PED. In a study of stent-assisted coiling in patients with subarachnoid hemorrhage, Bodily et al[39] found a clinically significant thromboembolic event rate of 6%. A meta-analysis by Shapiro et al[40] found that the overall procedural complication rate associated with stent coiling was 19%, the thromboembolic complication rate was 10%, and the periprocedural mortality was

153
Exhibit 9

2.1%. In the Neuroform stent (Stryker Neurovascular, Kalamazoo, Michigan) experience in 284 patients, Fiorella et al[41] reported a cumulative ischemic stroke rate of 8.8% and a 2.8% neurovascular death rate. They also reported that 15.1% of the cases had major recanalization requiring retreatment. Piotin et al[42] reported results on the treatment of aneurysms with coils, with and without stents, in 1137 patients. The rate of permanent neurologic procedure-related complications was 7.4% of the procedures with stents versus 3.8% in the procedures without stents ($P = .64$). Procedure-induced mortality occurred in 4.6% of the procedures with stents versus 1.2% in the procedures without stents ($P = .006$). The rate of thrombotic complications in the stent group was 14.8%, accounting for 11.1% of mortalities.[42] Retrospective studies comparing flow diversion with the PED with coiling (with and without stent assistance) have demonstrated that the PED provides higher aneurysm occlusion rates with similar morbidity and mortality rates.[23,43] In our study, anterior circulation aneurysms measuring <10 mm had the lowest neurologic morbidity and mortality rates (4.8%). These findings corroborate those of a previous study comparing the PED with stent-assisted coiling of patients with small, unruptured anterior circulation aneurysms, which demonstrated a complication rate of 5% in the PED group and 3% in the stent-assisted coiling group.[43] Given the wide range of treatment options available for the endovascular treatment of intracranial aneurysms, careful study and stratification of outcomes by aneurysm location and size are recommended to determine the best treatment for each patient. Ultimately, further comparative studies, especially in the case of small ICA aneurysms, are needed to determine which subsets of intracranial aneurysms would benefit most from PED placement compared with endosaccular coiling.

### Limitations

Our study has limitations. It was a retrospective study in which sites followed their standard of practice for treating aneurysms with PED, and there was a wide range of treatment regimens (eg, antiplatelet therapy) among centers. However, all study adverse events collected were prespecified in the study protocol and were adjudicated by the Adverse Events Review Committee to maintain consistency with the study results. Patients who underwent failed embolization or who did not have follow-up were excluded per the study design. There was no systematic imaging of patients required in this study because sites were required to follow their standard procedures. There was no protocol regarding the minimum duration of follow-up, and follow-up timing was per standard of care for the treating physician and institution. Another limitation of the study is that the reporting of major and minor complications was based on the duration of symptoms, not their severity or degree of disability. Information regarding management of the major and minor complications was not collected. A broad range of aneurysm types and sizes was included in this registry (ie, saccular/blister/ruptured/fusiform/dissecting), and subgroup analyses were not performed for the subset of blister/fusiform/dissecting aneurysms in this study. Last, 38% of these patients had been included in prior publications.

## CONCLUSIONS

Our study suggests that the treatment of intracranial aneurysms with PED is associated with the lowest complication rates when used to treat small aneurysms of the ICA. The rates of procedural-related morbidity and mortality are not negligible. Patients with posterior circulation aneurysms and giant aneurysms are at higher risk of ischemic stroke. Patients with large or giant aneurysms are at higher risk of ischemic stroke and SAH compared with small aneurysms. The neurologic morbidity and mortality rate drops when patients with difficult-to-treat aneurysms (ruptured, dissecting, or fusiform) are excluded. The complication rates with PED are comparable with those of other endovascular treatment options such as stent-assisted coiling. These findings should be considered when selecting the best therapeutic option for intracranial aneurysms.

Disclosures: David F. Kallmes—RELATED: Grant: ev3/Covidien,* Comments: funding for enrollment in clinical trial; Consulting Fee or Honorarium: ev3/Covidien,* Comments: funding for Principal Investigator duties, Steering Committee and Adverse Event Adjudication Committee; Grants/Grants Pending: MicroVention,* ev3/Covidien,* SurModics,* Codman,* Sequent Medical,* Benvenue Medical,* National Institutes of Health,* Comments: funding for preclinical research and clinical trials; Royalties: University of Virginia Patent Foundation, Comments: spinal fusion; Other: Radiological Society of North America, Comments: editorial support money to institution. Demetrius Lopes—RELATED: Board Membership: Covidien (advisory board); Consultancy: Covidien; Grant: Covidien; Payment for Lectures (including service on Speakers Bureaus, papers, and teaching): Covidien; Other: Covidien (proctorship, advisory board). Edoardo Boccardi—RELATED: Consulting Fee or Honorarium: Covidien; Support for Travel to Meetings for the Study or Other Purposes: Covidien; UNRELATED: Consultancy: Covidien, Comments: consultation and proctoring. Saruhan Cekirge—RELATED: Consulting Fee or Honorarium: Covidien; UNRELATED: Consultancy: MicroVention, Covidien, Sequent. Pascal Jabbour—UNRELATED: Consultancy: Covidien. Cameron McDougall—RELATED: Consulting Fee or Honorarium: ev3/Covidien; Fees for Participation in Review Activities such as Data Monitoring Boards, Statistical Analysis, Endpoint Committees, and the Like: ev3/Covidien (steering committee, medical advisory board); UNRELATED: Board Membership: ev3/Covidien; Consultancy: MicroVention/Terumo, Codman/Johnson and Johnson; Personal Fees: MicroVention (principal investigator, FRED). Adnan Siddiqui—UNRELATED: Board Membership: Codman & Shurtleff, Covidien, Comments: advisory board; Consultancy: Codman & Shurtleff, Concentric Medical, ev3/Covidien, GuidePoint Global, Penumbra, Stryker, Pulsar Vascular, MicroVention, Lazarus Effect, Blockade Medical, Comments: no consulting salary arrangements; all consulting is per project and/or per hour; Grants/Grants Pending: National Institutes of Health (coinvestigator: National Institute of Neurological Disorders and Stroke 1R01NS064592-01A1, hemodynamic induction of pathologic remodeling leading to intracranial aneurysms),* University at Buffalo (Research Development Award),* National Institutes of Health (coinvestigator: National Institute of Biomedical Imaging and Bioengineering 5 R01 EB002873-07, Micro-Radiographic Image for Neurovascular Interventions)*; National Steering Committees: Penumbra (3D Separator Trial), Covidien (SWIFT PRIME Trial), MicroVention (FRED Trial); Payment for Lectures (including service on speakers bureaus): Codman & Shurtleff; Stock/Stock Options: Hotspur, Intratech Medical, StimSox, Valor Medical, Blockade Medical, Lazarus Effect; Other: Abbott Vascular, Penumbra, Abbott Vascular, and Codman & Shurtleff (for training other neurointerventionists in carotid stenting and for training physicians in endovascular stenting for aneurysms), Comments: honoraria. Henry Woo—RELATED: Other: Covidien,* Comments: startup costs for institutional review board submission and payment for enrolled patients; UNRELATED: Grants/Grants Pending: Siemens,* Comments: grants for clinical and academic research; Royalties: Codman & Shurtleff, Comments: royalties for development of intellectual property; Other: shareholder in Vascular Simulators. Britton K. Woodward—UNRELATED: Personal Fees: Covidien, Comments: consultant for proctoring of cases. Shervin Dashti—UNRELATED: Other: proctoring fees from Covidien, MicroVention. Josser Delgado Almando—RELATED: Personal Fees: Covidien/ev3; UNRELATED: Personal Fee: Terumo/MicroVention. Istvan Szikora—RELATED: Grant: Covidien; Personal Fees: Covidien. Elad Levy—UNRELATED: Shareholder/Ownership Interest: Intratech Medical Ltd, Mynx Access Closure, Blockade Medical LLC. Alain Bonafé—UNRELATED: Personal Fees: Covidien (proctoring for PED). Michael Kelly—RELATED: Other: Covidien sponsored the IntrePED study, and all funds were paid to University of Saskatchewan. Raymond Turner—RELATED: Grants: Covidien, MicroVention, Codman, Blockade Medical, Reverse Medical; Personal Fees: Covidien, MicroVention, Codman, Blockade Medical, Pulsar Vascular. David Fiorella—UNRELATED: Grants: Siemens, MicroVention; Personal

Fees: Covidien/ev3, Cordis, Nfocus Neuromedical, Micrus Endovascular, *Comments:* Consultant; *Royalties:* Codman & Shurtleff (Revive); *Ownership Interests:* Vascular Simulators LLC, TDC Technologies, CVSL. Giuseppe Lanzino—*UNRELATED: Consultancy:* Edge Therapeutics, Covidien/ev3, Codman. Pedro Lylyk—*UNRELATED: Consultancy:* ev3, MicroVention, Codman; *Payment for Lectures (including service on Speakers Bureaus):* Covidien, MicroVention, Codman. Ricardo Hanel—*RELATED: Grant:* MicroVention; *UNRELATED: Consultancy:* Covidien, Codman, Stryker; *Other:* Blockade (shareholder). *Money paid to the institution.

## REFERENCES

1. Arrese I, Sarabia R, Pintado R, et al. **Flow-diverter devices for intracranial aneurysms: systematic review and meta-analysis.** *Neurosurgery* 2013;73:193–99; discussion 199–200

2. Briganti F, Napoli M, Tortora F, et al. **Italian multicenter experience with flow-diverter devices for intracranial unruptured aneurysm treatment with periprocedural complications: a retrospective data analysis.** *Neuroradiology* 2012;54:1145–52

3. Brinjikji W, Murad MH, Lanzino G, et al. **Endovascular treatment of intracranial aneurysms with flow diverters: a meta-analysis.** *Stroke* 2013;44:442–47

4. Yu SC, Kwok CK, Cheng PW, et al. **Intracranial aneurysms: midterm outcome of Pipeline embolization device: a prospective study in 143 patients with 178 aneurysms.** *Radiology* 2012;265:893–901

5. Chan TT, Chan KY, Pang PK, et al. **Pipeline embolisation device for wide-necked internal carotid artery aneurysms in a hospital in Hong Kong: preliminary experience.** *Hong Kong Med J* 2011;17:398–404

6. Cirillo L, Dall'Olio M, Princiotta C, et al. **The use of flow-diverting stents in the treatment of giant cerebral aneurysms: preliminary results.** *Neuroradiol J* 2010;23:220–24

7. Siddiqui AH, Kan P, Abla AA, et al. **Complications after treatment with Pipeline embolization for giant distal intracranial aneurysms with or without coil embolization.** *Neurosurgery* 2012;71:E509–13; discussion E513

8. Cruz JP, Chow M, O'Kelly C, et al. **Delayed ipsilateral parenchymal hemorrhage following flow diversion for the treatment of anterior circulation aneurysms.** *AJNR Am J Neuroradiol* 2012;33:603–08

9. Pierot L. **Flow diverter stents in the treatment of intracranial aneurysms: where are we?** *J Neuroradiol* 2011;38:40–46

10. Darsaut TE, Rayner-Hartley E, Makoyeva A, et al. **Aneurysm rupture after endovascular flow diversion: the possible role of persistent flows through the transition zone associated with device deformation.** *Interv Neuroradiol* 2013;19:180–85

11. Kuzmik GA, Williamson T, Ediriwickrema A, et al. **Flow diverters and a tale of two aneurysms.** *J Neurointerv Surg* 2013;5:e23

12. Turowski B, Macht S, Kulcsar Z, et al. **Early fatal hemorrhage after endovascular cerebral aneurysm treatment with a flow diverter (SILK-Stent): do we need to rethink our concepts?** *Neuroradiology* 2011;53:37–41

13. Lubicz B, Collignon L, Raphaeli G, et al. **Flow-diverter stent for the endovascular treatment of intracranial aneurysms: a prospective study in 29 patients with 34 aneurysms.** *Stroke* 2010;41:2247–53

14. Piano M, Valvassori L, Quilici L, et al. **Midterm and long-term follow-up of cerebral aneurysms treated with flow diverter devices: a single-center experience.** *J Neurosurg* 2013;118:408–16

15. Delgado Almandoz JE, Crandall BM, Scholz JM, et al. **Pre-procedure P2Y12 reaction units value predicts perioperative thromboembolic and hemorrhagic complications in patients with cerebral aneurysms treated with the Pipeline embolization device.** *J Neurointerv Surg* 2013;5(suppl 3):iii3–10

16. Delgado Almandoz JE, Crandall BM, Scholz JM, et al. **Last-recorded P2Y12 reaction units value is strongly associated with thromboembolic and hemorrhagic complications occurring up to 6 months after treatment in patients with cerebral aneurysms treated with the Pipeline embolization device.** *AJNR Am J Neuroradiol* 2014;35:128–35

17. Hanel RA, Taussky P, Dixon T, et al. **Safety and efficacy of ticagrelor for neuroendovascular procedures: a single center initial experience.** *J Neurointerv Surg* 2014;6:320–22

18. Chalouhi N, Jabbour P, Tjoumakaris S, et al. **Treatment of large and giant intracranial aneurysms: cost comparison of flow diversion and traditional embolization strategies.** *World Neurosurg* 2013 Mar 6. [Epub ahead of print]

19. Chalouhi N, McMahon JF, Moukarzel LA, et al. **Flow diversion versus traditional aneurysm embolization strategies: analysis of fluoroscopy and procedure times.** *J Neurointervent Surg* 2014;6:291–95

20. Chalouhi N, Tjoumakaris S, Dumont AS, et al. **Treatment of posterior circulation aneurysms with the Pipeline embolization device.** *Neurosurgery* 2013;72:883–89

21. Jabbour P, Chalouhi N, Tjoumakaris S, et al. **The Pipeline embolization device: learning curve and predictors of complications and aneurysm obliteration.** *Neurosurgery* 2013;73:113–20

22. Chitale R, Gonzalez LF, Randazzo C, et al. **Single center experience with Pipeline stent: feasibility, technique, and complications.** *Neurosurgery* 2012;71:679–91

23. Chalouhi N, Tjoumakaris S, Starke RM, et al. **Comparison of flow diversion and coiling in large unruptured intracranial saccular aneurysms.** *Stroke* 2013;44:2150–54

24. O'Kelly CJ, Spears J, Chow M, et al. **Canadian experience with the Pipeline embolization device for repair of unruptured intracranial aneurysms.** *AJNR Am J Neuroradiol* 2013;34:381–87

25. Cruz JP, O'Kelly C, Kelly M, et al. **Pipeline embolization device in aneurysmal subarachnoid hemorrhage.** *AJNR Am J Neuroradiol* 2013;34:271–76

26. Kan P, Siddiqui AH, Veznedaroglu E, et al. **Early postmarket results after treatment of intracranial aneurysms with the Pipeline embolization device: a US multicenter experience.** *Neurosurgery* 2012;71:1080–87

27. Siddiqui AH, Abla AA, Kan P, et al. **Panacea or problem: flow diverters in the treatment of symptomatic large or giant fusiform vertebrobasilar aneurysms—clinical article.** *J Neurosurg* 2012;116:1258–66

28. de Barros Faria M, Castro RN, Lundquist J, et al. **The role of the Pipeline embolization device for the treatment of dissecting intracranial aneurysms.** *AJNR Am J Neuroradiol* 2011;32:2192–95

29. Brinjikji W, Lanzino G, Cloft HJ, et al. **Patency of the posterior communicating artery after flow diversion treatment of internal carotid artery aneurysms.** *Clin Neurol Neurosurg* 2014;120:84–88

30. Berge J, Biondi A, Machi P, et al. **Flow-diverter Silk stent for the treatment of intracranial aneurysms: 1-year follow-up in a multicenter study.** *AJNR Am J Neuroradiol* 2012;33:1150–55

31. Leonardi M, Cirillo L, Toni F, et al. **Treatment of intracranial aneurysms using flow-diverting Silk stents (BALT): a single centre experience.** *Interv Neuroradiol* 2011;17:306–15

32. Velioglu M, Kizilkilic O, Selcuk H, et al. **Early and midterm results of complex cerebral aneurysms treated with Silk stent.** *Neuroradiology* 2012;54:1355–65

33. Hu YC, Deshmukh VR, Albuquerque FC, et al. **Histopathological assessment of fatal ipsilateral intraparenchymal hemorrhages after the treatment of supraclinoid aneurysms with the Pipeline embolization device.** *J Neurosurg* 2014;120:365–74

34. Byrne JV, Beltechi R, Yarnold JA, et al. **Early experience in the treatment of intra-cranial aneurysms by endovascular flow diversion: a multicentre prospective study.** *PLoS One* 2010;5:pii: e12492

35. McAuliffe W, Wycoco V, Rice H, et al. **Immediate and midterm results following treatment of unruptured intracranial aneurysms with the Pipeline embolization device.** *AJNR Am J Neuroradiol* 2012;33:164–70

36. Wong GK, Kwan MC, Ng RY, et al. **Flow diverters for treatment of intracranial aneurysms: current status and ongoing clinical trials.** *J Clin Neurosci* 2011;18:737–40

37. Tähtinen OI, Manninen HI, Vanninen RL, et al. **The Silk flow-diverting stent in the endovascular treatment of complex intracranial aneurysms: technical aspects and midterm results in 24 consecutive patients.** *Neurosurgery* 2012;70:617–23; discussion 623–24

38. McLaughlin N, McArthur DL, Martin NA. **Use of stent-assisted coil**

155
Exhibit 9

embolization for the treatment of wide-necked aneurysms: a systematic review. *Surg Neurol Int* 2013;4:43

39. Bodily KD, Cloft HJ, Lanzino G, et al. **Stent-assisted coiling in acutely ruptured intracranial aneurysms: a qualitative, systematic review of the literature.** *AJNR Am J Neuroradiol* 2011;32:1232–36

40. Shapiro M, Becske T, Sahlein D, et al. **Stent-supported aneurysm coiling: a literature survey of treatment and follow-up.** *AJNR Am J Neuroradiol* 2012;33:159–63

41. Fiorella D, Albuquerque FC, Woo H, et al. **Neuroform stent as-** sisted aneurysm treatment: evolving treatment strategies, complications and results of long term follow-up. *J Neurointerv Surg* 2010;2:16–22

42. Piotin M, Blanc R, Spelle L, et al. **Stent-assisted coiling of intracranial aneurysms: clinical and angiographic results in 216 consecutive aneurysms.** *Stroke* 2010;41:110–15

43. Chalouhi N, Starke RM, Yang S, et al. **Extending the indications of flow diversion to small, unruptured, saccular aneurysms of the anterior circulation.** *Stroke* 2014;45:54–58

156
Exhibit 9

Exhibit 10 Omitted

# Exhibit 11

161
Exhibit 11

# FY17Q1 SALES REGION MEETING

Neurovascular National Sales Meeting

We Are...
ALL IN

**Medtronic**
Further, Together



# TOP 20 PERFORMANCE PIPELINE - ACCOUNTS

| Sold To Name | FY2015 Sales | FY2016 Sales | YoY $ Growth | YoY % Growth |
|---|---|---|---|---|
| NY Presbyterian | $564,300 | $1,940,380 | $1,376,080 | 244% |
| NYU Langone Medical Center | $1,820,316 | $1,882,700 | $62,384 | 3% |
| Jefferson Hospital for Neuroscience | $978,350 | $1,793,500 | $815,150 | 83% |
| University of Iowa Hospital | $1,826,000 | $1,401,000 | ($425,000) | -23% |
| Westchester County Medical Center | $691,840 | $1,342,400 | $650,560 | 94% |
| Johns Hopkins Hospital | $554,700 | $1,306,400 | $751,700 | 136% |
| Baptist Medical Center | $497,877 | $1,086,096 | $588,219 | 118% |
| Emory University Hospital | $607,387 | $1,076,866 | $469,479 | 77% |
| Cleveland Clinic Foundation | $687,318 | $1,042,455 | $355,137 | 52% |
| Beth Israel Deaconess Medical Ctr | $699,400 | $1,014,700 | $315,300 | 45% |
| Duke Hospital North | $538,500 | $1,003,734 | $465,234 | 86% |
| Indiana University Health Methodist | $307,200 | $986,200 | $679,000 | 221% |
| Swedish Medical Center Cherry Hill | $766,816 | $985,460 | $218,644 | 29% |
| Stony Brook University Medical | $923,520 | $935,100 | $11,580 | 1% |
| Medical University Hospital Authori | $712,303 | $931,936 | $219,633 | 31% |
| Abbott Northwestern Hospital | $379,981 | $885,800 | $505,819 | 133% |
| Johns Hopkins Bayview Medical Cente | $602,000 | $873,150 | $271,150 | 45% |
| Kaleida Health-Buffalo General | $645,985 | $872,800 | $226,815 | 35% |
| Wellstar Kennestone Hospital | $190,100 | $868,100 | $678,000 | 357% |
| University of Maryland Medical Cent | $997,970 | $833,772 | ($164,198) | -16% |
| **Total** | **$14,991,863** | **$23,062,549** | **$8,070,686** | **54%** |

**Medtronic**

# Exhibit 12

Medtronic Pipeline Customer Hospitals with Quarterly Sales and Associated Proctors

| Customer Hospital | Location | Pipeline Sales Quarter Ended 4/29/15 | Pipeline Sales Quarter Ended 4/29/16 | Likely Proctors Associated With Hospital |
|---|---|---|---|---|
| NYU Langone Medical Center | New York, NY | 507,200 | 179,700 | Peter Nelson, Maksim Shapiro, Tibor Becske |
| University of Iowa Hospital | Iowa City, IA | 501,800 | 668,800 | |
| University of Maryland Medical Center | Baltimore, MD | 429,500 | 298,402 | |
| Westchester County Medical Center | Valhalla, NY | 412,500 | 99,540 | Michael Stiefel |
| Jefferson Hospital for Neuroscience | Philadelphia, PA | 356,100 | 394,800 | Luis Gonzalez, Pascal Jabbour |
| Cornell U Weill Medical College | New York, NY | 332,200 | 25,000 | |
| Riverside Methodist Hospital | Columbus, OH | 326,800 | 159,777 | |
| Rush University Medical Center | Chicago, IL | 323,190 | 237,500 | Demetrius Lopes |
| Medical University Hospital Authority | Charleston, SC | 315,200 | 424,450 | Mohammad Chaudry, Raymond Turner |
| St Josephs Hospital and Medical | Phoenix, AZ | 300,000 | 172,098 | Cameron McDougall |
| Froedtert Hospital | Wauwatosa, WI | 276,800 | 363,731 | |
| Cleveland Clinic Foundation | Cleveland, OH | 270,600 | 384,555 | |
| Stony Brook University Medical | Stony Brook, NY | 269,700 | 195,260 | David Fiorella |
| Emory University Hospital | Atlanta, GA | 242,916 | 339,066 | |
| St Lukes Health Baylor College | Houston, TX | 233,500 | 68,456 | Michel Mawad, Peter Kan |
| Washington Hospital Center | Washington, DC | 232,200 | 146,800 | William Bank, Andrew Stemer |
| Carolinas Medical Center | Charlotte, NC | 217,000 | 118,484 | Joe Bernard |
| North Shore University Hospital | Manhasset, NY | 214,300 | 173,194 | |
| Bellevue Hospital | New York, NY | 188,400 | 0 | |
| Swedish Medical Center Cherry Hill | Seattle, WA | 186,200 | 215,410 | |
| Kaiser Sunnyside Medical Center | Sunnyside, OR | 183,405 | 157,380 | Jeremy Fields |
| Baptist Medical Center | Jacksonville, FL | 175,875 | 337,288 | Ricardo Hanel |
| Johns Hopkins Hospital | Baltimore, MD | 169,900 | 411,900 | Alexander Coon |
| Santa Barbara Cottage Hospital | Santa Barbara, CA | 169,730 | 182,816 | |
| Barnes Jewish South Hospital | St. Louis, MO | 163,900 | 242,600 | Christopher Moran |
| Baptist Health Lexington | Lexington, KY | 163,800 | 164,870 | Curtis Given |
| VCU Health Systems | Richmond, VA | 158,100 | 113,874 | John Reavey-Cantwell |
| Methodist Hospital | Houston, TX | 156,900 | 178,992 | Orlando Diaz |
| Duke Hospital North | Durham, NC | 152,700 | 274,976 | Luis Gonzalez |
| NY Presbyterian Hospital Columbia | New York, NY | 150,000 | 183,760 | |

Medtronic Pipeline Customer Hospitals with Quarterly Sales and Associated Proctors

| Customer Hospital | Location | Pipeline Sales Quarter Ended 4/29/15 | Pipeline Sales Quarter Ended 4/29/16 | Likely Proctors Associated With Hospital |
|---|---|---|---|---|
| Nebraska Medical Center | Omaha, NE | 150,000 | 64,744 | |
| Montefiore Medical Center Moses | Bronx, NY | 150,000 | 0 | |
| Fort Sanders Regional Medical Center | Knoxville, TN | 144,500 | 70,224 | Britton Woodward |
| St Marys Hospital | West Palm Beach, FL | 141,900 | 54,416 | Ali Malek |
| Lehigh Valley Hospital | Allentown, PA | 139,200 | 135,720 | |
| University Hospital | Salt Lake City, UT | 135,450 | 207,535 | Philipp Taussky |
| Kaleida Health-Buffalo General | Buffalo, NY | 135,200 | 339,700 | Adnan Siddiqui, Elad Levy |
| University of Tennessee Hospital | Knoxville, TN | 131,600 | 82,248 | |
| Florida Hospital Apopka | Apopka, FL | 130,548 | 24,186 | |
| Borgess Medical Center | Kalamazoo, MI | 129,500 | 155,188 | |
| Robert Wood Johnson University Hospital | New Brunswick, NJ | 129,000 | 199,720 | |
| Hackensack University Medical | Hackensack, NJ | 129,000 | 141,600 | Ciro Randazzo |
| Greenville Memorial Hospital | Greenville, SC | 128,000 | 242,000 | |
| University of Virginia Medical | Charlottesville, VA | 127,700 | 150,900 | John Gaughen, Avery Evans |
| Mercy San Juan Hospital | Carmichael, CA | 127,700 | 0 | |
| Johns Hopkins Bayview Medical Center | Baltimore, MD | 127,200 | 272,300 | Alexander Coon |
| UMass Memorial Health Care | Worcester, MA | 125,000 | 116,775 | |
| Beth Israel Deaconess Medical Center | Boston, MA | 121,000 | 186,200 | Ajit Puri |
| Kaiser Permanente Redwood City | Redwood City, CA | 120,000 | 81,609 | Amon Liu |
| Baptist Hospital | Miami, FL | 118,800 | 0 | Guilherme Dabus, Italo Linfante |
| University of Kentucky Hospital | Lexington, KY | 115,200 | 244,386 | |
| UPMC Presbyterian | Pittsburgh, PA | 96,864 | 150,912 | |
| Hershey Medical Center | Hershey, PA | 90,300 | 228,580 | Kevin Cockroft |
| Hartford Hospital | Hartford, CT | 87,500 | 188,760 | |
| Wellstar Kennestone Hospital | Marietta, GA | 26,600 | 327,000 | |
| UF Health Shands Hospital | Gainesville, FL | 25,000 | 291,345 | Spiros Blackburn |
| Integris Baptist Medical Center | Oklahoma City, OK | 14,600 | 191,720 | |
| JCSD Medical Center Hillcrest | San Diego, CA | 12,900 | 157,056 | Arash Khalessi-Hosseini |
| Overlook Medical Center | Summit, NJ | 12,500 | 266,100 | Ciro Randazzo |
| Metropolitan Hospital | Wyoming, MI | 12,500 | 168,807 | |

Medtronic Pipeline Customer Hospitals with Quarterly Sales and Associated Proctors

| Customer Hospital | Location | Pipeline Sales Quarter Ended 4/29/15 | Pipeline Sales Quarter Ended 4/29/16 | Likely Proctors Associated With Hospital |
|---|---|---|---|---|
| Tampa General Hospital | Tampa, FL | 12,250 | 267,857 | Peter Sunenshine |
| Florida Hospital Orlando | Orlando, FL | 11,868 | 207,812 | |
| The Ohio State University | Columbus, OH | 0 | 360,000 | |
| Indiana University Health Methodist | Indianapolis, IN | 0 | 213,700 | |
| New York Presbyterian Hospital Cornell | New York, NY | 0 | 202,160 | |
| Barrows Neurological Institute | Phoenix, AZ | 0 | 156,547 | Cameron McDougall |
| UAB Hospital - Birmingham | Birmingham, AL | 0 | 154,960 | |

Hospital names and sales figures were obtained from internal Medtronic documents.

Hospital locations are based on public information and geographic territory covered by Medtronic sales personnel responsible for each hospital.

Likely proctors associated with each hospital are based on payment information in Exhibit 1 and public information regarding hospital affiliations.

Exhibit 13

Case 2:17-cv-01903-ODW-MRW   Document 81   Filed 04/26/21   Page 139 of 149   Page ID #:4504



Intervent Neurol 2016;5:89–99

DOI: 10.1159/000446503
Received: February 26, 2016
Accepted: April 21, 2016
Published online: May 26, 2016

© 2016 S. Karger AG, Basel
1664–9737/16/0052–0089$39.50/0
www.karger.com/ine

Original Paper

# Aneurysm Study of Pipeline in an Observational Registry (ASPIRe)

David F. Kallmes[1]   Waleed Brinjikji[1]   Edoardo Boccardi[2]   Elisa Ciceri[3]
Orlando Diaz[4]   Rabih Tawk[5]   Henry Woo[7]   Pascal Jabbour[9]
Felipe Albuquerque[11]   Rene Chapot[13]   Alain Bonafe[15]   Shervin R. Dashti[16]
Josser E. Delgado Almandoz[17]   Curtis Given II[18]   Michael E. Kelly[19]
DeWitte T. Cross III[21]   Gary Duckwiler[22]   Nasser Razack[23]   Ciaran J. Powers[24]
Sebastian Fischer[14]   Demetrius Lopes[25]   Mark R. Harrigan[26]
Daniel Huddle[27]   Raymond Turner IV[28]   Osama O. Zaidat[29]   Luc Defreyne[30]
Vitor Mendes Pereira[20]   Saruhan Cekirge[31]   David Fiorella[8]   Ricardo A. Hanel[6]
Pedro Lylyk[32]   Cameron McDougall[12]   Adnan Siddiqui[10]   Istvan Szikora[33]
Elad Levy[10]

[1]Department of Radiology, Mayo Clinic, Rochester, Minn., USA; [2]Department of Neuroradiology,
Niguarda Ca' Granda Hospital of Milan, and [3]Department of Radiology, Istituto Neurologico
Carlo Besta, Milan, Italy; [4]Department of Radiology, Houston Methodist Hospital, Houston, Tex.,
[5]Department of Neurosurgery, Mayo Clinic, and [6]Stroke and Cerebrovascular Surgery, Lyerly
Neurosurgery/Baptist Neurological Institute, Jacksonville, Fla., Departments of Neurosurgery at
[7]Stony Brook University and [8]Cerebrovascular Center, Stony Brook University Medical Center,
Stony Brook, N.Y., [9]Department of Neurosurgery, Thomas Jefferson University, Philadelphia, Pa.,
[10]Department of Neurosurgery, University at Buffalo Neurosurgery, Buffalo, N.Y., and Departments of
[11]Neurosurgery and [12]Endovascular Neurosurgery, Barrow Neurological Institute, Phoenix, Ariz.,
USA; [13]Neurointerventional Services, Department of Interventional Neuroradiology, Alfred
Krupp Hospital, Essen, and [14]Department of Radiology, Klinikum Stuttgart, Stuttgart, Germany;
[15]Department of Radiology, CHU Montpellier, Montpellier, France; [16]Department of Neurosurgery,
Norton Neuroscience Institute, Norton Healthcare, Louisville, Ky., [17]Department of Radiology,
Neuroscience Institute, Abbott Northwestern Hospital, Minneapolis, Minn., and [18]Neurointerventional
Services, Baptist Health Lexington, Lexington, Ky., USA; [19]Division of Neurosurgery, Royal University
Hospital, University of Saskatchewan, Saskatoon, Sask., and [20]Division of Neuroradiology, Joint
Department of Medical Imaging and Division of Neurosurgery, Department of Surgery, University
Health Network and Departments of Medical Imaging and Surgery, University of Toronto, Toronto,
Ont., Canada; [21]Department of Radiology, Washington University School of Medicine, St. Louis, Mo.,
[22]Department of Neuroradiology, David Geffen School of Medicine at UCLA, Los Angeles, Calif.,
[23]Neurointerventional Associates, P.A., St. Petersburg, Fla., [24]Department of Neurological Surgery, The
Ohio State University Wexner Medical Center, Columbus, Ohio, [25]Department of Neurological Surgery,
Rush University Medical Center, Chicago, Ill., [26]Department of Neurosurgery, University of Alabama,
Birmingham, Ala., [27]Swedish Medical Center/RIA Neurovascular, Englewood, Colo., [28]Department of
Neurosurgery, Medical University of South Carolina, Charleston, S.C., and [29]Department of
Neurology, Medical College of Wisconsin/Froedtert Hospital, Milwaukee, Wis., USA; [30]Department of
Interventional Radiology, Ghent University Hospital, Gent, Belgium; [31]Department of Radiology, Koru
Hospital and Bayindir Hospitals, Ankara, Turkey; [32]Department of Neurosurgery, Clinica La Sagrada
Familia, ENERI, Buenos Aires, Argentina; [33]Department of Neurointerventional Services, National
Institute of Clinical Neurosciences, Budapest, Hungary

Waleed Brinjikji, MD
Department of Radiology, Mayo Clinic
200 1st Street SW
Rochester, MN 55905 (USA)
E-Mail Brinjikji.waleed @ mayo.edu

KARGER

Intervent Neurol 2016;5:89–99

DOI: 10.1159/000446503

© 2016 S. Karger AG, Basel
www.karger.com/ine

Kallmes et al.: Aneurysm Study of Pipeline in an Observational Registry (ASPIRe)

## Key Words

Intracranial aneurysm · Flow diverter · Neurological morbidity and mortality

## Abstract

***Background and Objective:*** Few prospective studies exist evaluating the safety and efficacy of the Pipeline Embolization Device (PED) in the treatment of intracranial aneurysms. The Aneurysm Study of Pipeline In an observational Registry (ASPIRe) study prospectively analyzed rates of complete aneurysm occlusion and neurologic adverse events following PED treatment of intracranial aneurysms. ***Materials and Methods:*** We performed a multicenter study prospectively evaluating patients with unruptured intracranial aneurysms treated with PED. Primary outcomes included (1) spontaneous rupture of the Pipeline-treated aneurysm; (2) spontaneous nonaneurysmal intracranial hemorrhage (ICH); (3) acute ischemic stroke; (4) parent artery stenosis, and (5) permanent cranial neuropathy. Secondary endpoints were (1) treatment success and (2) morbidity and mortality at the 6-month follow-up. Vascular imaging was evaluated at an independent core laboratory. ***Results:*** One hundred and ninety-one patients with 207 treated aneurysms were included in this registry. The mean aneurysm size was 14.5 ± 6.9 mm, and the median imaging follow-up was 7.8 months. Twenty-four aneurysms (11.6%) were small, 162 (78.3%) were large and 21 (10.1%) were giant. The median clinical follow-up time was 6.2 months. The neurological morbidity rate was 6.8% (13/191), and the neurological mortality rate was 1.6% (3/191). The combined neurological morbidity/mortality rate was 6.8% (13/191). The most common adverse events were ischemic stroke (4.7%, 9/191) and spontaneous ICH (3.7%, 7/191). The complete occlusion rate at the last follow-up was 74.8% (77/103). ***Conclusions:*** Our prospective postmarket study confirms that PED treatment of aneurysms in a heterogeneous patient population is safe with low rates of neurological morbidity and mortality. Patients with angiographic follow-up had complete occlusion rates of 75% at 8 months.

© 2016 S. Karger AG, Basel

## Introduction

Treatment of intracranial aneurysms with the Pipeline Embolization Device (PED) is widely accepted as an excellent option for the treatment of intracranial aneurysms [1–4]. Flow diverter devices such as the PED were initially developed for the treatment of wide-necked and large and giant aneurysms, aneurysms which are typically difficult to treat with endosaccular coiling. High rates of complete aneurysm occlusion have been reported in a number of studies, even in large and giant aneurysms [1–7].

Important questions remain regarding the safety and efficacy of flow diverter therapy. Even though numerous previous studies have reported overall rates of adverse events similar to those of other endovascular procedures, several studies documenting severe and 'unexpected' adverse events such as spontaneous intraparenchymal hemorrhage, spontaneous aneurysm rupture and postoperative strokes have raised questions about the safety of these devices [1, 3, 8–13].

The majority of existing literature on flow diversion therapy is comprised of single-center retrospective or prospective case series. Such literature has substantial biases, including selection and publication biases, which may affect apparent rates of angiographic occlusion and severe, unexpected adverse events. These biases may be diminished through the development of a prospective clinical registry. The purpose of the Aneurysm Study of Pipeline In an observational Registry (ASPIRe) study was to prospectively determine the rates of complete aneurysm occlusion and neurologic adverse events following the treatment of intracranial aneurysms with PED and validate results from previous clinical trials.



Intervent Neurol 2016;5:89–99

| DOI: 10.1159/000446503 | © 2016 S. Karger AG, Basel |
| | www.karger.com/ine |

Kallmes et al.: Aneurysm Study of Pipeline in an Observational Registry (ASPIRe)

## Materials and Methods

*Study Design and Participants*

ASPIRe is a prospective, single-arm, multi-center postmarket registry of patients undergoing PED treatment of intracranial aneurysms. We prospectively evaluated all patients who were consented and treated with PED over a 3-year period in 28 centers in 7 countries experienced in PED use. Physicians who contributed data to this study were neurointerventionalists trained in endovascular techniques. As this was a multicenter registry, the following items varied across centers: selection of patients eligible for the treatment with the PED versus other treatment modalities, procedural details and periprocedural patient management. All centers used a common study protocol, which specified the data to be collected, study endpoints, events of interest and statistical analysis.

Patients were eligible for enrollment in the study if they: (1) consented to being included in the registry; (2) met the requirements for PED treatment per the instructions for use approved for the country in which they were treated, and (3) were willing and able to comply with follow-up visits. Patients were excluded if they (1) had an active bacterial infection; (2) had a contraindication to dual antiplatelet therapy or did not receive preoperative dual antiplatelet therapy; (3) had a preexisting stent in the parent artery at the target aneurysm location; (4) had a severe pre- or postaneurysmal narrowing, or (5) if the target aneurysm was acutely ruptured.

*Data Collection and Outcomes*

The baseline characteristics studied included medical history, demographic characteristics, presenting aneurysm location/size/type/rupture status, prior aneurysm treatment, concomitant medication use and presurgical imaging data. The operative characteristics studied included number and size of PEDs used, how PEDs were used (overlapping, multiple layers, etc.), side branch coverage, concomitant coiling, procedure duration and use of ancillary devices.

The primary study endpoint was comprised of the following: (1) spontaneous rupture of the Pipeline-treated aneurysm; (2) spontaneous nonaneurysmal intracranial hemorrhage (ICH) ipsilateral or contra-lateral to the treated aneurysm; (3) acute ischemic stroke; (4) symptomatic or asymptomatic parent artery stenosis, and (5) permanent cranial neuropathy. The secondary endpoints were (1) treatment success defined as complete occlusion of the Pipeline-treated aneurysm at the last follow-up and (2) morbidity and mortality at the 6-month follow-up. All vascular imaging was evaluated at an independent core laboratory for assessment of aneurysm occlusion and parent artery stenosis. Aneurysm occlusion was assessed using the scale of Roy and Raymond.

All adverse events were collected using a standard case report form. An adverse event was defined as any decline of the patient's baseline neurological status. Adverse events were defined as minor if the clinical sequelae of the complication resolved within 7 days and as major if the patient experienced a clinical deficit for >7 days. The relationship of the primary-endpoint adverse events and deaths to the procedure and device was established by an independent Clinical Events Committee.

Clinical and imaging follow-up time points were at the discretion of the operator. Clinical follow-up intervals were defined as follows: (1) baseline (before surgery); (2) surgery (at the time of surgery); (3) soon after surgery (up to 30 days after the procedure); (4) long after surgery (31–100 days after the procedure); (5) mid-term follow-up (101–250 days after the procedure), and (6) long-term follow-up (250 days or longer). Imaging follow-up intervals were defined as follows: 6 months (–20/+42 days after the procedure) and 1 year (±42 days after the procedure).

*Loss to Follow-Up and Subject Withdrawal*

Subjects were considered lost to follow-up if they could not be reached after 3 attempts to contact the subjects at least 1 week apart. The final documented attempt was to be made with a registered letter. All enrolled subjects had the right to withdraw their consent. All data up to the time of withdrawal could be used for analysis. Any patients with a protocol deviation in data reporting, inclusion/exclusion criteria and informed consent were to be excluded from the analysis. No patients were excluded from our study due to protocol deviations as there were no inclusion/exclusion criteria violations and all informed consent deviations were minor and administrative in nature.



91

Intervent Neurol 2016;5:89–99

DOI: 10.1159/000446503

© 2016 S. Karger AG, Basel
www.karger.com/ine

*Interventional Neurology*

Kallmes et al.: Aneurysm Study of Pipeline in an Observational Registry (ASPIRe)

**Table 1.** Patient characteristics

| | |
|---|---|
| **Age, years** | |
| Mean ± SD | 59.9±12.5 (191) |
| Median (min, max) | 60.0 (25.0, 89.0) |
| **Gender** | |
| Male | 16.2 (31/191) |
| Female | 83.8 (160/191) |
| **Race** | |
| White | 86.7 (157/181) |
| Black or African American | 7.2 (13/181) |
| Asian | 1.7 (3/181) |
| American Indian or Alaska Native | 0.6 (1/181) |
| Native Hawaiian or other Pacific Islander | 0.6 (1/181) |
| Other | 3.3 (6/181) |
| **Ethnicity** | |
| Hispanic or Latino | 17.5 (28/160) |
| **Hypertension** | |
| Yes | 53.9 (103/191) |
| Controlled | 93.2 (96/103) |
| No | 41.9 (80/191) |
| Unknown | 4.2 (8/191) |
| **Current or previous smoker** | 43.7 (80/183) |

Values are expressed as percentages with numbers in parentheses, unless otherwise indicated.

*Statistical Analysis*

All statistical analyses were performed using Statistical Analysis System (SAS) for Windows (version 9.2; SAS Institute Inc. Cary, N.C., USA). In general, data for all study subjects combined are presented. Data analysis is based on the subject level, except for aneurysm characteristics, which were based on the number of aneurysms.

Descriptive statistics are used to present the data and to summarize the results. Discrete variables are presented using frequency distributions and cross tabulations. Continuous variables are summarized by presenting the number of observations, mean, standard deviation, median, minimum and maximum values.

*Statement of Ethics*

Local institutional review boards or ethics committees approved the study and the use of the patients' data. Written informed consent was obtained from all study participants using a form approved by the local institutional review board or ethics committee.

**Results**

*Baseline Patient and Aneurysm Characteristics*

A total of 191 patients with 207 treated aneurysms were included in this registry. No patients were lost to clinical follow-up. The mean patient age was 59.9 ± 12.5 years. 160 patients (83.8%) were female. Hypertension was present in 53.9% (103/191 patients), and 43.7% (80/183 patients) were current or previous smokers. The mean aneurysm size was 14.5 ± 6.9 mm (range 0.9–41.0). Twenty-four aneurysms (11.6%) were small, 162 (78.3%) were large and 21 (10.1%) were giant. The mean aneurysm neck size was 7.1 ± 4.2 mm. 81.6% of the aneurysms (169/207) were saccular. In terms of aneurysm location, 95.2% (197/207) were located in the anterior circulation, with 89.4% (185/207) located on the internal carotid artery (ICA; 185/207). All treated aneurysms were unruptured. Median clinical follow-up time was 6.2 months (range 0.0–27.2). These data are summarized in tables 1 and 2.

Intervent Neurol 2016;5:89–99
DOI: 10.1159/000446503

© 2016 S. Karger AG, Basel
www.karger.com/ine

Kallmes et al.: Aneurysm Study of Pipeline in an Observational Registry (ASPIRe)

**Table 2.** Aneurysm characteristics

| | |
|---|---|
| Aneurysm size, mm | |
|     Mean ± SD | 14.5±6.9 (207) |
|     Median (min, max) | 12.0 (0.9, 41.0) |
| Aneurysm neck, mm | |
|     Mean ± SD | 7.1±4.2 |
|     Median (min, max) | 6.0 (0.0, 32.0) |
| Aneurysm size | |
|     Small | 11.6 (24/207) |
|     Large | 78.3 (162/207) |
|     Giant | 10.1 (21/207) |
| Aneurysm type | |
|     Saccular | 81.6 (169/207) |
|     Fusiform | 15.5 (32/207) |
|     Dissecting | 2.9 (6/207) |
| Aneurysm side | |
|     Left | 54.1 (112/207) |
|     Midline | 5.3 (11/207) |
|     Right | 40.6 (84/207) |
| Aneurysm location | |
|     ICA | 90.8 (188/207) |
|     Anterior cerebral artery | 0.5 (1/207) |
|     Middle cerebral artery | 1.4 (3/207) |
|     Posterior cerebral artery | 0.5 (1/207) |
|     Basilar artery | 2.9 (6/207) |
|     Vertebral artery | 1.4 (3/207) |
|     Anterior communicating artery | 2.4 (5/207) |
| Aneurysm status | |
|     Ruptured | 0.0 (0/207) |
|     Unruptured | 100.0 (207/207) |

Values are expressed as percentages with numbers in parentheses, unless otherwise indicated.

### Procedure Characteristics

Mean procedure time was 112.9 ± 54.9 min. 97.9% of the patients (187/191) were on anticoagulation/antiplatelet therapy. 66.5% of the patients (127/191) were treated with the PED alone. In 18.8% of the cases (39/207), multiple PEDs were used. Side branches were covered by the PED in 50.7% of the cases (104/205). Immediate post-treatment angiograms evaluated by the core laboratory demonstrated residual filling of the aneurysm in 86.9% of the cases (166/191) and a neck remnant in 8.4% of the cases (16/191). These data are summarized in table 3.

### Clinical and Imaging Outcomes

Major adverse events occurred in 6.8% of the patients (13/191), and minor adverse events occurred in 4.7% of the patients (9/191). Thirteen patients with major adverse events suffered neurological morbidity, 3 of whom suffered neurological mortality. Thus, the 6-month major neurological morbidity rate was 6.8% (13/191), the neurological mortality rate was 1.6% (3/191) and the combined neurological morbidity/mortality rate was 6.8% (13/191). There were no additional cases of neurological morbidity and mortality beyond 6 months. In patients with saccular aneurysms (excluding dissecting and fusiform aneurysms), the neurological morbidity and mortality rate was 5.8% (9/156), and in patients with dissecting or fusiform aneurysms, the neurological morbidity and mortality rate was 10.8% (4/37).

KARGER

Intervent Neurol 2016;5:89–99
DOI: 10.1159/000446503 | © 2016 S. Karger AG, Basel
www.karger.com/ine

Kallmes et al.: Aneurysm Study of Pipeline in an Observational Registry (ASPIRe)

**Table 3.** Procedure characteristics

| | |
|---|---|
| Procedure time, min | |
|     Mean ± SD | 112.9±54.9 (190) |
|     Median (min, max) | 107.0 (0.0, 369.0) |
| Anticoagulation/antiplatelet therapy | 97.9 (187/191) |
| Platelet aggregation assay | 61.3 (117/191) |
| Heparin during procedure | 87.4 (167/191) |
| If yes, was heparin reversed? | 16.2 (27/167) |
| Intraoperative imaging | |
|     Magnetic resonance angiography | 2.1 (4/191) |
|     Magnetic resonance imaging | 2.1 (4/191) |
|     Computed tomography | 9.4 (18/191) |
|     Computed tomography angiography | 12.0 (23/191) |
|     Angiogram | 98.4 (188/191) |
|     Other | 6.3 (12/191) |
| Level of occlusion (Core Laboratory reported) | |
|     100% occlusion | 1.0 (2/191) |
|     Neck remnant | 8.4 (16/191) |
|     Residual filling | 86.9 (166/191) |
|     Indeterminate or not available | 3.7 (7/191) |
| *Device characteristics* | |
| Type of treatment | |
|     PED alone | 66.5 (127/191) |
|     PED with coils | 17.3 (33/191) |
|     PED with balloons | 10.5(20/191) |
|     Other | 5.8 (11/191) |
| Number of PEDs utilized | |
|     Mean ± SD | 1.2±0.6 (207) |
|     Median (min, max) | 1.0 (0.0, 5.0) |
|     Multiple PEDs utilized | 18.8 (39/207) |
|     Multiple PEDs preplanned | 6.4 (13/202) |
| Multiple PEDs, method of use | |
|     Additional length | 35.9 (14/39) |
|     Multiple layers | 51.3 (20/39) |
|     Stabilization | 12.8 (5/39) |
|     Entire neck covered by PEDs | 94.2 (194/206) |
|     Side branch covered by PEDs | 50.7 (104/205) |
| Size of side branch from aneurysm sac, mm | |
|     Mean ± SD | 0.9±0.6 (70) |
|     Median (min, max) | 1.0 (0.0, 3.0) |

Values are expressed as percentages with numbers in parentheses, unless otherwise indicated.

The most common adverse event was ischemic stroke, which occurred in 4.7% of the patients (9/191) with stroke, resulting in major morbidity in only 1.6% of the patients (3/191). The timing of ischemic stroke was surgical/early postoperative in 7 patients, late postoperative in 2 patients, and during mid-term follow-up in 1 patient. The time range for acute ischemic stroke was 0–238 days after the procedure. One patient suffered two ischemic strokes. The acute ischemic stroke rate was 0% (0/10) in subjects with aneurysms in the posterior circulation and 1.7% (3/181) in subjects with aneurysms in the anterior circulation (p = 1.00).

Spontaneous ICH occurred in 3.7% of the patients (7/191). There were a total of nine ICHs in these 7 patients. ICH resulted in major morbidity in all 7 patients. The timing of ICH ranged from 0–103 days and was in the surgical/early postoperative period for 7 events in 6 patients, in the late postoperative period for 1 event in 1 patient and during mid-term follow-

KARGER

Intervent Neurol 2016;5:89–99

DOI: 10.1159/000446503 | © 2016 S. Karger AG, Basel
www.karger.com/ine

Kallmes et al.: Aneurysm Study of Pipeline in an Observational Registry (ASPIRe)

**Table 4.** Adverse events

| Adverse events of interest | Major | Minor |
|---|---|---|
| Ischemic stroke | 1.6 (3/191) | 3.1 (6/191) |
| ICH | 3.7 (7/191) | 0.0 (0/191) |
|    Ipsilateral ICH | 3.1 (6/191) | 0.0 (0/191) |
|    Contralateral ICH | 0.5 (1/191) | 0.0 (0/191) |
| Asymptomatic parent artery stenosis | 0.0 (0/191) | 1.6 (3/191) |
| Symptomatic parent artery stenosis | 0.0 (0/191) | 0.0 (0/191) |
| Spontaneous rupture | 1.6 (3/191) | 0.0 (0/191) |
| Permanent cranial neuropathy | 0.0 (0/191) | 0.0 (0/191) |
| Total events, n | 15 | 9 |
| Total subjects | 6.8 (13/191) | 4.7 (9/191) |

Values are presented as percentages with numbers in parentheses. Percentages are reported on a per-patient basis. There were a total of 9 ICHs in 7 subjects: 1 subject experienced two major ICHs on different days; 1 subject had two ICHs, one was major and one could not be categorized as 'major' or 'minor'.

**Table 5.** Timing of major adverse events

| Major adverse events of interest | <3 days | 3–30 days | >30 days | Total |
|---|---|---|---|---|
| Ischemic stroke | 1.0 (2/191) | 0.5 (1/191) | 0 (0/191) | 1.6 (3/191) |
| ICH | 2.6 (5/191) | 0.5 (1/191) | 0.5 (1/191) | 3.7 (7/191) |
| Asymptomatic parent artery stenosis | 0.0 (0/191) | 0.0 (0/191) | 0.0 (0/191) | 0.0 (0/191) |
| Symptomatic parent artery stenosis | 0.0 (0/191) | 0.0 (0/191) | 0.0 (0/191) | 0.0 (0/191) |
| Spontaneous rupture | 0.5 (1/191) | 1.0 (2/191) | 0 (0/191) | 1.6 (3/191) |
| Permanent cranial neuropathy | 0.0 (0/191) | 0.0 (0/191) | 0.0 (0/191) | 0.0 (0/191) |
| Neurologic morbidity | 4.2 (8/191) | 2.1 (4/191) | 0.5 (1/191) | 6.8 (13/191) |
| Neurologic mortality | 0 (0/191) | 1.0 (2/191) | 0.5 (1/191) | 1.6 (3/191) |
| Neurologic morbidity and mortality | 4.2 (8/191) | 2.1 (4/191) | 0.5 (1/191) | 6.8 (13/191) |

Values are expressed as percentages with numbers in parentheses.

up for 1 event in the same patient. Among the 7 subjects with ICH, 6 had hemorrhage occurring ipsilateral to the PED, and 1 had a contralateral hemorrhage. Spontaneous rupture occurred in 1.6% of the patients (3/191), resulting in major morbidity in all cases. All cases of spontaneous rupture occurred within 4 days of the procedure. One of these patients was concomitantly coiled, and none were previously coiled.

There were 3 cases of minor asymptomatic parent artery stenosis (1.6%) and no cases of permanent cranial neuropathy (0.0%). Twenty-one of the 25 primary adverse events (84%) were determined to be device- or procedure-related by the Clinical Events Committee. These data are summarized in tables 4 and 5.

There were no statistically significant differences in the rates of acute ischemic stroke, ICH or spontaneous aneurysm rupture between subjects who underwent different technical aspects of the procedure including: use of single or multiple PEDs, whether side branches were covered, whether the entire neck of the aneurysm was covered and whether the PED landed in the intended location. There were significant differences in the rates of acute ischemic stroke, spontaneous aneurysm rupture and neurological death based on aneurysm size. Subjects with giant aneurysms (≥25 mm) had significantly higher rates of acute ischemic

KARGER

Intervent Neurol 2016;5:89–99

DOI: 10.1159/000446503 | © 2016 S. Karger AG, Basel
www.karger.com/ine

Kallmes et al.: Aneurysm Study of Pipeline in an Observational Registry (ASPIRe)

stroke (p = 0.03), spontaneous aneurysm rupture (p = 0.03) and neurological death (p = 0.03) compared to subjects with small and large aneurysms. There was no significant difference in the rate of ICH between subjects with giant aneurysms and those with small and large aneurysms. Further, there was no significant difference in the rates of acute ischemic stroke, ICH, spontaneous aneurysm rupture or neurological death between subjects with small aneurysms and those with large aneurysms.

Imaging follow-up of at least 6 months was obtained in 103 subjects (54%). The complete occlusion rate at the last follow-up, which occurred at a median time of 7.8 months (mean 9.7 ± 4.2) after the procedure, was 74.8% (77/103). Among patients who had their last imaging follow-up at 6 months, the complete occlusion rate was 78.6% (33/42), and among patients who had their last imaging follow-up at 1 year, the complete occlusion rate was 79.0% (15/19). Eleven (5.8%) patients required retreatment.

### Discussion

Our study demonstrated that the treatment of unruptured intracranial aneurysms with the PED in a broad postmarket setting is safe. The complete occlusion rates were nearly 75% for patients with angiographic follow-up, with a median of 7.8 months of follow-up. Major adverse events occurred in <7% of the patients with ICH, and the stroke rates were <4 and 2%. Spontaneous rupture was rare, occurring in 1.6% of the patients. Approximately 80% of the major adverse events, particularly hemorrhages and spontaneous ruptures, occurred in the early postoperative period. These findings are important as they provide further data regarding the incidence of severe adverse events associated with flow diversion in a real-world setting with a broad range of aneurysm sizes and locations.

Our safety findings corroborate the findings of other large multicenter studies and meta-analyses including the International Retrospective Study of Pipeline Embolization Device registry (IntrePED) and the Pipeline for Uncoilable or Failed Aneurysms study (PUFS) [13, 14]. Long-term neurological morbidity and mortality rates were 8.4% in the IntrePED and 5.6% in the PUFS compared to 6.8% in our study. When patients with ruptured, dissecting or fusiform aneurysms were excluded in IntrePED, the overall neurological morbidity and mortality rate in IntrePED dropped down to 5.7%, similar to our study [13]. Two large meta-analyses of flow diverter treatment demonstrated morbidity rates of 5.0–7.3% and mortality rates of 2.8–4.0% [1, 3].

The rate of spontaneous rupture was slightly higher in our study when compared to IntrePED (1.6 vs. 0.6%) but was substantially lower than the 3% rate reported in the meta-analysis performed by Brinjikji et al. [3]. Similar to our study, PUFS reported a spontaneous aneurysm rupture rate of 1.9% [14]. The rate of ICH in ASPIRe was slightly higher than the rate in IntrePED (3.7 vs. 2.5%) but lower than that reported in PUFS (4.7%). Similar to both PUFS and IntrePED, a majority of spontaneous ICHs occurred in the early postoperative period.

Nearly 75% of the aneurysms in our study were large aneurysms of the ICA. Prior studies have demonstrated high angiographic cure rates when treating large ICA aneurysms with flow diverters such as the PED. Complete occlusion rates in studies reporting 6-to-12-month follow-ups typically range from 70 to 93% [14–19]. One large meta-analysis of nearly 1,500 patients with 1,700 aneurysms treated with flow diverters found complete occlusion rates of 76% at the last follow-up. One series of 38 aneurysms with medium-term follow-up reported complete occlusion of all 27 ICA aneurysms by 18 months with progressively increased occlusion between 3–18 months of follow-up [20]. In their study of 251 large and giant aneurysms undergoing PED treatment, Saatci et al. [21] reported a 91.2% complete occlusion rate at 6 months and a 94.6% complete occlusion rate at 1–2 years after the treatment.

KARGER

Intervent Neurol 2016;5:89–99
DOI: 10.1159/000446503
© 2016 S. Karger AG, Basel
www.karger.com/ine

Kallmes et al.: Aneurysm Study of Pipeline in an Observational Registry (ASPIRe)

Other endovascular treatments available for the treatment of wide-necked large and giant ICA aneurysms include stent-assisted endosaccular coiling as well as endovascular parent artery occlusion (PAO). In a series of 56 consecutive patients receiving PAO for the treatment of large/giant aneurysms of the carotid siphon, Labeyrie et al. [22] demonstrated an aneurysm retraction rate of 91% and a procedure-related permanent morbidity rate of 5%. Twenty-six percent of the patients in the Labeyrie series [22] suffered ischemic events, with symptoms resolving in most patients. Other series report ischemic stroke rates of 5–15% for PAO of ICA aneurysms with permanent occlusion rates of 90–100% [23–25]. While the rates of permanent aneurysm occlusion and procedure-related morbidity rates in the above series are similar to those of large and giant aneurysms in PUFS, it is important to emphasize that PAO techniques can only be used in patients who can tolerate occlusion of the carotid artery. By preserving parent artery flow, flow diverters such as the PED can be used in the treatment of patients in both the presence and absence of collateral flow [22].

Like flow diverter treatment, endosaccular and stent-assisted coiling allow for preservation of the parent artery flow. However, one major disadvantage of endosaccular coiling is the high rates of recanalization, especially when stent assistance is not used. In our study, there was a low rate of retreatment. In a meta-analysis of treatment of cavernous carotid artery aneurysms with endosaccular coiling and PAO, Turfe et al. [26] found long-term aneurysm complete occlusion rates of just 45.0% with non-stent-assisted endosaccular coiling and retreatment rates of 20.0%. Stent-assisted coiling resulted in a 56.0% complete occlusion rate and a retreatment rate of 22% [26]. Procedure-related morbidity and mortality were <5% for patients undergoing coiling. A meta-analysis of patients undergoing stent-assisted coiling versus coiling only found that stent-assisted coiling recurrence rates were 16.2% compared to 34.4% in non-stent-assisted coiling. Complication rates were not negligible with mortality rates ranging from 3–9% and permanent morbidity rates ranging from 4–6% [27]. In a series of over 150 large and giant ICA aneurysms treated with coil embolization, Chalouhi et al. [28] noted a 12% complication rate with recurrence and retreatment rates >30%. D'Urso et al. [29] demonstrated a complete occlusion rate of just 62% for ICA aneurysms treated with coil embolization and a 5% complication rate. When compared to the results of the PUFS trial, it is clear that despite their ability to preserve parent artery flow and low complication rates, coiling techniques with and without stent assistance have lower rates of angiographic occlusion and higher rates of recurrence and retreatment when compared to PED placement alone [14].

*Limitations*

Our study has limitations. This study was a prospective multicenter registry in which sites followed their standard of practice for treating aneurysms with PED and there was a wide range of treatment regimens (i.e. platelet testing and antiplatelet therapy) between centers. However, all study adverse events collected were prespecified and evaluated by an independent Clinical Events Committee to maintain consistency. As study eligibility was limited to the approved indication in the country of treatment, this registry did not capture use of the PED in patients treated off-label. Another potential limitation of this study is the fact that the indications for treatment varied from country to country, which can result in a degree of selection bias. Although there was a core laboratory for standardization of image reads, there was no protocol regarding the minimum angiographic follow-up as this was left to the discretion of the operator. Thus, there is substantial heterogeneity in the timing of the last imaging follow-ups with just over 50% of the patients having angiographic imaging follow-up at 6 months or later, thus limiting our evaluation of occlusion outcomes. However, unlike many other previously published studies, all patients included in our study had clinical follow-up, and no patients were lost to follow-up.

KARGER

Intervent Neurol 2016;5:89–99

DOI: 10.1159/000446503 | © 2016 S. Karger AG, Basel
www.karger.com/ine

Kallmes et al.: Aneurysm Study of Pipeline in an Observational Registry (ASPIRe)

## Conclusions

Our postmarket study of PED treatment of a broad range of intracranial aneurysm sizes and locations confirms that the treatment of intracranial aneurysms with the PED is both safe and effective with complete occlusion rates of approximately 75% at 7.8 months and low rates of neurological morbidity and mortality. The neurological morbidity and mortality rate drops further when patients with difficult-to-treat aneurysms (dissecting or fusiform) are excluded. These findings should be considered when determining the best therapeutic option for intracranial aneurysms.

## Acknowledgments

This observational registry was funded and supported by Covidien, with scientific oversight of the study steering committee members. This study was funded by Medtronic, and D.F.K. receives research funding from Medtronic.

## Disclosure Statement

The authors declare that there are no conflicts of interest to disclose.

## References

1 Arrese I, Sarabia R, Pintado R, et al: Flow-diverter devices for intracranial aneurysms: systematic review and meta-analysis. Neurosurgery 2013;73:193–200.
2 Briganti F, Napoli M, Tortora F, et al: Italian multicenter experience with flow-diverter devices for intracranial unruptured aneurysm treatment with periprocedural complications – a retrospective data analysis. Neuroradiology 2012;54:1145–1152.
3 Brinjikji W, Murad MH, Lanzino G, et al: Endovascular treatment of intracranial aneurysms with flow diverters: a meta-analysis. Stroke 2013;44:442–447.
4 Yu SC, Kwok CK, Cheng PW, et al: Intracranial aneurysms: midterm outcome of pipeline embolization device – a prospective study in 143 patients with 178 aneurysms. Radiology 2012;265:893–901.
5 Chan TT, Chan KY, Pang PK, et al: Pipeline embolisation device for wide-necked internal carotid artery aneurysms in a hospital in Hong Kong: preliminary experience. Hong Kong Med J 2011;17:398–404.
6 Cirillo L, Dall'olio M, Princiotta C, et al: The use of flow-diverting stents in the treatment of giant cerebral aneurysms: preliminary results. Neuroradiol J 2010;23:220–224.
7 Siddiqui AH, Kan P, Abla AA, et al: Complications after treatment with pipeline embolization for giant distal intracranial aneurysms with or without coil embolization. Neurosurgery 2012;71:E509–E513; discussion E13.
8 Cruz JP, Chow M, O'Kelly C, et al: Delayed ipsilateral parenchymal hemorrhage following flow diversion for the treatment of anterior circulation aneurysms. AJNR Am J Neuroradiol 2012;33:603–608.
9 Pierot L: Flow diverter stents in the treatment of intracranial aneurysms: where are we? J Neuroradiol 2011; 38:40–46.
10 Darsaut TE, Rayner-Hartley E, Makoyeva A, et al: Aneurysm rupture after endovascular flow diversion: the possible role of persistent flows through the transition zone associated with device deformation. Interv Neuroradiol 2013;19:180–185.
11 Kuzmik GA, Williamson T, Ediriwickrema A, et al: Flow diverters and a tale of two aneurysms. J Neurointerv Surg 2013;5:e23.
12 Turowski B, Macht S, Kulcsar Z, et al: Early fatal hemorrhage after endovascular cerebral aneurysm treatment with a flow diverter (SILK-Stent): do we need to rethink our concepts? Neuroradiology 2011;53:37–41.
13 Kallmes DF, Hanel R, Lopes D, et al: International retrospective study of the pipeline embolization device: a multicenter aneurysm treatment study. AJNR Am J Neuroradiol 2015;36:108–115.
14 Becske T, Kallmes DF, Saatci I, et al: Pipeline for uncoilable or failed aneurysms: results from a multicenter clinical trial. Radiology 2013;267:858–868.
15 Puffer RC, Piano M, Lanzino G, et al: Treatment of cavernous sinus aneurysms with flow diversion: results in 44 patients. AJNR Am J Neuroradiol 2014;35:948–951.



Intervent Neurol 2016;5:89–99

| DOI: 10.1159/000446503 | © 2016 S. Karger AG, Basel |
| | www.karger.com/ine |

Kallmes et al.: Aneurysm Study of Pipeline in an Observational Registry (ASPIRe)

16    Moon K, Albuquerque FC, Ducruet AF, et al: Resolution of cranial neuropathies following treatment of intra-
        cranial aneurysms with the Pipeline Embolization Device. J Neurosurg 2014;121:1085–1092.
17    Szikora I, Berentei Z, Kulcsar Z, et al: Treatment of intracranial aneurysms by functional reconstruction of the
        parent artery: the Budapest experience with the pipeline embolization device. AJNR Am J Neuroradiol 2010;
        31:1139–1147.
18    Lylyk P, Miranda C, Ceratto R, et al: Curative endovascular reconstruction of cerebral aneurysms with the
        pipeline embolization device: the Buenos Aires experience. Neurosurgery 2009;64:632–642; discussion
        42–43; quiz N6.
19    Nelson PK, Lylyk P, Szikora I, et al: The pipeline embolization device for the intracranial treatment of aneu-
        rysms trial. AJNR Am J Neuroradiol 2011;32:34–40.
20    Briganti F, Napoli M, Leone G, et al: Treatment of intracranial aneurysms by flow diverter devices: long-term
        results from a single center. Eur J Radiol 2014;83:1683–1690.
21    Saatci I, Yavuz K, Ozer C, et al: Treatment of intracranial aneurysms using the pipeline flow-diverter emboli-
        zation device: a single-center experience with long-term follow-up results. AJNR Am J Neuroradiol 2012;33:
        1436–1446.
22    Labeyrie MA, Lenck S, Bresson D, et al: Parent artery occlusion in large, giant, or fusiform aneurysms of the
        carotid siphon: clinical and imaging results. AJNR Am J Neuroradiol 2015;36:140–145.
23    Clarencon F, Bonneville F, Boch AL, et al: Parent artery occlusion is not obsolete in giant aneurysms of the ICA.
        Experience with very-long-term follow-up. Neuroradiology 2011;53:973–982.
24    van der Schaaf IC, Brilstra EH, et al: Endovascular treatment of aneurysms in the cavernous sinus: a systematic
        review on balloon occlusion of the parent vessel and embolization with coils. Stroke 2002;33:313–318.
25    van Rooij WJ: Endovascular treatment of cavernous sinus aneurysms. AJNR Am J Neuroradiol 2012;33:323–
        326.
26    Turfe ZA, Brinjikji W, Murad MH, et al: Endovascular coiling versus parent artery occlusion for treatment of
        cavernous carotid aneurysms: a meta-analysis. J Neurointerv Surg 2015;7:250–255.
27    Hong Y, Wang YJ, Deng Z, et al: Stent-assisted coiling versus coiling in treatment of intracranial aneurysm: a
        systematic review and meta-analysis. PLoS One 2014;9:e82311.
28    Chalouhi N, Tjoumakaris S, Gonzalez LF, et al: Coiling of large and giant aneurysms: complications and long-
        term results of 334 cases. AJNR Am J Neuroradiol 2014;35:546–552.
29    D'Urso PI, Karadeli HH, Kallmes DF, et al: Coiling for paraclinoid aneurysms: time to make way for flow
        diverters? AJNR Am J Neuroradiol 2012;33:1470–1474.

KARGER